UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ROBERT P. GARVER,

Plaintiff,

vs. Case No. 2:19-CV-02354-CM-KGG

PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES, INC., and DUANE ROTH,

Defendants.

VIDEO DEPOSITION OF ROBERT ANDERSON
Taken on behalf of the Defendants
July 29, 2020
Saundra Tippins, CCR

(The deposition began at 9:01 a.m.)

| QUESTIONS BY: | PAGE NO. |
|---|---|
| MR. BRANDT | 7 |
| MS. KERSTING | 98 |
| MR. MANN | 126 |
| MS. KERSTING | 128 |
| MR. MANN | 138 |
| MS. KERSTING | 139 |

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION OR BEGINNING BATES NUMBER | PAGE |
|---|---|---|
| Exhibit 1 | PLIC 41 | 104 |
| Exhibit 2 | PLIC 1 | 107 |
| Exhibit 125 | PLIC 1262 | 237 |
| Exhibit 438 | ROTH 4 | ss |
| Exhibit 453 | RPG1LTD | 284 |
| Exhibit 469 | ROTH 78 | 290 |
| Exhibit 487 | PLIC 1109 | sss |
| Exhibit 489 | ROTH 1106 | 293 |
| Exhibit 531 | PLIC 295 | 303 |
| Exhibit 537 | ROTH 1865 | 306 |
| Exhibit 539 | PLIC 167 | 307 |
| Exhibit 547 | RPG1EXPERT | SSS |

(Exhibits were attached to original and copies electronically.)

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ROBERT P. GARVER,

Plaintiff,

vs. Case No. 2:19-CV-02354-CM-KGG

PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES, INC., and DUANE ROTH,

Defendants.

VIDEO DEPOSITION OF ROBERT ANDERSON, produced, sworn, and examined on the 29th day of July, 2020, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of that day, all parties appearing remotely, before SAUNDRA TIPPINS, a Notary Public, and Certified Court Reporter within and for the States of Missouri and Kansas, in a certain cause now pending before the U.S. District Court, District of Kansas, wherein ROBERT P. GARVER is the Plaintiff, and PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES, INC. and DUANE ROTH are the Defendants.

A P P E A R A N C E S

For the Plaintiff:

MR. LAWRENCE MANN (by Zoom)
BOURHIS LAW GROUP
1808 Wedemeyer Street, Suite 214
San Francisco, California 94129
lawrence.mann@bourhislaw.com

For the Defendant Principal Life:

MS. EDNA KERSTING (by Zoom)
WILSON, EISLER, MOSKOWITZ, EDELMAN & DICKER
55 West Monroe Street, Suite 3800
Chicago, Illinois 60603
edna.kersting@wilsonelser.com

For the Roth Defendants:

MR. W. PERRY BRANDT (by Zoom)
MR. JESUS OSETE (by Zoom)
BRYAN CAVE LEIGHTON PAISNER
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
perry.brandt@bclplaw.com

The Court Reporter:

Ms. Saundra Tippins (by Zoom)
Alaris Litigation Services
1608 Locust Street
Kansas City, Missouri 64108

The Videographer:

Mr. Keith Montgomery (by Zoom)
Alaris Litigation Services
1608 Locust Street
Kansas City, Missouri 64108

EXHIBIT K

Page 5

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for Plaintiff and counsel for Defendants that the deposition of ROBERT ANDERSON may be taken in shorthand by Saundra Tippins, a notary public and shorthand reporter, and afterwards transcribed into typewriting; and the signature of the witness is expressly reserved.

* * * * *

THE VIDEOGRAPHER: Okay, we're on the record. Today's date is July 29th of the year 2020, and the time is 9:01 a.m. This is the video recorded deposition of Robert Anderson in the matter of Robert Garver versus Principal Life Insurance Company, et al., Case No. 2:19-CV-02354-JWB-KGG, in the United States District Court, District of Kansas.

This deposition is being held via Zoom link. The reporter's name is Saundra Tippins. My name is Keith Montgomery. We are with Alaris Litigation Services.

Would the attorneys present please introduce them themselves and the parties they represent.

MR. MANN: Lawrence Mann for Plaintiff.

Page 6

MS. KERSTING: Edna Kersting for the Defendant Principal Life Insurance Company.

MR. BRANDT: And Perry Brandt and Jesus Osete from Bryan Cave for the Defendant, Defendants The Roth Companies and Duane Roth.

THE VIDEOGRAPHER: And would the court reporter please read on her stipulation and then swear the witness in.

THE REPORTER: This is Saundra Tippins, and I am a Certified Court Reporter. This deposition is being taken remotely, and those participating in this examination today are attending via Zoom with the witness appearing via Zoom.

Counsel acknowledges their understanding that I am not physically present with the witness and that I will be reporting this proceeding remotely. Counsel further acknowledges that I will not be administering the oath in person, but am doing so remotely. The parties and counsel consent to this arrangement and waive any objections to this manner of proceeding.

Counsel, please indicate your agreement verbally on the record by stating your name and that you stipulate to these terms, after which I

Page 7

will swear in the witness and we may begin.

MR. MANN: Lawrence Mann. So stipulated.

MS. KERSTING: Edna Kersting. So stipulated.

MR. BRANDT: And Perry Brandt. So stipulated.

ROBERT ANDERSON,

of lawful age, produced, sworn and examined on behalf of Roth Defendants, deposes and says:

EXAMINATION

QUESTIONS BY MR. BRANDT:

**Q Thanks so much. Good morning, Mr. Anderson, Perry Brandt here.**

A Good morning, Mr. Brandt.

**Q And I represent, I represent The Roth Companies and Duane Roth, who are Defendants in this case, as I believe you understand.**

**You understand you're under oath?**

A Yes.

**Q And you've been deposed before, have you not?**

A Yes, probably 35 times or something like that.

**Q But that's kind of what I figured. So**

Page 8

**you know the ground rules, and I'll just go over them real, real briefly.**

**If at any time I ask a question that you don't understand or you'd like me to rephrase, will you let me know and I'll be happy to do so. Is that fair?**

A It is.

**Q Because otherwise we're going to assume you understood my question and you answered accordingly.**

**Also, you, as you know you have to give audible answers. You can't do nods of the head or whatever. You have to say yes or no. You understand that?**

A Yes.

**Q And then I will do my best to not talk over you if you will to your best not to talk over me, if that's okay.**

A Okay.

**Q Okay, great. So first some preliminary questions about you.**

**As I understand it, you live in Newport Beach; is that correct?**

A Correct, yes.

**Q And that's in Orange County,**

Page 9

California, correct?
A Yes, correct.
Q What's your address there?
A 1901 Windward Lane, Newport Beach, 92660.
Q Okay. So next what I'd like to do is talk about your educational background.
Could you tell us really quickly what your educational background has been.
A Yeah. I attended Claremont Men's College, which has now been renamed the Claremont McKenna College. I attended there for three years. My initial plans were to go on to Stanford for an engineering degree, and found out I was not a very good engineer, so I didn't do that. And so I only spent three years at Claremont, did not get a degree at Claremont.
Later I took what was represented to me to be essentially the M.B.A. program for Harvard University, and it was under the O.P.M. program, which was owners, presidents and managers, and typically people that took that version of the M.B.A. were senior managers, owned their own company or presidents or something like that.
Q I took that to be kind of an executive

Page 10

M.B.A. program.
A Yeah, it is, but the teachers said we got everything that a normal M.B.A. program would do, but yes, technically it's the executive M.B.A. program, right.
Q Got it. That jumped off the page at me. My daughter actually just graduated from HBS.
A Oh, wow.
Q Yeah. She had a great experience up there.
So then also, and I know this is in your report. In fact we might dial up Exhibit 547.
(Counsel presented to the witness premarked Exhibit No. 547.)
Q (By Mr. Brandt) And I know your professional resume is contained in there, but could you give us just briefly, I don't want to go into this in gory detail, but just give us a history of your employment history from the time you left college leading up to the present day.
A It was a family agency that my dad was a partner in that I ultimately joined and basically took over. Prior to that I spent several years as an underwriter in both Los Angeles and San Francisco, with several different

Page 11

companies, Industrial Indemnity, Pacific Indemnity which is now Chubb, and Firemen's Fund Insurance Company, and spent probably the better part of four years through various chairs of underwriting training during that time.
And it was kind of unusual during that time period for people in the brokerage community to specifically, you know, get an underwriting training first before becoming a broker, not that a lot of people who were underwriters didn't end up being brokers, but a lot of people didn't start out that way.
Then during that period of time, I ended up getting my Chartered Property and Casualty Underwriter, commonly known as CPCU, derogatively known as can't produce, can't underwrite. Anyway, and then, then basically founded a new agency called Anderson Anderson Insurance Brokers, which I led up until the time that we sold the company to Aon.
And then I worked for Aon for a couple of years in a national capacity. I kind of created my own job. Basically I was helping to integrate into various divisions of Aon all of the acquisitions that it made over the last ten

Page 12

years, which was about a hundred. So we were working and trying to make connections and bring some synergy to those acquisitions, particularly looking at industry-specific programs.
An example would be the hospitality industry, hotels. So we would bring all the diverse pieces of Aon to bear on that industry. Then after that I, I got a early retirement offer for the earliest you could possibly be to retire from Aon. And in the mail one night they gave me a retirement offer, and they put me into my plan retroactively 24 years, because I started my own agency, and I didn't know how I got that.
And so I assumed that that would be a great thing to do, so I took that early retirement and started collecting, you know, retirement income from Aon, which is quite a nice thing.
Q Was that an offer you couldn't refuse?
A Yeah. I don't know. I didn't negotiate it. I was totally unaware of it. It was unbelievable really.
And that allowed me to spent the next ten years in technology, which is sort of where I wanted to be back in the beginning when I was

Page 13

going to go to Stanford with an electrical engineering degree, a lot of that other great stuff.

I got into technology relating to insurance and was involved in about five different technology platforms, particularly in the health insurance area. And I still have one of those in Seattle, and we're waiting on the ship to come in on that one. It hasn't yet, but hopefully it will.

And then along with that, during that period of time, I also did consulting to a lot of insurance companies, brokerages and so forth and had about seven or eight different consulting assignments over the years, and then actually entered expert witness work about ten years ago when a friend of mine who had been in the business as an expert as pretty much his entire career had some health issues in his family, and I went in to sort of help him and never looked back.

So I've been doing that for about ten years and enjoy it immensely.

Q And as I understand it, the name of your firm that you provided expert witness services under is called The Anderson Edge?

Page 14

A Yes. Sometimes the edge is sharper than other times.

Q Got it. I hear you. And I notice that you said somewhere in your report, I think somewhere you'd been engaged about 80 times, give or take?

A Yes, that's correct. Engaged, sometimes I might not actually do a deposition or report, but I'm involved early on in consulting issues, but yes.

Q That was my question, though. So you think you've been engaged about 80 times?

A Yeah, just engagement. Testimony, provided probably more like 35.

Q I caught that from your earlier answer.

What is the typical type of matter that you get engaged in?

A Since I've done pretty much everything you can do in the insurance business, it's pretty wide ranging. And I end up getting a lot of assignments that other people don't get because they're looking for somebody with sort of multiple backgrounds.

Page 15

But, you know, I've done a lot of work in liability insurance related to long-tail torts, pollution liability. Probably my strongest suit altogether would be agent and broker standard of care. And I've done a lot of those both for insurance, you know, carriers representing the broker, and then on the other side representing the Plaintiff.

So I would say going back to tell you the numbers, probably a good half of my work has been agent and broker standard of care.

Q Okay. And about, and when you're talking about the agent and broker standard of care issues, what percentage of the time do you represent Plaintiffs, and what percentage of the time do you represent Defendants?

A Well, it's pretty much same level, probably a slight tilt towards Plaintiffs.

Q Okay. Have you worked previously with the Bourhis Law Firm?

A The Bourhis Law Firm? Yes, I have.

Q How many times have you worked with them? How many engagements?

A I think there's two other engagements at this point. Yeah, one is still ongoing and hasn't completed yet, but yes.

Page 16

Q And were those both Plaintiffs' cases, those two other matters?

A Yes.

Q So all told counting this case, you've been engaged by the Bourhis Law Firm three times, all in Plaintiffs' cases?

A I'm sorry. Could you repeat that?

Q Yeah. So just to sum up, as I understand it, you've been engaged three times by the Bourhis Law Firm, and all three times have been for the Plaintiff?

A Yes.

Q Were all three of those broker standard of care type cases, or were they other type of cases?

A Well, they involved direct writers with captive agents, so they were agent liability cases but might have had some overlap into the carrier itself.

Q Okay. All right, well, let's do this. I put up on the screen, it's been put up on the screen not by me, Exhibit 547. And this is your report dated February 28, 2020. Is that correct?

A Correct.

ALARIS LITIGATION SERVICES
www.alaris.us Phone: 1.800.280.3376 Fax: 314.644.1334

Page 17

Q And did you prepare this report, or did someone else in your firm prepare it for you?
A No. I wrote everything. I do have a very able assistant who, you know, cleaned up the typing and made it look better than I would have made it look.
Q I understand that. Now, if you would, you'll see at the bottom of these pages, they have a Bates stamp, RPG00001EXPERT?
Do you see that?
A Yes.
Q Let's go to the page that's Bates stamped 72EXPERT if we might. And this looks to be a letter from The Anderson Edge to Ray Bourhis of the Bourhis Law Group dated February 10, 2020; is that correct?
A That's correct.
Q And was this your engagement letter that you executed by which you were retained for this matter?
A Yes.
Q And I note that the date on this is February 10th. That's 18 days prior to the issuance of your report on February 28th, correct?
A Yes.

Page 18

Q Okay. Real quickly, if you go to the next page, it said one thing you asked for was a $5,000 retainer; is that correct?
A Correct.
Q And then if you go to the next page, Bates stamped 74, there's Exhibit A, and it's, excuse me, Appendix A, and it lists your fees and expenses, and it understands your fee is $580 an hour. Is that correct?
A Yes.
Q And then if you go to the page stamped 76, it shows you $580 per hour, 2120 for a half day and 4240 for a full day, and then it also mentions some associates and administrative personnel.
Do you see that?
A Yes, I do.
Q Did any of these associates or administrative personnel have any writing or say-so in the preparation of your report?
A No.
Q So this was all you a hundred percent?
A Right.
Q Can you tell us approximately how much time you've put in on this matter between

Page 19

February 10th and February 28th?
A I could look that up, but it's going to be a pure guess if I don't look it up.
Q I'll take your best guess.
MR. MANN: Well, if it's an estimate, that's fine.
A Okay. I'd say 35 to 40 hours.
Q (By Mr. Brandt) Okay. Who was it who initially contacted you about engaging you in this matter?
A I believe it was an administrative assistant at the Bourhis Law Firm, Ann Marie Due, I think it was, yes.
Q Okay. And what did she say to you and what did you say to her in that initial conversation?
A Pretty quick, it's, I did not know the other lawyer in the firm, Matthew Bourhis, because I had worked previously only with Mr. Mann. And she basically just said would you be interested in looking at a case from Mr. Matthew Bourhis? And I said, yes sure.
Q Okay.
A She sent me, I think she probably sent me the complaint at that point.

Page 20

Q Do you recall approximately when that conversation took place in relation to the February 10th engagement letter?
A I think it was very quickly afterwards, so I would say certainly no more -- it preceded, that call was probably no, not much earlier than a week before that, maybe even a couple of days.
Q Okay. And then did you talk to somebody other than Ann Marie after that?
A Yeah. I think I had a brief conversation with Matthew Bourhis and --
Q Okay.
A -- started plunging into the work, because it was obviously a very short fuse after that.
Q And what did he say to you about the case in the context of that conversation?
A I don't have any real distinct memories other than it was a disability case with Principal, and a little bit of background of the case, but not a lot.
Q Okay. And then I take it something was sent to you. I think you said the complaint.
A Yeah, I think I got the complaint. We

Page 21

usually get the complaint if not only to be able to title, you know, the engagement letter properly, so we usually ask for that.

Q Okay. So now what I'd like to do, and again we're still in Exhibit 547, I would like to take your attention to the page that's Bates stamped 3.

A Okay.

Q And this is a section titled Documents Relied Upon. Is that correct?

A Correct.

Q And again, and I think you've probably been an expert witness in Federal Court. This is one of the things they want you to put in your expert report, correct?

A Correct.

Q So I'm going to go down each one of these.

The first one says Excel spreadsheet attached as Exhibit C. I don't have an Excel spreadsheet. Do you know what that Excel spreadsheet was?

A Yeah. I actually reviewed it this morning, and I'm not sure that that ended up being an Excel spreadsheet in the presentation or not,

Page 22

but there is one that shows -- well, the basis of what that really shows is to look at every disability income insurance broker we could find.

And my assistant Erica Session did a lot of that searches on the internet to find and then to compare what they said on the, on their websites about services offered, and then comparing them all together against each other, and particularly with The Roth Companies.

Q So this was a spreadsheet of insurance carriers or insurance brokers?

A Insurance brokers.

Q Okay. And then when you say what it is they said, can you give me a little more, a little more detail? Because I'm unsure what you meant.

A So you, so you don't have anything that looks like a comparison of the brokers and that?

Q I really don't. Now, I've got an exhibit, if I can put my hand on it --

A I think there's some color in there, too. We've got color on there. At least the one I reviewed this morning had it.

Q Hold on one second. I've got a color

Page 23

copy of what we were sent, and if you can see me, I have an appendix.

A Yeah, yeah. Yeah, that's it, yeah, right. That's the one, yeah.

Q Okay. So Appendix B is the Excel spreadsheet.

A Did we have that mislabeled, then, if we said C and it should have been B?

Q Okay, that's fine. Fair enough. Okay, good. So as I read what -- let's go to page 25 of this exhibit then.

And this is the spreadsheet you're talking about?

A You know, I need that -- he's gonna blow that up again perfect. Okay.

Q Okay.

A I guess we mislabeled it. Right, okay.

Q Okay, no worries. I just wanted to make sure about that.

Okay, so tell us again what this is.

A Okay, so what this is, is every place we could find a brokerage firm that evidenced the fact that they were offering disability insurance that we could find. We listed all those,

Page 24

including The Roth Companies, and then looked at what, several different things.

One, did they do business planning? Did they offer a checklist, yes or no? And did they offer to analyze policies in detail? So these were every one we could find.

We didn't, we didn't leave out anybody, believe me. Everybody that we could find that really touted the fact they were doing disability, I would have thought there would have been a lot more than that, but that was it.

Q Okay.

A And, and then basically look at the various kinds of things that they did in terms of their services. For instance, going down to The Roth Companies, they did wealth management, business planning, offers to analyze current coverage and create a plan to maximize options and specifically analyze disability insurance policies in the market. I guess we spelled -- "o-n-t" should have been in the market, not "ont he" market.

Q Okay. And I think what the point of this is, and correct me if I'm wrong, when it comes to The Roth Companies, you checked the box

Page 25

yes that they offer business planning, checked the box no did they offer a checklist, and then checked the box yes, did they say they analyzed policies.

A Correct.

Q And then there's a little description next to The Roth Companies that says wealth management, business planning, offers to analyze current coverage and create a plan to maximize options and analyze disability insurance policies on the market.

Is that information you got from The Roth Companies' website?

A Yes, correct.

Q Okay. So now if we could let's go back to page three of this exhibit. And we're going to go through the documents relied upon. I'll skip down to number seven, and it says The Roth Companies website pdf attached as Exhibit 3, downloaded February 25, 2020. Is that correct?

A Correct.

Q And I take it this is something that you used, then, in doing the Excel spreadsheet that should be listed as Exhibit B but is Exhibit C?

Page 26

A Correct.

Q Now, going through the other documents relied upon, there's number two listed an article from Gallo, "Know your product with selling own-OCC."

Do you see that?

A I do.

Q Is that an article that you pulled?

A Yes.

Q That was, that wasn't given to you by the Bourhis Law Firm or anybody else, correct?

A No. As we look at the individual articles, some of the articles would have come from the Boston Insurance Library, at least one or two of them. And I can, when I look at them, I could tell because they just basically take a magazine or, you know, a book or magazine and fold it over and, you know, scan it, so you can tell the ones that were not just pulled off the, you know, might have been pulled off in our own research specifically, okay?

Q Well, skipping ahead, so the number two document is an article by Vince Gallo. The number three document is something from the Insurance Litigation Reporter. Number four is an

Page 27

article by Jeffery Peterson. And number six is an article by William Pollock. Is that correct?

A Correct.

Q And were these all materials that you collected?

A Yeah, either directly or from the Boston Insurance Library.

Q Got it. So then listed as number five is Plaintiff's First Amended Complaint.

Do you see that reference?

A Correct.

Q Now, is that the only document that you received from the Bourhis Law Firm relating to this case?

A I'm pretty sure it is, certainly any one we relied on. We didn't get anything else in terms of any type of an article or anything that one would expand upon, similar to the types of articles that I had listed or attached.

I think the only thing we would have had, it's possible that we got amended pleadings or something like that. I'm, I'd have to go back and just double-check. But, you know, essentially we're talking about we got legal documents from there. That's all we got.

Page 28

Q Okay.

MR. MANN: Okay, Mr. Brandt, just one second. Just so the record is clear, are you asking about deposition transcripts? Because we've sent him three deposition transcripts.

MR. BRANDT: Well, I was headed there in a minute.

MR. MANN: Okay.

MR. BRANDT: Yeah, and thank you for that clarification.

Q (By Mr. Brandt) So my question to you, Mr. Anderson, is as of the time that you gave your report dated February 28, 2020, was the only document you received from the Bourhis Law Firm the First Amended Compliant?

A It is. And if you want me to go back and double-check and see if we got any amended, further amended complaints or something like that. I don't think we did, but it's possible.

Q Okay. And you understand, do you not, that an amended complaint or a complaint filed in Federal Court are allegations, correct?

A I understand.

Q Okay. It's my understanding that so far in this case the Plaintiff Robert Garver and

the Bourhis Law Firm have produced in the case somewhere in excess of 4,000 pages of documents.
Prior to your report dated February 28, 2020, had you reviewed any of those documents?
A I don't think I had. I might have had a couple of other depositions, but I should probably take a look and double-check that other than --
Q Okay.
A I know --
Q Sorry.
A Yeah.
Q I'll represent to you there had not been any depositions taken before February 28.
A Okay. So I don't believe I had any other documents, no.
Q Okay. Okay. Also in this case we on behalf of The Roth Companies and Duane Roth have produced north of 1900 pages of documents.
Prior to February 28, 2020, the date of your report, had you reviewed any of the documents produced by us on behalf of The Roth Companies and Mr. Roth?
A I don't believe I have, no.
Q And then also in this case the

Defendant Principal Life Insurance Company has produced in excess of 3,000 pages of documents.
Had you reviewed any of the Principal production prior to the date of your report, February 28, 2020?
A I don't believe so, no.
Q Okay. So is it a fair statement that the only material that you had in front of you that related to this case as opposed to what you pulled off the internet and articles that you may have pulled, the only document you had on which to base your expert opinions was the First Amended Complaint, which you say is a statement of allegations?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) So now let's dig a little deeper. Let me ask you this. Thank you for reminding me.
Have you received documents since the date of your report, February 28, 2020?
A Yes. I just got three recent depositions and the exhibits that were attached to those documents.
Q Which depositions did you receive?

A Duane Roth's, Mr. Robert Garver's and Molly Garver.
Q Okay. So let's go move forward into your report. And I don't want to go into it in too much detail. But is it correct that the factual statements that -- well, let's do this. Let's start at page -- I apologize. Let's start at page four of this document, or excuse me, page five of this document. Can you dial that one up? And up at the top there's a section II, My Retention.
And then about two-thirds down the page, there's a section Roman numeral III, case description. Do you see that?
A Yes.
Q And starting on this page and going through the next page and then going to the middle of the page Bates stamped 7, there is a statement of the facts, correct?
A Right.
Q Is the sole statement of your basis for the facts here the amended complaint full of allegations that you reviewed?
A I would believe so at this point. But let me just check my file here. I want to make

sure I make an accurate statement. I think I can do that pretty quickly. Hold on.
I find it very hard to look up things on a computer while I'm talking to somebody on a computer for some reason. My brain doesn't have multiple tracks.
Q I hear you.
A Maybe it never did. Yeah, I think just to correct an earlier statement, I'm looking at the legal docs, documents that I got, and I actually, Defendant's amended complaint and the First Amended Compliant and Plaintiff's response, a couple of those.
So I had four back and forth complaints and, you know, responses. Okay, and then I ended, then to correct myself at this point, I would have had Plaintiff's produced documents, and I have the numbers for all those. I got several folders from that. I got a copy of the policy and the application. I think that's it.
Then the other ones, I would have gotten just the last couple of days. But I did, I did have some Plaintiff-produced documents. And I have the numbers on those. Do you want me to read those off to you?

Q Yeah. We probably should.
A Okay, these are folders with documents in them. And if I start opening each of the folders, it's going to take forever to do this. But I've got RFPD 171419, RFPD 2, RFPD 3 and 5, RFPD 4, 6, 8 and 15, RFPD -- I'm sorry to read those so fast.
Q By the way --
A Go ahead.
Q Go ahead.
A RFPD 9 and 10, RFPD 12 and RFPD 20.
Q And I want to make sure I'm clear in my timing.
Are these materials that you received before your report dated February 28, 2020, was issued?
A Hold on just a second. Let me just see if I can see the date on these. Yes.
Q Do you have a record there of when you received them?
A Well, it's not opening up big enough on my cell phone, so I was -- well, I tell you what. I can, the reason I know that I can say that with confidence is that it says modified five months ago, so that means the time I would have

taken it and opened it in my own file, so that shows five months ago.
Q But these documents you just mentioned were not listed on the page of documents relied upon, correct?
A It appears that way.
Q Did you do anything to independently verify the truth or accuracy of any of the allegations made in the First Amended Compliant?
MR. MANN: Object as to form.
Q (By Mr. Brandt) You can answer.
A No.
Q Okay, so let's go to the case description here. I want to walk through this in a little bit of detail. It says, This case arises out of a disability insurance coverage dispute concerning an individual, Robert Garver.
Robert Garver purchased own occupation disability insurance and paid the premiums, in reliance on misrepresentations about own occupation coverage.
Did I read that sentence correctly?
A Yes.
Q Is it correct now that you've had a chance to review the policy that the Principal

Life insurance policy at issue is not an own occupation policy?
A It uses the term "own occupation" several times throughout the policy. It is my impression no, it is not. It's common, as commonly understood in the industry, it's not an own occupation policy.
Q So the statement here that Garver purchased own occupation disability insurance actually isn't accurate because the policy is not an own occupation policy, correct?
A It has the language of own occupation policy, but it's not in fact, as it's understood in the industry, to be an own occupation. I think a correct reading of that sentence would say in reliance on misrepresentations about own occupation coverage.
Q And we're going to get into that in a little more detail later. And then it says, Robert Garver injured himself in his own occupation of a framer for houses in 2017.
Did I read that sentence correctly?
A Yes.
Q And so was it your understanding that in 2017, Mr. Garver was doing manual construction

work as a framer?
A Yes.
Q Did you notice in looking at the application for the disability insurance that when asked to describe what his job responsibilities were, Mr. Garver did not state that he was acting as a framer?
MR. MANN: Object as to form.
A I saw that. There was a lot of testimony back and forth about who actually filled that out. So, you know, I wouldn't say Mr. Garver came up with those words, but I would say they were, they were definitely attest in the application or the telephone inquiry during the application period, yes.
Q (By Mr. Brandt) And he signed the application, correct?
A Correct.
Q And it's customary in the insurance industry that when people sign an application like this, they are attesting to the truth and accuracy of the statements in the application?
A Yes.
Q Right? And the insurance company is entitled to rely on the representations made in

Page 37

the application and signed by the applicant, correct?

A Unless there's other mitigating factors yes.

Q Knowing what you know based on your experience in the insurance industry, if Principal had been told on the application that Mr. Garver was in the framing business as opposed to management, that that would have changed how they looked at the application from an underwriting standpoint?

MR. MANN: Object as to form.

A On the basis that it is obviously a more hazardous occupation, it might have changed the rating tables, yes.

Q (By Mr. Brandt) Okay, and so it could, they could have denied coverage or they could have charged a higher premium, correct?

MR. MANN: Object as to form.

A I think in denying coverage, that would assume coverage is in place. But you mean not, not offered a policy or not offered coverage?

Q (By Mr. Brandt) Not offered a policy, right.

A It's possible, yes.

Page 38

Q Okay. Then it continues on, In October 2017, his insurance company, Principal Life Insurance Company, responded to an email Garver wrote stating his disability benefits would begin after he completed the 90-day elimination period. The elimination period ended October 10, 2017.

Did I read that correctly?

A Correct. Rereading the depositions might have needed additional month. It might have been November 10th that he got it because, you know, the benefits are paid in arrears, so it could have been, could have been another month, but I'm not sure about the dates, but yes.

Q Okay. Then it says, In February 2018, Garver spoke with Ms. Garcia, employee of Principal, over the telephone. Ms. Garcia told Garver that as his policy was for his own occupation, if he were totally disabled from his own occupation, despite going to work in another occupation, he would still receive his total benefit, disability benefits without reduction.

Did I read that correctly?

A You did.

Q Is that information that you received

Page 39

from the allegations of the First Amended Compliant?

A Well, and the other, you know, there were like four altogether back and forth, but I presume I got it out of that one specifically, yes.

Q Have you had, have you had a chance to read Ms. Garcia's deposition in this case?

A I don't believe so, no.

Q If I were to ask you to assume that Ms. Garcia denied --

A Excuse me just a minute, Mr. Brandt. Let me double-check on that.

Q Sure. Take your time.

A I read a lot of stuff in the last few days, and I want to make sure I got it right.

No, I did read Ms. Garcia's deposition. Excuse me, excuse just a minute. No, I did receive one thing that says Garcia, and it's a, it's hard to say what it is.

Q There's actually two volumes, and the second volume came later, if that helps you.

A No, I did not have that, no.

Q Okay. If you were to assume with me that Ms. Garcia denies ever making such a

Page 40

statement to Mr. Garver, might that change your opinion in this matter?

A Well, this is one of the subsets of my overall opinion. I wouldn't say my overall opinion would change. This is supportive of my basic opinion.

Q If I were to show you documents later where Ms. Garcia actually said in writing the opposite of this and said that he would no longer receive total disability benefits, might that change your opinion?

MR. MANN: Let me just object as to form, particularly as to time.

Q (By Mr. Brandt) You can answer.

A I think I would, I would say that the telephone call -- I would really stand on what I said here about the telephone call.

I mean, it's very possible that she in later letter form said something different to that, but I believe the understanding gathered by Mr. Garver on the telephone call was accurate the way I've represented it here.

Q Okay. We're going to go through some documents later.

Then going to the next page Bates stamped

Page 41

6 at the top it says, In March of 2018, Garver spoke with Duane Roth of The Roth Companies, Inc. Roth informed Garver that Principal notified him that since the policy provided coverage for Garver's own occupation, he would still receive total disability benefits without reduction even if he worked in another occupation.

Did I read that sentence correctly?

A Correct.

Q And is this something that you got from the allegations of the amended complaint?

A And as we've now covered the other Plaintiff's documents provided, which I've read out in great detail, yes. It could have been involved in there as well.

Q You obviously were not at any March of 2018 meeting with Mr. Roth or Mr. Garver, correct?

A Correct.

Q Have you read Mr. Roth's deposition?

A I have.

Q And did you see in there that he denied making any such statement?

A I've just read 1100 pages in the last 23 hours, so I don't remember that specifically. I'm sorry.

Page 42

Q Okay. If Mr. Roth were to testify and be accurate that he never said such a statement to Mr. Garver, would that change your opinion?

MR. MANN: Object as to form, "and be accurate."

A No, it wouldn't.

Q (By Mr. Brandt) The next sentence says, In reliance upon the coverage representations by Roth, Roth Companies and Ms. Garcia, Garver began work at his stepfather's company, Welborn Sales, in March 2018.

Did I read that correctly?

A Correct.

Q Do you know whether or not actually Mr. Garver began working at Welborn Sales in January of 2018?

A I read --

MR. MANN: Object as to form.

A I read later testimony that he in fact had sort of a trial run for a couple of months. I don't know whether he was officially employed at that point in time or not, but he was, he was there doing something.

My understanding is he was sort of checking out to see whether he wanted to be

Page 43

working in the company or just an owner.

Q (By Mr. Brandt) Okay. In fact, I think what the testimony has been, is that he bought the company in January of 2018, correct?

A Yes.

Q Looking at this paragraph as a whole, where it says, In March of 2018, Garver spoke with Roth and in reliance on Roth, Garver began working at the company in March 2018, if Mr. Garver had actually started at Welborn in January, he could not have relied on any March conversation, correct?

MR. MANN: Object as to form.

A Well, that's certainly physically impossible. In fact, if that's the way it exactly happened without any conversations, yeah, yes, I would agree.

Q (By Mr. Brandt) Now, if we go to the next page marked 7, you have your opinions here, correct?

A Correct.

Q And the first is, the summary of your conclusions and opinions, I'm just going to read.

Roth assumed a greater responsibility, holding himself to a higher standard of care than

Page 44

Kansas law states.

I want to stop there. Did I read that sentence correctly?

A You did.

Q Okay. You live in Newport Beach, California, correct?

A Correct.

Q Do you know what Kansas law is?

A Well, I have, I can't recite it right at the moment, but we do have sort of a syllabus of what the agent broker standard of care is in all of the 50 states that was prepared by the, big I, Insurance Company.

I'm sure I reviewed that. I didn't quote it or cite it in this particular case, but I would have been careful about looking at that. I can't recite it at this point.

Q Okay. In any event, you're not a lawyer, correct?

A I'm not a lawyer.

Q So then it continues forward. It says, He offered an analysis of insurance coverages and to analyze what coverage is currently used to create tailored insurance for his clients. As the broker, it is his

Page 45

responsibility to fill out the application and explain each question in it to his clients. He failed to meet that industry standard and failed in checking the box that gives the intended coverage.

Garver upon submitting a claim wanted to clarify that he understood correctly and was led to believe that was the case. The definitions in the industry as to what is disability depend on the type of policy. Principal calls their modified own-occupation coverage as regular occupation, which deviates from industry standards.

As a broker for Principal, Roth should have been aware of this deviation since he holds himself to a higher standard of care. It is my opinion that Roth breached his duty of care and should be held liable.

Did I read that correctly?
A You did.
Q Now, you understand, do you not, that in, under federal law, an expert witness is not allowed to testify as to whether a party is liable or not liable? Are you aware of that?
A I am. I may have -- you're right.

Page 46

That should be, "held liable" probably shouldn't be in my report regrettably.
Q It should not be there, should it?
A Correct.
Q You can speak about what the standard of care is, but you can't talk about whether a party is liable, correct?
A Correct. I believe that's the judge's province.
Q Right. And you've known that throughout your career as an expert witness, correct?
A I have, and, but I'd just say it's a drafting error at this point.
Q As I understand your report here, what you say Mr. Roth should have done was to check a box for regular occupation rather than the boxes that were checked on the application; is that correct?
A Correct. Well, and I might add this. I might add this. The information about the way Principal handles these, the definition of regular occupation was basically extracted from current practices in the industry, including materials that Principal offers. And I've attached those.

Page 47

So my overall broader comment would be this is the way they do it. They have a regular occupation rider, and Mr. Roth should have been aware of that fact.
Q Okay. I want to make -- then let me ask you this question.
If you look through the amended complaint, as I read it, there's no reference at all to this notion of Mr. Roth should have checked the regular occupation rider box. Is that correct?
MR. MANN: Object as to form.
A I think this was research that I came up with, so I would not disagree that it probably wasn't in the complaint.
Q (By Mr. Brandt) Okay. So this was your idea, this checking the regular occupation rider box?
A Correct.
Q It's correct, is it not, that the application that is submitted to Principal is the client's application, so in this case it's Mr. Garver's application, correct?
MR. MANN: Object as to form.
A As a technical distinction yes.
Q (By Mr. Brandt) And he's the one

Page 48

making the application, and he's the one who is applying for particular types of insurance?
MR. MANN: Object as to form.
A Correct.
Q (By Mr. Brandt) Is there any other vehicle -- bad question.
Is the substance of your opinion about Mr. Roth and The Roth Companies that the regular occupation rider box should have been checked?
A Mr. Brandt, you broke up during that, that whole last question.
Q Oh, I'm sorry. I just want to, I'm going to try to sum up your opinion, and then we're going to move on to some documents.
But is the sum total of your opinion that Mr. Roth breached the standard of care the fact that the regular occupation box was not checked on the application?
MR. MANN: Object as to form. Are you saying only?
MR. BRANDT: Yeah, only.
Q (By Mr. Brandt) Is that the only thing you're really complaining about Mr. Roth?
MR. MANN: Object as to form.
A I think I had a much more detailed

opinion section than just that, but ...

Q (By Mr. Brandt) Well, tell me what it is. Tell me what it is that you complain about for Mr. Roth. I want to make sure I understand your opinion.

We talked about the regular occupation box. Tell me anything and everything else that you claim that Mr. Roth did that breached the standard of care.

A Well, first of all, Mr. Roth held himself out as, as an expert in overall wealth planning and insurance and particularly in finding gaps of coverage.

Relying upon his, you know, putting himself out as an expert in this particular area, he should have been aware of the particular differences that Principal had, being a major disability underwriter, and to know that when they said own occupation in their policy, they really didn't mean that. They meant, you know, that's what -- they didn't really mean that.

And to get true own occupation coverage, you would have really needed regular occupation coverage. So he should have pointed that out to Mr. Garver so that he realized there was a

difference between what he thought he was getting and what, and the vehicle that Principal would have had to offer that own occupation coverage had they granted it.

Q Okay. So is that a good summary of your opinions?

A Well, and --

MR. MANN: Object as to form.

A No. I would say that's -- inclusively I think I would say that Mr. Roth really had very lofty goals and ideals for his clients, which he held out to those and obviously backed up with his deposition testimony.

He really was somebody who would integrate all of the aspects of your estate planning and wealth planning and insurance coverage and life insurance and all that kind of stuff into an overall plan, including an analysis of businesses you were involved in and all things like that.

So he really had a very broad thing. So as he kept referring to in his deposition, the term "design," it wasn't the overall design, which he must have said a hundred times during his deposition.

So I look at him as holding himself out as

a person who said, look, I'm going to look at the complexity of your entire life, where insurance fits in it, in terms to plug some holes, and I'm going to be the one to recommend that insurance, but I'm also going to be the one to provide you an understanding of, you know, what's in the policies and all that.

So I didn't see that. I saw Mr. Roth as much broader than the typical insurance disability income agent or broker who might just say come to me to get a policy. I saw him integrating everything into a broader plan and to take a deep dive into, you know, gaps in coverage and things like that.

So I assume that he just, he really put himself out there as, as a real planning expert responsible for the overall design, which the disability income policy was a subset.

Q Okay. Anything else?

A Well, and I think he dis -- I think he used analogies, either purposely or by accident, that would lead one to believe that in fact that you got own occupation coverage.

A couple of things that really stood out to me. One would be that he made the, you know,

you won't have to be a McDonald's, you know, burger flipper if you can't do this work.

Well, what that really says is I don't have to have, take a job that I would be suited for, i.e. flipping burgers at McDonald's, if I can't do my regular occupation.

So I think that analogy really would lead one to believe that you really did have true own occupation coverage, but you know, Principal had their policy. So that would be the first thing.

You know, and then the other thought -- well, I'm sorry. I lost my train of thought after that long thing. I'll come back. Give me, give me an asterisk so I can come back to you in a minute. I want to think about it again.

Q I just want to make sure I understand your opinions completely.

A Yeah, okay.

Q So let me ask you this. Are you aware that Mr. Garver did indeed did make a claim under the disability policy?

A Yes.

Q And are you aware that the amount of the disability insurance that was provided for, for a total disability under the policy was $4,500

Page 53

per month?

MR. MANN: Object as to form.

A Yeah. There was an inflation rider, so I think it got up to be 4680 or something.

Q (By Mr. Brandt) Exactly. There was a cost of living adjustment rider that took it to 4680 per month, correct?

A Correct.

Q Okay. Now, what I want you to do if you will is take your opinions about Mr. Roth and kind of hold them off to the left for a moment.

A Okay.

Q Are you aware that in fact Principal did start paying the $4,680 a month commencing in November of 2017?

A Yes.

Q And they paid the benefit in December of 2017, correct?

A Correct.

Q And January of 2018, correct?

A I don't remember all the months, but they did pay for a period of time. Yes, I did know those.

Q Now, the question being, you've talked about own-occ policy and whether somebody can

Page 54

return to work or not. But the fact is Principal paid the maximum total disability benefit all the way up until September of 2018, correct?

A I don't remember the exact date, but there was an additional period of time, yes.

Q Right. And what happened was, what happened was Principal advised Mr. Garver along the way that because he had gone back to work at Welborn Sales, they were going to shift over to the residual disability rider, correct?

A Correct.

Q And that that might adjust what he received in disability benefits because we moved from total disability to perhaps residual disability, correct?

A Correct.

Q Okay. Now, isn't it true that in fact Principal never reduced Mr. Garver's total disability benefit ever?

MR. MANN: Object as to form.

Q (By Mr. Brandt) Correct?

A Well, I would, I would just add the fact that there is differing opinions between Mr. Garver and Principal as to whether or not he would have been eligible for the $7,000 a month

Page 55

benefit and which he kept claiming all the way through his testimony and his wife as well that he thought he was getting $7,000 a month, and then when he got 4500 and then 4680, he kept wondering where's the 7,000?

So there is, you know, once again an alleged reduction from what he thought he was going to get to what he actually got.

Q But what --

A But after, I would say after getting the 4680, they did reduce it.

Q And in fact, the policy was for the 4680, right, for the total disability benefit?

MR. MANN: Object as to form.

Q (By Mr. Brandt) Correct? We're going to get into the documents later, but that was the number, correct?

A Yeah.

MR. MANN: Object as to form.

A Yeah. 4680, yes.

Q (By Mr. Brandt) So here's my question, Mr. Anderson. Isn't what happened that Mr. Garver received the full total disability benefit throughout, but in September of 2018 when Principal asked Mr. Garver for income information

Page 56

or paystubs or other income information, Mr. Garver refused to provide it? Isn't that correct?

MR. MANN: Object as to form.

A That's correct.

Q (By Mr. Brandt) And isn't it in the policy that Mr. Garver was required to cooperate and give Principal any information that Principal asked for related to the disability policy? Correct?

MR. MANN: Object as to form.

A I think there was certain prescribed things they could ask for, but generally a correct statement.

Q (By Mr. Brandt) And that's common in the insurance industry, that when you sign up for a policy like this, you've got to cooperate with the insurance company?

A Correct.

MR. MANN: Object as to form.

Q (By Mr. Brandt) And, and when Mr. Garver refused to provide Principal with the information Principal had asked for, Principal then turned off the tap and denied benefits going forward because Mr. Garver wouldn't give him the

Page 57

information, correct?
A That's the way I understand it, yes.
Q And Mr. Roth had absolutely nothing to do with that, did he? He had nothing to do with Mr. Garver's decision not to provide the information, nor did he have anything to do with Principal's decision to cut off the benefits, correct?
MR. MANN: Object as to form.
A I believe, and I don't know the exact timing on this, that Mr. Roth agreed to intercede on behalf of Mr. Garver at some national meetings of his affiliated firm, national brokerage planners or whatever the name of it was. It was national something or other. And there were some discussions there. And I think he was aware of this all the way through.
So to be -- it's not that he wasn't aware, trying to do something about it. He ultimately, you know, could not stop Principal from doing what they did, which is to deny the payment.
Q But he had nothing, he had, Mr. Roth had nothing to do with Mr. Garver's decision not to supply Principal with information, correct?
MR. MANN: Objection to form.

Page 58

A Any testimony that I've been privileged to see, I didn't, I was aware of that, yes.
Q (By Mr. Brandt) And the flip side is he was not a decision-maker of Principal who made the decision to cut off the benefits because Mr. Garver wouldn't give the information, correct?
A Correct.
Q Okay, let's take five minutes. Take a little break.
THE VIDEOGRAPHER: We're off record, 10:05 a.m.
THE VIDEOGRAPHER: Back on record 10:11 a.m.
Q (By Mr. Brandt) So Mr. Anderson, you can set your report aside for now. And I'd like to direct your attention to Exhibit 438.
(Counsel presented to the witness premarked Exhibit No. 438.)
Q (By Mr. Brandt) This appears to be a disability income insurance illustration presented to Mr. Garver by Mr. Roth and prepared on May 29, 2015. Is that correct?
A Correct.

Page 59

Q And is it common in the insurance industry for agents or brokers to actually give a client or prospective client an illustration like this?
A Yes. Then I would just add that this appears from the logo of Principal down below that it's a presentation developed by Principal for Mr. Roth to give to his clients, but not something that appears to be developed by Mr. Roth himself.
Q Got it. But this is given to the client or prospective client, in this case Mr. Garver, correct?
A Correct.
Q Had you seen this document before you issued your report dated February 28, 2020?
A No. I think yesterday is the first time you saw it.
Q Okay. So let's take a look at it. The first, the second page in, which is Bates stamped 00005, is a premium summary of the illustration, correct?
A Yeah, yes.
Q And it's positing a monthly benefit of $7,000. Is that correct?
A Yes.

Page 60

Q And then if you flip over to the very back page of this document, which is Bates stamped 13, you see a disability insurance quote request and prescreen, correct?
A Yes. I'm just trying to determine who filled that document out or where did it come from, whose document it was.
Q Yeah. What it does show for Mr. Garver is a total annual income of $240,000. Is that correct?
A Yes, correct.
Q And in your experience in the insurance industry, is it part of the underwriting procedure for disability insurance policies where the carrier wants to look at the actual income and make a decision as to what's the appropriate level of disability insurance based on what the prior income is?
A Correct.
Q So then if you go back to the page that's Bates stamped 6, in the middle of the page it says, This illustration is a general description. It is not the policy and does not modify or change the provisions of any policy or rider.

Page 61

Did I read that correctly?
A Yes.
Q Because what, in the insurance business, the policy is the policy, and that's what actually controls the rights and duties of the parties, correct?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) Now then if you go to the next page Bates stamped 7, it says proposed coverage, your total monthly benefit, $7,000, and then it says, If you become totally disabled, benefits will become payable one month after your 90-day elimination period. Benefits continue while you remain totally disabled to age 65. Then it says, Your maximum monthly disability benefit is $7,000.
A summary of the definition of total disability is as follows. And then this is in bold letters, You must be unable to perform the substantial and material duties of your occupation and you are not working.
Did I read that correctly?
A You did.
Q And this was a document that

Page 62

Mr. Garver had in his possession at the time he was given this illustration that defined what a total disability was, correct?
MR. MANN: Object as to form.
A Well, I don't think we've established for certainty that he actually got this, but presuming that he did, yes.
Q (By Mr. Brandt) It's normal in the industry that the client is actually given this illustration, correct?
A Yeah. It's normal, but we don't know if he did or not, you know, unless you're asking --
Q Yeah. If you go to the page, if you go to the page that's Bates stamped 9, down about halfway that's a section called Residual Disability and Recovery Benefit Rider.
It says, If you are residually disabled under the terms of this rider and lose at least 20 percent of your prior earnings due solely to an injury or sickness and you are able to perform some but not all of the substantial and material duties or you are unable to work full time in your occupation or you are working in another occupation, you'll receive a benefit

Page 63

proportionate to your loss.
Did I read that correctly?
A You did.
Q And what this is saying is if you in fact go back to work, you will have some impact on your disability benefits, correct?
MR. MANN: Object as to form.
A Correct.
Q (By Mr. Brandt) And assuming that Mr. Garver in fact received this illustration, he would have had this information in front of him about the illustration, correct?
A Correct.
Q And he would have had in front of him the information about the definition of a total disability, and he would have had the information about the residual disability rider that says if you go back to work, your benefits will be impacted, correct?
A Correct.
MR. MANN: Object as to form.
(Counsel presented to the witness premarked Exhibit No. 444.)
Q (By Mr. Brandt) So now let's go forward to Exhibit 444. And this is the actual

Page 64

application that was submitted as amended.
Did you see this document before you issued your report on February 28, 2020?
A No. Yesterday would have been the first time.
Q Okay. So when you did your report back in February, you hadn't even looked at the application that had been submitted, correct?
A Correct.
Q Under personal information it says Robert P. Garver. Under occupation and duties it says owner/contractor. Correct?
A Right.
Q And then under the section 2 it says, Indicate coverages applying for. And the first box that's checked is disability income, correct?
A Correct.
Q And so did you understand here that the primary policy he was applying for was a disability policy?
A Yes.
Q And that presumed a total disability, correct?
A Yes.
Q And then if you go down to the bottom

under optional benefit riders, there is a box checked for catastrophic disability benefit, there's a box checked for the cost of living adjustment, and there's a box checked for the residual disability and recovery benefit rider. Is that correct?

A Correct.

Q And so the policy that was being applied for was for a total disability policy, but three other riders that would attach to it, correct?

A Yes, but absent from that obviously was the regular occupation rider, which we discussed earlier.

Q Right. That box was not checked.

Now go with me to the page that's Bates stamped at the bottom 2598. And here there's information about Mr. Garver. And under section A it says, Primary occupation, general contractor.

Did I read that correctly?

A Yes.

Q And then under nine it says, Current employment information, A, type of business or industry, new home construction. B, job title,

managing member, managing partner. And then it says C, what are your job activities and percentage of time spent in each?

And then it says coordinate job schedules 50 percent and oversee office management 50 percent.

Did I read that correctly?

A You did.

Q That does not say that Mr. Garver was engaged in framing or carpentry work or other actual construction work, correct?

MR. MANN: Object as to form.

A Correct, but it's unclear to me who actually filled out and typed up the form, so I don't know where that came from.

Q (By Mr. Brandt) Well, let's go over to the page Bates stamped 2602.

And do you see Mr. Garver's signature dated 8/7/2015?

A Followed by Mr. Roth's signature below I guess, correct?

Q Right. And then, right. And it says above that, Warning, any person who knowingly presents false or fraudulent information on an application for insurance or a false or fraudulent

claim for the payment of a loss may be guilty of insurance fraud as determined by a court of law.

Did I read that correctly?

A You did.

Q And you know from your experience in the insurance industry that applications are supposed to be accurate, are they not?

A They're supposed to be, but there is a skill set on behalf of certain brokers who are able to present a category that goes on the application that is technically potentially correct but maybe not exactly correct.

So I would, in my estimation, Mr. Garver was guided to that conclusion by Mr. Roth, who was savvy enough to be able to know how to get by the underwriter at Principal with an occupation that was not completely inaccurate but truthful enough to pass.

Q You have no actual knowledge as to what Mr. Roth did or what he was thinking, do you?

A No. I just know how brokers operate. That's all.

Q You're speculating as to what happened, but you don't know, do you?

A I don't, I don't know.

MR. MANN: Object as to form.

A I don't know for sure.

Q (By Mr. Brandt) Right. And the fact is, though, it's the client who signs the application, and the client's the one charged with the notion of it being accurate, and candidly a misrepresentation or a misstatement in a policy application can lead to a voiding of coverage, correct?

MR. MANN: Object as to form.

A It could.

Q (By Mr. Brandt) Now then if you'll look over here to page 2604, you will see an amendment and acceptance form. And here it says, The above-identified policy is issued or adjusted or reinstated as applicable by the company and accepted by the policy owner subject to the following terms, provisions or amendments. And then it says, With $4,500 monthly amount of disability benefit, with application part A amended to show question C, 2013 income was 182,000; 2014 income was 153,000; 2015 income was 213,000, with premium to be at smoker rates.

Did I read that correctly?

A Correct.

Page 69

Q And what this shows is that his actual income was less than the $240,000 that had been listed previously, correct?
A Well, right, but depends upon, there was a phrase or a qualifying statement on the application or one of the exhibits you showed earlier that said 35 percent. I think had they used the $213,000, they would have come a lot closer to the $7,000 a month than using whatever they ended up with. They might have taken a blended rate of the three years or something like that, so --
Q So that's a decision, that's a decision made by the underwriters at Principal, correct?
MR. MANN: Object as to form.
A Yes.
Q (By Mr. Brandt) Mr. Roth doesn't make the decision as to what the amount of coverage is, correct?
MR. MANN: Object as to form.
A No, but it's potentially possible at that point that Mr. Roth could have pushed for the more recent income as being more indicative of what his earning capacity is rather than the

Page 70

earlier years.
Q (By Mr. Brandt) In any event, at the bottom of the page you see Mr. Garver's signature, do you not?
A I do.
Q And so his signature is on the same page where it's disclosed that the amount of the monthly disability benefit is $4,500, correct?
A Correct.
Q Not $7,000, correct?
A Correct.
Q Now go to the page before that's Bates stamped 2603. And there's a section here that says limitation of authority. It's about halfway down. It says, I understand and agree that no agent, broker, licensed representative, telephone interviewer or medical examiner has any authority to determine insurability or to make, change or discharge any contract or to waive any of the company's rights.
The company's right to truthful and complete answers to all questions on the applications and on any medical questionnaires that become part of this application may not be waived. No knowledge of any fact on the part of

Page 71

any agent, broker, licensed representative, telephone interviewer, medical examiner or other person shall be considered knowledge of the company unless such fact is stated in the application.
Did I read that correctly?
A You did.
Q And what that's saying is no agent or representative like Mr. Roth can change the terms of the policy? The policy is the policy, correct?
MR. MANN: Object as to form.
A Correct.
Q (By Mr. Brandt) And that's standard in the industry? That's the way it works, correct?
MR. MANN: Object as to form.
A Well, yes. I do believe that the agent or broker may have broader responsibilities in a very complicated insurance product like this, particularly with the fact that Principal deviates, as I showed in one of my exhibits, from the standard typology of describing own occupation, any occupation, regular occupation.
So there's a lot of confusion in terms and particularly in Principal's case of not following

Page 72

the normal terms that, you know, that's got to be confusing to any purchaser of an insurance policy unless they happen to be a CLU or something like that, which obviously Mr. Garver wasn't.
But absent that console, I would say you are correct.
Q (By Mr. Brandt) Yeah. And so in fact Mr. Garver's signature is at the bottom of the page acknowledging what we just said, correct?
MR. MANN: Object as to form.
A Yes.
Q (By Mr. Brandt) And then also right below that section it says acknowledgment of delivery. I acknowledge the policy numbered 7881467 was delivered to me today and is based on the life of Robert P. Garver.
Did I read that correctly?
A Yes.
Q And so I also see Mr. Garver's signature at the bottom of that page, correct?
A Correct.
Q And that reflects that he got the policy?
MR. MANN: Object as to form.
Q (By Mr. Brandt) Correct?

Page 73

A I'm sorry. Would you repeat your last question? I didn't hear.
Q Yeah. He got the policy, correct?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) He acknowledges he got a copy of the policy?
A Correct.
MR. MANN: Object as to form.
(Counsel presented to the witness premarked Exhibit No. 453.)
Q (By Mr. Brandt) Okay. Now let's go over to the actual policy, which is Exhibit 453. And this is the disability income policy, correct?
A Right.
Q Is this a document that you had prior to the issuance of your report dated February 28, 2015?
A I think it was one of the Plaintiff produced documents, yes.
Q So you had a copy of the policy? You didn't have the application, but you had that policy?
A Right.

Page 74

Q Okay. So this is a document that Mr. Garver acknowledged he received, correct?
A Right.
Q Now --
MR. MANN: I'll object as to form.
Q (By Mr. Brandt) If you go over to the page that's Bates stamped at the very, very bottom RPG 00007, you see a section here called policy definitions, correct?
A Okay.
Q And it goes on for several pages, does it not?
A I assume. I haven't seen several pages, but I assume it does.
Q All right. And we're going to -- and let's flip through it.
So this is page seven, and then there's page eight, and then there's page nine, and then there's page ten, and then finally it goes about halfway down page 11. Correct?
A He hasn't looked to that far yet, but I assume so.
Q Now, first question, do you see any definition here, and there's a bunch of definitions, do you see any definition here of the

Page 75

phrase own occupation?
A No, but your occupation certainly is there, and that's such a synonymous term, I can't see how anybody could distinguish between your occupation and own occupation.
Q And it defines your occupation as means the professions or occupations, not a specific job or jobs with a certain employer, you are actively working in and not retired or unemployed from at the start of your disability.
If you are working in more than one occupation, your occupation includes all occupations you were actively working in at the start of this disability.
Did I read that correctly?
A Correct.
Q That does not say, does it, that you can become disabled in one occupation and go back to work in another occupation and still receive full disability benefits? It does not say that, does it?
MR. MANN: Object as to form.
A No, it doesn't.
Q (By Mr. Brandt) Go back to the page before, which is Bates stamped at the bottom 10.

Page 76

There is a definition of total disability, correct?
A Right.
Q And the definition here, like we've seen before, says, Total disability means solely due to injury or sickness, one, during the occupation, during the your occupation period, A, you are unable to perform the substantial and material duties of your occupation; and B, you are not working.
Did I read that correctly?
A Right.
Q And that means, what it says is a total disability means you can't do the job you were in plus you can't otherwise be working. Correct?
MR. MANN: Object as to form.
A Correct.
Q (By Mr. Brandt) And it doesn't say it's okay to go work in some other occupation, does it?
MR. MANN: Object as to form.
A No. I would just add to the fact, which I stated maybe a little bit earlier, that no reasonable person could look at the definition of

Page 77

your occupation or the caption your occupation and the caption of own occupation and conclude by the title that there was any difference at all. So it doesn't say own occupation. It says your occupation.

But any reasonable person would have to assume that those two are the same. And if you're being educated about you've got to have an own occupation policy, like I had my disability policy. I was very careful that I would own occupation. But if somebody said your occupation, I went, oh, what's the difference, you know?

So I think there's a blur, a deliberate blurring of term here that is very, very misleading. Misleading -- misleading, common understanding in the industry about what own occupation is. And because it says your occupation, to me that is very, very slippery slope that, you know, somebody is trying to, you know, trying to play a game there.

I just think it's, it's not very ethical. Put it that way.

Q (By Mr. Brandt) So you're saying the Principal policy itself is misleading?

Page 78

A Yes. Misleading from the common understanding of what the world knows about your own occupation, when you say your occupation as opposed to own occupation. No reasonable person would find a substantive difference between those two, those two titles.

Q Well, let's move forward to the next page, excuse me, a page over, page stamped at the bottom 15. And this is a section called claim information, notice of claim and proof of loss.

You or someone acting as your legal representative must fulfill all of the following requirements: One, give us written notice of claim, including your name and policy number, within 30 days of the date your disability began. Failure to provide timely notice of a claim will limit past benefit payments under all policy provisions.

If you qualify for benefits under the terms of the policy, past benefits will only be payable for a period of six months prior to the date we receive the notice of claim in the home office.

Then it says, two, send any proof of loss requested by us to our home office within 90 days

Page 79

after the end of each monthly period for which you are claiming disability. If you have not submitted proof of loss acceptable to us within one year from the date required, benefits will be denied. An exception will be made only if you and the owner were not competent to make a claim.

Three, provide proof of loss requirements at a reasonable frequency required by us. And four, fully cooperate with us concerning all matters relating to this policy and any claims filed under the policy.

Did I read that correctly?

A You did.

Q And this is saying, this is standard language in an insurance policy, correct?

A Correct.

MR. MANN: Object as to form.

Q (By Mr. Brandt) And what it's saying is the client, Mr. Garver, who has bought the policy, if asked by Principal to provide information and cooperate with Principal, he has to do that, correct?

MR. MANN: Object as to form.

Q (By Mr. Brandt) Correct?

A Correct. What if he was catastrophic,

Page 80

catastrophically injured any particular point? Would that matter?

Q Well, I don't think that's the case here, but my question to you is, what the policy says is you've got to cooperate and provide information, correct?

MR. MANN: Object as to form.

A Yes.

Q (By Mr. Brandt) And if you don't principal can cut off the benefits, correct?

A Correct.

MR. MANN: Object as to form.

Q (By Mr. Brandt) And we've already established that what happened here was whether or not it's an own occupation policy or a your occupation policy or a regular occupation policy or an any kind of policy, Principal paid the full benefits up until the time Mr. Garver said he wasn't going to provide any more information, and that's when Principal canceled the benefits. Correct?

MR. MANN: Object as to form.

A Correct.

Q (By Mr. Brandt) So all this talk about own occupation and your occupation and what

Page 81

do the applications say and what box got checked actually had nothing to do with why the benefits got shut off, correct?
MR. MANN: Object as to form.
A I would say --
Q (By Mr. Brandt) Correct?
A I would say.
Q Correct?
A At this particular point there was considerable concern about what future benefits might be payable given his change of occupation status to Welborn Sales or whatever the name of the company was.
And so the prospective possibility from the messages he was getting from both, you know, Pam and Roth was that, you know, you may not be getting them in the future, and so there was a lot of concern. But I would have to agree up to the point, at that point, they hadn't, they'd paid the benefits.
Q Okay. They paid everything. And the fact is what Mr. Garver could have done here is if he started receiving fewer benefits going forward, fight with Principal about that, but go ahead and give Principal the information they requested,

Page 82

correct?
MR. MANN: Object as to form.
A Could you, could the court reporter read back that question? It broke up again.
Q (By Mr. Brandt) I'll just, I'll rephrase it.
I said one thing Mr. Garver could have done here would have been to supply the information to Principal, and if Principal reduces the benefit by a thousand dollars a month or some other number, he can fight with Principal about that, but he's still getting some benefits, correct?
MR. MANN: Object as to form.
A Yes.
Q (By Mr. Brandt) But it was Mr. Garver's decision to not provide information that shut off the tap, correct?
MR. MANN: Object as to form.
A Yes.
(Counsel presented to the witness premarked Exhibit No. 469.)
Q (By Mr. Brandt) Okay. Let's move forward to 469, please.
A Before I do that, I did remember the

Page 83

second part of what I was talking. I was talking about Mr. Roth and his analogy of you won't have to go to McDonald's flipping burgers.
The other part of that, which came up multiple times through testimony and so forth, was Mr. Roth's recommendation to the Garvers that because of the possibility for physical harm because he was involved with, you know, working in the building industry, so forth, he really needed to get a disability policy.
So I think part of the understanding that Garvers got from conversations from Mr. Roth was his instigation of a policy particularly linked to the fact that he had a dangerous occupation. So it sort of leads to the point that I believe probably happened here, is he understood that that would be a difficult classification to get by Principal and sort of did the closest thing he could do to get some kind of a definition that would skate by without being obviously a framer falling off of a roof. And that's what happened in my mind.
But I think it was part of the reason, it's part of the reason that the Garvers were so, in such strong belief that this policy would have

Page 84

and should have covered the framing operation.
So Prudential (sic) did pay the claim up to that particular point, so I'm not, I'm not disputing that.
Q But that's speculation your part as to what Mr. Roth did or didn't do, correct?
MR. MANN: Object as to form.
A Yes.
Q (By Mr. Brandt) Let's go to 469, please. And this is the actual --
A Excuse me. I have to switch to my computer glasses.
Q Oh, no way. I hear you. No worries.
A Okay.
Q 469 is the actual claim that was filed originally.
Is this a document that you had had an opportunity to review before you issued your report dated February 28th?
A Yes.
Q Okay. If you turn to the second page, it says, List all important duties of your occupation and the number of hours spent per week at each duty for the period immediately preceding the date of disability.

Page 85

Here it says, Framing 20 hours a week and business management 20 hours a week. Correct?
A Correct.
Q Correct?
A Yes.
Q And then if you go down it says, Describe which duties and activities you are unable to perform as a result of your disability and why. And it says, Framing, trim carpentry, deck building, operating machinery and operating tools cannot be performed due to the extensive injuries, rehabilitation and pain management.
Did I read that correctly?
A You did.
Q And that is a different description of his job than what was on the original application, correct?
MR. MANN: Object as to form.
A Correct, but again, I believe Mr. Roth understood what he did on his job, and however it was written down on the application, there was an understanding by the agent at this particular point of what he did. I think he was really aware of what he did.
Q (By Mr. Brandt) But Mr. Garver, you

Page 86

read Mr. Roth's testimony that he was not aware that he was doing the framing and carpentry work, correct?
MR. MANN: Object as to form.
A Again, I think I previously testified I don't remember reading that in the last day, but I'll take your word for it if it was there.
Q (By Mr. Brandt) In any event, you will agree with me, will you not, that the description of Mr. Garver's duties is very different between the initial application for the policy and now the claim application form?
MR. MANN: Object as to form.
A It's different, yes.
(Counsel presented to the witness premarked Exhibit No. 487.)
Q (By Mr. Brandt) Turn with me now if you will to 487. And this looks to be a letter dated November 13th, 2017, from Stephanie Garcia to Mr. Garver dated November 13, 2017, correct?
A Correct.
Q Is this a document that you had had an opportunity to review prior to your February 28th report?
A I don't believe I've seen that letter

Page 87

yet, but I certainly read it in the last two days.
Q Now, skipping down to the third paragraph, it says, To review your claim eligibility beyond November 12, 2017, we need updated medical restrictions and limitations from your treating physician. Please have the enclosed continuation claim form completed and returned as soon as possible.
Did I read that correctly?
A Yes.
Q And that is customary in the business, that when somebody is making a claim under disability policy, the carrier needs updated medical information, et cetera?
MR. MANN: Object as to form.
A Yes.
Q (By Mr. Brandt) Then the next paragraph says, If you are able to return to work with restrictions from your doctor, we'll calculate your monthly earnings and pay your benefits based upon your loss of earnings. Please notify me as soon as possible if you return to work. To complete this calculation, we will need your monthly earnings and/or profit and loss statements on an ongoing basis.

Page 88

Did I read that correctly?
A Correct.
Q Now, when you take the policy that Mr. Garver had with the total disability provisions and then the residual disability rider, the way that worked just in terms of the policy, was if he was totally disabled and not working, he would get the full monthly benefit, but if he returned to work, there would be a potential reduction in his benefits based on what his earnings were, and you need to supply us information about your earnings. Correct?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) Okay. Mr. Garver was told that very thing in this letter in November of 2017, correct?
MR. MANN: Object as to form.
Q (By Mr. Brandt) That's what this paragraph says?
A Yeah. You're basically just saying --
MR. MANN: Object as to form.
A Basically you're saying the letter of November 13th, which you've just highlighted here, that he was sent that letter. Yes.

Page 89

Q (By Mr. Brandt) And he got this letter before he went to work at Welborn Sales, correct?
MR. MANN: Object as to form.
A From the testimony that we heard so far, I would agree.
(Counsel presented to the witness premarked Exhibit No. 489.)
Q (By Mr. Brandt) Now then let's go over to 489. And this is an email from Stephanie Garcia at Principal to Mr. Garver dated November 21, 2017, correct?
A Right.
Q And here it's, going down to the paragraph, it says, Your policy has a base benefit of amount of 4680, and after your 90-day elimination period, the initial benefit issued was for the period 10/10/17 to 11/12/17, so a full month and two additional days.
Did I read that correctly?
A Correct.
Q Then it goes down two paragraphs and said, In regards to the loss of income payment you mentioned, I'm not sure which rider you are referencing. You have the following riders on

Page 90

your policy; however, these are not applicable to you at this time based upon the information we have.
And then if you drop down, one of the items is residual and recovery rider, dash, if you are working and have a loss of earnings due to disability.
Did I read that correctly?
A Right.
Q Now, Ms. Garcia is correct at this moment in November of 2017 that the residual and recovery rider didn't apply because at this point Mr. Garver was not working, correct?
A Correct.
Q But this makes clear again that if he were to go back to work, the residual and recovery rider would kick in because it says if you are working and have a loss of earnings due to disability, correct?
MR. MANN: Object as to form.
A I'm a lifetime insurance broker. If I read that, I'd go like what the hell does that mean? I mean, I find it very confusing, maybe technically correct, but boy, I sure wouldn't pick it out.

Page 91

Q (By Mr. Brandt) But this is another time in November of 2017 where Ms. Garcia has made either clear or unclear if you go back to work, there's going to be an adjustment in your benefit, correct?
MR. MANN: Object as to form.
A Well, it says residual and recovery rider. If you are working and have a loss of earnings due to disability, that's when it applies. But it doesn't really say what's going to happen.
Q (By Mr. Brandt) In any event, he got this email prior to going to work at Welborn Sales, correct?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) Let's go -- I'm trying to make this shorter. I'm sure you'll appreciate that.
A I like that.
Q Let's go, let's go to 531.
(Counsel presented to the witness premarked Exhibit No. 531.)
Q (By Mr. Brandt) And this is a letter dated September 13, 2018, to Mr. Garver from

Page 92

Stephanie Garcia at Principal, correct?
A Yes.
Q It says, Dear Mr. Garver: We know that you are going through a lot, and we want to continue to make your claim experience as easy as possible. To help us with the review of your claim, we are in need of additional information from you.
In a recent email from you, you indicated that you had returned to work in June 2018; however, during the in-person interview you participated in on August 28, 2018, you stated that you have moved to Salina in January 2018, purchased Welborn Sales from your father-in-law, and assumed the role of president of Welborn Sales at that time. You indicated your current salary is 4,000 a month, with Welborn Sales typically has between 100,000 and 300,000 dollars worth of sales per month.
Did I read that correctly?
A You did.
Q So this is indicating that it goes all the way back to January of 2018 that Mr. Garver started back with Welborn Sales, correct?
MR. MANN: Object, object as to

ALARIS LITIGATION SERVICES
www.alaris.us Phone: 1.800.280.3376 Fax: 314.644.1334

Page 93

form.
A Correct.
Q (By Mr. Brandt) Then it says, Since you've returned to work, we'll calculate your monthly earning and pay your benefits based upon your loss of earnings. To complete this calculation, please send your monthly pay statements and profit and loss statements on an ongoing basis. To ensure prompt payments, please provide your monthly earnings information timely. At this time we will need statements from January 2018 to current.
Also, at the end of each year of disability we'll ask you to submit your individual income tax return and business tax return, if applicable. Once this information is received, we'll compare the benefit amounts we've paid to the earnings reported on the tax returns and determine if benefits were paid appropriately.
Next steps, if we do not receive the requested information by the above date, we will have to make a decision based on the information we already have.
Did I read that correctly?

Page 94

A You did.
Q And this fits with the policy provision that Principal can ask for information from the insured and also is entitled to cooperation from the insured, correct?
A Correct.
MR. MANN: Object as to form.
Q (By Mr. Brandt) Correct?
A Correct.
MR. MANN: Same objection.
Q (By Mr. Brandt) And if they don't get it, they can quit paying benefits, correct?
A Correct.
MR. MANN: Same objection.
Q (By Mr. Brandt) And this letter makes that pretty clear, correct?
MR. MANN: Same objection.
A It's a clear letter, yes.
(Counsel presented to the witness premarked Exhibit No. 537.)
Q (By Mr. Brandt) Okay. So now let's go forward to 537. And this is an email from Mr. Garver to Stephanie Garcia dated September 23rd, 2018, so a few days later; is that correct?

Page 95

A Yes.
Q Is this a document that you had the opportunity to look at prior to your expert report dated February 28, 2020?
A I think I read that for the first time in the last two days.
Q Okay. If you drop down to the fifth paragraph from the bottom, Mr. Garver says, quote, I am not agreeable to providing paystubs or any other financial information at this time.
Did I read that correctly?
A Yes.
Q He made that pretty clear, did he not?
A He did.
(Counsel presented to the witness premarked Exhibit No. 539.)
Q (By Mr. Brandt) And then if you skip forward to 539, this was a letter from Stephanie Garcia to Mr. Garver dated September 28, 2018, correct?
A Correct.
Q And it starts off by saying, Dear Mr. Garver: As of the date of this letter, we have not received the proof of loss that is needed for us to evaluate your claim to determine your

Page 96

eligibility to benefits per the terms of your policy. Consequently we are denying your claim.
Did I read that correctly?
A Yes.
Q And again, up to this time Principal had been paying the full total disability benefits and had not reduced these benefits in any way, shape or form, correct?
MR. MANN: Object as to form.
A Well, other than if there was a potential disagreement between the $7,000 that originally applied for and the 4680 that was paid, right.
Q (By Mr. Brandt) But assuming 4680 is the right number, he'd been getting that full payment all the way up to this letter, correct?
A Correct.
Q So whether or not this was an own-occ or a your-occ or an any-occ kind of policy at the end of the day did not affect any of the amount of benefits that were paid to Mr. Garver up until September of 2018, correct?
A Correct.
Q And what happened is, as we had discussed earlier, is Principal cut off the

Page 97

benefits because Mr. Garver refused to provide them information, correct?

MR. MANN: Object as to form.

A Correct.

Q (By Mr. Brandt) And Mr. Roth didn't have a hill of beans to do with that, correct?

MR. MANN: Object as to form.

A I didn't see any testimony to that effect other than, as I previously said, he was attempting to intervene with the higher-ups at Principal at a national meeting, and was not successful apparently.

MR. BRANDT: That's all I've got. Thank you so much.

THE WITNESS: Thank you.

MS. KERSTING: Let's take -- yes, I do have questions. Let's take a ten-minute break.

THE VIDEOGRAPHER: Going off the record 10:56 a.m.

(Recess.)

THE VIDEOGRAPHER: Back on record at 11:09 a.m.

EXAMINATION

QUESTIONS BY MS. KERSTING:

Page 98

Q Good morning, Mr. Anderson. My name is Edna Kersting. I am with Wilson Elser in Chicago, and I represent Principal Life Insurance Company. And I have a couple of questions for you as well.

I know you've gone through a bunch of documents already, and several of the documents that I'll be referring to are documents that you have already seen.

And I wanted to talk to you about the pointed out discrepancy on the application and the claim form. Do you remember what I'm talking about with regard to Mr. Garver's occupational duties?

A No, I'm sorry, I don't. Do you mean the description about the percentage of time spent on different duties, you mean?

Q Yes.

A Excuse me. Is it Mrs. or Ms. Kersting?

Q What?

A Your name is Ms. or Mrs. Kersting?

Q You can call me Edna.

A Edna, okay, thank you. Okay, yeah --

Q We can look at the application.

Page 99

A You were talking about the percentage of time spent in various, in different categories of his job, right?

Q Correct. We can look at the application again. That's my Exhibit 1.

A Okay.

(Counsel presented to the witness premarked Exhibit No. 1.)

Q (By Ms. Kersting) And it's on the, it's up there in number one. You see where it says occupation/duty, owner/contractor.

Did I read that correctly?

A Correct.

Q And then if we go to page I want to say three of four or five rather, sorry, up there, where it said, you see current employment information?

Do you see that?

A Where it says coordinate job schedules, you mean?

Q Right. It's current employment information under nine, it starts with A, type of business or industry?

A Right.

Q And it says new home construction.

Page 100

Did I read that correct?

A Correct.

Q And B, job title, managing member, managing partner?

A Correct.

Q And under C, what are your job activities and percentage of time spent in each.

Do you see that?

A I do.

Q And it says, Coordinate job schedules 50 percent, oversee office management 50 percent. Correct?

A Correct.

Q And you have read Mrs. Garver's deposition testimony, have you not?

A I did.

Q And I'm sure you read in that deposition testimony that she testified that she would not have described Mr. Garver's job that way; is that correct?

A That's what I read, yes.

Q And you also read that she testified that between 2015 when this application was completed and 2017 when the claim was submitted and, and that was previous Exhibit 469, the claim

Page 101

form that was Mr. Brandt's exhibit, that his job had not changed?
Did you read that as well?
A I did.
Q And you read that also in Mr. Garver's deposition, did you not?
A Yeah. I don't know if he had the exact same testimony as she did, but I thought it was similar, I guess.
Q He did testify to the fact that his job did not change between 2015 and 2017?
A Okay.
Q Did you read that?
A I did.
Q And are you familiar with the concept of telephonic applications?
A Certainly.
Q And you probably have also read given the fact that you read the deposition testimony in this case that part B, this portion of the application, this was a telephone application, did you not?
A Correct.
Q And you've probably seen the exhibit that was used in this specific case which

Page 102

demonstrates that Mr. Garver called in for this telephone application, correct?
A Yeah. I guess what was unclear to me, I don't know if it was partially it was filled out in advance and then he just testified to the accuracy of the question or if somebody -- I don't know how those words got in the application, but I certainly realize it is a telephone application, but I don't know how they got there.
Q So you do not understand how a telephone application works then?
A Well, I --
MR. MANN: Object as to form.
A What I don't know is whether the application was partially filled out in advance, submitted by potentially the agent, and then the telephone application just verified that that's one way of doing it.
It could be that those questions were directly asked and then the telephone person typed the answers in. I don't know how that, I don't know how the actual answers to those questions got there.
Q Let's take a look at the application then, because the application answers that

Page 103

question. That's Exhibit 1 again.
You see where it says disability insurance application, part A? Do you see that?
A I do.
Q Okay. Let's go to page two. You see that this is still part of part A, right?
A Right.
Q And now let's go to part, page three. Still part of part A, correct?
A Right.
Q And then let's go to the bottom of that specific page. And it says, If using teleapp, proceed to part C, page eight.
Do you see that?
A Right.
Q If we now go to part four, to page four, you see how this part is called part B, correct?
A Yeah, okay.
Q And it's not part, it's not page eight?
A I'm sorry. I didn't catch what you just said.
Q I said it is not page eight?
A Okay.

Page 104

Q At the end that at the end of part A directed the completion to go to, correct?
A Okay, I'm losing the point you're trying to make here. What are you trying to tell me at this point?
Q The completion of the application starts with part A. At the end of part A, it tells you that if the teleapp is going to be used, to proceed to part C, not to complete the answers in part B, but to provide to part C.
A Okay.
Q Correct?
A Correct.
Q And then if we go to part C, which is further down in the application, that is part C. You see that? You see that --
A I see part C, okay.
Q And you see that the font is different on this application on part A and part C, right? You see how it looks typewritten?
A Well, I think the only thing that looks typewritten is Robert P. Garver. I don't see anything else.
Q Correct. The rest is actually hand-filled, correct?

Page 105

A Well, I guess maybe I'm not looking at the same. I'm looking at page eight right now.
Q Right.
A And I don't see anything other than $390.95 that's been hand-filled.
Q Correct. Yes.
A Okay.
Q If we go back to part A, we will also see that a portion of it is typewritten, and a portion of it is handwritten, correct?
A Right.
Q And you see that the font in section number one is the same as the font on page eight, in the typewritten information.
Do you see that?
MR. MANN: Object as to form.
A I guess. I'm not an expert in font, so I'll take your word for it, it's the same. I don't, you know, I don't see --
Q (By Ms. Kersting) It looks the same, doesn't it?
A What's the point?
Q The point is that the font in part B is different.
A Is different.

Page 106

Q Correct.
MR. MANN: Object as to form.
A I'd have to -- I'm not agreeing to that at all. I've got to spend more time studying it than we have got now.
Q (By Ms. Kersting) You're not going to agree that the font in part B is different than the font in section A?
MR. MANN: Object as to form.
A I'm not, I'm not in a position to be able to make that determination at this point in time. I need a magnifying glass and some time to go over it. It doesn't look that different to me.
Q (By Ms. Kersting) Okay. All right, fine.
Based on your experience as an underwriter, which you told us before you understand that the premiums -- based on your experience as an underwriter, you understand that the premiums on a disability insurance policy are in part determined by the amount of the benefit issued?
A Well, sure, of course.
MR. MANN: Object as to form.
Q (By Ms. Kersting) And you also

Page 107

understand premiums in part are determined by the risk assumed as a result of the occupation?
A I understand that.
Q And you understand that in this specific case, by not mentioning the fact that Mr. Garver engaged in framing, his occupational class may have been a different one than if he had disclosed that he was engaged in framing; isn't that correct?
MR. MANN: Object as to form.
A I would agree with you in concept, although I do remember testimony that the classification was moved from a class two to a class three. And I don't know Principal's classifications, but it looked like somebody may have assumed that he was having some physical activities on the job and actually made it a more, you know, a more expensive classification based on risk.
Somebody changed the classification that was asked for. I can't remember whose testimony that was, but it definitely was there.
Q (By Ms. Kersting) You think somebody testified to that, that in underwriting the classification was changed?

Page 108

A From a two to a three, yes.
Q That's, that's your testimony as you sit here today, that you read testimony that the occupational classification was changed during underwriting?
A Yes.
Q Whose testimony?
A In addition, this was a conversation between I believe Mr. Roth and the wholesale insurance broker Target in this or Target Insurance, which is the one, is sort of the wholesale broker that he went and got the policy placed through.
He didn't place it directly with, even though he's the agent that signed it, he actually had a wholesaler, you know, do the work for him. And in that conversation between them, the category was increased from a two to a three, three being a higher risk category where the, my assumption was at this point that the underwriting said, well, there may be some physical activities as a part of this risk, and so therefore we're going to make it a three.
Okay. They didn't say that exactly. They just said change from two to three.

Page 109

Q You testified previously that the description of the occupational duties on the application that we just looked at differs from the description on the claim form; is that correct? Do we need to look at the form again?

MR. MANN: Object as to form. Object as to form.

A That's correct. That's correct.

Q (By Ms. Kersting) That is correct?

MR. MANN: Object as to form.

Q (By Ms. Kersting) Are you aware that Mr. Garver perpetuated this misrepresentation when asked about it during the claim process?

MR. MANN: Object as to form.

A I'm not exactly sure what you just asked me. You want to re-ask me the question?

Q (By Ms. Kersting) Uh-huh. I asked you, are you aware that Mr. Garver perpetuated the misrepresentation on the application for coverage when asked during the claim process?

MR. MANN: Object as to form.

A It's possible he did. I don't remember specifically reading that, so but ...

Q (By Ms. Kersting) Did you review the claim file documents in this case?

Page 110

A I -- but it's been several months since I -- and I most recently spent, you know, 11 hours reading depositions yesterday to be caught up for this one, so ...

Q Oh, no, you said it's been several months. When did you receive the claim file in this case?

A Again, show me the document where that's specifically said, and I can say yes or no.

Q Sure. That's Exhibit 125.

A Okay. Show it to me.

Q Alaris will do so.

(Counsel presented to the witness premarked Exhibit No. 125.)

Q (By Ms. Kersting) That is an email from Mr. Garver to Stephanie Garcia dated September 27, 2017.

A Okay.

Q With a cc to Molly Garver. Do you see that?

A So are you talking about 191 Street Investors is a company which buys lands and develops it? I am an owner in that company?

Q Right now I was just asking you if you see that there was a cc to Molly Garver. I wasn't

Page 111

asking you about the content.

A Yeah, I see that, okay, yeah.

Q Okay. Have you seen this document before?

A I'm pretty sure I must have. I don't specifically remember reading it. But anyway, so you want me to read where it says, My job consists of the 50/50 statement of coordinating and overseeing?

I think construction, sometimes as a contractor we're required to use tools and do work to meet deadlines if they don't follow through with their obligations. So he's basically saying he does perform physical activities when others are not available.

Q All right. Exactly he's saying sometimes. And it continues, This is the case in this scenario where there was a lack of labor to perform carpentry to meet deadlines and schedules, which then requires me to perform those tasks as needed from time to time.

The entire country is in a labor shortage for construction workers, and as a result the cost of labor have spiked over the last couple of years.

Page 112

Do you see that?

A Yes, I do.

Q And you remember how about Garver testified he strapped on his tool belt and was on the roof of a house every day. Do you remember that?

A Well, yes. He talked about doing that quite often, yes, uh-huh.

Q Yes. And he didn't talk about a change in his occupation from 2015 to 2017 as a result of labor shortage, did he not?

MR. MANN: Object as to form.

A Let me try to see the percentage. So he's testifying here a couple of years later that he would have to jump up and do labor work when other subcontractors were not available.

I'm not sure at that point, what question are you asking me versus earlier? That there was no change between when he started it out or what?

Q (By Ms. Kersting) No. I'm just asking you --

A I'm not clear on the question.

Q To verify based on your review of the deposition transcripts in this case that Mr. Garver had testified that there was no change

Page 113

between 2015 and 2017.
A And this says no change?
Q No, his deposition. You've already testified --
MR. MANN: Object as to form. Go ahead.
A I'm really confused about the question here I'm being asked.
Q (By Ms. Kersting) Of course you are. In 20 -- you have already answered this. You reviewed Mr. Garver's deposition transcript and Mrs. Garver's deposition transcript, and you verified for me that both of them testified that there was no change in Mr. Garver's occupation between 2015 and 2017?
A Correct.
Q Correct?
MR. MANN: Object as to form.
Q (By Ms. Kersting) And there was no testimony provided in this case that indicated that he only climbed on a roof from time to time when there was a need; isn't that correct?
MR. MANN: Object as to form.
Q (By Ms. Kersting) Or did you read such testimony?

Page 114

A No, I did. No, there was no testimony that said other than it was from time to time, correct.
Q You said there was no testimony other than that it was from time to time?
A No, no. I think you were asking did he testify that -- I think you just -- I think you just asked me that he had made testimony previously that it was from time to time he did this, and your question is, was it continuously that he was doing labor on top of roofs and things like that, or did he just do it from time to time? I think that's what your question is. But I'm not sure.
Q I asked you whether he ever testified -- if you read deposition testimony where he testified that he only went on roofs from time to time when there was labor shortage.
A He did not say that in deposition testimony, no.
Q Thank you. You talked to me -- you talked to Mr. Brandt about the fact that you believe that the insurance policy in this case was misleading. I would like you to elaborate on that. What do you mean by that?

Page 115

A I think you will see a couple of articles attached to my thing that are pretty explicit about that in the subject. The problem is there became an understanding of own occupation or your occupation, which meant in fact that you weren't -- you wouldn't be forced to do another job if you couldn't perform what you, what your own occupation or your occupation was.
Where it's misleading is that it doesn't say that in the, you know, in the Principal policy. It basically says, you know, if you can do something else, you're going to really have to be able to do that if you're capable of working. You have to work. So the whole point of why they wrote this policy the way it was, was that he wouldn't have to do something else in order to be able to collect the benefit.
So I'm saying, I'm saying when you look at the articles that I've put in the back of the thing which you haven't looked at or referred to yet, they basically say that what's been created over a period of time is a misleading discussion of what the actual things are, a morphing or a changing of the words into something different.
So Principal calls what I would call own

Page 116

occupation or your occupation coverage regular occupation, okay? But it leaves, it's in there. It's a box to check. It says regular occupation. And that means when everybody came to understood or understand what occupation coverage, your occupation coverage, your own occupation coverage meant. You didn't have to go to work flipping burgers at McDonald's.
So I'm just saying that the descriptions, not necessarily the words that explain everything, have been basically changed over a period of time, you know, and are misleading to the common understanding of the industry. And I don't think I could explain it any more simply than that.
Q You indicated that you believe or that you read that this policy forced people to go back to work to continue benefits. Where is that in the policy? And we can take a look at Exhibit 2, which is the policy.
(Counsel presented to the witness premarked Exhibit No. 2.)
Q (By Ms. Kersting) I would love to see where you think it says in this policy that in order to receive benefits, you need to work if

ALARIS LITIGATION SERVICES
www.alaris.us Phone: 1.800.280.3376 Fax: 314.644.1334

Page 117

you can.
A No. I think what I'm saying, you're not forced to go back to do some lower paying job, and if you do something else, you don't have to -- no, I clearly understand is if you don't go back to work, you continue to get paid, okay?
But if you work and it's not your regular occupation or own occupation or the occupation that you, you know, said you were starting out with in the policy application, that you basically would have a different structure being applied to it, and it simply did not follow through with the common understanding of what had been known in the industry as own occupation.
If you look back at the two articles that I captured, that goes into that in great detail.
Q So you're talking about the fact that if you go back to work, you're no longer totally disabled. But you're residually disabled. Is that what you're referring to?
A Well, I certainly am referring to that, but you are, if you go back to work and you suffer reduction of income from it and you're not doing your regular occupation, no, I'm just, what I'm really saying is there's a difference between

Page 118

the understanding of own occupation, which is if you can't do the principal duties of your own occupation, you don't, you continue to collect even though you're going back to work doing something else.
Q And it's your understanding of an own occupation policy?
A As it is commonly understood and evolved over decades in the business. What, what Principal has is a different definition, which is called regular occupation, which is a box that didn't get checked or discussed in the application. And it gives what everybody in the world knows is own occupation or your occupation coverage. But you guys call it regular occupation, okay?
Q You're referring to the regular occupation rider. Do you know what the regular occupation rider says? Have you ever seen Principal Life's regular occupation rider?
A I didn't see the rider because it wasn't provided, but I read on the website of Principal what it meant. And what I described is you don't have to go back to work -- if you go back to work at something else, you continue to

Page 119

collect the benefit of your regular occupation if you can't perform your regular occupation.
Q As an underwriter, which you've told us you have training in and were employed as, you understand that not all policy features are always available for all risk groups, don't you?
A Yes, but my point is this.
Q Yes will suffice. You understand that in this specific case or do you have any information that in this specific case Mr. Garver would have had access to the regular occupation rider?
A No.
Q So it's just speculation that you're saying he should have checked the box? You really don't know whether if the box had been checked a regular occupation rider could have been issued; isn't that correct?
A I don't know that, but with the regular occupation which would have provided the coverage that commonly is understood as own occupation, it should have been explained to him at that point that what he was really seeking was regular occupation coverage.
Whether or not it could be granted is a

Page 120

question, you know, that is for the underwriters to have determined whether it could or could not have been determined.
But he wasn't, he was, continued to believe that what he understood a real own occupation or your occupation coverage was really the coverage under regular occupation, and he wasn't explained what the difference was.
Q You weren't really there during the discussions between Mr. Roth and Mr. Garver, were you?
A No, I wasn't there.
Q And you don't really know what Mr. Garver said he wanted, do you?
MR. MANN: Object as to form.
A No. I just know what Mr. Garver testified to later and his understanding of what he thought he was getting, yes.
Q (By Ms. Kersting) I mean, you know now what he's claiming as part of this lawsuit, but you don't know what he told Mr. Roth when he applied for the coverage; isn't that correct?
A I wasn't --
MR. MANN: Object as to form.
A I wasn't in those conversations.

Page 121

Q (By Ms. Kersting) And then you also don't know whether the regular occupation rider hadn't been discussed and wasn't available, do you?
MR. MANN: Object as to form.
A Correct. I don't know that.
Q (By Ms. Kersting) Have you read Ms. Mueller's expert report? Do you know who Ms. Mueller is?
A No.
Q And you did not read her expert report?
A No.
Q And you have no idea what she said, do you?
A No.
Q You understand that all policy forms are approved by the state that they're issued in?
MR. MANN: Object as to form.
A Yes, I understand.
Q (By Ms. Kersting) And you understand that this is a policy that was approved by the State of Kansas?
MR. MANN: Object as to form.
A I would have to -- I accept that

Page 122

characterization, yes.
Q (By Ms. Kersting) You understand that future benefits under a disability insurance policy do not accrue until proof of loss has been provided?
A Yes.
Q And you said previously you understand that benefits are paid in arrears, correct?
A I think a month -- well, you got the three-month waiting period or some other waiting period, and then you've got an arrears of one month, yes.
Q That's what you said, but isn't that true, that that's always the case, the benefits --
A I'm not sure that all policies are that way, but this one is for sure.
Q Right. This one. We're only talking about this one. In this specific case, the disability benefits are always paid after the month of disability has occurred; isn't that correct?
A Right. It's a very reasonable position, I think.
Q And you went with Mr. Brandt through the proof of loss provisions, did you not?

Page 123

A Yes.
Q And the proof of loss provisions showed you that certain forms of proof of loss have to be requested, have to be provided when requested; isn't that correct?
A Yes.
Q And you understand that insureds have a duty to cooperate with the carriers?
A Yes.
Q And a duty --
MR. MANN: Object as to form.
Q (By Ms. Kersting) And that duty goes through the entire claim process, doesn't it?
A As laborious as it is yes.
Q I understand. As laborious as it may be, if there's information requested by the carrier, it is the duty of the Claimant to provide that information; isn't that correct?
A Correct.
MR. MANN: Object as to form.
Q (By Ms. Kersting) And when that information is not provided, then the proof of loss requirement isn't fulfilled; isn't that correct?
MR. MANN: Object as to form.

Page 124

A Correct.
Q (By Ms. Kersting) And as you saw in the proof of loss provision in this specific case, if proof of loss is not provided, Principal Life has the right to deny benefits; isn't that correct?
A Correct.
Q And you went with Mr. Brandt through the fact that this is exactly what occurred in this case; isn't that correct?
A Correct.
MR. MANN: Object as to form.
Q (By Ms. Kersting) Principal Life requested information, and Mr. Garver refused to provide that information. Isn't that correct?
MR. MANN: Object as to form.
A I think he provided a lot of information, some which required multiple mailings to get it there, but at a certain point he refused, yes.
Q (By Ms. Kersting) And as a result of the refusal, the benefits were terminated on this case, correct?
MR. MANN: Object as to form.
A You broke up there.

Page 125

Q (By Ms. Kersting) I said as a result of the refusal to provide documents that had been requested to calculate the benefit amount, the benefits were terminated; isn't that correct?
MR. MANN: Object as to form.
A That's my understanding.
Q (By Ms. Kersting) Are you aware of the fact that since that termination, additional benefits have been issued?
A I did read that, yes.
Q You were apprised of the fact that that information had eventually been provided during the lawsuit, and as a result of that information, additional benefits were issued?
A Yes.
Q Which is how it works? You provide proof of loss, and if the loss is satisfactory, benefits are being paid; isn't that correct?
A Correct.
Q And that's exactly what happened here? Proof of loss was provided and additional benefits were paid, correct?
A Correct.
MS. KERSTING: I have no further questions.

Page 126

MR. MANN: I have a few. And why don't I get them over with so that we can be finished.

EXAMINATION

QUESTIONS BY MR. MANN:
Q Mr. Anderson, you're aware that this particular Principal disability insurance policy had a rider for catastrophic injury in which if the insured is unable to perform two or more activities of daily living, he will receive $8,000 a month in benefits?
A Correct. I've read that, yes.
Q In the event that based on everything that you're aware of in the claims file after having read Mr., Mr. Garver's deposition, Molly Garver's deposition and Mr. Roth's deposition, in the event that Principal conducted no investigation whatsoever as to whether or not Mr. Garver suffered a catastrophic injury such that he could not perform two or more activities of daily living, if Principal performed no investigation whatsoever into that issue, do you have an opinion whether or not that would fall below the standard of care?
A Yes. That would definitely fall below

Page 127

the standard of care.
Q And please explain why.
A Well, you know, it was, it was pretty obvious at this particular point the severity of his injuries, given he had eight broken ribs on one side and three broken ribs on the other and ankles and fingers almost amputated and a whole bunch of other issues, that he was having a lot of trouble. And that should have sparked the fact that he, they should have looked at that coverage thing and seen whether or not there was a possibility of the catastrophic injury rider applying.
And they basically knew of the severity of his accident and knew the difficulties he was having, which was being communicated, but they didn't investigate it.
Q Okay. And then could you tell us whether or not in your opinion that fell below the standard of care required for an insurance company?
A Yeah. It's the insurance company's duty to find out in all cases whether or not an injury or other claim could be found underneath a policy and to investigate without prejudice

Page 128

whether or not there was a possibility of that, of that section or that rider applying.
MR. MANN: Thank you. I have no further questions.
MR. BRANDT: Nothing here.
MS. KERSTING: I have some more questions.

EXAMINATION

QUESTIONS BY MS. KERSTING:
Q You referred to a standard of care right there in response to Mr. Man's questions. What standard of care are you referring to?
A What standard? Well, the --
Q Yeah. You just said standard of care, it violates the standard of care. What standard of care?
A Well, you first of all have the fair faith in dealing of every insurance company's requirements, which are under Kansas law and every other law in the state -- in the U.S. pretty similar across the USA, because the National Association of Insurance Commissioners had developed a model act and a standard which has been principally adopted.
And one of those standards of care is to,

you know, is to seek to find coverage if it's available under various provisions of the policy. So the carrier can't just wait to see if somebody is going to bring up, well, clause 32X applies. They don't necessarily have to wait. I mean, they can't just, they're dependent upon the policyholder to be able to make a direct claim. They have to look for coverage under various aspects of the policy.

It's part of the, you know, the, I forget exactly the name of the title but, you know, fair, fair claims handling practices.

**Q This is this not an opinion that's contained in your expert report, is it?**

A It is not, no.

**Q You have not previously been asked to provide this opinion, have you not?**

A No, correct.

**Q Do you have any claims handling experience?**

A Yes. We supervised claims handling at my insurance agency for injured workers for about a hundred different commercial enterprises in California that we provided a offshore insurance program for Bermuda, and we were responsible for

overseeing the claim handling functions of that. I didn't do that --

**Q Sorry.**

A I didn't, I didn't do that exactly directly, but people in my agency did, so we had a staff that did that.

**Q What kind of insurance coverage was involved?**

A There would be injured workers, workers' compensation.

**Q Workmen's comp. Have you ever worked as a disability claims examiner?**

A No.

**Q Have you ever worked at an insurance company that issued disability insurance?**

A I'm sure that companies that I've been involved with, yes, would have issued it, yes.

**Q Were you directly involved with any of that disability coverage that you're sure those companies issued?**

A No.

**Q Do you have any training as a claims handler?**

A Well, we were provided by our errors and omissions carriers over the years training

involved with what we should and should not be doing as an insurance agency in terms of claims handling.

**Q You're saying you were part of an insurance agency and that insurance agency handled claims?**

A Yes.

**Q Do you have any certifications as a claims handler?**

A No.

**Q Have you ever testified as a so-called bad faith expert before?**

A Not directly, but several times in my testimony of underwriting and brokers or underwriting practices, I offered opinions about whether the underwriting portion of it was handled in good faith or not.

**Q Based on your experience as a supervisor to individuals who were handling claims for workmen's comp insurance, did you see any evidence in the claims file that Mr. Garver could not perform any of his activities of daily living?**

A Yeah. I think there was -- I don't know if it was in the claims file directly or whether it was just deposition testimony, but he

discussed how his wife Molly was, they had to aid, you know, she had to help him with bathing activities, with bathroom activities and with several different things, which would be part of the, you know, normal activities of daily living.

So it was discussed, but I can't remember if it was in the claim file or the deposition testimony.

**Q Based on your review of the claim file, did you see any doctor's recommendations in there for specific assistance that needed to be rendered to Mr. Garver once he returned?**

A I don't remember it, no.

**Q Would you agree with me that if there was absolutely no evidence in the claim file regarding Mr. Garver's inability to perform activities of daily living, the catastrophic disability rider is not applicable?**

A No.

MR. MANN: Object as to form.

**Q (By Ms. Kersting) Would you agree with me that once Mr. Garver in January of 2018 started commuting to Salina several days a week, driving himself and staying away from his wife at his in-laws' house, the catastrophic disability**

Page 133

rider would no longer be applicable if it ever was?

MR. MANN: Object as to form. Object as to form.

A No, I don't -- I read this, but I'm sort of under the general impression if the catastrophic rider was enacted for any period of time, that it would stay enacted. But that's what I believe I read, something similar to that, but I'm not, I'm not absolutely sure about that.

Q (By Ms. Kersting) You believe you read that on the rider, that once approved, it is approved forever?

A I scanned the rider and looked at it, and I think that's -- I don't think that, I think once it's a catastrophic, it's catastrophic, yeah, but I'm not, I'm not absolutely positive on how long it lasts.

Q Do you not believe that the proof of loss requirements apply to the catastrophic disability rider?

MR. MANN: Object as to form.

A Well, if you have a company's failure to investigate the possibility, then it may not have been in the proof of loss.

Page 134

Q (By Ms. Kersting) Is Principal Life also required to investigate riders on this policy without any indication in the claim file based on your opinion?

MR. MANN: Object as to form.

A Given the severity of the injury, it wouldn't take much of a stretch of imagination to realize that he was severely impacted, and those, you know, attributes of daily living would have been impacted. Just, just reading the severity of the injury would give you that.

Q (By Ms. Kersting) That wasn't my question at all. I asked you --

A Okay.

Q -- if Principal Life had the duty to investigate other riders that were attached to the policy without any indication of their applicability in the claim file.

MR. MANN: Object as to form.

A I think I'll let my answer stand. Given the severity of the accident which was described in the claim form, even though it was specifically not called out that activities of daily living were impacted, the severity of the accident would have led any medical examiner

Page 135

looking at it to realize that there was a very strong possibility that they would in fact have been impacted.

Q (By Ms. Kersting) Again, you're not answering my question. Strike the answer as unresponsive.

I'm asking you whether Principal Life had the duty to investigate all other riders attached to the policy even though there was no indication of the applicability in the claim file.

MR. MANN: Object as to the form, argumentative.

A In reading the severity of the accident from the physician's report, even though they may not have specifically indicated what activities of daily living were infected, affected, not infected, the severity was so substantial that one would have to assume that they were if they had basic medical training at all in reviewing the app or the claim.

Q (By Ms. Kersting) Again, you're not answering my question at all.

I'm talking about riders being attached to the policy, whether they're applicable. If you don't want to answer my question, we will certify

Page 136

this question, and we'll take it up with the Court.

A I did answer your question.

Q You're being evasive. No, you're not answering my question.

MR. MANN: Object as to form.

Q (By Ms. Kersting) You're always going back to the catastrophic disability rider. I'm asking you whether there's a duty of an insurance company, in this case Principal Life, to investigate the applicability of riders if there's no indication given in the claim file. It's a general question.

MR. MANN: Object as to form. Object as to form.

A I don't know how to answer the question any other way other than to say if you were reading the form, looking at the severity of the accident, so let's, so let's say that somebody was involved in an accident and was totally paralyzed from the waist down.

Q (By Ms. Kersting) Again, you're entirely evasive. That's not the answer. Let's strike the answer and certify the question.

A I am not evasive.

Page 137

Q You are evasive.
A I am answering your question.
Q Let the record reflect Mr. Anderson is refusing to answer my question. We can move on.
MR. MANN: Object as to form. Object as to these comments on the record.
Q (By Ms. Kersting) Do you realize that Mr. Garver was in the hospital for eight days?
A I remember reading that, yes.
Q And do you realize that Mrs. Garver testified that within three to four months of his return home, she did not need to provide any further assistance?
MR. MANN: Object as to form, misstates the testimony.
A I believe it said less assistance than she normally had to do at the beginning, but still she needed to help him, but it wasn't as extensive as it was in the first several months.
Q (By Ms. Kersting) And you realize that as of January of 2018, he drove himself to Salina and started working; isn't that correct?
MR. MANN: Object as to form. Object as to form.
A Yes.

Page 138

MS. KERSTING: No further questions.
MR. MANN: I just have a few more unless Mr. Perry Brandt wants to --
MR. BRANDT: No. I've got nothing.

EXAMINATION

QUESTIONS BY MR. MANN:
Q Okay. Let me ask, let me just ask these in this one area.
Mr. Anderson, you've seen statements of income by Mr. Garver at or around the time the policy was obtained?
A I'm sorry. You broke up through that question. I didn't hear the whole thing.
Q Yes, sir. You have seen statements of income, Mr. Garver's income, at or around the time the policy was obtained, the disability insurance policy from Principal?
A Yes. I saw them, but I probably focused on their income tax returns and things like that. I didn't look at those in detail.
But I saw numbers for I think it was 2016, '15, or 2015, 2014, 2013 years of what the income was. But I didn't, I didn't study the backup

Page 139

material in any detail.
Q Based on that stated income that you just described, in your understanding of obtaining disability insurance policies, did Mr. Garver state sufficient income such that he typically would qualify for $7,000 a month in disability insurance benefits?
A Yeah. Particularly if you use, if you use the most current year, 215,000. Yeah, for normal, for normal underwriting purposes, you know, that, that most recent year of 2015 would have, would have qualified for $7,000 a month, yes.
MR. MANN: I have no further questions. Thank you.
MR. BRANDT: Nothing here.
MS. KERSTING: I have further questions. Yeah, Perry, go.
MR. BRANDT: No, nothing. I'm good.

EXAMINATION

QUESTIONS BY MS. KERSTING:
Q Are you familiar with Principal life's underwriting guidelines?
MR. MANN: Vague and ambiguous,

Page 140

object as to form.
A You know, I took Mr. Mann's question to mean in general would he have qualified for that amount of income.
And the answer to your question specifically is no, I did not read Principal's underwriting guidelines.
Q (By Ms. Kersting) And you're not familiar with them either, are you?
A They weren't provided. No.
Q And you have never underwritten any Principal life insurance products, have you?
A No.
MS. KERSTING: No further questions.
THE VIDEOGRAPHER: This concludes the video recorded deposition of Robert Anderson at 11:55 a.m. We're off the record.
THE REPORTER: Would you like the witness to read and sign?
MR. MANN: Yes, please.
(The witness was excused, and the deposition ended at 11:55 a.m.)

CERTIFICATE OF REPORTER

I, Saundra Tippins, Certified Court Reporter (Missouri) and Certified Shorthand Reporter (Kansas), do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me pursuant to Section 492.010 RSMo; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Certified Court Reporter
Within and for the State of Missouri

ALARIS LITIGATION SERVICES

August 10, 2020

MR. LAWRENCE MANN
BOURHIS LAW GROUP
1808 Wedemeyer Street, Suite 214
San Francisco, California 94129

IN RE: ROBERT P. GARVER v. PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES, INC., and DUANE ROTH

Dear Mr. Mann,

Please find enclosed your copies of the deposition of ROBERT ANDERSON taken on July 29, 2020 in the above-referenced case. Also enclosed is the original signature page and errata sheets.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and notarized signature page within 30 days to our office at 711 N 11th Street, St. Louis, MO 63101 for filing.

Sincerely,

Saundra Tippins

ERRATA SHEET

Witness Name: ROBERT ANDERSON
Case Name: ROBERT P. GARVER v. PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES, INC., and DUANE ROTH
Date Taken: JULY 29, 2020

Page #_____ Line #_____
Should read: ______________________________
Reason for change: ______________________________

Page #_____ Line #_____
Should read: ______________________________
Reason for change: ______________________________

Page #_____ Line #_____
Should read: ______________________________
Reason for change: ______________________________

Page #_____ Line #_____
Should read: ______________________________
Reason for change: ______________________________

Page #_____ Line #_____
Should read: ______________________________
Reason for change: ______________________________

Witness Signature: ______________________________

STATE OF ________________)

COUNTY OF ________________)

I, ROBERT ANDERSON, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ______ day of ________________, 20____, at ____________________________.

____________________________
ROBERT ANDERSON

____________________________
NOTARY PUBLIC

My Commission Expires:
94673

A

a.m 1:13 5:11 58:13,15 97:20,23 140:18,23
ability 141:8
able 17:4 21:1 62:21 67:10,15 87:18 106:11 115:13,17 129:7
above-identifi... 68:15
above-refere... 142:9
absent 65:12 72:5
absolutely 57:3 132:15 133:10 133:17
accept 121:25
acceptable 79:3
acceptance 68:14
accepted 68:17
access 119:11
accident 51:21 127:15 134:21 134:25 135:14 136:19,20
accrue 122:4
accuracy 34:8 36:21 102:6
accurate 32:1 35:10 40:21 42:2,5 67:7 68:6
acknowledge 72:14
acknowledged 74:2
acknowledges 6:15,18 73:6
acknowledging 72:9
acknowledgm... 72:13
acquisitions 11:25 12:3
act 128:23
acting 36:6 78:11
action 141:11,15
actively 75:9,13
activities 66:2 85:7 100:7 107:17 108:22 111:15 126:10 126:20 131:22 132:3,3,5,17 134:23 135:16
actual 60:15 63:25 66:11 67:19 69:1 73:13 84:10,15 102:22 115:23
add 46:20,21 54:22 59:5 76:23
addition 108:8
additional 38:10 54:5 89:19 92:7 125:8,14 125:21
address 9:3
adjust 54:12
adjusted 68:15
adjustment 53:6 65:4 91:4
administering 6:19
administrative 18:14,19 19:11
adopted 128:24
advance 102:5 102:15
advised 54:7
affect 96:20
affiliated 57:13
afternoon 3:12
age 7:9 61:15
agency 10:21 11:18 12:13 129:22 130:5 131:2,5,5
agent 15:4,11,13 16:18 44:11 51:10 70:16 71:1,8,18 85:22 102:16 108:15
agents 16:18 59:2
ago 13:16 33:25 34:2
agree 43:17 70:15 81:18 86:9 89:6 106:7 107:11 132:14,21
agreeable 95:9
agreed 5:1 57:11
agreeing 106:3
agreement 6:23
ahead 26:22 33:9,10 81:24 113:6
aid 132:1
al 5:14
Alaris 4:18,22 5:19 110:12 142:1
allegations 28:22 30:14 31:23 34:9 39:1 41:11
alleged 55:7
allowed 12:23 45:23
altogether 15:4 39:4
ambiguous 139:25
amended 27:9 27:21 28:15,17 28:18,21 30:12 31:22 32:11,12 34:9 39:1 41:11 47:7 64:1 68:21
amendment 68:14
amendments 68:18
amount 52:23 68:19 69:19 70:7 89:16 96:20 106:21 125:3 140:4
amounts 93:17
amputated 127:7
analogies 51:21
analogy 52:7 83:2
analysis 44:22 50:18
analyze 24:5,17 24:19 25:8,10 44:23
analyzed 25:3
and/or 87:24 142:13 144:7
Anderson 1:8 3:9 5:4,12 7:8 7:14 11:18,18 14:1 17:14 28:12 55:22 58:16 98:1 126:6 137:3 138:11 140:17 142:9 143:1 144:4,19
Angeles 10:25
ankles 127:7
Ann 19:12 20:10
annual 60:9
answer 14:17 34:11 40:14 134:20 135:5 135:25 136:3 136:16,23,24 137:4 140:5
answered 8:9 113:10
answering 135:5,22 136:5 137:2
answers 8:12 70:22 102:21 102:22,25 104:9
any-occ 96:19
anybody 24:7 26:11 75:4
anyway 11:17 111:6
Aon 11:20,21,24 12:7,10,17
apologize 31:7
app 135:20
apparently 97:12
appearing 3:13 6:13
appears 34:6 58:21 59:6,9 141:5
appendix 18:7 23:2,5
applicability 134:18 135:10 136:11
applicable 68:16 90:1 93:16 132:18 133:1 135:24
applicant 37:1
application 32:20 36:4,14 36:15,17,20 36:22 37:1,7 37:10 45:1 46:18 47:20 47:21,22 48:1 48:18 64:1,8 66:25 67:11 68:5,8,20 69:6 70:24 71:5 73:23 85:16,21 86:11 86:12 98:11,25

99:5 100:23 101:21,21 102:2,7,8,11,15 102:17,24,25 103:3 104:6,15 104:19 109:3 109:19 117:10 118:13
applications 67:6 70:23 81:1 101:16
applied 65:9 96:12 117:12 120:22
applies 91:10 129:4
apply 90:12 133:20
applying 48:2 64:15,19 127:13 128:2
appreciate 91:19
apprised 125:11
appropriate 60:16
appropriately 93:20
approved 121:18 121:22 133:12 133:13
approximately 18:24 20:1
area 13:7 49:15 138:10
argumentative 135:12
arises 34:15
arrangement 6:21
arrears 38:12 122:8,11
article 26:3,8 26:23 27:1,2 27:17
articles 26:13,13 27:19 30:10 115:2,19 117:15
aside 58:17
asked 18:2 36:5 55:25 56:9 56:23 79:20 102:20 107:21 109:13,16,17 109:20 113:8 114:8,15 129:16 134:13
asking 28:4 62:13 110:24 111:1 112:18,21 114:6 135:7 136:9
aspects 50:15 129:9
assignments 13:15 14:23
assistance 132:11 137:13 137:16
assistant 17:4 19:12 22:4
associates 18:14 18:18
Association 128:22
assume 8:9 37:21 39:10 39:24 51:15 74:13,14,22 77:7 135:18
assumed 12:14 43:24 92:15 107:2,16
assuming 63:9 96:14
assumption 108:20
asterisk 52:14
attach 65:10
attached 2:24 21:20 25:19 27:19 30:23 46:25 115:2 134:16 135:8 135:23
attempting 97:10
attended 9:10 9:12
attending 6:13
attention 21:6 58:18
attest 36:13
attesting 36:21
attorney 141:13
attorneys 5:21
attributes 134:9
audible 8:12
August 92:12 142:2
authority 70:14 70:17
available 111:15 112:16 119:6 121:3 129:2
aware 45:15,24 47:4 49:16 52:19,23 53:13 57:16,18 58:2 85:23 86:1 109:11,18 125:7 126:6,14

B

B 23:5,8 25:24 65:25 76:9 100:3 101:20 103:17 104:10 105:23 106:7
back 12:25 13:21 15:9 25:16 27:22 28:16 32:14 36:10 39:4 52:13,14 54:8 58:14 60:2,20 63:5,18 64:7 75:18,24 82:4 90:16 91:3 92:23,24 97:22 105:8 115:19 116:17 117:3,5,15,18 117:22 118:4 118:24,25 136:8
backed 50:12
background 9:7 9:9 20:21
backgrounds 14:25
backup 138:25
bad 48:6 131:12
base 30:12 89:15
based 37:5 60:17 72:15 87:21 88:10 90:2 93:5,23 106:16,18 107:18 112:23 126:13 131:18 132:9 134:4 139:2
basic 40:6 135:19
basically 10:23 11:17,23 19:20 24:13 26:16 46:23 88:21 88:23 111:14 115:11,21 116:11 117:11 127:14
basis 22:1 31:21 37:13 87:25 93:9
Bates 2:11 17:9 17:12 18:6 21:6 31:18 40:25 59:19 60:2,21 61:10 62:15 65:16 66:17 70:12 74:7 75:25
bathing 132:2
bathroom 132:3
Beach 8:23 9:4 44:5
beans 97:6
bear 12:7
becoming 11:9
began 1:13 42:10,15 43:8 78:15
beginning 2:11 12:25 137:17
behalf 1:9 7:10 29:18,22 57:12 67:9
belief 83:25
believe 7:18 19:11 24:8 29:15,24 30:6 31:24 39:9 40:20 45:8 46:8 51:22 52:8 57:10 71:17 83:15 85:19 86:25 108:9 114:23 116:16 120:5 133:9,11,19 137:16
belt 112:4
benefit 38:22 53:17 54:2,19 55:1,13,24 59:23 61:11,17 62:17,25 65:1 65:2,5 68:20 70:8 78:17 82:10 88:8 89:15,17 91:5 93:17 106:21 115:17 119:1 125:3
benefits 38:4,12 38:22 40:10 41:6 54:13 56:24 57:7 58:6 61:13,14 63:6,18 75:20 78:19,20 79:4 80:10,18,20 81:2,10,20,23

82:12 87:21 88:10 93:5,19 94:12 96:1,6,7 96:21 97:1 116:18,25 122:3,8,14,19 124:5,22 125:4,9,14,18 125:21 126:11 139:7
Bermuda 129:25
best 8:16,17 19:4 141:8
better 11:3 17:5
beyond 87:4
big 33:21 44:12
bit 20:21 34:15 76:24
blended 69:11
blow 23:15
blur 77:14
blurring 77:15
bold 61:20
book 26:17
Boston 26:14 27:7
bottom 17:8 64:25 65:17 70:3 72:8,20 74:8 75:25 78:9 95:8 103:11
bought 43:4 79:19
Bourhis 4:3 15:20,21 16:6 16:11 17:14,15 19:12,18,21 20:12 26:11 27:13 28:14 29:1 142:3
box 24:25 25:2 25:3 45:4 46:17 47:10,17 48:9,17 49:7 64:16 65:1,3,4 65:15 81:1 116:3 118:11 119:15,16
boxes 46:17
boy 90:24
brain 32:5
Brandt 2:2 4:12 6:3,3 7:6,6,12 7:14,15 10:15 19:8 28:2,6,9 28:11 30:17 34:11 36:16 37:16,23 39:12 40:14 42:7 43:2,18 47:15,25 48:5 48:10,21,22 49:2 53:5 54:21 55:15,21 56:6,15,21 58:4,16,21 61:9 62:8 63:9,24 66:16 68:3,12 69:18 70:2 71:13 72:7,12,25 73:6,12 74:6 75:24 76:19 77:24 79:18 79:24 80:9,13 80:24 81:6 82:5,16,23 84:9 85:25 86:8,17 87:17 88:15,19 89:1 89:9 91:1,12,17 91:24 93:3 94:8,11,15,21 95:17 96:14 97:5,13 114:22 122:24 124:8 128:5 138:4,5 139:16,19
Brandt's 101:1
breached 45:17 48:16 49:8
break 58:11 97:18
brief 20:11
briefly 8:2 10:17
bring 12:2,6 129:4
broad 50:20
broader 47:1 51:9,12 71:18
broke 48:10 82:4 124:25 138:14
broken 127:5,6
broker 11:9 15:4 15:7,11,13 16:14 22:3 44:11,25 45:14 51:10 70:16 71:1,18 90:21 108:10 108:12
brokerage 11:7 23:23 57:13
brokerages 13:13
brokers 11:11,19 22:11,12,18 59:2 67:9,21 131:14
Bryan 4:13 6:4
building 83:9 85:10
bunch 74:24 98:6 127:8
burger 52:2
burgers 52:5 83:3 116:8
business 13:18 14:21 24:3,17 25:1,8 37:8 61:4 65:24 85:2 87:11 93:15 99:23 118:9
businesses 50:18
buys 110:22

C

C 4:1 21:20 23:8 25:25 66:2 68:21 100:6 103:13 104:9 104:10,14,15,17 104:19
calculate 87:20 93:4 125:3
calculation 87:23 93:7
California 4:4 9:1 44:6 129:24 142:4
call 20:6 40:16 40:17,21 98:23 115:25 118:15
called 11:18 14:1 62:16 74:8 78:9 102:1 103:17 118:11 134:23
calls 45:10 115:25
canceled 80:20
candidly 68:7
capable 115:13
capacity 11:22 69:25
caption 77:1,2
captive 16:18
captured 117:16
care 15:5,11,14 16:15 43:25 44:11 45:16,17 46:6 48:16 49:9 126:24 127:1,20 128:10,12,14,15 128:16,25
career 13:19 46:11
careful 44:16 77:10
carpentry 66:10 85:9 86:2 111:19
carrier 16:20 60:15 87:13 123:17 129:3
carriers 15:6 22:11 123:8 130:25
case 1:4 3:4 5:14 7:18 16:5 19:21 20:18,20 20:22 27:14 28:25 29:1,17 29:25 30:9 31:13 34:13,15 39:8 44:15 45:8 47:21 59:11 71:25 80:3 101:20 101:25 107:5 109:25 110:7 111:17 112:24 113:20 114:23 119:9,10 122:14,18 124:4,10,23 136:10 142:9 143:2
cases 16:2,7,15 16:16,19 127:23
Casualty 11:14
catastrophic 65:2 79:25 126:8,19 127:12 132:17 132:25 133:7 133:16,16,20 136:8
catastrophically 80:1
catch 103:22
categories 99:2
category 67:10 108:18,19
caught 14:16 110:3
cause 3:16
Cave 4:13 6:4

cc 110:19,25
CCR 1:11
cell 33:22
certain 3:16
   56:12 67:9
   75:8 123:3
   124:19
certainly 20:5
   27:15 43:14
   75:2 87:1
   101:17 102:8
   117:21
certainty 62:6
CERTIFICATE
   141:1
certifications
   131:8
Certified 3:14
   6:10 141:2,3,21
certify 135:25
   136:24 141:4
   144:4
cetera 87:14
chairs 11:4
chance 34:25
   39:7
change 40:1,5
   40:11 42:3
   60:24 70:18
   71:9 81:11
   101:11 108:25
   112:10,19,25
   113:2,14 143:7
   143:11,15,19,23
changed 37:9
   37:14 101:2
   107:20,25
   108:4 116:11
changes 142:13
   144:6,9
changing
   115:24
characterizati...
   122:1
charged 37:18
   68:5
Chartered 11:14

check 31:25
   46:16 116:3
checked 24:25
   25:1,3 46:18
   47:9 48:9,17
   64:16 65:2,3,4
   65:15 81:1
   118:12 119:15
   119:16
checking 42:25
   45:4 47:16
checklist 24:4
   25:2
Chicago 4:9
   98:3
Chubb 11:2
cite 44:15
City 4:14,19,23
claim 45:6 49:8
   52:20 67:1
   78:9,10,14,16
   78:22 79:6
   84:2,15 86:12
   87:3,7,12 92:5
   92:7 95:25
   96:2 98:12
   100:24,25
   109:4,13,20
   109:25 110:6
   123:13 127:24
   129:7 130:1
   132:7,9,15
   134:3,18,22
   135:10,20
   136:12
Claimant 123:17
claiming 55:1
   79:2 120:20
claims 79:10
   126:14 129:12
   129:19,21
   130:12,22
   131:2,6,9,19,21
   131:24
Claremont 9:10
   9:11,16,17
clarification

28:10
clarify 45:7
class 107:7,13,14
classification
   83:17 107:13
   107:18,20,25
   108:4
classifications
   107:15
clause 129:4
cleaned 17:4
clear 28:3 33:12
   90:15 91:3
   94:16,18 95:13
   112:22
clearly 117:5
client 59:3,3,11
   59:11 62:9
   68:4 79:19
client's 47:21
   68:5
clients 44:25
   45:2 50:11
   59:8
climbed 113:21
closer 69:9
closest 83:18
CLU 72:3
collect 115:17
   118:3 119:1
collected 27:5
collecting 12:16
college 9:11,12
   10:20
color 22:22,23
   22:25
come 13:9
   26:13 51:11
   52:13,14 60:6
   69:8
comes 24:25
commencing
   53:14
comment 47:1
comments
   137:6
commercial

129:23
Commission
   144:23
Commissioners
   128:22
common 35:5
   56:15 59:1
   77:16 78:1
   116:13 117:13
commonly 11:15
   35:6 118:8
   119:21
communicated
   127:16
community 11:7
commuting
   132:23
comp 130:11
   131:20
companies 1:6
   3:6,19 6:5 7:17
   11:1 13:13 22:9
   24:1,16,25
   25:7,19 29:18
   29:23 41:2
   42:9 48:8
   130:16,20
   142:6 143:2
Companies'
   25:13
company 5:14
   6:2 9:24 11:3
   11:20 30:1
   36:24 38:2,3
   42:11 43:1,4,9
   44:13 56:18
   68:16 71:4
   81:13 98:4
   110:22,23
   127:21 130:15
   136:10
company's
   70:20,21
   127:22 128:18
   133:23
compare 22:6
   93:17

comparing 22:8
comparison
   22:18
compensation
   130:10
competent 79:6
complain 49:3
complaining
   48:23
complaint 19:25
   20:24,25 21:1
   27:9 28:21,21
   30:13 31:22
   32:11 41:11
   47:7,14
complaints
   28:18 32:14
complete 70:22
   87:23 93:6
   104:9
completed 16:1
   38:5 87:7
   100:24
completely
   52:17 67:17
completion
   104:2,6
complexity 51:2
Compliant
   28:15 32:12
   34:9 39:2
complicated
   71:19
computer 32:4
   32:5 84:12
concept 101:15
   107:11
concern 81:10
   81:18
concerning
   34:17 79:9
conclude 77:2
concludes
   140:16
conclusion
   67:14
conclusions

43:23
conducted 126:17
confidence 33:24
confused 113:7
confusing 72:2 90:23
confusion 71:24
connections 12:2
consent 6:21
Consequently 96:2
considerable 81:10
considered 71:3
consists 111:7
console 72:5
construction 35:25 65:25 66:11 99:25 111:10,23
consulting 13:12 13:14 14:10
contacted 19:9
contained 10:16 129:14
content 111:1
context 20:18
continuation 87:7
continue 61:14 92:5 116:18 117:6 118:3,25
continued 120:4
continues 38:1 44:21 111:17
continuously 114:10
contract 70:19
contractor 65:20 111:11
controls 61:5
conversation 19:16 20:2,12 20:18 43:11 108:8,17
conversations 43:16 83:12 120:25
cooperate 56:7 56:17 79:9,21 80:5 123:8
cooperation 94:5
coordinate 66:4 99:19 100:10
coordinating 111:8
copies 2:25 142:8
copy 23:1 32:19 73:7,22 142:12
correct 8:23,24 9:1,2 14:8 16:24,25 17:16 17:17,24 18:3,4 18:9 21:10,11 21:15,16 24:24 25:5,14,20,21 26:1,11 27:2,3 27:11 28:22 30:15 31:5,19 32:9,16 34:5 34:24 35:11,15 36:17,18 37:2 37:18 38:9 41:9,17,18 42:13 43:4,12 43:20,21 44:6 44:7,19 46:4,7 46:8,12,19,20 47:10,18,19,22 48:4 53:7,8,18 53:19,20 54:3 54:10,11,15,16 54:21 55:15,17 56:3,5,10,13 56:19 57:1,8 57:24 58:8,9 58:24,25 59:12,13,21,24 60:4,10,11,19 61:6,7 62:3,10 63:6,8,12,13 63:19,20 64:8 64:9,12,16,17 64:23 65:6,7 65:11 66:11,13 66:21 67:12,12 68:9,25 69:3 69:15,20 70:8 70:9,10,11 71:10,12,15 72:6,9,20,21 72:25 73:3,4 73:8,15 74:2,9 74:20 75:16 76:2,16,18 79:15,16,22 79:24,25 80:6,10,11,21 80:23 81:3,6 81:8 82:1,13,18 84:6 85:2,3,4 85:17,19 86:3 86:20,21 88:2 88:12,13,17 89:3,12,21 90:10,13,14,19 90:24 91:5,14 91:15 92:1,24 93:2 94:5,6,8 94:9,12,13,16 94:25 95:20 95:21 96:8,16 96:17,22,23 97:2,4,6 99:4 99:13 100:1,2 100:5,12,13,20 101:23 102:2 103:9,18 104:2 104:12,13,24 104:25 105:6 105:10 106:1 107:9 109:5,8 109:8,9 113:16 113:17,22 114:3 119:18 120:22 121:6 122:8,21 123:5,18,19,24 124:1,6,7,10,11 124:15,23 125:4,18,19,22 125:23 126:12 129:18 137:22 144:8,12
corrections 142:13
correctly 34:22 35:22 38:8,23 41:8 42:12 44:3 45:7,19 61:1,23 63:2 65:21 66:7 67:3 68:24 71:6 72:17 75:15 76:11 79:12 85:13 87:9 88:1 89:20 90:8 92:20 93:25 95:11 96:3 99:12
cost 53:6 65:3 111:24
counsel 5:2,2 6:15,18,20,23 10:13 58:19 63:22 73:10 82:21 86:15 89:7 91:22 94:19 95:15 99:7 110:13 116:21 141:10 141:13
counting 16:5
country 111:22
County 8:25 144:2
couple 11:21 20:8 29:6 32:13,22 42:20 51:24 98:4 111:24 112:14 115:1
course 106:23 113:9
court 1:1 3:1,15 3:17 4:16 5:16 6:7,10 21:13 28:22 67:2 82:3 136:2 141:2,21
coverage 24:18 25:9 34:16,21 35:17 37:17,20 37:21,22 41:4 42:8 44:23 45:5,11 49:13 49:22,24 50:3,16 51:13 51:23 52:9 61:11 68:9 69:19 109:20 116:1,5,6,6 118:15 119:21 119:24 120:6,7 120:22 127:10 129:1,8 130:7 130:19
coverages 44:23 64:15
covered 41:12 84:1
CPCU 11:15
create 24:18 25:9 44:24
created 11:22 115:21
current 24:17 25:9 46:23 65:23 92:16 93:12 99:16,21 139:9
currently 44:24
customary 36:19 87:11
cut 57:7 58:6 80:10 96:25

D

daily 126:10,21
131:22 132:5
132:17 134:9
134:24 135:16
dangerous
83:14
dash 90:5
date 5:10 17:22
29:20 30:4
30:20 33:18
54:4 78:15,22
79:4 84:25
93:22 95:23
143:3
dated 16:24
17:15 28:13
29:3 33:15
59:15 66:19
73:18 84:19
86:19,20 89:11
91:25 94:23
95:4,19 110:16
dates 38:14
daughter 10:7
day 3:10,13
10:20 18:13,13
86:6 96:20
112:5 144:13
days 17:23 20:8
32:22 39:16
78:15,25 87:1
89:19 94:24
95:6 132:23
137:8 142:18
deadlines 111:12
111:19
dealing 128:18
Dear 92:3
95:22 142:7
decades 118:9
December
53:17
decision 57:5,7
57:23 58:6
60:16 69:13,14
69:19 82:17
93:23

decision-maker
58:5
deck 85:10
declare 144:11
deep 51:13
deeper 30:18
Defendant 4:6
6:2,4 30:1
Defendant's
32:11
Defendants 1:7
1:9 3:7,20 4:11
5:3 6:5 7:10,17
15:16
defined 62:2
defines 75:6
definitely 36:13
107:22 126:25
definition 46:22
61:18 63:15
74:24,25 76:1
76:4,25 83:19
118:10
definitions 45:8
74:9,25
degree 9:14,17
13:2
deliberate 77:14
delivered 72:15
delivery 72:14
demonstrates
102:1
denied 37:17
39:11 41:22
56:24 79:5
denies 39:25
deny 57:21
124:5
denying 37:20
96:2
depend 45:9
dependent
129:6
depends 69:4
deposed 7:21
deposes 7:10
deposition 1:8

1:13 3:9 5:3,12
5:17 6:11 14:9
28:4,5 39:8,17
41:19 50:13,21
50:24 100:15
100:18 101:6
101:19 112:24
113:3,11,12
114:16,19
126:15,16,16
131:25 132:7
140:17,23
141:5,11 142:8
144:5,7,10
depositions
29:6,14 30:23
30:25 38:9
110:3
derogatively
11:15
describe 36:5
85:7
described
100:19 118:23
134:22 139:3
describing
71:22
description 2:10
25:6 31:14
34:14 60:23
85:15 86:10
98:16 109:2,4
descriptions
116:9
design 50:22
50:22 51:17
desired 142:14
despite 38:20
detail 10:18
22:15 24:5
31:5 34:15
35:19 41:14
117:16 138:22
139:1
detailed 48:25
determination
106:11

determine 60:5
70:18 93:19
95:25
determined
67:2 106:21
107:1 120:2,3
developed 59:7
59:9 128:23
develops
110:23
deviates 45:12
71:21
deviation 45:15
dial 10:12 31:9
DICKER 4:8
difference 50:1
77:3,12 78:5
117:25 120:8
differences
49:17
different 10:25
13:6,14 24:2
40:19 85:15
86:11,14 98:17
99:2 104:18
105:24,25
106:7,13 107:7
115:24 117:11
118:10 129:23
132:4
differing 54:23
differs 109:3
difficult 83:17
difficulties
127:15
dig 30:17
direct 16:17
58:18 129:7
directed 104:2
direction 141:9
directly 27:6
102:20 108:14
130:5,18 131:13
131:24
dis 51:20
disability 20:20
22:3 23:24

24:10,19 25:10
34:16,19 35:9
36:4 38:4,22
40:10 41:6
45:9 49:18
51:10,18 52:21
52:24,25
54:2,10,13,14
54:15,19 55:13
55:23 56:9
58:22 60:3,14
60:17 61:16,19
62:3,17 63:6
63:16,17 64:16
64:20,22
65:2,5,9
68:20 70:8
73:14 75:10,14
75:20 76:1,5
76:14 77:9
78:15 79:2
83:10 84:25
85:8 87:13
88:4,5 90:7,19
91:9 93:14
96:6 103:2
106:20 122:3
122:19,20
126:7 130:12
130:15,19
132:18,25
133:21 136:8
138:18 139:4,6
disabled 38:19
61:12,15 62:18
75:18 88:7
117:19,19
disagree 47:13
disagreement
96:11
discharge 70:19
disclosed 70:7
107:8
discrepancy
98:11
discussed
65:14 96:25

118:12 121:3 132:1,6
discussion 115:22
discussions 57:16 120:10
dispute 34:16
disputing 84:4
distinct 20:19
distinction 47:24
distinguish 75:4
District 1:1,1 3:1,1 3:17,17 5:16,16
dive 51:13
diverse 12:7
divisions 11:24
docs 32:10
doctor 87:19
doctor's 132:10
document 26:23,24 27:12 28:14 30:11 31:8,9 59:14 60:2,6 60:7 61:25 64:2 73:17 74:1 84:17 86:22 95:2 110:8 111:3
documents 21:9 25:17 26:2 27:25 29:2,4 29:16,19,22 30:2,20,24 32:10,17,23 33:2 34:3,4 40:7,24 41:13 48:14 55:16 73:21 98:7,7,8 109:25 125:2
doing 6:20 13:22 24:9 25:23 35:25 42:23 57:20 86:2 102:18 112:7 114:11
117:24 118:4 131:2
dollars 82:10 92:18
double-check 27:23 28:17 29:7 39:13
downloaded 25:20
drafting 46:14
driving 132:24
drop 90:4 95:7
drove 137:21
Duane 1:6 3:6 3:20 6:5 7:17 29:18 31:1 41:2 142:6 143:3
due 19:12 62:20 76:6 85:11 90:6,18 91:9
duly 141:6
duties 61:5,21 62:23 64:11 76:9 84:22 85:7 86:10 98:14,17 109:2 118:2
duty 45:17 84:24 123:8 123:10,12,17 127:23 134:15 135:8 136:9

E

E 4:1,1
earlier 14:16 20:7 32:9 65:14 69:7 70:1 76:24 96:25 112:18
earliest 12:9
early 12:8,15 14:10
earning 69:25 93:5
earnings 62:20 87:20,21,24
88:11,12 90:6 90:18 91:9 93:6,10,18
easy 92:5
EDELMAN 4:8
edge 14:1,2 17:14
Edna 4:7 6:1 7:4 98:2,23,24
edna.kersting... 4:10
educated 77:8
educational 9:7 9:9
effect 97:9
eight 13:14 74:18 103:13 103:21,24 105:2,13 127:5 137:8
EISLER 4:8
either 27:6 51:21 91:3 140:9
elaborate 114:24
electrical 13:1
electronically 2:25
eligibility 87:4 96:1
eligible 54:25
elimination 38:5,6 61:14 89:17
Elser 98:2
email 38:3 89:10 91:13 92:9 94:22 110:15
employed 42:21 119:4 141:10,13
employee 38:16 141:13
employer 75:8
employment
10:19 65:24 99:16,21
enacted 133:7,8
enclosed 87:6 142:8,9
ended 11:13 21:24 32:16 38:6 69:10 140:23
engaged 14:6,8 14:13,19 16:6 16:10 66:10 107:6,8
engagement 14:14 17:18 20:3 21:2
engagements 15:23,24
engaging 19:9
engineer 9:15
engineering 9:14 13:2
enjoy 13:23
ensure 93:9
entered 13:16
enterprises 129:23
entire 13:18 51:2 111:22 123:13
entirely 136:23
entitled 36:25 94:4
Erica 22:4
errata 142:10,14 142:17 143:1
error 46:14
errors 130:24
essentially 9:19 27:24
established 62:5 80:14
estate 50:15
estimate 19:6
estimation 67:13
et 5:14 87:14
ethical 77:22
evaluate 95:25
evasive 136:4 136:23,25 137:1
event 44:18 70:2 86:8 91:12 126:13,17
eventually 125:12
everybody 24:8 116:4 118:13
evidence 131:21 132:15
evidenced 23:23
evolved 118:9
exact 54:4 57:10 101:8
exactly 43:15 53:5 67:12 108:24 109:15 111:16 124:9 125:20 129:11 130:4
examination 6:12 7:11 97:24 126:4 128:8 138:7 139:21
examined 3:10 7:9
examiner 70:17 71:2 130:12 134:25
example 12:5
Excel 21:19,20 21:21,25 23:5 25:23
exception 79:5
excess 29:2 30:2
excuse 18:7 31:8 39:12,18 39:18 78:8 84:11 98:19
excused 140:22
executed 17:19

144:13
executive 9:25
 10:4
exhibit 2:10,12
 2:13,14,15,16
 2:17,18,19,20
 2:21,22,23
 10:12,14 16:23
 18:6 21:5,20
 22:21 23:11
 25:16,19,24
 25:25 58:18
 58:20 63:23
 63:25 73:11,13
 82:22 86:16
 89:8 91:23
 94:20 95:16
 99:5,8 100:25
 101:1,24 103:1
 110:10,14
 116:19,22
exhibits 2:9,24
 30:23 69:6
 71:21
expand 27:18
expenses 18:8
expensive
 107:18
experience
 10:9 37:6
 60:12 67:5
 92:5 106:16,19
 129:20 131:18
expert 13:16,18
 13:25 21:13,15
 30:12 45:22
 46:11 49:11,15
 51:16 95:3
 105:17 121:8,11
 129:14 131:12
Expires 144:23
explain 45:2
 116:10,14 127:2
explained
 119:22 120:8
explicit 115:3
expressly 5:7

extensive 85:11
 137:18
extracted 46:23

F

fact 10:12 23:24
 24:9 35:13
 42:19 43:2,15
 47:4 48:16
 51:22 53:13
 54:1,17,23
 55:12 63:5,10
 68:3 70:25
 71:4,20 72:7
 76:23 81:22
 83:14 101:10
 101:19 107:5
 114:22 115:5
 117:17 124:9
 125:8,11 127:9
 135:2
factors 37:4
facts 31:19,22
factual 31:6
failed 45:3,3
failure 78:16
 133:23
fair 8:6 23:9
 30:7 128:17
 129:12,12
faith 128:18
 131:12,17
fall 126:23,25
falling 83:21
false 66:24,25
familiar 101:15
 139:23 140:9
family 10:21
 13:19
far 28:25 74:21
 89:6
fast 33:7
father-in-law
 92:14
features 119:5
February 16:24
 17:15,23,24

19:1,1 20:3
 25:20 28:13
 29:3,14,20
 30:5,21 33:15
 38:15 59:15
 64:3,7 73:18
 84:19 86:23
 95:4
federal 21:13
 28:22 45:22
fee 18:8
fees 18:7
fell 127:19
fewer 81:23
fifth 95:7
fight 81:24 82:11
figured 7:25
file 31:25 34:1
 109:25 110:6
 126:14 131:21
 131:24 132:7
 132:10,15
 134:3,18
 135:10 136:12
filed 28:21 79:11
 84:15
filing 142:19
fill 45:1
filled 36:10
 60:6 66:14
 102:4,15
finally 74:19
financial 95:10
financially
 141:14
find 22:3,5
 23:23,25
 24:6,8 32:3
 78:5 90:23
 127:23 129:1
 142:8
finding 49:12
fine 19:6 23:9
 106:15
fingers 127:7
finished 126:3
Firemen's 11:2

firm 13:25 15:20
 15:21 16:6,11
 17:2 19:12,18
 23:23 26:11
 27:13 28:15
 29:1 57:13
first 8:20 11:9
 21:19 27:9
 28:15 30:12
 32:12 34:9
 39:1 43:22
 49:10 52:10
 59:16,19 64:5
 64:15 74:23
 95:5 128:17
 137:19
fits 51:3 94:2
five 3:12 13:5
 27:8 31:9
 33:24 34:2
 58:10 99:15
flip 58:4 60:1
 74:16
flipper 52:2
flipping 52:5
 83:3 116:7
focused 138:21
fold 26:17
folders 32:19
 33:2,4
follow 111:12
 117:12
Followed 66:20
following 68:18
 71:25 78:12
 89:25
follows 61:19
font 104:18
 105:12,13,17
 105:23 106:7
 106:8
forced 115:6
 116:17 117:3
foregoing 141:5
 144:5,12
forenoon 3:12
forever 33:4

133:13
forget 129:10
form 30:16
 34:10 36:8
 37:12,19 40:13
 40:19 42:4,18
 43:13 47:11,23
 48:3,19,24
 50:8 53:2
 54:20 55:14
 55:19 56:4,11
 56:20 57:9
 57:25 61:8
 62:4 63:7,21
 66:12,14 68:1
 68:10,14 69:16
 69:21 71:11,16
 72:10,24 73:5
 73:9 74:5
 75:22 76:17
 76:22 79:17
 79:23 80:7,12
 80:22 81:4
 82:2,14,19
 84:7 85:18
 86:4,12,13
 87:7,15 88:14
 88:18,22 89:4
 90:20 91:6,16
 93:1 94:7 96:8
 96:9 97:3,7
 98:12 101:1
 102:13 105:16
 106:2,9,24
 107:10 109:4,5
 109:6,7,10,14
 109:21 112:12
 113:5,18,23
 120:15,24
 121:5,19,24
 123:11,20,25
 124:12,16,24
 125:5 132:20
 133:3,4,22
 134:5,19,22
 135:11 136:6,14
 136:15,18

137:5,14,23,24 140:1 144:6
forms 121:17 123:3
forth 13:13 32:14 36:10 39:4 83:5,9
forward 31:3 44:21 56:25 63:25 78:7 81:23 82:24 94:22 95:18
found 9:14 127:24
founded 11:17
four 11:4 26:25 31:8 32:14 39:4 79:9 99:15 103:16 103:17 137:11
framer 35:21 36:1,7 83:20
framing 37:8 66:10 84:1 85:1,9 86:2 107:6,8
Francisco 4:4 10:25 142:4
fraud 67:2
fraudulent 66:24,25
frequency 79:8
friend 13:17
front 30:8 63:11 63:14
fulfill 78:12
fulfilled 123:23
full 18:13 31:22 55:23 62:23 75:20 80:17 88:8 89:18 96:6,15
fully 79:9
functions 130:1
Fund 11:2
further 6:18 28:18 104:15 125:24 128:4 137:13 138:1 139:14,17 140:14 141:12
fuse 20:15
future 81:10,17 122:3

G

Gallo 26:4,23
game 77:21
gaps 49:13 51:13
Garcia 38:16,17 39:11,19,25 40:8 42:10 86:19 89:11 90:10 91:2 92:1 94:23 95:19 110:16
Garcia's 39:8,17
Garver 1:2 3:2 3:18 5:13 28:25 31:2 34:17,18 35:8 35:20,25 36:6,11 37:7 38:4,16,18 40:1,21 41:1,3 41:17 42:3,10 42:15 43:7,8,9 45:6 49:25 52:20 54:7,24 55:23,25 56:2,7,22,25 57:12 58:7,23 59:12 60:9 62:1 63:10 64:11 65:18 66:9 67:13 72:4,16 74:2 79:19 80:18 81:22 82:7 85:25 86:20 88:4,15 89:11 90:13 91:25 92:3,23 94:23 95:8,19,23 96:21 97:1 102:1 104:22 107:6 109:12 109:18 110:16 110:19,25 112:3,25 119:10 120:10 120:14,16 124:14 126:19 131:21 132:12 132:22 137:8 137:10 138:12 139:4 142:5 143:2
Garver's 31:1 41:5 47:22 54:18 57:5,23 66:18 70:3 72:8,19 82:17 86:10 98:13 100:14,19 101:5 113:11,12 113:14 126:15 126:16 132:16 138:17
Garvers 83:6,12 83:24
gathered 40:20
general 60:22 65:19 133:6 136:13 140:3
generally 56:13
getting 11:14 14:22 50:1 55:3,10 81:15 81:17 82:12 96:15 120:18
give 8:11 10:17 10:18 14:6 22:14 52:13,14 56:8,25 58:7 59:2,8 78:13 81:25 134:11
given 26:10 59:10 62:2,9 81:11 101:18 127:5 134:6,21 136:12
gives 45:4 118:13
glass 106:12
glasses 84:12
go 8:1 9:13 10:18 13:1 17:12 18:1 18:5,11 21:17 23:10 25:15,17 27:22 28:16 31:3,4 33:9,10 34:13 40:23 43:18 60:20 61:9 62:14,15 63:5,18,24 64:25 65:16 66:16 70:12 73:12 74:6 75:18,24 76:20 81:24 83:3 84:9 85:6 89:9 90:16,22 91:3 91:17,21,21 94:22 99:14 103:5,8,11,16 104:2,14 105:8 106:13 113:5 116:7,17 117:3 117:5,18,22 118:24,24 139:18
goals 50:11
goes 67:10 74:11,19 89:22 92:22 117:16 123:12
going 8:8 13:1 15:9 19:2 21:17 24:15 25:17 26:2 31:16,17 33:4 35:18 38:20 40:23 40:25 43:23 48:13,14 51:1,4 51:5 54:9 55:8,15 56:24 74:15 80:19 81:23 89:14 91:4,10,13 92:4 97:19 104:8 106:6 108:23 115:12 118:4 129:4 136:7
gonna 23:14
good 7:13,15 9:15 15:10 23:10 50:5 98:1 131:17 139:20
gory 10:18
gotten 32:21
graduated 10:7
granted 50:4 119:25
great 8:20 10:9 12:15 13:2 41:14 117:16
greater 43:24
ground 8:1
Group 4:3 17:15 142:3
groups 119:6
guess 19:3,4 23:17 24:20 66:21 101:9 102:3 105:1,17
guided 67:14
guidelines 139:24 140:7
guilty 67:1
guys 118:15

H

half 15:10 18:12
halfway 62:16 70:14 74:20
hand 22:21
hand-filled 104:25 105:5
handled 131:5 131:16

handler 130:23
131:9
handles 46:22
handling 129:12
129:19,21
130:1 131:3,19
handwritten
105:10
happen 72:3
91:11
happened
43:16 54:6,7
55:22 67:24
80:14 83:16,21
96:24 125:20
happy 8:5
hard 32:3
39:20
harm 83:7
Harvard 9:19
hazardous
37:14
HBS 10:7
head 8:12
headed 28:6
health 13:7,19
hear 14:4 32:7
73:2 84:13
138:15
heard 89:5
held 5:17 45:18
46:1 49:10
50:12
hell 90:22
help 13:20 92:6
132:2 137:18
helping 11:23
helps 39:22
higher 37:18
43:25 45:16
108:19
higher-ups
97:10
highlighted
88:24
hill 97:6
history 10:19,19

hold 22:25
32:2 33:17
53:11
holding 43:25
50:25
holds 45:15
holes 51:3
home 65:25
78:22,25
99:25 137:12
hopefully 13:10
hospital 137:8
hospitality 12:5
hotels 12:6
hour 18:9,12
hours 3:11 19:7
41:24 84:23
85:1,2 110:3
house 112:5
132:25
houses 35:21
hundred 12:1
18:22 50:23
129:23

I

i.e 52:5
idea 47:16
121:14
ideals 50:11
II 31:10
III 31:13
Illinois 4:9
illustration
58:22 59:3,21
60:22 62:2,10
63:10,12
imagination
134:7
immediately
84:24
immensely
13:23
impact 63:5
impacted 63:19
134:8,10,24
135:3

important
84:22
impossible
43:15
impression
35:5 133:6
in-laws' 132:25
in-person 92:11
inability 132:16
inaccurate
67:17
includes 75:12
including 24:1
46:24 50:18
78:14
inclusively 50:9
income 12:17
22:3 51:10,18
55:25 56:1
58:22 60:9,15
60:18 64:16
68:21,22,22
69:2,24 73:14
89:23 93:15
117:23 138:12
138:17,17,21
138:24 139:2
139:5 140:4
increased
108:18
Indemnity 11:1,1
independently
34:7
INDEX 2:9
indicate 6:23
64:15 142:13
indicated 92:9
92:16 113:20
116:16 135:15
indicating
92:22
indication 134:3
134:17 135:9
136:12
indicative
69:24
individual 26:12

34:17 93:15
individuals
131:19
Industrial 11:1
industry 12:6,7
35:6,14 36:20
37:6 45:3,9,12
46:24 56:16
59:2 60:13
62:9 65:25
67:6 71:14
77:17 83:9
99:23 116:13
117:14
industry-speci...
12:4
infected 135:16
135:17
inflation 53:3
information
25:12 38:25
46:21 55:25
56:1,8,23 57:1
57:6,24 58:7
63:11,15,16
64:10 65:18
65:24 66:24
78:10 79:21
80:6,19 81:25
82:9,17 87:14
88:12 90:2
92:7 93:10,16
93:22,23 94:3
95:10 97:2
99:17,22
105:14 119:10
123:16,18,22
124:14,15,18
125:12,14
informed 41:3
initial 9:13 19:15
86:11 89:17
initially 19:9
injured 35:20
80:1 129:22
130:9
injuries 85:12

127:5
injury 62:21
76:6 126:8,19
127:12,24
134:6,11
inquiry 36:14
instance 24:15
instigation
83:13
insurability
70:18
insurance 1:5
3:5,19 5:14
6:2 11:2,18
13:5,7,13 14:21
15:2,6 22:3,10
22:11,12 23:24
24:19 25:10
26:14,25 27:7
30:1 34:16,19
35:1,9 36:4,19
36:24 37:6
38:2,3 44:13
44:22,24 48:2
49:12 50:16,17
51:2,4,9
52:24 56:16
56:18 58:22
59:1 60:3,13
60:14,17 61:3
66:25 67:2,6
71:19 72:2
79:15 90:21
98:3 103:2
106:20 108:10
108:11 114:23
122:3 126:7
127:20,22
128:18,22
129:22,24
130:7,14,15
131:2,5,5,20
136:9 138:18
139:4,7 140:12
142:6 143:2
insured 94:4,5
126:9

insureds 123:7
integrate 11:23 50:14
integrating 51:12
intended 45:4
intercede 57:11
interested 19:20 141:15
internet 22:5 30:10
intervene 97:10
interview 92:11
interviewer 70:17 71:2
introduce 5:22
investigate 127:17,25 133:24 134:2 134:16 135:8 136:11
investigation 126:18,22
Investors 110:22
involved 13:5 14:10 16:17 41:15 50:19 83:8 130:8,17 130:18 131:1 136:20
issuance 17:24 73:18
issue 35:1 126:22
issued 33:16 59:15 64:3 68:15 84:18 89:17 106:22 119:17 121:18 125:9,14 130:15,17,20
issues 13:19 14:11 15:14 127:8
items 90:5

J

January 42:16 43:4,10 53:20 92:13,23 93:12 132:22 137:21
Jeffery 27:1
Jesus 4:13 6:4
job 11:23 36:5 52:4 65:25 66:2,4 75:8 76:14 85:16 85:20 99:3,19 100:3,6,10,19 101:1,11 107:17 111:7 115:7 117:3
jobs 75:8
joined 10:22
judge's 46:8
July 1:10 3:11 5:10 142:9 143:3
jump 112:15
jumped 10:6
June 92:10

K

Kansas 1:1 3:1,16 3:17 4:14,19,23 5:16 44:1,8 121:23 128:19 141:4
Keith 4:21 5:19
kept 50:21 55:1 55:4
Kersting 2:3,5,7 4:7 6:1,1 7:4,4 97:16,25 98:2 98:20,22 99:9 105:20 106:6,14,25 107:23 109:9 109:11,17,24 110:15 112:20 113:9,19,24 116:23 120:19 121:1,7,21 122:2 123:12 123:21 124:2 124:13,21 125:1 125:7,24 128:6,9 132:21 133:11 134:1,12 135:4,21 136:7 136:22 137:7 137:20 138:1 139:17,22 140:8,14
kick 90:17
kind 7:25 9:25 11:6,22 50:17 53:11 80:17 83:19 96:19 130:7
kinds 24:14
knew 127:14,15
know 8:1,5,11 10:11,15 11:8 12:13,16,20 15:1,6 17:4 19:17 21:2,21 23:14 26:4,17 26:18,20 27:23 29:10 32:15 33:23 36:11 37:5 38:12 39:3 42:14,21 44:8 49:14,18,20 51:6,13,25 52:1,9,11 53:23 55:6 57:10,20 62:11 62:12 66:15 67:5,15,21,24 67:25 68:2 72:1 77:13,20 77:21 81:15,16 83:8 92:3 98:6 101:7 102:4,7,9,14 102:21,22 105:19 107:14 107:18 108:16 110:2 115:10,11 116:12 117:9 118:18 119:16 119:19 120:1,13 120:16,19,21 121:2,6,8 127:3 129:1,10 129:11 131:24 132:2,5 134:9 136:16 139:11 140:2
Knowing 37:5
knowingly 66:23
knowledge 67:19 70:25 71:3
known 11:15,16 46:10 117:14
knows 78:2 118:14

L

labor 111:18,22 111:24 112:11,15 114:11,18
laborious 123:14 123:15
lack 111:18
lands 110:22
Lane 9:4
language 35:12 79:15
lasts 133:18
law 4:3 15:20,21 16:6,11 17:15 19:12 26:11 27:13 28:14 29:1 44:1,8 45:22 67:2 128:19,20 142:3
lawful 7:9
Lawrence 4:3 5:24 7:2 142:3
lawrence.man... 4:5
lawsuit 120:20 125:13
lawyer 19:18 44:19,20
lead 51:22 52:7 68:8
leading 10:20
leads 83:15
leave 24:7
leaves 116:2
led 11:19 45:7 134:25
left 10:20 53:11
legal 27:24 32:10 78:11
LEIGHTON 4:13
let's 16:21 17:12 23:10 25:15 30:17 31:3,6,7 31:7 34:13 58:10 59:18 63:24 66:16 73:12 74:16 78:7 82:23 84:9 89:9 91:17,21,21 94:21 97:16,17 102:24 103:5 103:8,11 136:19 136:19,23
letter 17:14,18 20:3 21:2 40:19 86:18 86:25 88:16 88:23,25 89:2 91:24 94:15,18 95:18 95:23 96:16
letters 61:20
level 15:17 60:16
liability 15:2,3 16:18
liable 45:18,23 45:24 46:1,7
Library 26:14 27:7

licensed 70:16 71:1
life 1:5 3:5,19 4:6 5:13 6:2 30:1 35:1 38:3 50:16 51:2 72:16 98:3 124:5,13 134:1 134:15 135:7 136:10 140:12 142:5 143:2
life's 118:20 139:23
lifetime 90:21
limit 78:17
limitation 70:14
limitations 87:5
Line 143:5,9,13 143:17,21
link 5:18
linked 83:13
List 84:22
listed 23:25 25:24 26:3 27:8,19 34:4 69:3
lists 18:7
Litigation 4:18 4:22 5:20 26:25 142:1
little 20:21 22:14,15 25:6 30:18 34:15 35:19 58:11 76:24
live 8:22 44:5
living 53:6 65:3 126:10,21 131:22 132:5 132:17 134:9 134:24 135:16
Locust 4:18,22
lofty 50:11
logo 59:6
long 52:13 133:18
long-tail 15:2
longer 40:9 117:18 133:1
look 17:5,6 19:2 19:3 22:2 24:13 26:12,15 29:7 32:3 47:7 50:25 51:1,1 59:18 60:15 68:13 76:25 95:3 98:25 99:4 102:24 106:13 109:5 115:18 116:19 117:15 129:8 138:22
looked 13:20 24:1 37:10 64:7 74:21 107:15 109:3 115:20 127:10 133:14
looking 12:4 14:24 19:21 32:9 36:3 43:6 44:16 105:1,2 135:1 136:18
looks 17:13 22:18 86:18 104:20,22 105:20
Los 10:24
lose 62:19
losing 104:3
loss 63:1 67:1 78:10,24 79:3 79:7 87:21,25 89:23 90:6,18 91:8 93:6,8 95:24 122:4 122:25 123:2 123:3,23 124:3,4 125:17 125:17,21 133:20,25
lost 52:12
lot 11:10,11 13:2 13:12 14:22 15:1,5 20:22 22:4 24:11 36:9 39:15 69:8 71:24 81:18 92:4 124:17 127:8
Louis 142:19
love 116:23
lower 117:3

M

M.B.A 9:19,23 10:1,3,4
machinery 85:10
magazine 26:17 26:17
magnifying 106:12
mail 12:10
mailings 124:18
Main 4:14
major 49:17
making 39:25 41:22 48:1 87:12
Man's 128:11
management 24:16 25:8 37:9 66:5 85:2,12 100:11
managers 9:21 9:23
managing 66:1,1 100:3,4
Mann 2:4,6 4:3 5:24,24 7:2,2 19:5,19 28:2,8 30:16 34:10 36:8 37:12,19 40:12 42:4,18 43:13 47:11,23 48:3,19,24 50:8 53:2 54:20 55:14 55:19 56:4,11 56:20 57:9 57:25 61:8 62:4 63:7,21 66:12 68:1,10 69:16,21 71:11 71:16 72:10,24 73:5,9 74:5 75:22 76:17 76:22 79:17 79:23 80:7,12 80:22 81:4 82:2,14,19 84:7 85:18 86:4,13 87:15 88:14,18,22 89:4 90:20 91:6,16 92:25 94:7,10,14,17 96:9 97:3,7 102:13 105:16 106:2,9,24 107:10 109:6 109:10,14,21 112:12 113:5,18 113:23 120:15 120:24 121:5 121:19,24 123:11,20,25 124:12,16,24 125:5 126:1,5 128:3 132:20 133:3,22 134:5,19 135:11 136:6,14 137:5 137:14,23 138:3,8 139:14 139:25 140:21 142:3,7
Mann's 140:2
manner 6:22
manual 35:25
March 41:1,16 42:11 43:7,9,11
Marie 19:12 20:10
marked 43:19
market 24:20 24:21,22 25:11
material 30:8 61:21 62:22 76:9 139:1
materials 27:4 33:14 46:24
matter 5:13 14:18 17:20 18:25 19:10 40:2 80:2
matters 16:3 79:10
Matthew 19:18 19:21 20:12
maximize 24:18 25:9
maximum 54:2 61:16
McDonald's 52:1,5 83:3 116:8
McKenna 9:12
mean 37:21 40:18 49:20 49:21 90:23 90:23 98:15 98:17 99:20 114:25 120:19 129:5 140:3
means 33:25 75:7 76:5,13 76:14 116:4
meant 22:16 49:20 115:5 116:7 118:23
medical 70:17 70:23 71:2 87:5,14 134:25 135:19
meet 45:3 111:12 111:19
meeting 41:17 97:11
meetings 57:12
member 66:1 100:3
memories

20:20
Men's 9:10
mentioned 34:3 89:24
mentioning 107:5
mentions 18:14
messages 81:15
middle 31:17 60:21
mind 83:22
mine 13:17
minute 28:7 39:12,18 52:15
minutes 58:10
mislabeled 23:7 23:17
misleading 77:16,16,16,25 78:1 114:24 115:9,22 116:12
misrepresent... 68:7 109:12,19
misrepresent... 34:20 35:16
Missouri 3:16 4:14,19,23 141:3,22
misstatement 68:7
misstates 137:15
mitigating 37:3
MO 142:19
model 128:23
modified 33:24 45:11
modify 60:24
Molly 31:2 110:19,25 126:15 132:1
moment 44:10 53:11 90:11
Monroe 4:9
Montgomery 4:21 5:19
month 38:10,13 53:1,7,14 54:25 55:3 61:13 69:9 82:10 89:19 92:17,19 122:9 122:12,20 126:11 139:6 139:12
monthly 59:23 61:11,16 68:19 70:8 79:1 87:20,24 88:8 93:5,7,10
months 33:25 34:2 42:20 53:21 78:21 110:1,6 137:11 137:19
morning 7:13,15 21:24 22:24 98:1
morphing 115:23
MOSKOWITZ 4:8
move 31:3 48:14 78:7 82:23 137:4
moved 54:13 92:13 107:13
Mueller 121:9
Mueller's 121:8
multiple 14:24 32:6 83:5 124:18

N

N 4:1 142:18
name 5:18,19 6:24 13:24 57:14 78:14 81:12 98:1,22 129:11 143:1,2 144:10
national 11:22 57:12,13,15 97:11 128:21
necessarily 116:10 129:5
necessary 144:8
need 23:14 87:4 87:24 88:11 92:7 93:11 106:12 109:5 113:22 116:25 137:12
needed 38:10 49:23 83:10 95:24 111:21 132:11 137:18
needs 87:13
negotiate 12:21
neither 141:9
never 13:20 32:8 42:2 54:18 140:11
new 11:17 65:25 99:25
Newport 8:22 9:4 44:5
nice 12:17
night 12:10
nine 3:11 65:23 74:18 99:22
nods 8:12
normal 10:3 62:8,11 72:1 132:5 139:10 139:10
normally 137:17
north 29:19
notarized 142:17
notary 3:14 5:5 142:15 144:22
note 17:22
notice 14:4 36:3 78:10,13,16,22
notified 41:3
notify 87:22
notion 47:9 68:6
November 38:11 53:15 86:19 86:20 87:4 88:16,24 89:12 90:11 91:2
number 2:11 25:18 26:3,22 26:24,25 27:1 27:8 55:17 78:14 82:11 84:23 96:15 99:10 105:13
numbered 72:14
numbers 15:10 32:18,24 138:23
numeral 31:13

O

o'clock 3:11,12
o-n-t 24:20
O.P.M 9:20
oath 6:19 7:19
object 30:16 34:10 36:8 37:12,19 40:12 42:4,18 43:13 47:11,23 48:3 48:19,24 50:8 53:2 54:20 55:14,19 56:4 56:11,20 57:9 61:8 62:4 63:7 63:21 66:12 68:1,10 69:16 69:21 71:11,16 72:10,24 73:5 73:9 74:5 75:22 76:17 76:22 79:17 79:23 80:7,12 80:22 81:4 82:2,14,19 84:7 85:18 86:4,13 87:15 88:14,18,22 89:4 90:20 91:6,16 92:25 92:25 94:7 96:9 97:3,7 102:13 105:16 106:2,9,24 107:10 109:6,7 109:10,14,21 112:12 113:5,18 113:23 120:15 120:24 121:5 121:19,24 123:11,20,25 124:12,16,24 125:5 132:20 133:3,4,22 134:5,19 135:11 136:6,14,15 137:5,6,14,23 137:24 140:1
objection 57:25 94:10,14,17
objections 6:22
obligations 111:13
obtained 138:13 138:18
obtaining 139:3
obvious 127:4
obviously 20:15 37:13 41:16 50:12 65:12 72:4 83:20
occupation 34:18,21 35:2 35:3,7,9,11,12 35:14,17,21 37:14 38:19 38:20,21 41:5 41:7 45:12 46:17,23 47:3 47:10,16 48:9 48:17 49:6,19 49:22,23 50:3 51:23 52:6,9 61:22

62:24,25 64:11 65:13,19 67:16 71:23,23 71:23 75:1,2,5 75:5,6,12,12 75:18,19 76:7 76:7,9,20 77:1 77:1,2,4,5,9,11 77:12,18,19 78:3,3,4 80:15 80:16,16,25 80:25 81:11 83:14 84:23 107:2 112:10 113:14 115:4,5 115:8,8 116:1,1 116:2,3,5,6,6 117:8,8,8,14,24 118:1,3,7,11,14 118:14,16,18,19 118:20 119:1,2 119:11,17,20,22 119:24 120:6,6 120:7 121:2
occupation/d... 99:11
occupational 98:13 107:6 108:4 109:2
occupations 75:7,13
occurred 122:20 124:9
October 38:2,6
offer 12:8,11,19 24:4,5 25:1,2 50:3
offered 22:7 37:22,22,23 44:22 131:15
offering 23:24
offers 24:17 25:8 46:25
office 66:5 78:23,25 100:11 142:18
officially 42:21
offshore 129:24
oh 10:8 48:12 77:12 84:13 110:5
okay 5:9 8:18,19 8:20 9:6 15:12 15:19 16:21 18:1 19:7,8,14 19:23 20:9,13 20:23 21:4,8 22:13 23:5,9 23:10,15,16,18 23:19,21,22 24:12,23 25:15 26:21 28:1,2,8,20 28:24 29:9,15 29:17,17 30:7 31:3 32:15 33:2 34:13 37:16 38:1,15 39:24 40:23 42:1 43:2 44:5 44:18 47:5,15 50:5 51:19 52:18 53:9,12 54:17 58:10 59:18 64:6 73:12 74:1,10 76:20 81:21 82:23 84:14 84:21 88:15 94:21 95:7 98:24,24 99:6 101:12 103:5,19,25 104:3,11,17 105:7 106:14 108:24 110:11 110:18 111:2,3 116:2 117:6 118:16 127:18 134:14 138:9
omissions 130:25
once 55:6 93:16 132:12 132:22 133:12 133:16
ones 26:19 32:21
ongoing 15:25 87:25 93:9
ont 24:21
opened 34:1
opening 33:3,21
operate 67:21
operating 85:10 85:10
operation 84:1
opinion 40:2,4 40:5,6,11 42:3 45:17 48:7,13 48:15 49:1,5 126:23 127:19 129:13,17 134:4
opinions 30:12 43:19,23 50:6 52:17 53:10 54:23 131:15
opportunity 84:18 86:23 95:3
opposed 30:9 37:8 78:4
opposite 40:9
optional 65:1
options 24:18 25:10
Orange 8:25
order 115:16 116:25
original 2:24 85:16 142:9
originally 84:16 96:12
Osete 4:13 6:4
outcome 141:15
overall 40:4,4 47:1 49:11 50:18,22 51:17
overlap 16:19
oversee 66:5 100:11
overseeing 111:9 130:1
own-occ 26:5 53:25 96:18
own-occupati... 45:11
owned 9:23
owner 43:1 68:17 79:6 110:23
owner/contra... 64:12 99:11
owners 9:21

P

P 1:2 3:2,18 4:1,1 64:11 72:16 104:22 142:5 143:2
Pacific 11:1
page 2:1,10 10:6 17:12 18:2,5,11 21:6 23:10 25:16 31:7,8,8 31:12,16,17,18 34:4 40:25 43:19 59:19 60:2,20,21 61:10 62:14,15 65:16 66:17 68:13 70:3,7 70:12 72:9,20 74:7,17,18,18 74:19,20 75:24 78:8,8 78:8 84:21 99:14 103:5,8 103:12,13,16 103:20,24 105:2,13 142:10,15,18 143:5,9,13,17 143:21
pages 17:8 29:2 29:19 30:2 41:23 74:11,14
paid 34:19 38:12 53:17 54:2 80:17 81:20,21 93:18 93:19 96:12,21 117:6 122:8,19 125:18,22
pain 85:12
PAISNER 4:13
Pam 81:16
paragraph 43:6 87:3,18 88:20 89:15 95:8
paragraphs 89:22
paralyzed 136:21
part 11:3 60:13 68:20 70:24 70:25 83:1,4 83:11,23,24 84:5 101:20 103:3,6,6,8,9 103:9,13,16,17 103:17,20 104:1,7,7,9,10 104:10,14,15,17 104:19,19 105:8,23 106:7,21 107:1 108:22 120:20 129:10 131:4 132:4
partially 102:4 102:15
participated 92:12
participating 6:12
particular 44:15 48:2 49:15,16 80:1 81:9 84:3 85:22 126:7 127:4
particularly 12:3 13:6 22:9 40:13 49:12

71:20,25
83:13 139:8
parties 3:13
5:22 6:20
61:6 141:11,14
partner 10:22
66:1 100:4
party 45:23
46:7
pass 67:18
pay 53:22 84:2
87:20 93:5,7
payable 61:13
78:21 81:11
paying 53:14
94:12 96:6
117:3
payment 57:21
67:1 89:23
96:16
payments 78:17
93:9
paystubs 56:1
95:9
pdf 25:19
penalty 144:11
pending 3:16
people 9:22
11:7,10,11 14:23
36:20 116:17
130:5
percent 18:22
62:20 66:5,6
69:7 100:11,11
percentage
15:14,15 66:3
98:16 99:1
100:7 112:13
perfect 23:15
perform 61:20
62:21 76:8
85:8 111:14,19
111:20 115:7
119:2 126:9,20
131:22 132:16
performed
85:11 126:21

period 11:7,13
13:12 36:15
38:6,6 53:22
54:5 61:14
76:7 78:21
79:1 84:24
89:17,18
115:22 116:12
122:10,11 133:7
perjury 144:11
perpetuated
109:12,18
Perry 4:12 6:3
7:6,14 138:4
139:18
perry.brandt...
4:15
person 6:19 51:1
66:23 71:3
76:25 77:6
78:4 102:20
personal 64:10
personnel 18:15
18:19
Peterson 27:1
phone 33:22
phrase 69:5
75:1
physical 83:7
107:16 108:22
111:14
physically 6:16
43:14
physician 87:6
physician's
135:14
pick 90:24
pieces 12:7
place 20:2
23:22 37:21
108:14
placed 108:13
Plaintiff 1:3 3:3
3:18 4:2 5:2
5:25 15:8
16:12 28:25
73:20

Plaintiff's 27:9
32:12,17 41:13
Plaintiff-produ...
32:23
Plaintiffs 15:15
15:18
Plaintiffs' 16:2,7
plan 12:11 24:18
25:9 50:18
51:12
planners 57:14
planning 24:3
24:17 25:1,8
49:12 50:15,16
51:16
plans 9:13
platforms 13:6
play 77:21
pleadings 27:21
please 5:21 6:7
6:23 82:24
84:10 87:6,22
93:7,9 127:2
140:21 142:8
142:12,17
PLIC 2:12,13,14
2:18,20,22
plug 51:3
plunging 20:14
plus 76:15
point 15:25
19:25 24:23
31:24 32:16
42:22 44:17
46:14 69:23
80:1 81:9,19,19
83:15 84:3
85:23 90:12
104:3,5
105:22,23
106:11 108:20
112:17 115:14
119:7,23
124:19 127:4
pointed 49:24
98:11
policies 24:5,19

25:4,10 51:7
60:14 122:15
139:4
policy 32:20
34:25 35:1,2,4
35:7,10,11,13
37:22,23
38:18 41:4
45:10 49:19
51:11,18 52:10
52:21,25
53:25 55:12
56:7,9,17
60:23,24 61:4
61:4 64:19,20
65:8,9 68:8
68:15,17 71:10
71:10,10 72:2
72:14,23 73:3
73:7,13,14,22
73:24 74:9
77:9,10,25
78:14,17,20
79:10,11,15,20
80:4,15,16,16
80:17 83:10,13
83:25 86:12
87:13 88:3,6
89:15 90:1
94:2 96:2,19
106:20 108:12
114:23 115:11
115:15 116:17
116:19,20,24
117:10 118:7
119:5 121:17,22
122:4 126:7
127:25 129:2
129:9 134:3,17
135:9,24
138:13,18,19
policyholder
129:7
Pollock 27:2
pollution 15:3
portion 101:20
105:9,10

131:16
positing 59:23
position 106:10
122:23
positive 133:17
possession 62:1
possibility 81:14
83:7 127:12
128:1 133:24
135:2
possible 27:21
28:19 37:25
40:18 69:22
87:8,22 92:6
109:22
possibly 12:9
potential 88:9
96:11
potentially 67:11
69:22 102:16
practices 46:24
129:12 131:15
preceded 20:6
preceding
84:24
prejudice
127:25
preliminary 8:21
premarked
10:14 58:20
63:23 73:11
82:22 86:16
89:8 91:23
94:20 95:16
99:8 110:14
116:22
premium 37:18
59:20 68:23
premiums 34:19
106:18,20
107:1
preparation
18:20
prepare 17:1,2
prepared 44:12
58:23
prescreen 60:4

prescribed 56:12
present 5:21 6:16 10:20 67:10
presentation 21:25 59:7
presented 10:13 58:19,23 63:22 73:10 82:21 86:15 89:7 91:22 94:19 95:15 99:7 110:13 116:21
presents 66:24
president 92:15
presidents 9:21 9:24
presume 39:5
presumed 64:22
presuming 62:7
pretty 13:18 14:20,21 15:17 19:17 27:15 32:2 94:16 95:13 111:5 115:2 127:3 128:20
previous 100:25
previously 15:19 19:19 69:3 86:5 97:9 109:1 114:9 122:7 129:16
primary 64:19 65:19
principal 1:5 3:5 3:19 4:6 5:13 6:2 20:21 30:1 30:3 34:25 37:6 38:2,17 41:3 45:10,14 46:22,25 47:20 49:17

50:2 52:9 53:13 54:1,7,18 54:24 55:25 56:8,8,22,23 56:23 57:20 57:24 58:5 59:6,7 67:16 69:14 71:20 77:25 79:20 79:21 80:10,17 80:20 81:24 81:25 82:9,9 82:11 83:18 89:11 92:1 94:3 96:5,25 97:11 98:3 115:10,25 118:2,10,20,23 124:4,13 126:7 126:17,21 134:1 134:15 135:7 136:10 138:19 139:23 140:12 142:5 143:2
Principal's 57:7 71:25 107:14 140:6
principally 128:24
prior 10:23 17:23 29:3,20 30:4 60:17 62:20 73:17 78:21 86:23 91:13 95:3
privileged 58:2
probably 7:23 11:3 14:15 15:3 15:10,18 19:24 20:6 21:12 29:7 33:1 46:1 47:13 83:16 101:18,24 138:20
problem 115:3
procedure 60:14

proceed 103:13 104:9
proceeding 6:17,22
process 109:13 109:20 123:13
produce 11:16
produced 3:10 7:9 29:1,19,22 30:2 32:17 73:21
product 26:4 71:19
production 30:4
products 140:12
professional 10:16
professions 75:7
profit 87:24 93:8
program 9:19 9:20 10:1,3,5 129:25
programs 12:4
prompt 93:9
proof 78:10,24 79:3,7 95:24 122:4,25 123:2,3,22 124:3,4 125:17 125:21 133:19 133:25
properly 21:3
Property 11:14
proportionate 63:1
proposed 61:10
prospective 59:3,11 81:14
provide 51:5 56:2,22 57:5 78:16 79:7,20 80:5,19 82:17 93:10 97:1 104:10 123:17

124:15 125:2 125:16 129:17 137:12
provided 13:25 14:15 41:4,13 52:24 113:20 118:22 119:20 122:5 123:4 123:22 124:4 124:17 125:12 125:21 129:24 130:24 140:10
providing 95:9
province 46:9
provision 94:3 124:3
provisions 60:24 68:18 78:18 88:5 122:25 123:2 129:2
Prudential 84:2
public 3:14 5:5 142:15 144:22
pulled 26:8,19 26:20 30:10,11
purchased 34:18 35:9 92:14
purchaser 72:2
pure 19:3
purposely 51:21
purposes 139:10
pursuant 141:6
pushed 69:23
put 12:11 16:22 16:22 18:25 21:14 22:21 51:15 77:23 115:19
putting 49:14

Q
qualified 139:12 140:3
qualify 78:19

139:6
qualifying 69:5
question 8:3,9 14:12 28:11 45:2 47:6 48:6,11 53:24 55:22 68:21 73:2 74:23 80:4 82:4 102:6 103:1 109:16 112:17 112:22 113:7 114:10,13 120:1 134:13 135:5 135:22,25 136:1,3,5,13,17 136:24 137:2,4 138:15 140:2,5
questionnaires 70:23
questions 2:1 7:12 8:21 70:22 97:17 97:25 98:4 102:19,23 125:25 126:5 128:4,7,9,11 138:2,8 139:15 139:18,22 140:15
quick 19:17
quickly 9:8 18:1 20:4 32:2
quit 94:12
quite 12:17 112:8
quote 44:14 60:3 95:8

R
R 4:1
ranging 14:22
rate 69:11
rates 68:23
rating 37:15
Ray 17:14
re-ask 109:16
read 6:7 23:10

32:25 33:6 34:22 35:22 38:8,23 39:8 39:15,17 41:8 41:13,19,23 42:12,17,19 43:23 44:2 45:19 47:8 61:1,23 63:2 65:21 66:7 67:3 68:24 71:6 72:17 75:15 76:11 79:12 82:4 85:13 86:1 87:1,9 88:1 89:20 90:8 90:22 92:20 93:25 95:5,11 96:3 99:12 100:1,14,17,21 100:22 101:3,5 101:13,18,19 108:3 111:7 113:24 114:16 116:17 118:22 121:7,11 125:10 126:12,15 133:5,9,12 140:6,20 142:12 143:6 143:10,14,18 143:22 144:5
reading 35:15 86:6 109:23 110:3 111:6 134:10 135:13 136:18 137:9
real 8:2,2 18:1 20:19 51:16 120:5
realize 102:8 134:8 135:1 137:7,10,20
realized 49:25
really 9:8 12:22 22:2,20 24:9 40:16 48:23 49:20,21,23 50:10,14,20 51:15,24 52:3 52:7,8 83:9 85:23 91:10 113:7 115:12 117:25 119:15 119:23 120:6,9 120:13
reason 32:5 33:23 83:23 83:24 143:7,11 143:15,19,23
reasonable 76:25 77:6 78:4 79:8 122:22
recall 20:1
receive 30:25 38:21 39:19 40:10 41:5 62:25 75:19 78:22 93:21 110:6 116:25 126:10
received 27:13 28:14 30:20 33:14,20 38:25 54:13 55:23 63:10 74:2 93:17 95:24
receiving 81:23
Recess 97:21
recite 44:9,17
recommend 51:4
recommendat... 83:6
recommendat... 132:10
record 5:10 6:24 28:3 33:19 58:13,14 97:20,22 137:3,6 140:18
recorded 5:12 140:17
recovery 62:17 65:5 90:5,12 90:16 91:7
reduce 55:11
reduced 54:18 96:7 141:8
reduces 82:10
reduction 38:22 41:6 55:7 88:10 117:23
reference 27:10 47:8
referencing 89:25
referred 115:20 128:10
referring 50:21 98:8 117:20,21 118:17 128:12
reflect 137:3
reflects 72:22
refusal 124:22 125:2
refuse 12:19
refused 56:2 56:22 97:1 124:14,20
refusing 137:4
regard 98:13
regarding 132:16
regards 89:23
regrettably 46:2
regular 45:11 46:17,22 47:2 47:10,16 48:8 48:17 49:6,23 52:6 65:13 71:23 80:16 116:1,3 117:7 117:24 118:11 118:15,17,18,20 119:1,2,11,17,20 119:24 120:7 121:2
rehabilitation 85:12
reinstated 68:16
related 15:2 30:9 56:9 141:10
relating 13:4 27:13 79:10
relation 20:2
relative 141:12
reliance 34:20 35:16 42:8 43:8
relied 21:10 25:17 26:3 27:16 34:4 43:11
rely 36:25
Relying 49:14
remain 61:15
remember 41:24 53:21 54:4 82:25 86:6 98:12 107:12,21 109:23 111:6 112:3,5 132:6 132:13 137:9
reminding 30:19
remotely 3:13 6:11,18,20
renamed 9:11
render 144:8
rendered 132:12
repeat 16:8 73:1
rephrase 8:4 82:6
report 10:12 14:5,10 16:24 17:1,24 18:20 21:15 28:13 29:3,21 30:4 30:21 31:4 33:15 46:2,15 58:17 59:15 64:3,6 73:18 84:19 86:24 95:3 121:8,12 129:14 135:14
reported 93:18
reporter 3:15 4:16 5:5 6:7,9 6:10 26:25 82:3 140:19 141:1,2,3,21
reporter's 5:18
reporting 6:17
represent 5:23 7:16,16 15:15 15:16 29:13 98:3
representatio... 36:25 42:9
representative 70:16 71:1,9 78:12
represented 9:18 40:22
representing 15:6,7
request 60:3
requested 78:25 81:25 93:22 123:4,5 123:16 124:14 125:3
required 56:7 79:4,8 111:11 124:18 127:20 134:2
requirement 123:23
requirements 78:13 79:7 128:19 133:20
requires 111:20
Rereading 38:9
research 26:21 47:12

reserved 5:7
residual 54:10 54:14 62:16 63:17 65:5 88:5 90:5,11 90:16 91:7
residually 62:18 117:19
responded 38:3
response 32:12 128:11
responses 32:15
responsibilities 36:5 71:18
responsibility 43:24 45:1
responsible 51:17 129:25
rest 104:24
restrictions 87:5,19
result 85:8 107:2 111:23 112:11 124:21 125:1,13
resume 10:16
retained 17:19
retainer 18:3
Retention 31:11
retire 12:9
retired 75:9
retirement 12:8 12:11,16,17
retroactively 12:12
return 54:1 87:18,23 93:15,16 137:12 142:17
returned 87:7 88:9 92:10 93:4 132:12
returns 93:18 138:21
review 34:25 84:18 86:23 87:3 92:6 109:24 112:23 132:9
reviewed 21:23 22:24 29:4,21 30:3 31:23 44:14 113:11
reviewing 135:20
RFPD 33:5,5,5 33:6,6,11,11,11
ribs 127:5,6
rider 47:3,10,17 48:9 53:3,6 54:10 60:25 62:17,19 63:17 65:5,13 88:5 89:24 90:5,12 90:17 91:8 118:18,19,20 118:21 119:12 119:17 121:2 126:8 127:12 128:2 132:18 133:1,7,12,14 133:21 136:8
riders 65:1,10 89:25 134:2 134:16 135:8 135:23 136:11
right 10:5 16:21 18:23 23:4,17 31:20 36:24 37:24 39:16 44:9 45:25 46:10 54:6 55:13 64:13 65:15 66:22 66:22 68:3 69:4 70:21 72:12 73:16 73:25 74:3,15 76:3,12 89:13 90:9 96:13,15 99:3,21,24 103:6,7,10,15 104:19 105:2,3 105:11 106:14 110:24 111:16 122:17,22 124:5 128:11
rights 61:5 70:20
risk 107:2,19 108:19,22 119:6
Robert 1:2,8 3:2 3:9,18 5:3,12 5:13 7:8 28:25 31:1 34:17,18 35:20 64:11 72:16 104:22 140:17 142:5,9 143:1,2 144:4 144:19
role 92:15
Roman 31:13
roof 83:21 112:5 113:21
roofs 114:11,17
Roth 1:6,6 2:15 2:17,19,21 3:6 3:6,19,20 4:11 6:5,5 7:10,16 7:17 22:9 24:1 24:16,25 25:7 25:12,19 29:18 29:18,22,23 41:2,2,3,17 42:1,9,9 43:8 43:8,24 45:14 45:17 46:16 47:3,9 48:8,8 48:16,23 49:4 49:8,10 50:10 51:8 53:10 57:3,11,22 58:23 59:8,9 67:14,20 69:18,23 71:9 81:16 83:2,12 84:6 85:19 97:5 108:9 120:10,21 142:6,6 143:2 143:3
Roth's 31:1 41:19 66:20 83:6 86:1 126:16
RPG 74:8
RPG00001EX... 17:9
RPG1EXPERT 2:23
RPG1LTD 2:16
RSMo 141:6
rules 8:1
run 42:20

## S

S 4:1
salary 92:17
sales 42:11,15 54:9 81:12 89:2 91:14 92:14,16,17,19 92:24
Salina 92:13 132:23 137:22
San 4:4 10:25 142:4
satisfactory 125:17
Saundra 1:11 3:14 4:17 5:4 5:18 6:9 141:2 142:24
savvy 67:15
saw 36:9 51:8,11 59:17 124:2 138:20,23
say-so 18:20
saying 48:20 63:4 71:8 77:24 79:14,18 88:21,23 95:22 111:14 111:16 115:18,18 116:9 117:2,25 119:15 131:4
says 7:10 21:19 25:7,18 33:24 34:15 35:19 38:15 39:19 41:1 42:8 43:7 44:22 52:3 60:22 61:10,12 61:16 62:18 63:17 64:10,12 64:14 65:19 65:23 66:2,4 66:22 68:14 68:19 70:14,15 72:13 76:5,13 77:4,18 78:24 80:5 84:22 85:1,6,9 87:3 87:18 88:20 89:15 90:17 91:7 92:3 93:3 95:8 99:11,19 99:25 100:10 103:2,12 111:7 113:2 115:11 116:3,24 118:19
scan 26:18
scanned 133:14
scenario 111:18
schedules 66:4 99:20 100:10 111:19
screen 16:22,23
searches 22:5
Seattle 13:8
second 22:25 28:3 33:17 39:22 59:19 83:1 84:21
section 21:9 31:10,13 49:1 62:16 64:14 65:18 70:13 72:13 74:8 78:9 105:12 106:8 128:2 141:6
see 17:8,10

18:16 23:1
26:6 27:10
28:17 31:14
33:18,18 41:21
42:25 51:8
58:2 60:3
64:2 66:18
68:13 70:3
72:19 74:8,23
74:25 75:4
97:8 99:10,16
99:18 100:8
103:2,3,5,14,17
104:16,16,17,18
104:20,23
105:4,9,12,15
105:19 110:19
110:25 111:2
112:1,13 115:1
116:23 118:21
129:3 131:20
132:10
seek 129:1
seeking 119:23
seen 59:14
74:13 76:5
86:25 98:9
101:24 111:3
118:19 127:11
138:11,16
selling 26:4
send 78:24
93:7
senior 9:23
sent 19:24,24
20:24 23:1
28:5 88:25
sentence 34:22
35:15,22 41:8
42:7 44:3
September
54:3 55:24
91:25 94:24
95:19 96:22
110:17
services 4:18
4:22 5:20 14:1

22:7 24:15
142:1
Session 22:4
set 58:17 67:9
seven 13:14
25:18 74:17
severely 134:8
severity 127:4
127:14 134:6
134:10,21,24
135:13,17
136:18
shape 96:8
sharper 14:2
SHEET 143:1
sheets 142:10
142:14,17
shift 54:9
ship 13:9
short 20:15
shortage 111:22
112:11 114:18
shorter 91:18
shorthand 5:4,5
141:3
show 40:7 60:8
68:21 110:8,11
showed 69:6
71:21 123:3
shows 18:12
22:1,2 34:2
69:1
shut 81:3 82:18
sic 84:2
sickness 62:21
76:6
side 15:7 58:4
127:6
sign 36:20
56:16 140:20
142:14
signature 5:7
66:18,20 70:4
70:6 72:8,20
142:10,14,18
143:25
signed 36:16

37:1 108:15
signs 68:4
similar 27:18
101:9 128:21
133:9
simply 116:14
117:12
Sincerely
142:21
sir 138:16
sit 108:3
six 27:1 78:21
skate 83:20
skill 67:9
skip 25:18 95:17
skipping 26:22
87:2
slight 15:18
slippery 77:19
slope 77:20
smoker 68:23
so-called 131:11
sold 11:20
sole 31:21
solely 62:20
76:5
somebody
14:24 20:10
32:4 50:14
53:25 77:11
77:20 87:12
102:6 107:15
107:20,23
129:3 136:19
soon 87:8,22
sorry 16:8 29:11
33:6 41:25
48:12 52:12
73:1 98:15
99:15 103:22
130:3 138:14
sort 12:24 13:20
14:24 42:20
42:24 44:10
83:15,18 108:11
133:6
sparked 127:9

speak 46:5
specific 75:8
101:25 103:12
107:5 119:9,10
122:18 124:3
132:11
specifically 11:8
24:19 26:21
39:5 41:24
109:23 110:9
111:6 134:23
135:15 140:6
speculating
67:23
speculation
84:5 119:14
spelled 24:20
spend 106:4
spent 9:16
10:23 11:3
12:23 66:3
84:23 98:16
99:2 100:7
110:2
spiked 111:24
spoke 38:16
41:2 43:7
spreadsheet
21:19,21,22,25
22:10 23:6,12
25:23
ss 2:15
sss 2:18,23
St 142:19
staff 130:6
stamp 17:9
stamped 17:13
18:6,11 21:7
31:18 40:25
59:20 60:2,21
61:10 62:15
65:17 66:17
70:13 74:7
75:25 78:8
stand 40:16
134:20
standard 15:4,11

15:13 16:15
43:25 44:11
45:3,16 46:5
48:16 49:9
71:13,22 79:14
126:24 127:1
127:20 128:10
128:12,13,14,15
128:15,23
standards 45:13
128:25
standpoint 37:11
Stanford 9:13
13:1
start 11:12 31:7,7
33:3 53:14
75:10,14
started 12:12,16
20:14 43:10
81:23 92:24
112:19 132:23
137:22
starting 31:16
117:9
starts 95:22
99:22 104:7
state 36:6
121:18,23
128:20 139:5
141:22 144:1
stated 71:4
76:24 92:12
139:2
statement 30:7
30:13 31:18,21
32:1,9 35:8
40:1 41:22
42:2 56:14
69:5 111:8
statements 31:6
36:22 87:25
93:8,8,11
138:11,16
states 1:1 3:1,15
5:15 44:1,12
stating 6:24
38:4

status 81:12
stay 133:8
staying 132:24
stepfather's 42:10
Stephanie 86:19 89:10 92:1 94:23 95:18 110:16
steps 93:21
stipulate 6:25
stipulated 5:1 7:3,5,7
stipulation 6:7
stood 51:24
stop 44:2 57:20
strapped 112:4
Street 4:4,9,14 4:18,22 110:21 142:4,19
stretch 134:7
strike 135:5 136:24
strong 83:25 135:2
strongest 15:3
structure 117:11
study 138:25
studying 106:4
stuff 13:3 39:15 50:17
subcontractors 112:16
subject 68:17 115:3
submit 93:14
submitted 47:20 64:1,8 79:3 100:24 102:16
submitting 45:6
subscribe 144:10
subset 51:18
subsets 40:3
substance 48:7 144:7
substantial 61:21 62:22 76:8 135:18
substantive 78:5
successful 97:12
suffer 117:23
suffered 126:19
suffice 119:8
sufficient 139:5
suit 15:3
Suite 4:4,9,14 142:4
suited 52:4
sum 16:9 48:13 48:15
summary 43:22 50:5 59:20 61:18
supervised 129:21
supervisor 131:19
supply 57:24 82:8 88:11
supportive 40:5
supposed 67:7 67:8
sure 19:22 21:24 23:20 27:15 32:1 33:12 38:14 39:14,16 44:14 49:4 52:16 68:2 89:24 90:24 91:18 100:17 106:23 109:15 110:10 111:5 112:17 114:14 122:15 122:16 130:16 130:19 133:10
swear 6:8 7:1
switch 84:11
sworn 3:10 7:9 141:6
syllabus 44:10
synergy 12:3
synonymous 75:3

T

tables 37:15
tailored 44:24
take 14:7 19:4 20:23 21:6 25:22 26:16 29:7 33:4 39:14 51:13 52:4 53:10 58:10,10 59:18 86:7 88:3 97:16,17 102:24 105:18 116:19 134:7 136:1
taken 1:9 5:4 6:11 29:14 34:1 69:10 141:7,12 142:9 143:3
talk 8:16,17 9:7 20:9 46:6 80:24 98:10 112:9
talked 49:6 53:24 112:7 114:21,22
talking 15:13 23:12 27:24 32:4 83:1,1 98:12 99:1 110:21 117:17 122:17 135:23
tap 56:24 82:18
Target 108:10 108:10
tasks 111:20
tax 93:15,15,18 138:21
teachers 10:2
technical 47:24
technically 10:4 67:11 90:24
technology 12:24 13:4,6
teleapp 103:13 104:8
telephone 36:14 38:17 40:16,17,21 70:16 71:2 101:21 102:2,8 102:11,17,20
telephonic 101:16
tell 9:8 15:9 18:24 23:21 26:16,18 33:22 49:2,3 49:7 104:4 127:18
tells 104:8
ten 11:25 12:23 13:16,22 74:19
ten-minute 97:17
term 35:3 50:22 75:3 77:15
terminated 124:22 125:4
termination 125:8
terms 6:25 24:14 27:17 51:3 62:19 68:18 71:9,24 72:1 78:20 88:6 96:1 131:2
testified 86:5 100:18,22 102:5 107:24 109:1 112:4,25 113:4,13 114:16 114:17 120:17 131:11 137:11
testify 42:1 45:23 101:10 114:7
testifying 112:14
testimony 14:14 36:10 42:19 43:3 50:13 55:2 58:1 83:5 86:1 89:5 97:8 100:15,18 101:8,19 107:12 107:21 108:2,3 108:7 113:20 113:25 114:1,4 114:8,16,20 131:14,25 132:8 137:15 141:5,7
thank 28:9 30:18 97:14,15 98:24 114:21 128:3 139:15
Thanks 7:13
thereon 144:9
thereto 141:14
they'd 81:19
thing 12:15,18 18:2 27:20 39:19 48:23 50:20 52:10 52:13 82:7 83:18 88:16 104:21 115:2 115:20 127:11 138:15
things 21:14 24:2,14 32:3 50:19 51:14,24 56:13 114:11 115:23 132:4 138:21
think 14:5,13 15:24 19:13,24 20:4,11,24,25 21:12 22:22 24:23 27:20 28:19 29:5 32:1,8,20 35:14 37:20

40:15 43:3
47:12 48:25
50:10 51:20
51:20 52:7,15
53:4 56:12
57:16 59:16
62:5 69:7
73:20 77:14
77:22 80:3
83:11,23
85:23 86:5
95:5 104:21
107:23 111:10
114:6,7,7,13
115:1 116:14,24
117:2 122:9,23
124:17 131:23
133:15,15,15
134:20 138:23
**thinking** 67:20
**third** 87:2
**thought** 24:10
50:1 52:11,12
55:3,7 101:8
120:18
**thousand** 82:10
**three** 9:12,16
16:6,10,11,14
25:16 26:24
28:5 30:22
65:10 69:11
79:7 99:15
103:8 107:14
108:1,18,19,23
108:25 127:6
137:11
**three-month**
122:10
**tilt** 15:18
**time** 5:11 8:3
10:19 11:5,7,13
11:19 13:12
15:14,16 18:25
28:12 33:25
39:14 40:13
42:22 53:22
54:5 59:17
62:1,23 64:5
66:3 80:18
90:2 91:2
92:16 93:11
95:5,10 96:5
98:16 99:2
100:7 106:4,12
106:12 111:21
111:21 113:21,21
114:2,2,5,5,9
114:9,12,12,18
114:18 115:22
116:12 133:8
138:12,17
**timely** 78:16
93:10
**times** 7:23 14:3
14:6,13 15:22
16:6,10,11 35:4
50:23 83:5
131:13
**timing** 33:13
57:11
**Tippins** 1:11 3:14
4:17 5:5,18
6:10 141:2
142:24
**title** 21:2 65:25
77:3 100:3
129:11
**titled** 21:9
**titles** 78:6
**today** 6:12
72:15 108:3
**Today's** 5:10
**told** 16:5 37:7
38:17 88:16
106:17 119:3
120:21
**tool** 112:4
**tools** 85:11 111:11
**top** 31:10 41:1
114:11
**torts** 15:2
**total** 38:21
40:10 41:6
48:15 52:25
54:2,14,18
55:13,23 60:9
61:11,18 62:3
63:15 64:22
65:9 76:1,5,14
88:4 96:6
**totally** 12:21
38:19 61:12,15
88:7 117:18
136:20
**touted** 24:9
**tracks** 32:6
**train** 52:12
**training** 11:5,9
119:4 130:22
130:25 135:19
**transcribed** 5:6
**transcript** 113:11
113:12 142:13
**transcripts** 28:4
28:5 112:24
**treating** 87:6
**trial** 42:20
**trim** 85:9
**trouble** 127:9
**true** 49:22 52:8
54:17 122:14
144:8,12
**truth** 34:8 36:21
**truthful** 67:17
70:21
**try** 48:13 112:13
**trying** 12:2
57:19 60:5
77:20,21 91:18
104:4,4
**turn** 84:21 86:17
**turned** 56:24
**two** 15:24 16:3
26:3,15,23
39:21 77:7
78:6,6,24 87:1
89:19,22 95:6
103:5 107:13
108:1,18,25
117:15 126:9
126:20
**two-thirds** 31:12
**type** 14:18 16:15
16:16 27:17
45:10 65:24
99:22
**typed** 66:14
102:21
**types** 27:18
48:2
**typewriting** 5:6
141:9
**typewritten**
104:20,22
105:9,14
**typical** 14:18
51:9
**typically** 9:22
92:18 139:5
**typing** 17:5
**typology** 71:22

U

**U.S** 3:17 128:20
**uh-huh** 109:17
112:8
**ultimately** 10:22
57:19
**unable** 61:20
62:23 76:8
85:8 126:9
**unaware** 12:21
**unbelievable**
12:22
**unclear** 66:13
91:3 102:3
**underneath**
127:24
**understand** 7:18
7:19 8:4,14,22
13:24 16:10
17:7 28:20,23
45:21 46:15
49:4 52:16
57:2 64:18
70:15 102:10
106:18,19 107:1
107:3,4 116:5
117:5 119:5,8
121:17,20,21
122:2,7 123:7
123:15
**understanding**
6:15 28:24
35:24 40:20
42:24 51:6
77:17 78:2
83:11 85:22
115:4 116:13
117:13 118:1,6
120:17 125:6
139:3
**understands**
18:8
**understood** 8:9
35:6,13 45:7
83:16 85:20
116:4 118:8
119:21 120:5
**underwrite** 11:16
**underwriter**
10:24 11:15
49:18 67:16
106:17,19 119:3
**underwriters**
11:10 69:14
120:1
**underwriting**
11:4,8 37:10
60:13 107:24
108:5,21 131:14
131:15,16
139:10,24
140:7
**underwritten**
140:11
**unemployed**
75:10
**United** 1:1 3:1
5:15
**University** 9:20
**unresponsive**
135:6
**unsure** 22:15
**unusual** 11:6

updated 87:5 87:13
USA 128:21
use 111:11 139:8 139:9
uses 35:3
usually 21:1,3

V

v 142:5 143:2
Vague 139:25
various 11:4,24 24:14 99:2 129:2,8
vehicle 48:6 50:2
verbally 6:24
verified 102:17 113:13
verify 34:8 112:23
version 9:22
versus 5:13 112:18
video 1:8 3:9 5:11 140:17
Videographer 4:20 5:9 6:6 58:12,14 97:19 97:22 140:16
Vince 26:23
violates 128:15
voiding 68:8
volume 39:22
volumes 39:21
vs 1:4 3:4

W

W 4:12
waist 136:21
wait 129:3,5
waiting 13:8 122:10,10
waive 6:21 70:19
waived 70:25
walk 34:14
want 10:17 21:14 28:16 31:4,25 32:24 33:12 34:14 39:16 44:2 47:5 48:12 49:4 52:15,16 53:9 92:4 99:14 109:16 111:7 135:25
wanted 12:25 23:19 42:25 45:6 98:10 120:14
wants 60:15 138:4
Warning 66:23
wasn't 26:10 47:14 50:22 57:18 72:4 80:19 110:25 118:22 120:4,8 120:12,23,25 121:3 134:12 137:18
way 11:12 33:8 34:6 40:22 43:15 46:21 47:2 54:3,8 55:1 57:2,17 71:14 77:23 84:13 88:6 92:23 96:7,16 100:20 102:18 115:15 122:16 136:17
we'll 87:19 93:4 93:14,17 136:1
we're 5:9 8:8 13:8 21:5 25:16 27:24 35:18 40:23 48:14 55:15 58:12 74:15 108:23 111:11 122:17 140:18
we've 22:23 28:5 41:12 62:5 76:4 80:13 93:17
wealth 24:16 25:7 49:11 50:16
website 25:13 25:19 118:22
websites 22:7
Wedemeyer 4:4 142:4
week 20:7 84:23 85:1,2 132:23
Welborn 42:11 42:15 43:10 54:9 81:12 89:2 91:13 92:14,15,17,24
went 13:20 77:12 89:2 108:12 114:17 122:24 124:8
weren't 115:6 120:9 140:10
West 4:9
whatsoever 126:18,22
wholesale 108:9,12
wholesaler 108:16
wide 14:22
wife 55:2 132:1 132:24
William 27:2
Wilson 4:8 98:2
Windward 9:4
witness 5:7 6:8 6:13,16 7:1 10:14 13:16,25 21:13 45:22 46:11 58:20 63:23 73:11 82:22 86:16 89:8 91:23 94:20 95:16 97:15 99:8 110:14 116:22 140:20,22 141:4,7 142:12 143:1,25
wondering 55:4
word 86:7 105:18
words 36:12 102:7 115:24 116:10
work 13:16 15:1 15:10 20:14 36:1 38:20 42:10 52:2 54:1,8 62:23 63:5,18 66:10 66:11 75:19 76:20 86:2 87:18,23 88:9 89:2 90:16 91:4,13 92:10 93:4 108:16 111:12 112:15 115:14 116:7,18 116:25 117:6,7 117:18,22 118:4 118:24,25
worked 11:21 15:19,22 19:19 41:7 88:6 130:11,14
workers 111:23 129:22 130:9
workers' 130:10
working 12:2 42:15 43:1,8 61:22 62:24 75:9,11,13 76:10,15 83:8 88:7 90:6,13 90:18 91:8 115:13 137:22
workmen's 130:11 131:20
works 71:14 102:11 125:16
world 78:2 118:14
worries 23:19 84:13
worth 92:19
wouldn't 36:11 40:4 42:6 56:25 58:7 90:24 115:6,16 134:7
wow 10:8
writers 16:17
writing 18:19 40:8
written 78:13 85:21
wrong 24:24
wrote 17:3 38:4 115:15

X

Y

yeah 9:10 10:2 10:9 12:20 14:14 15:25 16:9 20:11,25 21:23 23:3,3,3 23:3,4 27:6 28:9 29:12 32:8 33:1 43:16 48:21 52:18 53:3 55:18,20 59:22 60:8 62:11,14 72:7 73:3 88:21 98:24 101:7 102:3 103:19 111:2,2 127:22 128:14 131:23 133:16 139:8,9 139:18
year 5:10 79:4 93:13 139:9,11
years 9:13,16 10:24 11:4,22

12:1,12,24 13:15,16,23 69:11 70:1 111:25 112:14 130:25 138:24
**yesterday** 59:16 64:4 110:3
**your-occ** 96:19

Z

**Zoom** 4:3,7,12 4:13,17,21 5:17 6:13,14

0

**00005** 59:20
**00007** 74:8

1

**1** 2:12,13 99:5,8 103:1
**10** 17:15 33:11 38:6 75:25 142:2
**10/10/17** 89:18
**10:05** 58:13
**10:11** 58:15
**10:56** 97:20
**100,000** 92:18
**104** 2:12
**107** 2:13
**10th** 17:23 19:1 20:3 38:11
**11** 74:20 110:2
**11/12/17** 89:18
**11:09** 97:23
**11:55** 140:18,23
**1100** 41:23
**1106** 2:19
**1109** 2:18
**11th** 142:19
**12** 33:11 87:4
**1200** 4:14
**125** 2:14 110:10 110:14
**126** 2:4
**1262** 2:14
**128** 2:5
**13** 60:3 86:20 91:25
**138** 2:6
**139** 2:7
**13th** 86:19 88:24
**15** 33:6 78:9 138:24
**153,000** 68:22
**1608** 4:18,22
**167** 2:22
**171419** 33:5
**18** 17:23
**1808** 4:4 142:4
**182,000** 68:22
**1865** 2:21
**1900** 29:19
**1901** 9:4
**191** 110:21

2

**2** 2:13 33:5 64:14 116:19 116:22
**2:19-CV-0235...** 1:4 3:4
**2:19-CV-0235...** 5:15
**20** 33:11 62:20 85:1,2 113:10 144:14
**2013** 68:21 138:24
**2014** 68:22 138:24
**2015** 58:24 68:22 73:19 100:23 101:11 112:10 113:1,15 138:24 139:11
**2016** 138:23
**2017** 35:21,25 38:2,7 53:15 53:18 86:19 86:20 87:4 88:17 89:12 90:11 91:2 100:24 101:11 110:17 112:10 113:1,15
**2018** 38:15 41:1 41:17 42:11,16 43:4,7,9 53:20 54:3 55:24 91:25 92:10,12,13,23 93:12 94:24 95:19 96:22 132:22 137:21
**2020** 1:10 3:11 5:11 16:24 17:15 25:20 28:13 29:4,20 30:5,21 33:15 59:15 64:3 95:4 142:2,9 143:3
**21** 89:12
**2120** 18:12
**213,000** 68:23 69:8
**214** 4:4 142:4
**215,000** 139:9
**23** 41:24
**237** 2:14
**23rd** 94:24
**24** 12:12
**240,000** 60:9 69:2
**25** 23:11 25:20
**2598** 65:17
**2602** 66:17
**2603** 70:13
**2604** 68:13
**27** 110:17
**28** 16:24 28:13 29:3,14,20 30:5,21 33:15 59:15 64:3 73:18 92:12 95:4,19
**284** 2:16
**28th** 17:24 19:1 84:19 86:23
**29** 1:10 58:24 142:9 143:3
**290** 2:17
**293** 2:19
**295** 2:20
**29th** 3:10 5:10

3

**3** 21:7 25:19 33:5
**3,000** 30:2
**30** 78:15 142:18
**300,000** 92:18
**303** 2:20
**306** 2:21
**307** 2:22
**32X** 129:4
**35** 7:23 14:15 19:7 69:7
**3800** 4:9,14
**390.95** 105:5

4

**4** 2:15 33:6
**4,000** 29:2 92:17
**4,500** 52:25 68:19 70:8
**4,680** 53:14
**40** 19:7
**41** 2:12
**4240** 18:13
**438** 2:15 58:18 58:20
**444** 63:23,25
**4500** 55:4
**453** 2:16 73:11 73:13
**4680** 53:4,7 55:4,11,13,20 89:16 96:12,14
**469** 2:17 82:22 82:24 84:9,15 100:25
**487** 2:18 86:16 86:18
**489** 2:19 89:8 89:10
**492.010** 141:6

5

**5** 33:5
**5,000** 18:3
**50** 44:12 66:5,6 100:11,11
**50/50** 111:8
**531** 2:20 91:21 91:23
**537** 2:21 94:20 94:22
**539** 2:22 95:16 95:18
**547** 2:23 10:12 10:14 16:23 21:5
**55** 4:9
**580** 18:8,12

6

**6** 33:6 41:1 60:21
**60603** 4:9
**63101** 142:19
**64105** 4:14
**64108** 4:19,23
**65** 61:15

7

**7** 2:2 31:18 43:19 61:10
**7,000** 54:25 55:3,5 59:24 61:11,17 69:9 70:10 96:11 139:6,12
**711** 142:18
**72EXPERT** 17:13
**74** 18:6
**76** 18:12
**78** 2:17
**7881467** 72:15

8

**8** 33:6
**8,000** 126:10
**8/7/2015** 66:19
**80** 14:6,13

**9**

**9** 33:11 62:15
**9:01** 1:13 5:11
**90** 78:25
**90-day** 38:5
  61:14 89:16
**92660** 9:5
**94129** 4:4 142:4
**94673** 144:24
**98** 2:3