SUSAN THOMPSON  7/30/2020

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF KANSAS
 2
    ROBERT P. GARVER,
 3
                    Plaintiff,
 4
             vs.          Case No. 2:19-CV-02354-JWB-KGG
 5
    PRINCIPAL LIFE INSURANCE
 6  CO., THE ROTH COMPANIES,
    INC., and DUANE ROTH,
 7
                    Defendants.
 8
           VIDEOTAPED DEPOSITION OF SUSAN THOMPSON
 9          Taken on behalf of the Defendants

10                    July 30, 2020

11              Saundra Tippins, CCR

12

13          (The deposition began at 8:57 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

SUSAN THOMPSON  7/30/2020

```
 1   QUESTIONS BY:                          PAGE NO.

 2   MS. KERSTING                                7

 3   MR. OSETE                                  93

 4   MR. BOURHIS                               114

 5   MR. OSETE                                 155

 6   MS. KERSTING                              SSS

 7

 8                    INDEX OF EXHIBITS

 9
     EXHIBIT          DESCRIPTION OR             PAGE
10   NO.              BEGINNING BATES NUMBER

11   Exhibit 2    PLIC  1                         49

12   Exhibit 126  Thompson CV                     10

13   Exhibit 127  Thompson Initial Expert Report  27

14   Exhibit 128  Thompson Report Addendum        40

15   Exhibit 129  Thompson Supplemental Report    82

16   Exhibit 548  RPG78EXPERT                      94

17   Exhibit 550  Thompson Supplemental Report   109

18

19   Plaintiff's 2 Letter 6/19/20

20                   Bourhis/Principal           121

21   Plaintiff's 3 Thompson Report Addendum      116

22   Plaintiff's 4 Smith Rebuttal Report         125

23   (Exhibits were attached to original and

24    copies electronically.)

25
```

SUSAN THOMPSON  7/30/2020

```
 1                UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2
     ROBERT P. GARVER,
 3
                     Plaintiff,
 4
                 vs.            Case No. 2:19-CV-02354-JWB-KGG
 5
     PRINCIPAL LIFE INSURANCE
 6   CO., THE ROTH COMPANIES,
     INC., and DUANE ROTH,
 7
                     Defendants.
 8
 9                VIDEOTAPED DEPOSITION OF SUSAN THOMPSON,
10   produced, sworn, and examined on the 30th day of
11   July, 2020, between the hours of nine o'clock in
12   the forenoon and five o'clock in the afternoon of
13   that day, all parties appearing remotely, before
14   SAUNDRA TIPPINS, a Notary Public, and Certified
15   Court Reporter within and for the States of
16   Missouri and Kansas, in a certain cause now pending
17   before the U.S. District Court, District of Kansas,
18   wherein ROBERT P. GARVER is the Plaintiff, and
19   PRINCIPAL LIFE INSURANCE CO., THE ROTH COMPANIES,
20   INC. and DUANE ROTH are the Defendants.
21
22
23
24
25
```

SUSAN THOMPSON  7/30/2020

```
 1                  A P P E A R A N C E S
 2              For the Plaintiff:
 3              MR. MATTHEW BOURHIS (by Zoom)
                BOURHIS LAW FIRM
 4              1808 Wedmeyer Street, Suite 214
                San Francisco, California  94129
 5              matthew.bourhis@bourhislaw.com
 6
                For the Defendant Principal Life:
 7
                MS. EDNA KERSTING (by Zoom)
 8              WILSON, EISLER, MOSKOWITZ, EDELMAN &
                DICKER, LLP
 9              55 West Monroe Street, Suite 3800
                Chicago, Illinois  60603
10              edna.kersting@wilsonelser.com
11
                For the Roth Defendants:
12
                MR. JESUS OSETE (by Zoom)
13              BRYAN CAVE LEIGHTON PAISNER, LLP
                1200 Main Street, Suite 3800
14              Kansas City, Missouri  64105
                jesus.osete@bclplaw.com
15
16              The Court Reporter:
17              Ms. Saundra Tippins (by Zoom)
                Alaris Litigation Services
18              1608 Locust Street
                Kansas City, Missouri  64108
19
20              The Videographer:
21              Mr. Keith Montgomery (by Zoom)
                Alaris Litigation Services
22              1608 Locust Street
                Kansas City, Missouri  64108
23
24
25
```

SUSAN THOMPSON  7/30/2020

```
 1                 IT IS HEREBY STIPULATED AND AGREED,
 2      by and between counsel for Plaintiff and counsel
 3      for Defendants that the deposition of SUSAN
 4      THOMPSON may be taken in shorthand by Saundra
 5      Tippins, a notary public and shorthand reporter,
 6      and afterwards transcribed into typewriting; and
 7      the signature of the witness is expressly reserved.
 8                       * * * * *
 9                 THE VIDEOGRAPHER:  We are on the
10      record.  Today's date is July 30th, 2020, and the
11      time is 8:57 a.m.  This is the video recorded
12      deposition of Susan Thompson in the matter of
13      Robert Garver versus Principal Life Insurance
14      Company, et al., Case No. 2:19-CV-02354-JWB-KGG in
15      the United States District Court for the District
16      of Kansas.
17            This deposition is being held via Zoom
18      link.  The reporter's name is Saundra Tippins.
19      My name is Keith Montgomery.  We are with Alaris
20      Litigation Services.
21            Would the attorneys present please
22      introduce themselves and the parties they
23      represent.
24                 MR. BOURHIS:  Matthew Bourhis on
25      behalf of Plaintiff.
```

SUSAN THOMPSON  7/30/2020

```
 1                   MS. KERSTING:  Edna Kersting with
 2    Wilson Elser on behalf of Defendant Principal
 3    Life.
 4                   MR. OSETE:  Jesus Osete with Bryan
 5    Cave Leighton Paisner on behalf of Defendants The
 6    Roth Companies and Duane Roth.
 7                   THE VIDEOGRAPHER:  And would the
 8    court reporter please read on her stipulation and
 9    then swear the witness in.
10                   THE REPORTER:  This is Saundra
11    Tippins, and I am a Certified Court Reporter.
12    This deposition is being taken remotely, and those
13    participating in this examination today are
14    attending via Zoom with the witness appearing via
15    Zoom.
16          Counsel acknowledges their understanding
17    that I am not physically present with the witness
18    and that I will be reporting this proceeding
19    remotely.  Counsel further acknowledges that I
20    will not be administering the oath in person, but
21    am doing so remotely.  The parties and counsel
22    consent to this arrangement and waive any
23    objections to this manner of proceeding.
24          Counsel, please indicate your agreement
25    verbally on the record by stating your name and
```

SUSAN THOMPSON  7/30/2020

```
 1    that you stipulate to these terms, after which I
 2    will swear in the witness and we may begin.
 3                    MR. BOURHIS:  Matthew Bourhis.  So
 4    stipulated.
 5                    MS. KERSTING:  Edna Kersting.  So
 6    stipulated.
 7                    MR. OSETE:  Jesus Osete.  So
 8    stipulated.
 9                    THE VIDEOGRAPHER:  You may
10    proceed.
11                    SUSAN THOMPSON,
12    of lawful age, produced, sworn and examined on
13    behalf of Defendant Principal Life, deposes and
14    says:
15                    EXAMINATION
16    QUESTIONS BY MS. KERSTING:
17          Q    Good morning.
18          A    Good morning.
19          Q    And state your name for the record.
20          A    I didn't hear you.  I'm sorry.
21          Q    I said please state your name for the
22    record.
23          A    Susan Thompson.
24          Q    What is your address?
25          A    My work address is 7541 North
```

SUSAN THOMPSON  7/30/2020

```
 1    Remington Avenue in Fresno.
 2         Q    Is that in California?
 3         A    Yes.  I'm sorry.
 4         Q    What is your telephone number there?
 5         A    (559)440-0575.
 6         Q    And are you currently employed?
 7         A    Yes.
 8         Q    Where are you currently employed?
 9         A    At Hemming Morse, LLC, LLP.
10         Q    What kind of business is Hemming
11    Morse?
12         A    It's an accounting firm.  It's
13    forensic and litigation support.
14         Q    And what is your position with Hemming
15    Morse?
16         A    I'm a partner.
17         Q    As a partner with Hemming Morse, what
18    do you do on a day-to-day basis?
19         A    I work on various types of consulting
20    and litigation types of engagements.
21         Q    How many years have you been with
22    Hemming and Morse?
23         A    I'd have to look at my CV.  Over 25, I
24    think.
25         Q    And how many years have you solely
```

SUSAN THOMPSON  7/30/2020

```
 1    been devoting your time to consulting and forensic

 2    litigation support?

 3                    MR. BOURHIS:  Objection, form.

 4         A    Solely, probably since I joined

 5    Hemming Morse.  I think that was in 2001, roughly.

 6         Q    (By Ms. Kersting) So about 19 years?

 7    Is that fair to say?

 8         A    No.  It's probably more than that, but

 9    around 20.

10         Q    Aside from Hemming Morse, are you

11    involved in any other businesses?

12         A    As a profession no.

13         Q    Are you represented by an attorney

14    today for your deposition?

15         A    Well, I'm here on behalf of and

16    working for Matthew Bourhis on this.

17         Q    But he is not your attorney, is he?

18         A    That's correct.

19         Q    Let's take a look at Exhibit 126.

20         A    I don't know what that is.

21         Q    It'll come.

22                    MR. BOURHIS:  Edna, we were never

23    provided with a file for your exhibits in advance

24    of this deposition.

25                    MS. KERSTING:  Right.  I'm screen
```

SUSAN THOMPSON  7/30/2020

1    sharing them, as is allowed in our stipulation.

2                    MR. BOURHIS:  Okay.  I'm just

3    going to put an objection in the record.

4                    MS. KERSTING:  That is the last

5    way in the options on how exhibits can be shared.

6    I do not have to provide you a copy of the

7    exhibits in advance.

8                    (Counsel presented to the

9           witness premarked Exhibit No. 126.)

10        **Q    (By Ms. Kersting) Is this your CV,**

11   **Ms. Thompson?**

12        A    Yes.  It looks like it.

13        **Q    And you can, if Mr. Montgomery would**

14   **be so kind, he can scroll through it to the extent**

15   **that we need to make sure it's updated.**

16        **Is this your most recent version of your**

17   **CV?**

18        A    I can't tell without taking a really

19   close look at it, but it kind of looks like it.

20        **Q    Okay.  What formal education did you**

21   **receive?**

22        A    It's right there.  I went to, I

23   graduated from Loma Linda University with a B.S.

24   in Accounting.

25        **Q    Do you have any post-graduate degrees?**

```
Case 2:19-cv-02354-TC   Document 138-1   Filed 05/07/21   Page 11 of 203
```

1        A    No.
2        Q    Do you have any other formal school
3    other than the B.S. in accounting from Loma Linda?
4    Did you respond?
5        A    Can you repeat that?  I'm sorry.
6        Q    Do you have any other formal education
7    other than a B.S. in accounting from Loma Linda?
8        A    No, other than the continuing
9    education that I required to keep my license.
10       Q    Do you have an active CPA license?
11       A    Yes, I do.
12       Q    In what state?
13       A    California.
14       Q    Only in California?
15       A    Yes.
16       Q    And your license is in good standing?
17       A    Yes.
18       Q    Do you hold any other certifications
19    or licenses of any kind other than your driver's
20    license?
21       A    I'm certified in financial forensics
22    by the AICPA.
23       Q    Are you licensed in any aspect related
24    to insurance?
25       A    No.

SUSAN THOMPSON  7/30/2020

```
 1          Q    Do you have any training in handling
 2    claims?
 3               MR. BOURHIS:  Objection, form.
 4          A    I don't know what you mean by
 5    training.  I don't, I don't adjust insurance
 6    claims.  That's not my role, if that's what you're
 7    asking me.
 8          Q    (By Ms. Kersting) No.  I'm asking if
 9    you ever received any training in handling
10    claims, meaning claims --
11               MR. BOURHIS:  Objection, vague and
12    ambiguous.
13          Q    -- of any kind, life --
14               MS. KERSTING:  Matthew, I'm not
15    done yet.
16          Q    (By Ms. Kersting) -- life, disability
17    or health types of insurance?
18               MR. BOURHIS:  Objection, vague and
19    ambiguous as to the term "claims."
20          A    Yeah.  I'm not sure what you mean by
21    instructions in handling claims.  Clearly I've
22    worked on such things probably for 30 years or
23    better.  I've had instructions from counsel, from
24    opposing counsel, from the triers of fact.  I've
25    worked on many of these.  I've worked alongside
```

SUSAN THOMPSON  7/30/2020

1    adjustors.

2         So I have had informally a lot of training

3    on how to do this and what is expected and what's

4    appropriate under various types of damage

5    calculations.

6         **Q    (By Ms. Kersting) Have you ever made**

7    **a claim determination?**

8         A    I'm unsure what that means.

9              MR. BOURHIS:  Objection, vague and

10   ambiguous.  Sorry, vague and ambiguous.  I just

11   need to make my objection.  Vague and ambiguous as

12   to the term "claims."

13             MS. KERSTING:  But she already

14   answered, Matthew.

15        **Q    (By Ms. Kersting) Have you already**

16   **decided a claim and made the determination as to**

17   **whether somebody was entitled to benefits?**

18             MR. BOURHIS:  Objection, form.

19        A    I don't think that that's my role, to

20   determine whether someone is entitled to anything.

21   My role is to calculate the damages in accordance

22   with the policy and the information that I have.

23        **Q    (By Ms. Kersting) That is not the**

24   **question.**

25        A    That wasn't done.

SUSAN THOMPSON  7/30/2020

```
 1                    MR. BOURHIS:  Edna, you're
 2   interrupting the witness during the middle of her
 3   answer.  Please don't do that.
 4                    MS. KERSTING:  It sounded to me
 5   like she was done.  Maybe it's the connection,
 6   Matthew.
 7        Q    (By Ms. Kersting) Go ahead,
 8   Ms. Thompson.
 9        A    I don't, I don't even know where I was
10   in my answer, so go ahead.
11        Q    I said this is not a trick question.
12   This is not a question as to whether, what your
13   role is here today.  It's a question to explore
14   your general background.
15        So I'm asking you whether you've ever made
16   a claim determination as to whether someone was
17   entitled to benefits.
18        A    That's what my answer was.
19                    MR. BOURHIS:  Objection to form.
20   Sorry, Susan.  Objection, form.  It's compound.
21   It's vague and ambiguous.
22                    MS. KERSTING:  Please limit your
23   objection, Matthew, to what's allowed, which is
24   form.
25        Q    (By Ms. Kersting) Go ahead,
```

SUSAN THOMPSON  7/30/2020

1    Ms. Thompson.  You said you answered that

2    question already?

3         A    Yes.

4         Q    Please strike the answer as

5    nonresponsive.  Certify as evasive.

6              Are you a licensed actuary?

7         A    Nope.

8         Q    Did you ever receive any training in

9    actuary science?

10        A    No.

11        Q    Have you ever been a party to any

12   civil or criminal procedure?

13        A    No.

14        Q    Have you ever been sued?

15        A    Not that I know of.

16        Q    Have you ever had a disciplinary

17   action filed against you?

18        A    Nope.

19        Q    Prior to becoming a forensic

20   accountant and expert witness, have you ever been

21   involved in litigation with regard to a matter

22   that you were an accountant on?

23        A    Not that I know of, not that I recall.

24        Q    So it is fair to say that your current

25   practice consists hundred percent of consulting?

SUSAN THOMPSON  7/30/2020

```
 1          A    No.  Well, I do do some assurance work
 2     in agreed-upon procedures on occasion, which I
 3     think --
 4          Q    What does that mean?
 5          A    I think that goes beyond the
 6     consulting because it has some attestation
 7     attached to it.
 8          Q    What exactly does that work entail?
 9          A    It's, it's doing agreed-upon
10     procedures.
11          Q    What kind of procedures?
12          A    Whatever the client directs.  It's,
13     it's a type of very limited scope investigation.
14          Q    Oh, similar to like a fraud
15     investigation?
16          A    No.  It could be something where the
17     Board of Directors would like someone to come in
18     and perform five specific steps with regard to a
19     specific financial, a specific, I'm trying to
20     think, types of transactions to make sure that
21     they are, their company is following certain
22     procedures and policies in the way that they're
23     doing things, and so it gives them assurance that
24     the specific things they asked you to check in
25     your agreed-upon procedures either is or is not
```

SUSAN THOMPSON  7/30/2020

1    being performed, or you just give your opinion on

2    what you've found in doing those agreed-upon

3    procedures.

4            So it's a very directed -- it can be for

5    anything.  It could be looking at payroll.  It

6    could be looking at revenue recognition.  It just

7    depends on what the client is asking for.  That's

8    why it's called an agreed-upon procedures.

9            They tell you what it is they're

10   looking -- they want to you look at specifically,

11   how they want you to do it, and then you report

12   back.  So that's a little different than a

13   consulting.

14           **Q     And the clients in those kinds of**

15   **cases are companies?**

16           A     Yes, generally, yes.

17           **Q     Okay.  How many times have you been**

18   **retained as an expert witness?**

19           A     I don't know.

20           **Q     Are all retentions reflected on your**

21   **CV?**

22           A     No.

23           **Q     Not in all cases where you're**

24   **retained, you end up testifying; is that correct?**

25           A     That's correct.

SUSAN THOMPSON  7/30/2020

```
 1          Q     Aside from California and Nevada, have
 2    you ever been retained in any other state?
 3          A     I don't think so, not that I know of.
 4          Q     So would it be fair to say that the
 5    majority, the vast majority of your retentions and
 6    testimony are limited to California?
 7          A     Yes.
 8          Q     State and Federal Court in California?
 9          A     Correct.
10          Q     What kind of cases do you end up being
11    retained on?
12          A     That's kind of a very large question.
13    I can refer back to my CV and tell you what it
14    says in there.  I've done many insurance claims,
15    suspected fraudulent insurance claims.  I've done
16    fraud investigations for various types of white
17    collar crimes.  I've worked on GAAP/GAAS
18    departures, worked on personal wrongful
19    terminations, wrongful death, general damages,
20    breach of contracts wage-an-hour, real estate
21    types, lots of agricultural types of claims and
22    losses, class action lawsuits regarding defective
23    manufacturing, trust and estates, to name a few.
24          I think it's pretty well delineated in my
25    CV.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q    Have you ever been retained in another
 2     disability insurance case such as this one?
 3          A    I'm sorry.  You broke up.
 4          Q    Have you ever been retained in another
 5     disability insurance case such as this one?
 6          A    I don't know.  I may have.
 7          Q    None of the cases listed on your CV,
 8     though, are disability insurance cases; is that
 9     correct?
10          A    I don't know.  I don't think so, but
11     again, the only things listed on my CV are things
12     in which either I've testified in court or in
13     deposition.
14          Q    Understood, understood.  None of those
15     struck me as disability insurance cases, but I'm
16     happy to confirm.
17          We can take a look at Exhibit 126 and go
18     through your list of cases if you'd like.  Would
19     that refresh your recollection?
20          A    No.  I just said I don't think there's
21     any on there.
22          Q    Okay.  But you have been retained in a
23     disability insurance case but simply did not
24     testify?
25          A    It's possible, yes.
```

SUSAN THOMPSON  7/30/2020

1        **Q**    **But you don't know for sure?**

2        A    Correct.

3        **Q**    **Do you generally get retained by**

4  **Plaintiffs?**

5        A    No.

6        **Q**    **What would you say is the percentage**

7  **split between retentions by Defendant and**

8  **retentions by Plaintiffs?**

9        A    It really depends on the year.  I

10  don't work, I don't think, predominantly for one

11  versus the other.

12        **Q**    **So you would be open to either side**

13  **contacting you?**

14        A    Yes.

15        **Q**    **And the cases listed on your CV would**

16  **reflect that if we went through those cases and**

17  **saw which side you were retained on?**

18        A    Sure.

19        **Q**    **If we go through the cases listed on**

20  **your resume, if we double-checked on which side**

21  **you were retained, would we see a fairly even**

22  **split between defense retentions and Plaintiffs'**

23  **retentions?**

24                MR. BOURHIS:  Calls for

25  speculation.

SUSAN THOMPSON  7/30/2020

```
 1          A    It, like I said, it depends on the
 2    year.  There may be a year where I do only two or
 3    three and they're all Plaintiffs and a year I do
 4    five and they're all defense.  It's just, it just
 5    depends.  I don't think it's heavily skewed one
 6    way or the other.
 7          Q    (By Ms. Kersting) Talking about the
 8    cases in your CV?
 9          A    Yeah, that's what I'm talking about.
10          Q    So you don't know whether those cases
11    on your CV reflect a 50/50 or fairly even split
12    between defense retentions and Plaintiffs'
13    retentions?
14               MR. BOURHIS:  Objection, asked and
15    answered.
16          A    They probably won't show a 50/50.
17    Like I said, it varies, but I don't work
18    predominantly for one side or the other, at least
19    not intentionally.
20          Q    (By Ms. Kersting) And you have been
21    deposed before obviously?
22          A    Yes.
23          Q    How many times have you been deposed
24    before?
25          A    I don't know, maybe a couple dozen.
```

SUSAN THOMPSON  7/30/2020

1          **Q     More than 50?**

2          A     Probably not.

3          **Q     More than 30?**

4          A     I don't know.  I could count them up

5     if you want me to.

6          **Q     Are all of your depositions reflected**

7     **on your CV?**

8          A     They should be.

9                MR. BOURHIS:  Objection, asked and

10    answered.

11         **Q     (By Ms. Kersting) Did any of the**

12    **cases that are listed on your CV involve an**

13    **installment insurance product?**

14         A     I'm not even sure I know what an

15    installment insurance product means.

16         **Q     You do not?  You have never heard that**

17    **term before?**

18         A     No, I don't think so.

19                MR. BOURHIS:  Objection, vague and

20    ambiguous as to the term "installment insurance."

21         **Q     (By Ms. Kersting) When were you**

22    **retained in this case?**

23         A     I don't know.  I'd have to look in my

24    file.

25         **Q     Did you have your file there?  Please**

SUSAN THOMPSON  7/30/2020

```
 1   do.
 2               MS. KERSTING:  I would just like
 3   to put a note on the record that Mr. Bourhis seems
 4   to be unable to confine himself to the allowed
 5   objections to form and is coaching his witness.
 6        Q    (By Ms. Kersting) Have you found the
 7   date?
 8        A    I'm looking.  Give me a second.
 9               MR. BOURHIS:  Edna, I know that in
10   depositions you tend to object on the basis of
11   form.  If you prefer, I'm happy to do that.  But I
12   usually will specify what form my objection is
13   based on, vagueness, ambiguity, whether it's
14   unintelligible or not, so you have an opportunity
15   to fix your question or not.
16               MS. KERSTING:  Maybe that's what
17   you do in California, but that's improper.
18   Objection to form is all you're allowed to say.
19               MR. BOURHIS:  Okay.  That's what
20   I'll do then.
21               MS. KERSTING:  Great.
22        A    Okay.  It was roughly in February of
23   2020, I believe.
24        Q    (By Ms. Kersting) Do you remember the
25   date?
```

SUSAN THOMPSON  7/30/2020

Page 24

```
 1          A    Well, my engagement letter is dated
 2    January 30, 2020, so it was shortly before that,
 3    that I was contacted or it could have been that
 4    day.
 5          Q    Who retained you?
 6          A    Matthew Bourhis.
 7          Q    Did he reach out to you directly?
 8          A    Yes.
 9          Q    Yes?
10          A    Yes.
11          Q    He called you on the phone?
12          A    Yes.
13          Q    Had you ever talked to him before?
14          A    Before this case?  No.
15          Q    Have you ever had any other dealings
16    with his law firm?
17          A    No.
18          Q    What did he tell you?
19          A    He asked me if we had the ability to
20    calculate the, sorry, trying to use your guys'
21    terminology.
22          Initially we were asked to determine the
23    benefits due to Garver versus based upon the
24    policy, on the disability policy.
25          Q    And you were not able to complete that
```

SUSAN THOMPSON  7/30/2020

1    **task by February 3; is that correct?**

2                    MR. BOURHIS:  Objection, calls for

3    speculation.

4          A    Correct.  It was not done by

5    February 3.

6          **Q    (By Ms. Kersting) When did you**

7    **complete it?**

8          A    My initial report is dated July 24th,

9    2020.

10         **Q    That's not your initial report; that's**

11   **your last version of your report.  Isn't that**

12   **correct?**

13         A    No, I don't think so.  Oh, you're

14   right.  I'm sorry.

15         **Q    That's okay.**

16         A    Sorry.  My initial report was

17   April 15, 2020.

18         **Q    And prior to that, you performed**

19   **calculations and only provided schedules; isn't**

20   **that correct?**

21                   MR. BOURHIS:  Objection, form.

22         A    To Mr. Bourhis?

23         **Q    (By Ms. Kersting) Yes, to**

24   **Mr. Bourhis.**

25         A    That's probably true, yes.

SUSAN THOMPSON  7/30/2020

```
 1          Q    And then he came back to you and said
 2    you needed to put some writing with it?
 3          A    Then he asked me if I could do a full
 4    report.
 5          Q    And initially he only asked you to do
 6    schedules?
 7          A    I don't recall if the, if initially we
 8    were going to always do a report.  Generally we
 9    start with schedules to make sure that we have our
10    assumptions and our facts correct.
11          Q    Where did you get your facts from in
12    this case?
13          A    Mr. Bourhis.
14          Q    And where did you get your assumptions
15    from in this case?
16          A    Mr. Bourhis.
17          Q    Did you review any documents?
18          A    Yes, I did.
19          Q    What did you review?
20          A    We reviewed various tax documents, tax
21    forms generally, and the policy.
22          Q    Are those listed in your report?
23          A    Excuse me?
24          Q    Are those listed in your report?
25          A    Yes.
```

SUSAN THOMPSON  7/30/2020

```
 1            Q     Let's take a look at 127.
 2                        (Counsel presented to the
 3            witness premarked Exhibit No. 127.)
 4            Q     (By Ms. Kersting) Is that your
 5     initial report that you prepared for Mr. Bourhis?
 6            A     I can't tell by looking at the front
 7     page.
 8            Q     Can we scroll.  Does that assist?
 9            A     It might be.
10            Q     We can go a little further.
11            A     Stop moving because you're moving and
12     I'm trying to catch up on my hard copy.
13            Q     Okay, go to page four.  Page four may
14     help.
15            A     Yeah, so that looks like the original.
16            Q     And you cite to the First Amended
17     Complaint with regard to allegations with regard
18     to paragraph six, seven and eight?
19            Q     Do you see that?
20            A     Okay, I see it.
21            Q     Did Mr. Bourhis provide with you the
22     First Amended Complaint?
23            A     Yes.
24            Q     You understand that a complaint is
25     just a pleading, right?
```

SUSAN THOMPSON  7/30/2020

```
 1            A    I'm sorry, I didn't understand.
 2            Q    You understand that a complaint is
 3    just a pleading, correct?
 4                 MR. BOURHIS:  Objection, calls for
 5    a legal conclusion.
 6            A    A complaint is a pleading, okay.
 7            Q    (By Ms. Kersting) And it contains
 8    allegations?
 9            A    Sure, yes.
10            Q    Did you independently investigate
11    these allegations?
12                 MR. BOURHIS:  Objection, form.
13            A    Which allegations are you
14    specifically -- any, all, one?
15            Q    (By Ms. Kersting) Any and all.
16            A    So yeah, I probably did look at some
17    as regarding his whether or not he had a loss of
18    income, but I didn't -- a lot of them are beyond
19    my area of expertise.
20            Q    You independently investigated the
21    allegations about the loss of income?
22            A    Not the allegations.  Well, I guess
23    I'm not understanding your question.  I apologize.
24            I don't investigate anybody's allegations.
25            Q    That's my point.
```

SUSAN THOMPSON  7/30/2020

```
 1          A    I just performed a calculation.
 2    That's why I misunderstood you.  I'm sorry.
 3          Q    It's not a problem at all.
 4          You took the complaint for its truth, did
 5    you not?
 6                MR. BOURHIS:  Object to form,
 7    calls for speculation, calls for legal opinion.
 8          A    That along with counsel.
 9                MS. KERSTING:  Matthew, we were
10    going to be limiting your objections to form;
11    isn't that true?
12                MR. BOURHIS:  I can object on the
13    basis of --
14                MS. KERSTING:  I wasn't done with
15    my question, and Matthew, I wasn't done with my
16    question.
17          Q    (By Ms. Kersting) You did not
18    independently investigate the truth of the
19    allegations in the complaint, did you?
20          A    Correct.
21                MR. BOURHIS:  Hold on a sec.
22    That's where I need to make my objections.
23    Objection as to form.  Objection that it calls for
24    a legal opinion.  Objection that it calls for
25    speculation.
```

SUSAN THOMPSON  7/30/2020

```
 1                    MS. KERSTING:  Okay.
 2        Q    (By Ms. Kersting) If you, if we go
 3   back to Exhibit 126, 127, sorry.  And in
 4   paragraph III there you see documents considered.
 5        The documents I considered in reaching my
 6   opinion in this matter are listed in Exhibit B to
 7   attached to this report.  Did I read that
 8   correctly?
 9        A    You read, yeah, as far as you read,
10   yeah.
11        Q    And if we may take a look at
12   Exhibit B.
13                    THE VIDEOGRAPHER:  Sorry,
14   Exhibit what?
15                    MS. KERSTING:  It's at the end of
16   it, if you just scroll through the document.  It's
17   first her resume, and then the next one should be
18   the list of documents.  There we go.
19        Q    (By Ms. Kersting) Are these all the
20   documents you had available to you when you
21   formed your opinions that are reflected in this
22   initial report?
23        A    Yes.
24                    MR. BOURHIS:  Objection, form.
25        Q    (By Ms. Kersting) Are there any other
```

SUSAN THOMPSON  7/30/2020

1    documents that you considered when preparing your

2    opinions in this initial report?

3            A    I don't believe so.

4            Q    And take a look at this document.

5    It's the Robert P. Garver disability policy number

6    7881467.

7            Did you obtain that policy from

8    Mr. Bourhis?

9            A    Yes.

10           Q    And the same with the W-2s for 2018

11   and 2019?

12           A    Yes.

13           Q    And with regard to the 2015 amended

14   federal and amended Kansas return, you obtained

15   those from Mr. Bourhis?

16           A    Yes.

17           Q    And the 2016 returns as well?

18           A    All of the tax information.

19           Q    All of the tax returns, up until 2018,

20   191st Street Investors form?

21           A    Correct.

22           Q    The draft PV schedules, are those your

23   schedules that you prepared?

24           A    Yes.

25           Q    What are the notes re 191st?

SUSAN THOMPSON  7/30/2020

```
 1          A    Just file notes.  Usually when we turn
 2    over our documents, we turn over everything.  And
 3    if we have notes in our file from counsel, we
 4    include those.  So we probably gained some
 5    information on 191st based on the discussion, and
 6    that's why the notes are in there.
 7          Q    They're your notes with regard to
 8    information that was provided to you by
 9    Mr. Bourhis?
10          A    Correct.
11          Q    The Livingston survey 12/13/19, what
12    is that?
13          A    That's economic data that we look up.
14    It's publicly available.
15          Q    Same with the U.S. Consumer Price
16    Index?
17          A    Yes.
18          Q    So that is information that you looked
19    up yourself?
20          A    Yes.
21          Q    It's not information that was provided
22    to you by Mr. Bourhis?
23          A    No, no.  This is all our usage from
24    there down.
25          Q    And the web link below with the U.S.
```

SUSAN THOMPSON  7/30/2020

Page 33

```
 1      Consumer Price Index, is that the web link to that
 2      specific information?
 3              A    Yes.
 4              Q    And the ten-year daily treasure yield
 5      curve rate as of 2/26/2020, that's also
 6      information you looked up?
 7              A    Yes.
 8              Q    That wasn't provided to you by
 9      Mr. Bourhis?
10              A    Correct.
11              Q    Was it suggested by Mr. Bourhis that
12      that's the information that you should be looking
13      at?
14              A    No.
15              Q    That was your own decision?
16              A    Yes.
17              Q    Since rendering of initial opinion and
18      receipt of these documents that we just looked at
19      in Exhibit B, have you received any additional
20      documents from Mr. Bourhis?
21              A    Yes.
22              Q    Was that a yes?
23              A    I think so.
24              Q    What else?  What else did you receive?
25              A    We received a few documents yesterday
```

SUSAN THOMPSON  7/30/2020

1    that I didn't have a chance to look at, so I can't

2    even tell you what they are unless I pull up the

3    email.  I know one of the things that was in it

4    was something we already had, which was the letter

5    from the insurance company saying that they had

6    paid the disability through I think October, but

7    that's all I remember from what we got.

8         Other than that, I don't, I didn't look at

9    it yet.

10        **Q    Are you referring to documents labeled**

11   **as exhibits that you received yesterday, or did**

12   **you receive other documents?**

13        A    I think it was proposed exhibits.  As

14   I said, I haven't, didn't have a chance to look at

15   them.

16        **Q    Did you receive any other documents**

17   **from Mr. Bourhis?**

18        A    I don't think so.

19        **Q    Did you receive any deposition**

20   **transcripts?**

21        A    No.

22        **Q    Have you ever seen an expert report**

23   **prepared by a Mr. Finch?**

24        A    Oh, no, but I -- you reminded me I do

25   have an expert report by Mr. Smith, so I did

SUSAN THOMPSON  7/30/2020

1    receive that.  Sorry about that.

2         **Q    Not a problem.  Do you remember when**

3    **you received Mr. Smith's expert report?**

4         A    I think maybe this past Tuesday.

5         **Q    So just very recently?**

6         A    Yes.

7         **Q    And you did not have it when you**

8    **prepared your initial opinion or your supplemental**

9    **opinion; is that correct?**

10        A    Well, it's in rebuttal to my initial

11   opinion, so it would not have been prepared before

12   then, I don't believe, but I didn't have it until

13   Tuesday.

14        **Q    Tuesday of this week?**

15        A    Yes.

16        **Q    So we're talking about the 28th,**

17   **July 28th?**

18        A    If that's Tuesday.

19        **Q    And you have never received**

20   **Mr. Finch's report?**

21        A    No.

22        **Q    Do you know who Mr. Finch is?**

23        A    Nope.

24        **Q    Do you know who Mr. Smith is?**

25        A    I have his report.  I don't know him.

SUSAN THOMPSON  7/30/2020

Page 36

1    I read his CV.

2         Q    But otherwise you have no knowledge of

3    Mr. Smith?

4         A    Beyond this report no.

5         Q    Aside from the documents that were

6    listed in Exhibit B and Dr. Smith's report, did

7    you review any other documents in preparation for

8    today?

9         A    You're assuming I reviewed all that in

10   preparation for today, but no.

11        Q    If you --

12        A    I've reviewed my reports and the Smith

13   report.  That's it.

14        Q    You read your reports and the Smith

15   report, is what you're saying?

16        A    Yes.

17        Q    You did not review any of the

18   underlying documents?

19             MR. BOURHIS:  Objection, asked and

20   answered.

21        A    In my review of Smith's report, I did

22   go back to the underlying documents to see what he

23   was referring to, kind of ticked and tied.  And so

24   that's what I consider part of the review, so yes,

25   I did look at the underlying documents.

SUSAN THOMPSON  7/30/2020

1          **Q     (By Ms. Kersting) Did you speak with**
2    **Mr. Bourhis in preparation for your deposition?**
3          A    Yes.
4          **Q    When did you speak with him?**
5          A    Yesterday.
6          **Q    What did you speak about?**
7          A    The timing, because we thought it was
8    9 o'clock our time, not 7 o'clock.  We went over
9    the changes that we made.  We indicated that there
10   were some indication from the insurance company
11   that they thought one of the -- Welborn maybe was
12   not a 50/50 owned by husband and wife entity, and
13   we talked about that and the tax returns and how
14   his clearly weren't 50/50; that the tax returns
15   for Robert Garver Builder are clearly marked as a
16   hundred percent ownership, and that he was just
17   asking to be sure that he understood how we
18   treated those.
19          And we treated those in our calculation in
20   accordance with how they are presented on the tax
21   returns.  And that was generally the sum and
22   substance of our discussion.
23          **Q    You said you talked about the changes**
24   **that we made.  What do you mean by that?**
25          A    I believe he mentioned that the

SUSAN THOMPSON  7/30/2020

1    insurance company was making an assertion that

2    Welborn should be treated as a hundred percent

3    ownership for Robert.

4         **Q    Are you reading that from your notes?**

5         A    No.

6         **Q    Okay.  I just saw you looking to the**

7    **side away from this camera so I was just --**

8         A    Because I keep forgetting which

9    entities I'm talking about.  There's more than

10   one.

11        **Q    So you're saying that Mr. Bourhis told**

12   **you that the, that Principal Life is claiming that**

13   **Welborn was owned 100 percent by Mr. Garver?**

14        A    Yes, or at least treating the income

15   that way.

16        **Q    And what were your thoughts about**

17   **that?**

18        A    Well, as I said, we, we followed what

19   was on the tax returns, and the tax returns, you

20   know, are filed under penalty of perjury.  Their

21   hundred percent is attributed to him for Robert

22   Garver Builder, and only 50 percent is

23   attributable directly to him for Welborn.

24        So that's how we treated the income.  We

25   followed what's presented on the tax return as

SUSAN THOMPSON  7/30/2020

1   far as owner.

2          Q     And would you -- sorry, I thought you

3   were done.

4          So when you calculated the stream of

5   payments, you used the tax returns and the

6   information that was reflected in those tax

7   returns, just like you just said?

8          A     Yes.

9          Q     And you calculated a stream of income

10  based on hundred percent ownership in Robert

11  Garver Builder and 50 percent ownership in Welborn

12  Sales?

13         A     Correct.

14         Q     How much money have you charged the

15  Bourhis law firm so far for your services?

16         A     I don't know.

17         Q     Have you provided invoices to the

18  Bourhis law firm?

19         A     Yes.

20         Q     Are your invoices paid?

21         A     I believe they are.

22         Q     Did you charge Mr. Bourhis for your

23  discussion yesterday?

24         A     I will.

25         Q     What is your forensic rate?

SUSAN THOMPSON  7/30/2020

```
 1          A    400 on this, I believe.

 2          Q    $400 an hour for preparation of the

 3   report?

 4          A    For all the work that I do, yes.

 5          Q    All the work?  It's all the same,

 6   meaning deposition testimony?

 7          A    Correct.

 8          Q    And if you were to be asked to testify

 9   in Kansas, the Bourhis law firm would compensate

10   you for your travel?

11          A    I expect so.

12          Q    We've looked at 127, which was your

13   initial report.  You have since then provided a

14   supplemental and an amended and corrected report;

15   isn't that correct?

16          A    So we have provided an addendum to the

17   expert report to update certain aspects.

18          Q    Okay.  That is Exhibit 127, I believe.

19   Oh, 128.

20               (Counsel presented to the

21          witness premarked Exhibit No. 128.)

22          Q    (By Ms. Kersting) Is that the

23   addendum you're talking about?

24          A    Yes.

25          Q    Okay.  Let's, okay, let's talk about
```

SUSAN THOMPSON  7/30/2020

1    this a little more.  Let's go to page four.  Can

2    we flip the report to page four.  Sorry.

3          Down there in paragraph eight you're

4    referencing a June 19, 2020, letter?  Do you see

5    that?

6          A    Yes.

7          Q    Which basically indicates that

8    Mr. Garver was paid remaining benefits for 2018;

9    isn't that correct?

10         A    Yes.

11         Q    And is that the letter that you just

12   referred to?

13         A    Uh-huh.

14         Q    Telling you that you had seen a letter

15   recently?

16         A    I believe so, yes.

17         Q    And then if we look at paragraph ten,

18   you're calculating past benefits due from

19   10/1/2018 through 7/31/2020.  Is that a

20   miscalculation or a typo?

21         A    Well, I believe that we were told that

22   they were only paid through September.

23         Q    So that calculation does include

24   benefits between October and December of 2018?

25         A    Yes.  It includes from October 1.

SUSAN THOMPSON  7/30/2020

1      **Q    And the June 19 letter, which you just**
2  **cited in paragraph eight, that says that benefits**
3  **were paid through the end of 2018?**
4      A    That may be -- I may have misstated
5  that.  I'd have to look at the letter again.
6      **Q    So you misstated the letter or you**
7  **misstated your calculation?**
8      A    I'd have to look at the letter again.
9  My calculation is through the dates that I have
10  there, from 10/1.
11     **Q    Your calculation is from 10/1?**
12     A    Correct.
13     **Q    So that's not a typo?  That's indeed**
14  **intended?**
15     A    Yes.
16     **Q    Okay.**
17         MR. BOURHIS:  Can we take a
18  five-minute break, Edna?
19         MS. KERSTING:  Ms. Thompson, do
20  you need a break?  Because I'm kind of --
21         THE WITNESS:  I would appreciate
22  that.  I need to get something hot in my throat or
23  something.
24         MS. KERSTING:  Okay, sure,
25  absolutely.

SUSAN THOMPSON  7/30/2020

```
 1                    THE WITNESS:  Thank you.
 2                    THE VIDEOGRAPHER:  Going off
 3      record 9:46 a.m.
 4                    (Recess.)
 5                    THE VIDEOGRAPHER:  Back on record
 6      9:54 a.m.
 7                    MR. BOURHIS:  Susan, did you have
 8      a correction that you wanted to make?
 9                    THE WITNESS:  So it's more of a
10      clarification on the past benefits.
11          We didn't, we understand that those
12      benefits were paid.  What we calculated was just
13      the interest on the delay of that payment.  So as
14      far as the 2018 goes, that's, that's what's
15      included as past.  It's just the interest at
16      18 percent.
17          Q    (By Ms. Kersting) Did you see any
18      provision in the insurance policy which I know
19      you had, because it was listed, that allowed for
20      interest?
21          A    No.  That was at direction of counsel.
22          Q    Counsel told you to include interest?
23          A    Yes.
24          Q    So you did not see any provision in
25      the insurance policy that allowed for interest?
```

SUSAN THOMPSON  7/30/2020

```
 1            A    I don't recall seeing anything.
 2            Q    And you don't have any opinions as to
 3      whether interest is actually due, do you?
 4            A    No.
 5            Q    You were just told by counsel to
 6      include interest?
 7            A    Yes.
 8            Q    And you performed a calculation?
 9            A    Yes.
10            Q    He also told you the interest rate?
11            A    Correct.
12            Q    And you have no opinion as to whether
13      that interest rate is appropriate or not, do you?
14                 MR. BOURHIS:  Objection, calls for
15      a legal conclusion, calls for speculation.
16            A    I'm relying on his representation and
17      the information that he provided me.
18            Q    (By Ms. Kersting) That's my point.
19                 MR. BOURHIS:  Objection,
20      argumentative.
21                 MS. KERSTING:  It wasn't a
22      question, Matthew.
23                 MR. BOURHIS:  I know.  It was an
24      argument.
25                 MS. KERSTING:  No.  It was a
```

SUSAN THOMPSON  7/30/2020

```
 1    response to you and your objection.  And again,
 2    please limit your objections to the form.
 3    Otherwise we'll have to stop this deposition and
 4    start at a later point again if you can't do that.
 5    It's standard.
 6          Q     (By Ms. Kersting) Do you have any
 7    information as to when benefits accrue under the
 8    disability insurance policy?
 9                MR. BOURHIS:  Objection, form.
10          A    I don't understand your question.
11          Q     (By Ms. Kersting) Do you have any
12    information on when benefits accrue, when they
13    become due?
14                MR. BOURHIS:  Same objection.
15          A    Well, nothing other than based on the
16    reading of the policy.
17          Q     (By Ms. Kersting) What did you read
18    in the policy about when benefits become due?
19          A    My understanding is they become due as
20    time passes.
21          Q     Automatically?
22          A    Excuse me?
23          Q     Automatically?
24          A    Well, as long as you're meeting the
25    provisions of the policy.
```

SUSAN THOMPSON  7/30/2020

1          Q      What provisions?

2          A      However the calculations are called to

3    be done for how you calculate benefits.  That was

4    a very convoluted answer.  Let me start that over.

5          It's that benefits would be paid in

6    accordance with the policy.  The policy

7    calculates the method, provides a methodology for

8    calculating that, and that methodology is based

9    on time.  And generally this one is based on the

10   passage of each month.

11         Q      And it is your opinion that there

12   aren't any further requirements?

13         A      I don't know.

14         Q      As far as you know, it's only the

15   passage of time that makes the benefits due?

16                MR. BOURHIS:  Objection, calls for

17   a legal conclusion, form.

18         A      I don't know.  That's what I was

19   instructed, and that's how I read the policy.

20         Q      (By Ms. Kersting) And you have no

21   opinion on that really?  You were just told to

22   run a calculation and you did?

23         A      Correct.

24         Q      Correct?  In calculating Mr. Garver's

25   pre-disability earnings, you used the amounts on

SUSAN THOMPSON  7/30/2020

```
 1   his K-1 and his W-2s; is that correct?

 2        A    I don't think that's everything.  No,

 3   we got information generally out of the tax

 4   returns as well, I think.  I don't think we used

 5   the paystubs so much.

 6        But yes, the information that we use is

 7   basically out of the tax returns.  I just don't

 8   want you to limit it to a K-1 and whatever else

 9   you said.

10        Q    W-2.  So you did not use just the K-1

11   and the W-2.  What else did you use?

12        A    We used the, we reviewed the tax

13   returns in their entirety, not just the K-1s.

14        Q    Did you look at the earnings

15   definition in the policy?

16        A    Yes.

17        Q    Did you follow the earnings definition

18   in the policy?

19        A    Yes.

20        Q    And you were told again by counsel to

21   make certain assumptions; isn't that correct?

22        A    Yes.

23        Q    And to include certain information and

24   exclude certain information, correct?

25                  MR. BOURHIS:  Objection, form.
```

SUSAN THOMPSON  7/30/2020

Page 48

```
 1          A    I don't know that I agree with that.
 2    Are you referring to something specific?
 3          Q    (By Ms. Kersting) We can look at the
 4    section.  We can look at the section in your
 5    report if you'd like to, in case I am misquoting
 6    you.  It was the last exhibit that we pulled up,
 7    128.  Let's go forward, I think pages four and
 8    five, page five and page six.
 9          In paragraph 16 you talk about his prior
10    earnings, correct?  Is that the definition that
11    you used for the calculation that's right above
12    it?
13          A    Yes.  That comes right out of the
14    policy.
15          Q    Is that the only definition you used
16    for the calculation?
17               MR. BOURHIS:  Objection, form.
18          A    I think that's the definition that we
19    used.
20          Q    (By Ms. Kersting) What?  Pardon me?
21    I didn't understand you.
22          A    I believe that was the definition that
23    we used.
24          Q    There is no other policy language that
25    you used in connection with your calculation of
```

SUSAN THOMPSON  7/30/2020

```
 1    Mr. Garver's pre-disability earnings; is that
 2    correct?
 3          A    Well, I read the entirety of it.  If
 4    there's anything else that also refers to it, then
 5    I read that, relied on that as well.  But as far
 6    as just what prior earnings specifically are,
 7    that's what I used.
 8          Q    And you were instructed by Mr. Bourhis
 9    to not include the 2016 losses related to 191st
10    Street Investors; is that correct?
11          A    191st Street, 191st Street Investors,
12    that's correct.
13          Q    Uh-huh.  And then in accordance with
14    that direction, you excluded those from your
15    calculation, correct?
16          A    That's correct.
17          Q    Let's take a look at Exhibit 2.
18               (Counsel presented to the
19          witness premarked Exhibit No. 2.)
20          Q    (By Ms. Kersting) And that is page
21    four of the policy.
22          At the bottom there, do you see where it
23    says earnings?
24          A    Yes.
25          Q    Have you seen this definition before?
```

SUSAN THOMPSON  7/30/2020

Page 50

```
 1          A     Yes.
 2          Q     And it continues on page five up
 3     there.
 4          A     Right.
 5          Q     Did you apply this definition to the
 6     calculation of your earnings?
 7          A     Yes.
 8          Q     When you reviewed Mr. Garver's tax
 9     return, did you see any K-1s that were issued to
10     his wife?
11          A     I believe so.
12          Q     With regard to the Robert Garver
13     Builder tax returns or only with regard to the
14     Welborn tax returns?
15          A     I know with Welborn, but she wouldn't
16     have a K-1 from Robert Garver Builder.
17          Q     Because the tax returns reflected
18     Mr. Garver as the hundred percent owner and
19     shareholder of Robert Garver Builder, correct?
20          A     Yes.
21          Q     Have you ever been asked to calculate
22     what his pre-disability earnings would have been
23     had there been two K-1s issued, one to Mr. Garver
24     and one to his wife, based on the assumption of
25     the 50 percent ownership?
```

SUSAN THOMPSON  7/30/2020

```
 1           A     For Robert Garver Builder?  Is that
 2      what you --
 3           Q     Yes, for his pre-disability earnings.
 4           Were you ever asked to calculate
 5      pre-disability earnings based on the assumption
 6      that Mr. Garver was only a 50 percent owner?
 7                     MR. BOURHIS:  Objection, form.
 8           A     Yesterday in talking to Mr. Bourhis,
 9      he indicated that, that going forward that we
10      might want to look at that; that there were other
11      things that we would likely, not likely, that we
12      might explore based upon that, the stance that the
13      insurance company took to say that -- this is my
14      understanding -- if Robert Garver Builder was a
15      hundred percent owned, then Welborn should be
16      treated the same way, which I don't agree with
17      from an accounting standpoint and from a tax
18      standpoint.
19           But there was discussion that while if you
20      divided this 50/50 and this was all a hundred and
21      that was a hundred, and how does all this change?
22      It's like, well, you can do it, but I don't think
23      it's right based upon the information that we
24      have in the tax returns.  So I have not done that
25      calculation.
```

SUSAN THOMPSON  7/30/2020

Page 52

```
 1        Q    So did Mr. Bourhis explain to you that
 2   the reason why hundred percent of the Welborn
 3   Sales income and revenue was interesting to
 4   Principal Life, did he say the rationale for that
 5   was that Robert Garver Builder was reflected as
 6   hundred percent owned by Mr. Garver?
 7                  MR. BOURHIS:  Objection, form.
 8        A    What I heard was because Robert Garver
 9   Builder is a hundred percent owned, the insurance
10   company is arbitrarily saying that Welborn is a
11   hundred percent owned by Robert.
12        Q    (By Ms. Kersting) Is that what he
13   explained to you?
14        A    Yes.
15        Q    And that's the information you have?
16        A    It was a very brief discussion
17   yesterday.
18        Q    And in that discussion, it was
19   discussed that you may want to explore calculating
20   the pre-disability earnings based on a 50 percent
21   ownership of Robert Garver Builder?
22                  MR. BOURHIS:  Objection, asked and
23   answered.
24        A    He hasn't asked me to do that.  He
25   said we'll, as time goes, if we have to redo
```

SUSAN THOMPSON  7/30/2020

```
 1    things, that may be a consideration.
 2         Q    (By Ms. Kersting) But you haven't
 3    done it yet?
 4         A    No.
 5         Q    Based on what you've seen so far in
 6    the calculations performed, would you expect his
 7    pre-disability earnings to decrease if that were
 8    the case?
 9              MR. BOURHIS:  Objection, form.
10         A    If?
11         Q    (By Ms. Kersting) If he wasn't a
12    hundred percent owner of Robert Garver Builder.
13              MR. BOURHIS:  Same objection.
14         Q    (By Ms. Kersting) If?
15         A    Yes.  Clearly if you're only
16    attributing half of the income, yes, it would go
17    down.
18         Q    And then with regard to your
19    calculation of post-disability earnings, which
20    means earnings starting in 2018, you used Welborn
21    Sales' information, meaning the K-1 that was
22    issued to Mr. Garver and his W-2; is that correct?
23              MR. BOURHIS:  Objection, form.
24         A    I don't think that's all of it, but
25    that's the majority of it.
```

SUSAN THOMPSON  7/30/2020

1          **Q      (By Ms. Kersting) Can you please tell**
2    **me what else you used?**
3          A     Yes, that is what we used, the, the
4    Schedule E and the wages.
5          **Q      And you talked to me earlier about a**
6    **clarification.  You made a clarification after the**
7    **break with regard to your prior testimony.**
8          **Is that because you talked to counsel**
9    **during the break?**
10         A     No.  It's because I looked at my own
11   report, the calculation, because that was one of
12   the, the changes that we made in the, in that we
13   were calling it the addendum.  I wanted to make
14   sure I referred to them correctly.
15         In the addendum, that was one of the
16   changes that we made in that one so I wanted to
17   make sure that I got that correct and, you know,
18   that we went in and added just, we reduced the
19   what we took off.  We did not include past
20   benefits payments that were, we found out were
21   then made from that June 19 letter from
22   Principal.
23         So we removed those from our calculation,
24   and then we replaced it with whatever the payment
25   date that Mr. Bourhis gave us.  We replaced it

SUSAN THOMPSON  7/30/2020

```
 1    with just an interest calculation.
 2           So I just wanted to make sure that when
 3    you were asking about the dates, that I had the
 4    dates right as well.
 5           Q    You did not talk to Mr. Bourhis during
 6    the break?
 7           A    He did call me.
 8           Q    He did call you.  But you did not talk
 9    about this issue?
10           A    We did.  He was just confirming that
11    that's what we did.  I told him I'd already looked
12    it up and I was good.
13           Q    And then he prompted you for a
14    correction once we were back on the record,
15    correct?
16           A    I don't know that it was a correction
17    as much as a clarification.  You were asking me if
18    the dates were correct, and I said yeah, the dates
19    are correct.  The dates are correct.  The
20    information that I have in there about the letter
21    is correct.
22           But I think your assumption that it
23    included still the disability payments from
24    October was incorrect.  So I was making a
25    clarification to make sure that you understood
```

SUSAN THOMPSON  7/30/2020

```
 1    that the dates are correct.  And the difference
 2    is that it's no longer the disability payment.
 3    It's just the interest on the, on the payment
 4    that was made late.  That's the clarification.
 5         Q    In your report -- okay.  But your
 6    report states past benefits from 10/1/2018 through
 7    July 2020, doesn't it?
 8         A    It does.  And I'm including the
 9    interest as being a benefit at that point, which
10    is probably not as accurate as it could be.
11         Q    How did you calculate Mr. Garver's
12    post-disability earnings for 2019?
13         A    We assumed that he could operate at
14    least at the same level that he did in 2018.
15         Q    So what information or what documents
16    did you use to calculate his post-disability
17    earnings for 2019?
18         A    That's it.  It's an assumption.
19         Q    And the assumption that you made was
20    what?
21         A    I just said that what he did in 2018,
22    he could likely continue to do at least that well.
23    And there's, as the calculation goes, there's,
24    according to the policy, there's an escalation for
25    CPIU at specific times.  So the escalation of his
```

SUSAN THOMPSON  7/30/2020

1    income is only by CPIU, which is the exact same as

2    what's used for the policy payments.

3           **Q     In 2019 did you use his 2019 W-2 and**

4    **his 2018 K-1?**

5           A     I don't believe I had any 2019

6    information at the time.  Wait a second.  I didn't

7    use it.  I just used his 2018.

8           **Q     So you did not use his 2019 W-2?**

9           A     I lost the last part of what you said.

10          **Q     You did not use his 2019 W-2?**

11          A     Correct.

12          **Q     You used his 2018 W-2 and his 2018 K-1**

13   **for 2019?**

14          A     I used his Schedule E and his wages

15   that were on his tax return, I believe.

16          **Q     And the only tax return that you had**

17   **was the 2018 one, right?**

18          A     I have a lot of tax returns, '15, '16,

19   '17, '18.

20          **Q     With regard to that year, we're**

21   **talking about his 2019 post-disability earnings.**

22          A     So what I used for that is the 2018

23   tax returns and tax information, yes.

24          **Q     And the 2018 tax return that would**

25   **have been filed in early 2019, right?**

SUSAN THOMPSON  7/30/2020

```
 1          A    I don't know when it was filed.  Do
 2   you want me to look?
 3          Q    And it reflects -- well, usually the
 4   2018 tax return gets filed in 2019, correct?
 5          A    Mine does not get filed in early 2019.
 6   You said it was filed in early 2019.  I don't
 7   know.
 8          Q    Or it was filed in late 2019.  Let's
 9   not argue about the time.
10          My point is the 2018 taxes get filed in
11   2019, correct?
12          A    They should.
13          Q    And you do not have the 2019 taxes, do
14   you?
15          A    Tax return, no, I do not.
16          Q    So for your 2019 post-disability
17   earnings, you looked back to what was filed that
18   year with regard to 2018; is that correct?
19          A    Right.  I looked at the most complete
20   information that I had at the time.
21          Q    Did you understand that 2018 was the
22   first year that Mr. Garver worked at Welborn
23   Sales?
24          A    I believe that's correct.
25          Q    Do you understand that he purchased
```

SUSAN THOMPSON  7/30/2020

```
 1    the business in January of 2018?
 2         A    I think I read that somewhere.
 3         Q    And that he started working there in
 4    January 2018 on a commuting basis, commuting to
 5    Salina, Kansas, several days a week to learn the
 6    ropes, as his wife phrased it?
 7                   MR. BOURHIS:  Objection, form.
 8         A    I don't know.  I have that
 9    information.  I don't recall it as I sit here.
10         Q    (By Ms. Kersting) Do you understand
11    that Welborn Sales changed its web page during
12    that time period?
13         A    Changed what?
14         Q    Its web page.
15         A    I don't know.
16         Q    During that period?
17         A    No.
18         Q    Do you understand that Welborn Sales
19    hired different people, and it got rid of other
20    employees?
21                   MR. BOURHIS:  Objection, form.
22         A    I don't know.
23         Q    (By Ms. Kersting) Do you understand
24    that it changed its employee roster and used a
25    new accountant?
```

SUSAN THOMPSON  7/30/2020

```
 1                    MR. BOURHIS:  Objection, form.
 2          A    I don't have any knowledge of that.
 3          Q    (By Ms. Kersting) You have no
 4     knowledge about any of the changes that
 5     Mr. Garver made in 2018 to Welborn Sales, do you?
 6          A    That's correct.
 7                    MR. BOURHIS:  Objection, form.
 8          Q    (By Ms. Kersting) And you have no
 9     knowledge of the expenses that he may have
10     incurred in doing those changes, do you?
11          A    That's correct.
12          Q    And you have no knowledge as to
13     whether those expenses would have been replicated
14     in 2019 once those changes were in place, did you?
15          A    That's correct.
16          Q    Nevertheless, however, for your 2019
17     assumption, you used the 2018 tax return, did you?
18          A    That's correct.
19          Q    Assuming that the information would
20     simply replicate itself?
21          A    That's correct.  It's the best
22     information I had at the time.
23          Q    Was it an assumption that was, that
24     you were instructed to make by counsel?
25          A    No.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q     It was your own assumption?
 2          A     Yes.
 3          Q     And then you did the same thing until
 4    2039, did you?
 5          A     So let me clarify that.  That was an
 6    assumption that I made that I also ran that by
 7    counsel for reasonableness, but that is an
 8    assumption that I made and relied upon.
 9          Q     And counsel thought that that was
10    reasonable?
11          A     Yes.
12          Q     And then you both agreed that that's
13    how you were going to calculate the
14    post-disability earnings through 2039?
15          A     That I decided that that's what I was
16    going to use, and that's what I calculated it on,
17    yes.
18          Q     Which based on your understanding of
19    the policy will become due as time passes,
20    correct?
21          A     That's my general understanding.
22          Q     Did you look at any balance statements
23    or proof of loss statements for 2019?
24          A     What's a balance statement?  I don't
25    understand.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q     Do you know what a profit and loss
 2     statement is?
 3          A     Yes.
 4          Q     A statement that records all the
 5     deposits, all the payments made, the money coming
 6     in, the money going out for Welborn Sales?
 7          A     It's not an accurate description of a
 8     profit and loss statement, but I know what a
 9     profit and loss statement is.
10          Q     Did you look at any profit and loss
11     statements for Welborn Sales for 2019?
12          A     If they were included in the tax
13     return.
14          Q     In what tax return?
15          A     The Welborn, the Welborn.
16          Q     You just told me that you didn't have
17     Welborn Sales' tax return for 2019.
18          Was that an incorrect statement?
19          A     I'm sorry, you talk -- I thought you
20     asked me did I ever look at any profit and loss
21     statements for Welborn Sales.
22          Q     For 2019.  I asked you --
23          A     Okay.
24          Q     -- whether you looked at 2019 profit
25     and loss statements?
```

SUSAN THOMPSON  7/30/2020

1          A    I don't have it.

2          Q    **Statements for Welborn Sales?**

3          A    I didn't understand the timeframe.  I

4    don't have anything for 2019.

5          Q    **Nothing at all?  No balance sheets, no**

6    **profit and loss statements, nothing?**

7          A    That's correct.

8          Q    **Did you have a general ledger for**

9    **2019?**

10         A    I do not.

11         Q    **So the assumption that 2019 for**

12   **Welborn Sales would look exactly like 2018 is**

13   **really just a guess, isn't it?**

14         A    It's an estimate.

15         Q    **It's speculation?**

16         A    It's based upon the best

17   information --

18               MR. BOURHIS:  Wait a minute.

19   That's not a question.

20               MS. KERSTING:  Yes, it was a

21   question.

22         Q    **(By Ms. Kersting) It's speculation,**

23   **isn't it?**

24         A    No.

25         Q    **Do you have any evidence that shows**

SUSAN THOMPSON  7/30/2020

```
 1      that 2019 for Welborn Sales looks exactly the same
 2      as 2018?
 3            A    No.
 4            Q    Do you know what the sales volume was
 5      for Welborn Sales in 2019?
 6            A    No.
 7            Q    Do you know what Welborn Sales'
 8      expenses were in 2019?
 9            A    No.
10            Q    Do you have any of that information
11      for 2020?
12            A    No.
13            Q    Do you know how Welborn Sales is
14      currently doing?
15            A    No.
16            Q    Do you know what the owner
17      distributions were that were paid to Mrs. Garver
18      and her husband in 2019?
19            A    No.
20            Q    Do you know about their arrangement
21      that they have a goal with regard to owner
22      distributions, and that if that goal cannot be met
23      she, Mrs. Garver, would take her owner
24      distribution but Mr. Garver would not?
25                      MR. BOURHIS:  Objection, form.
```

SUSAN THOMPSON  7/30/2020

```
 1            A    I'm unaware of --
 2            Q    (By Ms. Kersting) You're unaware of
 3       any of that?
 4            A    Any of what you just discussed.
 5            Q    And with regard to your projection as
 6       to how Mr. Garver's post-disability earnings would
 7       look like starting in 2021, you really have
 8       absolutely no information, do you, because 2021
 9       hasn't even happened yet?
10                 MR. BOURHIS:  Objection, form.
11            Q    (By Ms. Kersting) Correct?
12            A    It's a projection.  That's correct.
13            Q    And you don't have a crystal ball,
14       though, do you?
15                 MR. BOURHIS:  Objection, form.
16            Q    (By Ms. Kersting) Let's go back to
17       the policy, Exhibit 2.  Look at page 12.  That's
18       PLIC 15, yeah.
19            Do you see where it says notice of claim
20       and proof of loss?
21            A    Yes.
22            Q    And you see where it says, You or
23       someone acting as your legal representative must
24       fulfill all of the following requirements?
25            A    Uh-huh, yes.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q    Did I read that correctly?
 2          And then under two it says, Send any proof
 3  of loss requested by us to our home office within
 4  90 days after the end of each monthly period for
 5  which you are claiming disability.
 6          Do you see that?
 7          A    Yes.
 8          Q    And that means that there is a
 9  requirement to submit entitlement document, proof
10  loss, for every single month as time goes on;
11  isn't that correct?
12                  MR. BOURHIS:  Objection, calls for
13  a legal conclusion.
14          A    I was just going to say I don't know.
15          Q    (By Ms. Kersting) You don't
16  understand that sentence?
17          A    I don't understand what you said.  I
18  don't know if what you said is that requirement.
19          Q    It said, Send any proof of loss
20  requested by us to our home office within 90 days
21  after the end of each monthly period for which you
22  are claiming disability.
23          You understand that sentence?
24                  MR. BOURHIS:  Objection, calls for
25  a legal conclusion.
```

SUSAN THOMPSON  7/30/2020

```
 1          A    I understand what you said, yes.
 2          Q    (By Ms. Kersting) And then it
 3    continues, If you have not submitted proof of
 4    loss acceptable to us within one year from the
 5    date required, benefits will be denied.
 6          Do you see that?
 7          A    Yes.
 8          Q    An exception will be made only if you
 9    and the owner were not competent to make a claim.
10          You see that, right?
11          A    Yes.
12          Q    And I read that correctly, didn't I?
13          A    I believe so.
14          Q    And that means that if the proof of
15    loss that's being requested by Principal Life is
16    not received, then the claim will be denied,
17    correct?
18                   MR. BOURHIS:  Objection, calls for
19    a legal conclusion.
20          A    That's what it sounds like.
21          Q    (By Ms. Kersting) And it continues in
22    three, Provide proof of loss requirements at a
23    reasonable frequency required by us.
24          Do you see that?
25          A    Yes.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q    And then it continues with number
 2     four.  Fully cooperate with us concerning all
 3     matters relating to this policy and any claims
 4     filed under the policy.
 5          Do you see that?
 6          A    Yes.
 7          Q    So in essence, when proof of loss is
 8     being required or requested by the insurer and
 9     that information is not provided, then no further
10     benefits are being paid?
11                MR. BOURHIS:  Objection, calls for
12     a legal conclusion, speculative.
13          Q    (By Ms. Kersting) Isn't that correct?
14          A    I don't know.  I don't get involved
15     with that.
16          Q    Do you consider -- okay, sorry, go
17     ahead.  You said you don't get involved with that?
18          A    That's correct.
19          Q    Did you consider any of that in your
20     calculation?
21          A    No.
22          Q    Did you consider that Mr. Garver has
23     to provide proof of loss for every single months
24     that he's receiving disability benefits for?
25          A    Well, yes, I did do that.  But as far
```

g

SUSAN THOMPSON  7/30/2020

```
 1   as the notice and claim and timing and all of

 2   that, as far as whether or not it was going to be

 3   denied or not, that's not part of what I'm tasked

 4   to do.

 5        Do I understand that I had to prepare it

 6   on a monthly basis?  Yes, I did.  I believe that

 7   that's what I did.

 8        Q    And you assumed that he would provide

 9   the necessary proof of loss for benefit

10   entitlement going forward based on the 2018 tax

11   return; isn't that correct?

12              MR. BOURHIS:  Objection, form,

13   asked and answered.

14        A    That's not my concern going forward.

15   That's Mr. Bourhis asked me to do a task.  I did

16   his task.

17        How the rest of it works out between the

18   insured and the insurance company is not my

19   responsibility, and I don't, I don't have a task

20   beyond that.

21        Q    (By Ms. Kersting) Meaning you just

22   calculated a stream of payments?

23              MR. BOURHIS:  Objection, form.

24        Q    (By Ms. Kersting) Correct?

25        A    Yeah, in accordance with the policy,
```

SUSAN THOMPSON  7/30/2020

1    sure, and the documents I had.  I did calculate a

2    stream of payments.  You are correct.

3         **Q    And for all intents and purposes, you**

4    **acted like a human calculator?**

5                   MR. BOURHIS:  Objection, totally

6    argumentative, disrespectful, unprofessional,

7    discourteously.  Objection to form.

8         A    I would disagree with you.

9         **Q    (By Ms. Kersting) So you did not just**

10   **calculate a stream of payments?**

11        A    I am not just a human calculator.  It

12   takes my experience and expertise to know how to

13   read a tax return, how to interpret the

14   information, how to even prepare a calculation

15   such as this.

16        So to say that all I am is a human

17   calculator is somewhat offensive and incorrect.

18        **Q    And for the benefit period of 2021**

19   **through 2039, there was no tax return to read, was**

20   **there?**

21                   MR. BOURHIS:  Objection, asked and

22   answered.

23        A    That's correct.

24        **Q    (By Ms. Kersting) So you just**

25   **replicated a calculation that you already**

SUSAN THOMPSON  7/30/2020

1    **performed?**

2                    MR. BOURHIS:  Objection, misstates

3    the witness' testimony.

4        A    So I prepared a calculation.

5        **Q    (By Ms. Kersting) And your**

6    **calculations do not assume that Mr. Garver passes**

7    **at any point between now and 2039, do they?**

8        A    Correct.  My calculation goes through

9    age 65 in accordance with the terms of the

10   contract.

11       **Q    And they do not consider mortality as**

12   **a factor, do they?**

13       A    They do not.

14                   MR. BOURHIS:  Objection, asked and

15   answered.

16       **Q    (By Ms. Kersting) And they do not**

17   **consider morbidity as a factor, do they?**

18                   MR. BOURHIS:  Objection, asked and

19   answered.

20       A    Correct.

21       **Q    (By Ms. Kersting) And they do not**

22   **consider what would happen if Mr. Garver acquired**

23   **a second business, do they?**

24                   MR. BOURHIS:  Objection,

25   speculative.

SUSAN THOMPSON  7/30/2020

1          A     Well, it assumes that he's not working

2     in his profession, right, because that's part of

3     the, the way the policy reads, if he can't work,

4     he's no longer able to work in his current

5     capacity.

6          So, so it does not contemplate any other

7     type of income that was the same as the type of

8     work he was doing pre-injury.

9          **Q     (By Ms. Kersting) But it also does**

10    **not contemplate him buying a second company**

11    **similar to Welborn Sales, does it?**

12         A     I don't even know what Welborn Sales

13    does, so no, it doesn't, it doesn't consider.

14         **Q     It doesn't contemplate it?**

15         A     Doesn't consider anything other than

16    Welborn Sales going forward at just a flat rate

17    with nothing but CPIU over time.

18         **Q     Which would mean that your calculation**

19    **would be wrong if Mr. Garver acquired a second**

20    **business and suddenly received a second K-1 from**

21    **another business; isn't that correct?**

22              MR. BOURHIS:  Objection, form,

23    calls for speculation.

24         A     I don't know that that's true.  I'm

25    not going to agree with you on that just as a, as

SUSAN THOMPSON  7/30/2020

```
 1    a blanket statement.
 2         Q    (By Ms. Kersting) Your calculation is
 3    right even if Mr. Garver's income increases?
 4               MR. BOURHIS:  Objection, misstates
 5    the witness' testimony, asked and answered.
 6         A    I'm sorry, can you please repeat
 7    yourself?
 8         Q    (By Ms. Kersting) Yes.  I'm trying to
 9    understand why you denied what I just asked you.
10    And it seems to suggest to me that you're saying
11    that your calculation is right even if Mr. Garver
12    has an increase in income.
13               MR. BOURHIS:  Objection, form.
14         A    You said Mr. Garver has other
15    companies and does other types of things.
16               MR. BOURHIS:  It's an objection,
17    misstates the witness' testimony.  Objection to
18    form.  Objection to calls for speculation.
19               MS. KERSTING:  The only proper
20    objection is form.  This is the last warning,
21    Matthew.  Can you confine yourself to the form
22    objections?  You're coaching your witness.  We all
23    know it.
24               MR. BOURHIS:  I'm not coaching my
25    witness.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q     (By Ms. Kersting) Ms. Thompson, you
 2     can answer the question.
 3                    MR. BOURHIS:  I will continue to
 4     make my objections as I see fit.  I will try to
 5     uphold your request that I object to form only,
 6     but if it calls for a legal conclusion or if it
 7     calls for speculation, that's my objection.
 8                    MS. KERSTING:  Those are form
 9     objections, Matthew.
10          Q     (By Ms. Kersting) Ms. Thompson?
11          A     Yes.
12          Q     Do you need the question reread?
13          A     Yes.
14                    MS. KERSTING:  Saundra, would you
15     be so kind.  I'm sorry.
16                    (The reporter read back the
17               question:  I'm trying to understand why
18               you denied what I just asked you.  And it
19               seems to suggest to me that you're saying
20               that your calculation is right even if
21               Mr. Garver has an increase in income.)
22                    MR. BOURHIS:  Same objections.
23          A     The previous question that I heard was
24     you asked me if he had other businesses, and my
25     response was that's not necessarily true because
```

SUSAN THOMPSON  7/30/2020

```
 1   my understanding of the policy is that it's
 2   related to, and I can't find the specific wording,
 3   but if it's not in his occupation.
 4        So if he does something totally different
 5   and outside, I don't think that that would affect
 6   the calculation.  I may be wrong.  But if you're
 7   just asking if Welborn Sales' revenues wildly
 8   increased by 50 percent every year, yeah, my
 9   report would need to be recalculated.
10        Q    (By Ms. Kersting) And if Mr. Garver
11   and Mrs. Garver had a divorce and Mr. Garver
12   would receive Mrs. Garver's portion of Welborn
13   Sales, your calculation would also be wrong,
14   correct?
15             MR. BOURHIS:  Objection, form.
16        A    If they got a divorce and he
17   received -- well, I don't even know that that's a
18   real thing, so I'm not going to answer that.
19   That's kind of a wild hypothetical.
20        Q    (By Ms. Kersting) It's a wild
21   hypothetical that he would buy her out as part of
22   a divorce?
23        A    You didn't say that.  You said he got
24   her income stream.
25        Q    No.  He received her 50 percent
```

SUSAN THOMPSON  7/30/2020

```
 1    ownership in the company.
 2          A    Okay.  That's different than what you
 3    said originally.
 4          Q    I did not talk about an income stream.
 5               MR. BOURHIS:  Edna, you're being
 6    argumentative.
 7          Q    (By Ms. Kersting) So my question
 8    is -- let me rephrase it so we're all clear what
 9    I'm asking.
10          I'm asking that your calculation would be
11    wrong if Mr. Garver and Mrs. Garver have a
12    divorce and he as part of that divorce would be
13    awarded her 50 percent share in the company;
14    isn't that correct?
15               MR. BOURHIS:  Objection, form.
16          A    So you're asking me if at some point
17    he owns a hundred percent of Welborn Sales for
18    whatever reason, my calculation would change.  And
19    that's correct, because right now I have his
20    income stream at 50 percent.  If he owned all of
21    it, it would definitely go up, unless their sales
22    went down.
23          Q    (By Ms. Kersting) We talked about
24    installment benefit contracts and installment
25    insurance products earlier, and you said you
```

SUSAN THOMPSON  7/30/2020

1    didn't know what that is.

2          Has anything that you've seen so far in

3    this case and during this deposition refreshed

4    your recollection?

5          A    I don't think I've ever used that term

6    or those terms specifically.

7          Q    You understand that a disability

8    benefit policy or a disability insurance policy is

9    an installment benefit contract?

10               MR. BOURHIS:  Objection, form.

11         A    That sounds reasonable.

12         Q    (By Ms. Kersting) And that the

13   benefits that you calculated going forward from

14   July 30, 2020, are not due yet.

15         Do you understand that?

16         A    I don't know when they're due.  By a

17   matter of law, I don't know how that works.

18         Q    When you receive electricity, you

19   don't have to pay for the electricity that you

20   haven't received yet; is that correct?

21               MR. BOURHIS:  Objection, form,

22   calls for speculation.  It's an incomplete

23   hypothetical.

24         A    I don't prepay my electrical, if

25   that's what you're asking me.

SUSAN THOMPSON  7/30/2020

```
 1          Q    (By Ms. Kersting) You receive the
 2     electricity each month, and you pay your bill
 3     afterwards for the electricity that you use;
 4     isn't that correct?
 5          A    Generally yes.
 6          Q    And the company cannot ask you for
 7     payment for electricity that you haven't used yet?
 8                MR. BOURHIS:  Objection, form.
 9          A    I don't know if they can or can't, but
10     they don't.
11          Q    (By Ms. Kersting) Correct.  That is
12     an installment contract just like the benefit
13     policy here?  The benefits starting after July 30
14     aren't due yet; isn't that correct?
15                MR. BOURHIS:  Objection, form,
16     calls for a legal conclusion.
17          A    The benefits starting after July 30,
18     what year are we talking about?  I'm confused.
19          Q    (By Ms. Kersting) July 30th this
20     year, today.
21          A    Well, that would be correct.
22          Q    Future benefits aren't due yet?
23                MR. BOURHIS:  Objection, form.
24          Q    (By Ms. Kersting) That's correct?
25     That's what you just said, right?  Are you still
```

SUSAN THOMPSON  7/30/2020

1    **thinking about the answer, or did you answer?**

2        A    Oh, I'm sorry, I didn't realize there

3    was a question pending.

4        **Q    Yeah.  I asked you whether future**

5    **benefits are not due yet.**

6                MR. BOURHIS:  Objection, form,

7    asks for legal conclusion, asked and answered.

8        A    That's correct.

9                MR. BOURHIS:  Edna, why don't we

10   take a five-minute break here, okay?

11               MS. KERSTING:  Oh, I don't really

12   want to take a break right now.

13               MR. BOURHIS:  Well, I'm going to

14   take a break, and Susan is going to take a break.

15               MS. KERSTING:  The break has to be

16   taken in consensus.  You can't unilaterally take a

17   break unless you go --

18               MR. BOURHIS:  I'm going to use the

19   bathroom, and I'm going to take a break, and I'll

20   be back in five minutes.  Susan?

21               MS. KERSTING:  Okay, but we're

22   continuing.  We're not going off the record.

23               MR. BOURHIS:  Susan, I'm going to

24   ask you to step away from your computer and just

25   take a five-minute break.  Is that all right?

SUSAN THOMPSON  7/30/2020

```
 1            Q    (By Ms. Kersting) You used the U.S.
 2    Department of the Treasury ten-year daily yield
 3    curve rate published on July 22nd, 2020, for your
 4    present value of discount?
 5                 MS. KERSTING:  Please let the
 6    record reflect that the witness left.  We can take
 7    a ten-minute break if we want to and reflect the
 8    record accordingly.
 9                 THE VIDEOGRAPHER:  Going off
10    record 10:39 a.m.
11                 (Recess.)
12                 THE VIDEOGRAPHER:  Back on record
13    10:43 a.m.
14            Q    (By Ms. Kersting) You used the U.S.
15    Department of Treasury Daily Yield Curve Rate
16    published on July 22nd, 2020, for your present
17    value calculation; is that correct?
18            A    Yes.
19            Q    Is that based on your experience?
20            A    Yes.
21            Q    Also based on counsel's --
22            A    That is something we use in doing
23    these present value calculations.
24            Q    Did you consider any actuarial
25    calculations in your present value reduction?
```

SUSAN THOMPSON  7/30/2020

```
 1          A    No.
 2          Q    You just used the rate straight?
 3          A    That's correct.
 4          Q    Did you use any disability tables in
 5     evaluating the stream of payments that you
 6     calculated?
 7          A    I did not.
 8          Q    Let's take a look at the supplemental
 9     expert report that you prepared, which is just
10     provided to us six days ago, I believe.
11          A    Can I make one correction on, I was,
12     at the break I was looking at the, you were asking
13     me about my Schedule 3, and I noticed on the, I
14     have a little footnote there.  It says percentage
15     payable 2019 to 2039.
16          And when I reread that, I see in there
17     that we used the 2018 Welborn Sales Schedule E
18     and the 2019 Welborn Sales W-2.  So I misspoke
19     when I told you we did not use that W-2.
20          But we did, and it's a note on Schedule 3
21     under the box that says percentage payable 2019
22     to 2039.  So that's, that's the only 2019
23     information we have.  That's why we combined it
24     with the 2018.
25          Q    During the break that we just took,
```

SUSAN THOMPSON  7/30/2020

1    did you talk to counsel?

2            A    No, I did not.

3                 (Counsel presented to the

4            witness premarked Exhibit No. 129.)

5            Q    (By Ms. Kersting) The document that

6    was just pulled up, which is Exhibit 129, I

7    believe, is that the supplemental expert report

8    that you had?

9            A    Yes.

10           Q    And that report you prepared this

11   month; isn't that correct?

12           A    That's correct.

13           Q    Do you remember, do you remember when

14   you were contacted with regard to preparing this

15   report?

16           A    It was some point this month.  I don't

17   know precisely when.

18           Q    It was not something that you had

19   previously been contacted about; is that correct?

20           A    It was something that I was asked to

21   do in addition to my original assignment.

22           Q    And the opinions that are contained in

23   the supplemental expert report dated July 24 were

24   not previously included in your expert report that

25   you disclosed in --

SUSAN THOMPSON  7/30/2020

```
 1                      MR. BOURHIS:  Object to the form.
 2        Q     -- in 2020, correct?
 3                      MR. BOURHIS:  Objection, form.
 4        A     Are you talking about the report that
 5   we were just looking at that was dated July 20?
 6        Q     (By Ms. Kersting) No.  I'm talking
 7   about the one that's right in front of us.
 8        A     Then I don't understand your question.
 9   That information is not included in any previous
10   report, if that's your question.
11        Q     And the opinions that you include in
12   this report were not previously shared in any
13   previous report; isn't that correct?
14        A     That's correct.
15                      MR. BOURHIS:  Objection, form.
16        Q     (By Ms. Kersting) Who contacted you
17   with regard to preparing the calculation that is
18   included in this report?
19        A     Mr. Bourhis.
20        Q     What did Mr. Bourhis tell you?
21        A     He asked me to prepare a separate
22   calculation of catastrophic disability in
23   accordance with the rider.
24        Q     And what other instructions did he
25   give you?
```

SUSAN THOMPSON  7/30/2020

```
 1           A     That was generally it.
 2           Q     Did he tell you when that stream of
 3     payments was supposed to start?
 4           A     No.  We calculated that based on the
 5     policy.
 6           Q     Who's "we"?
 7           A     My staff.
 8           Q     Your staff calculated the beginning
 9     date?
10           A     Yes, based on the policy.
11           Q     And did they calculate the end date as
12     well?
13           A     The end date I think follows the
14     policy.
15           Q     Was your staff substantially involved
16     in the preparation of the expert report?
17                 MR. BOURHIS:  Objection, form.
18           A     We were both involved in the
19     preparation of the report.
20           Q     (By Ms. Kersting) Who is the second
21     person who was involved in the preparation of the
22     report?
23           A     Brian Repucci, R-e-p-u-c-c-i.
24           Q     Who is Brian Repucci?
25           A     He's a principal in our firm.
```

SUSAN THOMPSON  7/30/2020

1         Q      Is he a licensed CPA?

2         A      Yes, he is.

3         Q      Do you bill out for his time?

4         A      Yes.

5         Q      Did he prepare the calculations in

6    this case?

7         A      Did he do what?

8         Q      Did he prepare the calculations in

9    this case?

10        A      Yes.  He set up the schedules at my

11   direction.

12        Q      And in this supplemental expert

13   report, you said you calculated a catastrophic

14   disability benefit with a start date you said in

15   accordance with the language in the policy and an

16   end date in accordance with the language in the

17   policy.

18        And paragraph four right down there said

19   you started past benefits due on 10/1/2018?

20        A      I believe that again is referring to

21   the interest calculation itself.

22        Q      So the benefits that you calculated

23   start on January 1st, 2019, and 10/1/2018 through

24   December of 2018 it includes interest?

25                   MR. BOURHIS:  Objection, form.

SUSAN THOMPSON  7/30/2020

```
 1           A     (Witness looking at exhibit.)  So what
 2     I did on the past benefits due is we calculated
 3     the amount due based on the rider benefit of
 4     8,000.  Then on the change date we calculate the
 5     percentage COLA increase.  And the past benefits
 6     include a component again of the statutory
 7     interest at 18 percent to July 31, 2020.
 8           Now, interest again was calculated at the
 9     direction of counsel.
10           Q     (By Ms. Kersting) And the past
11     benefits due start when?
12           A     I believe we're showing that they
13     start on, our calculations start on 10/31/2017, is
14     where our calculations start.
15           Q     10/21/2017, so paragraph four which
16     says, Past benefits due 10/1/2018 through
17     7/31/2020 is incorrect?
18           A     Yeah.  It looks like that may have
19     been inadvertently copied from the prior report.
20     I believe that the Schedule 1, it says Schedule 1
21     supplemental report is correct and has the correct
22     dates on it.
23           Q     So the amount is right, but the date
24     is a typo and it should --
25           A     I believe that's correct.
```

SUSAN THOMPSON  7/30/2020

Page 87

```
1            Q      -- be 10/21/2017?
2                   MR. BOURHIS:  Objection, form.
3       A    Are you asking me if it should be '17
4  instead of '18?  Is that your question?
5       Q    (By Ms. Kersting) No.  I asked you
6  whether it should say past benefits due
7  10/27/2017 because that's the date you gave me to
8  7/31/2020.
9                   MR. BOURHIS:  Objection, form.
10      A    I'm sorry, where did you get 10/27?
11      Q    (By Ms. Kersting) That's the date you
12 just gave me that you said Schedule 1 started
13 running.
14      A    Oh, I misspoke.  We started, the
15 benefits start, the calculation, the date the
16 calculation begins is 10/12.  It's clearly stated
17 on the Schedule 1 of the supplemental report.
18      Q    So the body here is a misstatement?
19                  MR. BOURHIS:  Objection, form.
20      A    What's in paragraph four is a
21 misstatement.
22      Q    (By Ms. Kersting) Right.  The date is
23 wrong, right?
24      A    What are you asking me?  I just said
25 the date -- I'm sorry, you're confusing me.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q    Where it says, Past benefits due
 2   10/1/2018 to 7/31/2020, the start date is wrong,
 3   correct?
 4          A    Correct.
 5          Q    And it should say, as you said,
 6   10/12/2017?
 7          A    Our Schedule 1 says that our
 8   calculation date begins 10/12/17, correct.
 9          Q    And again, as you said before, you did
10   not calculate this stream of payment in
11   consideration of any of the proof of loss
12   requirements; is that correct?
13                    MR. BOURHIS:  Objection to form.
14          A    I'm sorry.  Say it one more time.
15          Q    (By Ms. Kersting) As you said before,
16   you did not calculate this stream of payment
17   considering any of the proof of loss requirements
18   in the policy; is that correct?
19                    MR. BOURHIS:  Same objection.
20          A    I'm going stupid here.  I don't
21   understand your question.  One more time.  I'm
22   sorry.
23          Q    (By Ms. Kersting) You told me before
24   when I asked you about the proof of loss
25   requirements that you quote/unquote don't get
```

SUSAN THOMPSON  7/30/2020

Page 89

```
1    involved with those.  That applies to this stream
2    of payment as well, correct?  You don't --
3            A    Oh, I'm sorry.
4            Q    -- get involved with the proof of loss
5    requirements, correct?
6                    MR. BOURHIS:  Objection, form.
7            A    Yes, that's correct.
8            Q    (By Ms. Kersting) And you have no
9    opinion as to whether or not Mr. Garver is
10   entitled to those benefits, do you?
11           A    Correct.
12           Q    You basically performed a calculation
13   upon direction of counsel, correct?
14           A    And in accordance with the policy.
15   That's correct.
16           Q    And when you say accordance with the
17   policy, you mean the onset date and the end date,
18   the amount?
19                   MR. BOURHIS:  Objection, form.
20           A    I'm referring to the policy
21   definitions and instructions on the methods and
22   how you calculate what you include, so ...
23           Q    (By Ms. Kersting) What specific, what
24   specific method did you use with regard to the
25   calculation of the catastrophic disability
```

SUSAN THOMPSON  7/30/2020

1    **benefits?**

2         A    So the calculation is, it's basically

3    it's 8,000 flat benefit, but the calculation of

4    the instruction one, the COLA kicks in, and what

5    you use for that.

6         **Q    Correct.  And I just included that in**

7    **my question.  So let me ask my question.**

8         **When you say you calculated the benefit in**

9    **accordance with the policy, that means you**

10   **considered the start date, the end date, the**

11   **benefit amount and the COLA right; is that**

12   **correct?**

13             MR. BOURHIS:  Objection, form.

14        A    Well, I think that may be a little

15   more simplistic because what we considered is I

16   think well defined on my Schedule 1.  I mean,

17   we're looking at his date of disability, his date

18   of birth, his, you know, when the elimination

19   period, the calculation begins, the maximum

20   benefit period, the age at the end of the period,

21   you know, when the COLA adjustment.

22        So it's a little more than just the few

23   things that you mentioned.  So I don't, I don't

24   want to -- I want to be clear that there is,

25   there was more consideration than just the few

SUSAN THOMPSON  7/30/2020

Page 91

```
 1   things that you mentioned.
 2        Q    (By Ms. Kersting) The birth date of
 3   Mr. Garver determines the end date of the
 4   benefits, doesn't it?
 5             MR. BOURHIS:  Objection, form,
 6   calls for a legal conclusion.
 7        A    Well, yeah, because the end date is at
 8   age 65, so that would be true.
 9        Q    (By Ms. Kersting) It does not affect
10   any other portion of your benefit calculation,
11   does it?
12             MR. BOURHIS:  Objection, form.
13        A    His birth date, that would be correct.
14        Q    (By Ms. Kersting) And the elimination
15   period determines the onset date, doesn't it?
16             MR. BOURHIS:  Objection, form.
17        A    The elimination period does what?
18        Q    (By Ms. Kersting) Determines the
19   onset date, the end benefit date, the onset date
20   of the benefit payments, doesn't it?
21             MR. BOURHIS:  Same objection.
22        A    Yes.
23        Q    (By Ms. Kersting) This doesn't, it
24   doesn't affect any other portion of your
25   calculation, does it?
```

SUSAN THOMPSON  7/30/2020

```
 1          A    No, just when we start the
 2   calculation.
 3          Q    And the COLA rider determines the
 4   increase on the change date of the policy,
 5   correct?
 6          A    You said the COLA rider does what?
 7          Q    Determines the increase to the benefit
 8   amount paid on the change date, correct?
 9          A    Yes.  It gives direction on that.
10          Q    It does not affect the benefit
11   calculation in any other way, does it?
12          A    That's correct.  You know what, I'm
13   looking at this supplemental report, and I realize
14   I gave you the date of disability as 7/12/17 and
15   said that's when it started.  Our calculation
16   doesn't start until 10/12/17, so I need to correct
17   that.
18          Q    You did say that.  You said 10/12/17.
19          A    Okay.  I wasn't sure.  I'm looking at
20   10/12, 7/12.  I want to make sure I didn't mess
21   that up.
22          Q    So aside from those facts, meaning
23   Mr. Garver's birth date, the date of disability,
24   the elimination period and the benefit onset date
25   and the COLA increase, did you consider any other
```

SUSAN THOMPSON  7/30/2020

```
 1    policy provisions in your benefit calculation?
 2         A    I don't think so.
 3              MR. BOURHIS:  Objection, form.
 4         A    Sorry.  I don't think so.
 5         Q    (By Ms. Kersting) You did not
 6    consider Mr. Garver's medical condition, did you?
 7         A    No.
 8         Q    You did not read any deposition
 9    transcripts or medical records prior to performing
10    your calculation, did you?
11         A    That's correct.
12         Q    And you have no idea really what his
13    benefits or what his medical condition is
14    currently like and what it will be in two years,
15    do you?
16         A    That's correct.
17              MR. BOURHIS:  Objection, form.
18              MS. KERSTING:  Thank you.  I
19    currently don't have any more questions.
20              MR. OSETE:  Thank you, Edna.
21                 EXAMINATION
22    QUESTIONS BY MR. OSETE:
23         Q    Hi, Ms. Thompson.  This is Jesus
24    Osete.  As I mentioned earlier, I'm an attorney at
25    Bryan Cave, and I represent Defendants The Roth
```

SUSAN THOMPSON  7/30/2020

```
 1   Companies and Defendant Duane Roth.
 2           I just want to let you know at the outset,
 3   you mentioned something about giving us a signal
 4   if you have to use your inhaler.  Please let me
 5   know.  I just want to let you know right now if
 6   you need to do that, you can wave at me or you
 7   can point your finger up so you can do that.  I'm
 8   sorry you're not feeling well.  And I can tell
 9   you I only have a few questions, so we can maybe
10   try to wrap my end of the questioning pretty
11   quickly.
12           But just please let me know if that's, if
13   that's your situation.
14           A    Thank you.
15           Q    You're welcome.  I think I want to
16   start, you know, Ms. Kersting talked about your
17   initial report, your supplemental report and your
18   addendum.  And I just, I just need to clarify a
19   few things.
20                MR. OSETE:  So Keith, can we pull
21   up Exhibit 548, which is the original report,
22   please.
23                (Counsel presented to the
24           witness premarked Exhibit No. 548.)
25           Q    (By Mr. Osete) So just to confirm,
```

SUSAN THOMPSON  7/30/2020

1    Ms. Thompson, this is in fact your original

2    report dated April 15, 2020?

3           A    Yes.

4                MR. OSETE:  Okay.  Keith, can you

5    go to Bates number 86 at the very bottom there.

6           Q    (By Mr. Osete) Okay, I just want to,

7    I just want to clarify this.

8           Did you receive any assistance from anyone

9    in preparing this report?

10               MR. BOURHIS:  Objection, asked and

11   answered.

12          A    My staff and I prepared the report.

13          Q    (By Mr. Osete) Okay.  And I think you

14   mentioned a name earlier.  Could you, could you

15   restate that, please.

16          A    Brian Repucci.

17          Q    Okay.  Did you receive assistance from

18   Mr. Bourhis or anybody at his firm in preparing

19   this report?

20          A    No.

21               MR. BOURHIS:  Objection, asked and

22   answered.

23          Q    (By Mr. Osete) You did not?

24          A    No, I did not.

25          Q    Okay.  And I just want to confirm the

SUSAN THOMPSON  7/30/2020

```
 1    signature on the page that I'm showing you right
 2    now.  That's in fact your signature?
 3         A    Yes.
 4         Q    Okay.  And when you say -- that's
 5    okay, Keith, thank you.
 6         And when you say that you did not receive
 7    assistance from Mr. Bourhis or his firm in
 8    preparing this report -- no, actually let me
 9    strike that.
10              MR. OSETE:  Keith, go to, go to
11    page number 82.  Okay, can you -- let's see.
12         Q    (By Mr. Osete) Do you see, you see
13    the top there Ms. Thompson where it says, and I
14    quote, I was provided a copy of Garver's
15    disability income policy.  I wouldn't read the
16    policy number.  Based on my review of the policy
17    and guidance from counsel, I established the
18    following.
19         Is that correct?  Does it say that?
20         A    Yes.
21         Q    Okay.  What did you mean by "guidance
22    from counsel"?
23         A    Oh, I was getting -- my staff and I
24    were, we said okay, we believe the date of
25    disability is this.  Here's the 90 periods.
```

SUSAN THOMPSON  7/30/2020

```
 1    Here's what we think that the monthly benefit is.
 2    And it goes to age 65.  Did we interpret this
 3    properly in this situation?
 4          And he confirmed or helped us read through
 5    different, you know, make sure that we looked at
 6    different places where residual disability
 7    benefit was defined, and just to make sure that
 8    we were all in agreement as to where we were
 9    starting from.
10          Q    Okay.  And if I told you that this
11    phrase appears also in your supplemental report
12    and your addendum, is that the same understanding
13    you had with this phrase, what you just explained?
14          A    Yes.
15                MR. BOURHIS:  Objection, form.
16          Q    (By Mr. Osete) Okay.  I just didn't
17    want to, I didn't want to walk through the other
18    exhibits if it's the same understanding, so I
19    just wanted to double-check that.
20          There's another part I wanted to ask you
21    about, and that is in the same exhibit at --
22                MR. OSETE:  Keith, could you
23    please go to page 83.  Let's blow up paragraph 16,
24    please.
25          Q    (By Mr. Osete) Can you see that on
```

SUSAN THOMPSON  7/30/2020

1    **your screen?**

2            A    Yeah, uh-huh.

3            **Q    Okay.  And I know we talked about**

4    **this, but again I just want to clarify this.**

5            **Where it's, where you say, and I will**

6    **quote, Based on this understanding of the losses**

7    **and direction from counsel, these amounts have**

8    **been excluded from the calculation of prior**

9    **earnings.**

10           **Did I read that correctly?**

11           A    With regard to 191st Street Investors,

12   yes, that's correct.

13           **Q    Okay.  So please for the record tell**

14   **us, what does direction from counsel mean?**

15           A    We were told to exclude the activity

16   from financial activity from 191st Street

17   Investors from the --

18           **Q    Okay.**

19           A    -- from the revenue stream.

20           **Q    Okay, thank you.  And assume, assume**

21   **you were not told to exclude those amounts.  Would**

22   **that have changed your calculations or analysis?**

23           A    I don't have a deep understanding of

24   what 191st Street Investors does and what their,

25   what was on the income tax returns and what that

SUSAN THOMPSON  7/30/2020

```
 1   represented.
 2          So at this point I can't tell you one way
 3   or the other.
 4          Q    Okay.  What do you know from, about?
 5   What do you know about 191st Street Investors
 6   other than just the tax return, if anything?
 7          A    That's pretty much it.
 8          Q    Pretty much it?  Okay.  That's fine.
 9          A    My understanding it was just some, a
10   tax kind of a situation.
11          Q    Okay.  And the -- I won't have, I
12   won't have Keith go back to it just because I
13   believe you've already been shown this.  But it
14   was your Exhibit --
15                 MR. OSETE:  Actually, you know
16   what, Keith, let's go to it.  Let's go to
17   Exhibit B.  It's going to be after her resume I
18   think at page, it might be, 97.  There you go.
19   One more.
20          Q    (By Mr. Osete) Can you see that,
21   Ms. Thompson?
22          A    Yes.
23                 MR. OSETE:  Keith can you blow it
24   up, please?  Thank you.
25          Q    (By Mr. Osete) Now, I just want to be
```

SUSAN THOMPSON  7/30/2020

1    clear.  Are these the only documents that you

2    consulted in preparing this report?

3                    MR. BOURHIS:  Objection, asked and

4    answered.

5         A    If that's the one that came from the

6    initial report, then yes.

7         Q    (By Mr. Osete) Okay, yes.

8         A    From the initial report.

9         Q    Now, there are several -- you talked

10   earlier about how there are several tax returns

11   and other tax forms on this list.  You know what?

12   Strike that.

13        Let's go back to, let's go back to

14   paragraph 13 where we were talking about the

15   losses.  Keith, I think, was that page, it was

16   page 83.  Oh, no, 16, right there.  So let's pull

17   this up again because I just want to clarify

18   this.

19        When you say, you say, Based on this

20   understanding of the losses and direction from

21   counsel, these amounts have been excluded from

22   the calculation of prior earnings, when you say

23   "the losses," what are you referring to?

24        A    I believe it's the losses that are

25   shown on the tax return for 191st Street

SUSAN THOMPSON  7/30/2020

1    Investors.

2          Q    Okay.  And these losses, as you

3    testified earlier, you did not include them in

4    your calculation based on the direction of

5    counsel; is that correct?

6          A    Yes.

7          Q    But you have not expressed an opinion

8    as to what the calculation would be, if your

9    calculation would change had you included those

10   losses?

11         A    Correct.

12         Q    Okay.  And Mr. Bourhis has not asked

13   you to perform such a calculation?

14         A    No.

15         Q    Not at all?  Okay.  And I just want

16   to, I just want to make another thing clear.

17              MR. OSETE:  Keith, go to page 80,

18   please.  Blow up paragraph number one.  Thank you.

19         Q    (By Mr. Osete) I'm going to read this

20   to you.  It says, Specifically we were engaged to

21   calculate the value of past and future benefits

22   due Garver as set forth in the disability policy,

23   end of quote.

24         Did I quote that correctly?

25         A    Yes.

SUSAN THOMPSON  7/30/2020

1        **Q    Okay.  And that was, that is your,**
2   **that was your principal assignment in preparing**
3   **this report, correct?**
4        A    That report, correct.
5             MR. OSETE:  Okay.  Let's see.
6   Keith, can you go to, can you please go to page,
7   go to the, go to the last page, her page nine.  I
8   think it would be page 89 or 86, yeah, there you
9   go.  Okay, can you blow up paragraph 32, please.
10       **Q    (By Mr. Osete) Okay, so you say or**
11  **this report says, quote, The present value of**
12  **past and future benefits due Garver as of**
13  **February 29, 2020, is $1,293,377.**
14       **Is that correct as stated in the report?**
15       A    Yes.
16       **Q    Okay.  And we'll get to, we'll get to**
17  **your addendum and your supplement later.  But for**
18  **purposes of this conclusion, this statement in**
19  **your report, I just want to be clear.**
20       **Had you considered any future risks in**
21  **calculating future benefits allegedly due to**
22  **Mr. Garver, for example death, unemployment,**
23  **those kind of factors?  Did you include any of**
24  **that in your calculation?**
25       A    No.

SUSAN THOMPSON  7/30/2020

```
 1                    MR. BOURHIS:  Objection, asked and
 2     answered.
 3          Q    (By Mr. Osete) I'm sorry, say that
 4     again.
 5          A    No.
 6          Q    You did not.  Why not?
 7          A    I don't have any information as to
 8     that at this point, at the point that I have done
 9     that.  I didn't have any of that.
10          Q    So is it fair to say you have not been
11     provided that information by Mr. Bourhis or his
12     law firm?
13          A    With regard to his health and future,
14     I don't have any information on his health.  The
15     information that I base this off of was that he
16     was disabled, and that was the extent of it.
17                    MR. OSETE:  Let's go to, one
18     second here, go to, go to, Keith, please go to
19     page -- oh, no it's already -- never mind.  Can
20     you blow up, please, paragraph 31.
21          Q    (By Mr. Osete) Okay, I'm going to
22     quote this from the report.  The present value of
23     future benefits due are discounted to
24     February 29, 2020, using the U.S. Department of
25     Treasury ten-year daily yield curve rate
```

SUSAN THOMPSON  7/30/2020

1    published on February 26, 2020, of 1.33 percent.

2    The total present value of future benefits as of

3    February 29, 2020, calculated on Schedule 1 is

4    $1,205,453.

5         Did I quote that correctly?

6         A    Yes.

7         Q    Okay.  How did you reach the

8    1.33 percent that you reference in that paragraph?

9         A    That literally comes off of the U.S.

10   Department of Treasury ten-year daily yield curve

11   rate that's published.

12        Q    Okay, okay.  And in reaching that

13   1.33 percent, does the inclusion of any of the

14   future risks that we just talked about that you

15   apparently didn't consider in this report, does

16   that affect at all the rate that you would use?

17              MR. BOURHIS:  Objection, form.

18        Q    (By Mr. Osete) In other words, I can,

19   maybe I can clarify that.

20        In other words, the future risks, such as

21   retirement and unemployment, et cetera, all the

22   future risks that you've said you did not

23   consider in this report, does that have anything

24   to do with this rate of 1.33 percent?

25              MR. BOURHIS:  Objection, form.

SUSAN THOMPSON  7/30/2020

1          A     I use this rate to calculate the

2    payments that are due under the contract to age

3    65.  That's all it is.  It's a calculation of the

4    contract rate through age 65.

5          **Q     (By Mr. Osete) Okay.  And just to be**

6    **clear, you did not consider the probability of**

7    **death, unemployment, leaving the workforce or any**

8    **other business uncertain piece?**

9          A     That's correct.

10         **Q     Okay, thank you.  Let's see.  Just**

11   **give me one minute, please.**

12         **Did you, did you calculate any monthly**

13   **earnings, any of Mr. Garver's monthly earnings in**

14   **reaching your calculation?**

15         A     I don't understand your question.  Are

16   you asking me did I, did I calculate his monthly

17   earnings past future?  I don't understand your

18   question.

19         **Q     Yeah, I know.  Did you, did you make a**

20   **calculation as to his monthly earnings in reaching**

21   **either prior earnings or future earnings?**

22                MR. BOURHIS:  Objection, form.

23         A     So we don't have information on a

24   monthly basis.  And what we had was an annual

25   basis with a tax return, which I think is a very

SUSAN THOMPSON  7/30/2020

1    reasonable basis.

2         I find that in many small business, they

3    don't often have, because they don't prepare

4    monthly financial statements, they don't either

5    have the time or they don't feel they're useful.

6    And oftentimes even the companies that do prepare

7    them, they don't prepare the, all of the proper

8    journal entries that are required on a monthly

9    basis.

10         And so using the yearend information,

11    financial information, that's used for the tax

12    return, is usually a better, a better source of

13    information for a smaller business such as this

14    who may not do that era of reporting.

15         So I used the annual reporting and then

16    simply divided it by 12 to have an estimation of

17    monthly.

18         **Q    Okay.  In calculating his prior**

19    **earnings under Schedule 3, could you please tell**

20    **us why you started with the 2016 return?**

21         A    There's, I believe the policy says you

22    can use the highest 12 months previous to the

23    disability, and that's the best information we had

24    for a 12-month period, right, because he was

25    disabled in 2017, so 2016 would be the first year

SUSAN THOMPSON  7/30/2020

1    that would not include the, any effect of the

2    disability.

3         Q    Did you or did you not prorate any

4    2017 earnings through the July accident date?

5         A    See, that said, again we're looking,

6    we only have annual information.  So there's no

7    way for me to know what happened.  It's best, I

8    thought it was best not to slice and dice it and

9    just use what we had as known and a complete

10   12-month period.

11        Q    Okay.  We talked about the loss, so I

12   won't ask you about that.

13        And just to be clear, you have not

14   received any of his 2019 tax returns; is that

15   right?

16        A    Yes, that's correct.  I think I only

17   have that one W-2.

18        Q    Okay.  And just to, just to clarify,

19   you did, you reviewed, I believe you referenced a

20   letter earlier from the insurance company from

21   June of 2020.  Is that, is that right?

22        A    Yes.

23        Q    Okay.  And what was your understanding

24   of that letter?

25                  MR. BOURHIS:  Objection, asked and

SUSAN THOMPSON  7/30/2020

1    answered.

2          A    Well, I think we just used it to, I

3    think Mr. Bourhis sent it to us just to alert us

4    that there had been payments made.

5          Q    (By Mr. Osete) Payments made through

6    2018?

7          A    Yes, on the disability income benefit.

8    I'm sorry.

9          Q    Okay.  Okay.  One thing I wanted to

10   ask.

11         In your, in the report you had, and again

12   we'll get to the supplemental report later, but

13   you had included a 2.2 annual increase.  I

14   believe this is the product index.

15         Why did you reach that 2.2 increase?  Do

16   you know what I'm talking about?  If not, I can

17   have Keith pull it up.  Okay.

18         A    Oh, that's a CPIU of 2.22 percent.  Is

19   that what you're referring to?

20         Q    Yes.  How did you reach that?

21         A    That's what's required in the policy.

22   We just looked it up.

23         Q    Okay.  Let's see.

24              MR. OSETE:  Keith, can we please

25   pull up Exhibit 550.  I'm sorry, excuse me, 549.

SUSAN THOMPSON  7/30/2020

1    Thank you.  Okay I think go, Keith, go to the very

2    last page of her report, please.  I'm afraid it's

3    not Bates stamped.  Let's see.

4              MR. BOURHIS:  Why don't we take a

5    five-minute break?  Is that all right with you?

6              MR. OSETE:  That's totally fine.

7    Thank you.

8              THE VIDEOGRAPHER:  Going off

9    record 11:24 a.m.

10             (Recess.)

11             THE VIDEOGRAPHER:  Back on record

12   11:30 a.m.

13       **Q    (By Mr. Osete) Thank you, Keith.**

14   **Thank you, Ms. Thompson.  I only have a few more**

15   **questions, and we'll finish up at least my end of**

16   **the questioning.  I just want to, I just want to**

17   **ask you about --**

18             MR. OSETE:  Keith, could you pull

19   up Exhibit 550, please.

20             (Counsel presented to the

21         witness premarked Exhibit No. 550.)

22       **Q    (By Mr. Osete) And Ms. Thompson, I**

23   **know you, I know you talked a little bit with**

24   **Ms. Kersting about this supplemental report.  I**

25   **just wanted to ask you --**

SUSAN THOMPSON  7/30/2020

```
 1                    MR. OSETE:  Keith, can you go to
 2     her page, her very first, her page three and blow
 3     up the introduction in paragraph one.
 4          Q    (By Mr. Osete) Okay, Ms. Thompson,
 5     I'm just going to read this.  Quote, My original
 6     report in the above-referenced matter was
 7     submitted on April 15, 2020, and updated on
 8     July 24, 2020.  In concurrence to that
 9     submission, I was asked by counsel to prepare a
10     supplemental benefits calculation for Robert P.
11     Garver related to the catastrophic disability
12     rider attached to the Principal Life Insurance
13     disability income policy number 7881467 dated
14     August 6, 2015.
15          Did I read that correctly?
16          A    Yes.
17          Q    Okay.
18          A    Yes, sorry.
19          Q    That's okay.  With regard to that
20     phrase "catastrophic disability rider," were you
21     asked to provide an opinion as to whether or not
22     that rider applied in this case?
23          A    No.
24                    MR. BOURHIS:  Objection, form.
25          Q    (By Mr. Osete) You were not?
```

SUSAN THOMPSON  7/30/2020

Page 111

```
 1          A    No, I was not.
 2          Q    Okay.  So in your calculation, in your
 3    calculations pursuant to this report that we have
 4    in front of us, you simply assumed that the
 5    catastrophic disability rider applied; is that
 6    right?
 7          A    That's what -- yes, that's correct.
 8          Q    And that is what you based your
 9    calculations on in this report?
10          A    Yes.
11          Q    Okay.  Had you ever, have you ever
12    testified -- well, strike that.
13          Do you have any familiarity with a
14    catastrophic disability rider in the industry,
15    generally speaking?
16               MR. BOURHIS:  Objection, form.
17          A    Other than how to read them and how to
18    calculate the damages that would apply, no.
19          Q    (By Mr. Osete) Okay.  And how many
20    other times have you calculated a catastrophic
21    disability rider pursuant to a policy in previous
22    cases?
23          A    I don't think I have.
24               MR. BOURHIS:  Objection, form.
25          Q    (By Mr. Osete) So this is the first,
```

SUSAN THOMPSON  7/30/2020

1    this is the first time you've been asked to make

2    this kind of calculation with respect to a

3    catastrophic disability rider?

4          A    As I recall yes.

5          Q    Okay.  And on page, Keith could you go

6    to her page four, please.  And blow up paragraph

7    five.  And I just want to make this clear.  And

8    it's blown up for you there.

9          When you say "guidance from counsel,"

10   again what does that mean?

11         A    Exactly what I described.

12              MR. BOURHIS:  Objection, asked and

13   answered.

14         Q    (By Mr. Osete) Go ahead.

15         A    Exactly what I described earlier.

16         Q    Okay.  In other words, you were, you

17   were, you were told to calculate the rider with

18   however Mr. Bourhis told you to calculate it?

19              MR. BOURHIS:  Objection, misstates

20   the witness' testimony.  Objection to form.

21         A    No, no.  Guidance from counsel meaning

22   to make sure that my understanding of each of

23   those bullet points was correct and consistent

24   with the facts in this case.

25         Q    (By Mr. Osete) Okay.  And is the

SUSAN THOMPSON  7/30/2020

1    phrase "guidance from counsel" synonymous with

2    the phrase "direction from counsel" that you use

3    later in this report?  Let me rephrase that.

4         You were asked to, when the report uses

5    the phrase "direction from counsel," it's in

6    reference to excluding certain losses from your

7    calculation.  And I believe you testified that it

8    was something you were told to exclude; is that

9    right?

10        A    Correct.

11        Q    Okay.  And that had the same meaning

12   in this report when it uses the phrase "direction

13   from counsel"?

14             MR. BOURHIS:  Objection, asked and

15   answered.  Objection to form.

16        A    It's, the direction from counsel

17   regarding leaving out 191st Street is the same in

18   both reports.  It's nothing different from

19   guidance of counsel, which you asked a minute ago.

20        Q    Okay.  And just to be clear, we talked

21   about in the original report and who assisted you

22   with that report.

23        With respect to this report, supplemental

24   expert report, did anyone assist you in preparing

25   this supplemental report?

SUSAN THOMPSON  7/30/2020

```
 1          A    My staff, yes.  Brian and I worked on
 2     this.
 3          Q    Okay.
 4               MR. OSETE:  And just for the
 5     record, Keith, could you pull up page seven of her
 6     report, please, on this one.
 7          Q    (By Mr. Osete) That is, that is your
 8     signature at the bottom there, correct?
 9          A    Yes.
10          Q    But you were assisted from other
11     people on your staff in preparing this report?
12          A    Correct.
13          Q    Okay.  That's all I have,
14     Ms. Thompson.
15               MR. OSETE:  Ms. Kersting, I'll
16     send her back to you.  Thank you.
17               MS. KERSTING:  Matt, do you have
18     any questions?
19               MR. BOURHIS:  I do.
20                  EXAMINATION
21     QUESTIONS BY MR. BOURHIS:
22          Q    Okay, Susan.  So we've talked a lot
23     today about guidance from counsel, and I want to
24     ask you a little bit more about that.
25               So when we contacted each other, you
```

SUSAN THOMPSON  7/30/2020

```
 1       obviously recall that we discussed the need to
 2       calculate the present value of past policy
 3       benefits, current policy benefits and future
 4       policy benefits, correct?
 5            A    Yes.
 6            Q    And that's your area of expertise?
 7       You've done that on numerous occasions, as we've
 8       discussed already, right?
 9                 MS. KERSTING:  Objection, form.
10            A    Those types of calculations yes.
11            Q    (By Mr. Bourhis) Okay.  And in this
12       particular case, we reviewed the policy together,
13       right?
14            A    Yes.
15                 MS. KERSTING:  Objection, form.
16            Q    (By Mr. Bourhis) Okay.  And when I
17       say "the policy," I mean the disability insurance
18       policy, all riders, amendments, attachments, all
19       the exhibits contained in your report, right?
20                 MS. KERSTING:  Objection, form.
21            A    Correct.
22            Q    (By Mr. Bourhis) Okay.  And you read
23       this entire policy, right?
24                 MS. KERSTING:  Objection, form.
25            A    Yes.
```

SUSAN THOMPSON  7/30/2020

 1          **Q     (By Mr. Bourhis) Okay.  Let's go to**
 2   **Exhibit 3.**
 3                    MR. BOURHIS:  Keith, you have a
 4   link to my exhibits, right?
 5                    THE VIDEOGRAPHER:  Yes.  Sorry,
 6   stand by.
 7                    MR. BOURHIS:  That's all right.
 8                    (Counsel presented to the
 9          witness premarked Exhibit No. 3.)
10          **Q     (By Mr. Bourhis) Okay.  And if we go**
11   **to pdf page 32.  I'm sorry, it's not Bates**
12   **stamped either.  We'll see a section of the**
13   **policy.  Actually why don't we start at page 31.**
14   **There we go.  Yeah, so we'll start at page 31**
15   **towards the bottom this is the earnings provision**
16   **of the disability insurance policy, right?**
17          A     Yes.
18          **Q     And this is something that you**
19   **reviewed before you ever created a present value**
20   **report, right?**
21          A     Yes.
22          **Q     This is a relevant definition when**
23   **this comes to calculating benefits under the**
24   **residual disability provision, right?**
25                    MS. KERSTING:  Objection, form.

```
 1          A    Yes.
 2          Q    (By Mr. Bourhis) Okay.  And so in
 3   essence, would you agree that you're looking at
 4   Robert Garver's past earnings, comparing that to
 5   his current earnings, and using that to calculate
 6   the amount of benefits that are owed under the
 7   residual disability provision of this policy?
 8          A    Generally yes.
 9               MS. KERSTING:  Objection, form.
10   Ms. Thompson, you've got to let me object in
11   between there, so if you could wait a little bit
12   with your answers, that would be great.
13          A    Certainly.  I said generally yes.
14          Q    (By Mr. Bourhis) Okay.  And if you
15   recall we reviewed this definition of earnings
16   together.
17               MR. BOURHIS:  And Keith, if you
18   would go to the page.
19          Q    (By Mr. Bourhis) Would you please
20   read this, by the, way as we're going along here.
21   The first section of the earnings provision
22   states, If you are an employee with no ownership
23   interest in a business entity, earnings include
24   the amounts as reported for federal income tax
25   purposes of, and then it lists one through four,
```

SUSAN THOMPSON  7/30/2020

```
 1    right?

 2         A    Yes.

 3         Q    Okay.  But in this case, obviously Bob

 4    Garver has ownership interests in numerous

 5    businesses, correct?

 6         A    Yes.

 7         Q    Okay.  And so if we could go down to

 8    the next page, this provision specifies how to

 9    calculate earnings when you are a business owner

10    contrary to the previous provision we've just

11    looked at, right?

12         A    Yes.

13         Q    Okay.  And so this is the governing

14    provision in your opinion when it comes to

15    calculating Bob Garver's earnings at Robert Garver

16    Builder, right?

17         A    Yes.

18              MS. KERSTING:  Objection, form.

19         Q    (By Mr. Bourhis) Okay.  Would you

20    please read this provision to yourself.  And let

21    me know when you're done.

22         A    (Witness looking at exhibit.)  Okay.

23         Q    Okay.  And if you recall when we had

24    reviewed this at the time you were retained as an

25    expert witness, this is a complicated provision
```

SUSAN THOMPSON  7/30/2020

```
 1    with a lot of different factors.  Would you agree?
 2                MS. KERSTING:  Objection, form.
 3         A    There's a lot of things to consider in
 4    this.  That's correct.
 5         Q    (By Mr. Bourhis) Okay.  And we also
 6    discussed that this requires some guidance?  A
 7    lot of this is not very clear?  You remember
 8    that, right?
 9         A    Yes.
10                MS. KERSTING:  Objection, form.
11         Q    (By Mr. Bourhis) And you would also
12    agree that this provision here is vague and
13    ambiguous, right?
14                MS. KERSTING:  Objection, form.
15         A    Some of it is, yes.
16         Q    (By Mr. Bourhis) Okay.  And as you
17    sit here today reading this provision, you don't
18    see the term "business losses" included anywhere
19    in here, do you?
20                MS. KERSTING:  Objection, form.
21         A    No.
22         Q    (By Mr. Bourhis) Okay.  And so when
23    it comes to 191st Street Investors, we talked
24    about whether or not to include business losses
25    when it comes to calculating prior earnings; is
```

SUSAN THOMPSON  7/30/2020

 1    that correct?

 2                    MS. KERSTING:  Objection, form.

 3          A    Correct.

 4          Q    (By Mr. Bourhis) I'm sorry, I didn't

 5    hear a response.

 6          A    Yes.  Sorry.

 7          Q    Okay.  And this is what you mean when

 8    you mention the word "guidance" in your expert

 9    report, that we talked about the meaning of the

10    vague and ambiguous term in the policy and how you

11    should interpret that, right?

12                    MS. KERSTING:  Objection, form.

13          A    Yes.

14          Q    (By Mr. Bourhis) All right.  And I

15    didn't --

16                    MS. KERSTING:  Again, you have to

17    give me time to object, please.  Otherwise we keep

18    on talking over each other.

19          Q    (By Mr. Bourhis) Yeah, I'm sorry,

20    Susan.  It's always helpful with the Zoom stuff

21    to remember to take like a three-second pause.

22    I'm guilty of that myself, so we'll do better.

23          Okay, and so we had talked about how to

24    interpret this vague and ambiguous provision, and

25    that's what you mean when you're referring to

SUSAN THOMPSON  7/30/2020

```
 1    guidance, right?  I didn't order you or tell you
 2    what to think when it came to this policy
 3    provision, right?
 4                    MS. KERSTING:  Objection, form.
 5         A    That's correct.
 6         Q    (By Mr. Bourhis) We simply had a
 7    normal discussion about how to interpret
 8    something that's vague and ambiguous.  Would you
 9    agree?
10                    MS. KERSTING:  Objection, form.
11         A    Yes.
12         Q    (By Mr. Bourhis) Okay.  Let's go,
13    okay, let's go to Exhibit 2.
14                    (Counsel presented to the
15                    witness premarked Exhibit No. 2.)
16         Q    (By Mr. Bourhis) Okay, so this is a
17    June 19th, 2020, letter from Principal Insurance
18    Company.  And you've reviewed this letter before,
19    right?
20         A    Yes.
21         Q    And I've provided you a copy of this
22    letter, and you read that before you and I ever
23    talked about it, right?
24                    MS. KERSTING:  Objection, form.
25         A    Yes.
```

SUSAN THOMPSON  7/30/2020

```
 1          Q    (By Mr. Bourhis) All right.  And when
 2     we first talked about this letter, I didn't tell
 3     you that this was an arbitrary decision by
 4     Principal, right?
 5                    MS. KERSTING:  Objection, form.
 6          A    No.
 7          Q    (By Mr. Bourhis) That was your
 8     opinion, right?  And I'm referring by the way --
 9     strike that.
10          This letter states on page two, Federal
11     tax return on file for Robert Garver Builders,
12     Inc. for 2015 to 2018 verify that Mr. Garver
13     retained 100 percent ownership of the business
14     based on the 1125-E and K-1 forms provided for
15     each year.
16          And as you've testified today, you agree,
17     right?  That's what those forms say, is that he
18     owned a hundred percent of Robert Garver
19     Builders, correct?
20          A    Yes.
21          Q    You also have testified today that tax
22     forms also indicate that he and his wife, Molly
23     Garver, own Welborn Sales in 50/50 ownership,
24     correct?
25          A    Yes.
```

SUSAN THOMPSON  7/30/2020

```
 1        Q    And there's no reason to believe that
 2   that's not true, right?
 3              MR. OSETE:  Objection, form.
 4              MS. KERSTING:  Join.
 5        A    I said that's correct.
 6        Q    (By Mr. Bourhis) Okay.  And if we go
 7   to page three, the second paragraph from the
 8   bottom states, When Mr. Garver took over
 9   ownership and the role of president of Welborn
10   Sales, his ownership decreased from 100 percent
11   ownership of Robert Garver Builders, Inc. to
12   50 percent ownership of Welborn Sales, Inc.
13   Mr. Garver's policy provides that loss of
14   earnings must be solely due to disability.  A
15   change in ownership percentage would impact
16   Mr. Garver's earnings for reasons that are not
17   due to disability.
18          As a result, we maintain our position to
19   attribute 100 percent of Welborn Sales business
20   income, expenses and depreciation to Mr. Garver
21   to more accurately reflect his loss of earnings
22   after December 31st, 2018.
23          Did I read that paragraph accurately?
24        A    Yes.
25        Q    And your opinion is that he does in
```

SUSAN THOMPSON  7/30/2020

1    fact only own 50 percent of Welborn Sales, Inc.,

2    right?

3          A    Yes.

4          Q    And that this is a arbitrary decision

5    by Principal to attribute 100 percent of Welborn

6    Sales' business income, expenses and depreciation

7    to Mr. Garver when in fact he only owns 50 percent

8    of it, right?

9               MS. KERSTING:  Objection, form,

10   lack of qualification.

11         A    Yes.

12         Q    (By Mr. Bourhis) Okay.  And you read

13   the policy as we discussed, and you don't see

14   anything in the policy that would suggest that

15   Principal is allowed to do this, right?

16              MS. KERSTING:  Objection, form,

17   lack of qualification.

18         A    Yes.

19         Q    (By Mr. Bourhis) Okay.  And you've

20   identified nothing in this letter from a

21   financial standpoint that indicates that it would

22   be appropriate to attribute 100 percent of

23   Welborn Sales' business income, expenses and

24   depreciation to Mr. Garver, right?

25              MS. KERSTING:  Objection, form,

SUSAN THOMPSON  7/30/2020

```
 1    lack of qualification.

 2         A    Yes.

 3         Q    (By Mr. Bourhis) Okay.  Let's go to

 4    Exhibit 4.

 5              (Counsel presented to the

 6              witness premarked Exhibit No. 4.)

 7         Q    (By Mr. Bourhis) This is an expert

 8    witness report from Ernest Patrick Smith dated

 9    April 30, 2020, correct?

10         A    Yes.

11         Q    All right.  And you've reviewed this

12    report, and this is essentially a rebuttal report

13    to your expert report, right?  Strike that.

14              MS. KERSTING:  Objection, form.

15         Q    (By Mr. Bourhis) You understand that

16    this is a rebuttal report to your initial report?

17              MS. KERSTING:  Objection, form.

18         A    Yes.

19         Q    (By Mr. Bourhis) Okay.  This report

20    doesn't address your addendum or supplemental

21    reports, right?

22         A    Correct.

23         Q    Okay.  And if you could please review

24    this document, we're going to go through every

25    point that you disagree with.  So I'd like to ask
```

SUSAN THOMPSON  7/30/2020

1    **you to just review this from the beginning, and**

2    **where you find points of disagreement, could you**

3    **please identify that for me.**

4         A    (Witness looking at exhibit.)  Hang on

5    just a second.  I need to -- I misplaced the first

6    page.

7         **Q    That's all right.  Take your time.**

8         A    Okay, so there's a lot of information

9    on here.  I don't really disagree with anything

10   that I'm seeing here on the first page.  I note

11   that he has some information that we don't have,

12   looking at page three and four.  I think where I,

13   where I would start is on his page five of 12 on

14   his opinion number one.

15        I think makes some claim here that,

16   according to my reading of his CV, are outside of

17   his area of expertise or very broad and

18   encompassing and not necessarily true in this

19   instance.

20        For example, his first paragraph says, The

21   continuation and level of Plaintiff's earnings

22   during the claimed total disability period

23   indicates that his claimed disability did not

24   prevent him from generating earnings from his

25   occupation during the period analyzed.

SUSAN THOMPSON  7/30/2020

1          And I don't know that as a CPA or his
2     other accounting qualifications would give him
3     the expertise to say that he is generating
4     earnings from his occupation.
5          Going down into the next paragraph, it
6     says, Had Plaintiff been disabled and unable to
7     work, he would not have been able to transition
8     into a business owner from Robert Garver
9     Builders, Inc. to Welborn Sales, Inc. and would
10    have -- and would not have been sustainable and
11    able to take care of the costs associated with
12    owning a business.
13         I mean, he provides no basis whatsoever
14    for that statement that he would not have been
15    sustainable and able to take care of the costs
16    associated with owning a business.
17         He goes down further in the second to the
18    last line of that paragraph.  He says, He did not
19    lose his ability to work and did not experience a
20    loss of income.  Again, I don't think he has the
21    expertise to say that he did not lose his ability
22    to work.  I think that's beyond his expertise.
23         And he makes a comment that he did not
24    experience a loss of income; however, he provides
25    no, nothing to substantiate that.  There's no

SUSAN THOMPSON  7/30/2020

1   calculation.  There's no discussion.  It's just a

2   statement.

3         Going down to the next paragraph, he says,

4   A business owner who becomes unable to work, to

5   work as the result of a disability will have no

6   means of generating income until he or she is

7   able to go back to work.  I think that that is

8   false.  I think it's, it's an absolute that he's

9   making here that is not necessarily true.

10        After returning to work, a business owner

11  spends much of his or her time focused on

12  building client relationships before starting to

13  generate revenue and bring in enough business to

14  get his or her earnings to the level they would

15  have been prior to becoming disabled.

16        I don't, he has no basis for that comment.

17  And I can tell you from many, many years of doing

18  business interruption calculations that that is

19  not necessarily true.  It is not the absolute

20  that he has here.

21        Going down to the third paragraph from the

22  bottom, he said that Plaintiff's earnings were

23  derived mostly from his business of Robert Garver

24  Builders, and then he goes on to say that

25  earnings were derived mostly from Welborn Sales,

SUSAN THOMPSON  7/30/2020

```
 1    and he's talking all pre-disability, which
 2    doesn't make sense.  It's inconsistent.
 3         If you go to the next page, I think on the
 4    Welborn Sales for the claimed post-disability, he
 5    has a slightly different number than we used.  I
 6    understand what the difference is, but it's not
 7    material, but it's wrong.
 8         On page four, I mean seven of 12, seven of
 9    12 is just a bunch of observations, information
10    he pulled from different documents.  Eight of 12,
11    again he's just re-summarizing information off of
12    documents.
13         Q    Let me stop you there and ask about
14    page seven of 12.
15         A    Sure.
16         Q    In the third paragraph from the
17    bottom, it identifies Plaintiff's share 50 percent
18    of ordinary income from Welborn Sales.
19         Is it your opinion from reading this that
20    this expert's report attributes 50 percent of
21    Welborn Sales' income, expenses and liabilities
22    to Bob Garver rather than 100 percent as
23    Principal declared it would do?
24         A    No.  He interpreted it the same way
25    that we did.
```

1        Q    Okay.  Please continue.  Let me
2    actually ask you about the second paragraph on or
3    the second paragraph from the bottom on page seven
4    of 12.  This identifies that Bob Garver owns
5    40 percent of ordinary losses from 191st Street
6    Investors.
7        If you were to include the income and
8    losses from 191st Street Investors when you're
9    calculating Bob Garver's earnings, how would you
10   be able to calculate his earnings if he
11   experiences a net loss in any given year from
12   191st Street Investors?
13       A    Hang on a second.  I'm getting dizzy.
14       Q    Are you all right?
15       A    Can we just take -- I think I spoke
16   too much and now I can't breathe.  Can we just
17   take a second, please?
18       Q    Of course.  Why don't we take a five
19   or ten-minute break.
20            THE VIDEOGRAPHER:  Going off
21   record, 11:58 a.m.
22            (Recess.)
23            THE VIDEOGRAPHER:  Back on record
24   12:03 p.m.
25       Q    (By Mr. Bourhis) Let's go back to

1    your addendum just for a moment.  This is

2    Exhibit 3., and this would be page eight.  Now,

3    I'll wait for you to pull it up.  Take your time.

4    That would be page eight, please.  Okay.  There

5    we go.  All right.

6          So just to identify the residual

7    disability benefit under paragraph 14 there,

8    that's simply the algorithm or calculation that

9    you use to calculate the amount of benefits owed

10   under residual disability, right?

11              MS. KERSTING:  Objection, form.

12        A    Yes.

13        Q    (By Mr. Bourhis) Okay.  How would you

14   put that?  Would you call it an algorithm or it's

15   a calculation of sorts, right?  It's an equation,

16   right?

17              MS. KERSTING:  Objection, form.

18        A    Yes.  It's just, that's just a

19   calculation.  They provide the methodology how

20   it's supposed to be and then plug in the

21   appropriate components.

22        Q    (By Mr. Bourhis) So would you agree

23   that it's essentially an equation provided by the

24   policy where you have to plug in certain numbers

25   for each of these terms?  For example, prior

SUSAN THOMPSON  7/30/2020

```
 1    earnings, that's a term that's defined in the
 2    policy.  It has a numerical amount assigned to
 3    it.  And once you figure out what that amount is,
 4    you plug it into this equation, and you calculate
 5    the amount of residual disability benefits that
 6    are owed, right?
 7                  MS. KERSTING:  Objection, form.
 8         A    Yes.
 9         Q    (By Mr. Bourhis) Okay.  Now, we
10    talked about 191st Street and how you decided not
11    to include the losses when it comes to the
12    calculation of earnings.
13         Hypothetically, if there were losses and
14    something like current earnings was a negative
15    figure based off of those losses, what would
16    happen to this equation?  You've got prior
17    earning in a certain amount.  It's a positive
18    figure.  Let's just say that it's $100,000.  And
19    your current earnings are negative because you've
20    taken substantial losses in a business of 191st
21    Street.  Let's say that it's negative $50,000.
22         That's going to make the whole calculation
23    go completely haywire, wouldn't it?
24                  MS. KERSTING:  Objection, form.
25         A    Well, what it does is if I'm now
```

SUSAN THOMPSON  7/30/2020

```
1    including in her earnings in addition to what's
2    already there a large loss, it creates, it would
3    create a larger potentially delta between prior
4    earnings and current earnings such that right now
5    we're looking at 75 percent.  It's just going to
6    make that 75 percent like 85 percent, or it will
7    make it higher.
8         So it would not have a, the effect would
9    not be to reduce the benefits calculated if we
10   had a gain in the pre and then a loss in the
11   post.  It would not affect my current calculation
12   at all.
13        Q    Okay.  And if prior earnings were a
14   negative figure because it included losses, what
15   would happen mathematically speaking, because I'm
16   not a mathematician, what would happen if you took
17   a negative figure for prior earnings, subtracted
18   that from the current earnings, which is a
19   positive figure, and then divided that by a
20   negative figure for prior earnings?
21        A    You're giving me a little too much --
22             MS. KERSTING:  Objection to form.
23        A    I think you're giving me a little bit
24   too much credit there to follow that in my head.
25        Q    (By Mr. Bourhis) Yeah, we can, we can
```

SUSAN THOMPSON  7/30/2020

```
 1    walk through it on a piece of paper.
 2          A    Okay, say it again.
 3          Q    Let's just play with the hypothetical
 4    here.  Let's say that prior earnings are negative
 5    $100,000 because of the losses that an insured
 6    experiences.  That's possible, right?  It's
 7    possible that you experience a net loss, isn't it?
 8          A    Sure.
 9          Q    Okay.  And let's say that your current
10    earnings are a positive figure.  Let's say that
11    it's $50,000.  Right?
12          A    Okay.
13          Q    Negative $100,000 in your prior
14    earnings minus $50,000 divided by negative
15    $100,000, what does that give you?
16          A    .5, so it gives you 500, right?
17    50,000?
18          Q    You broke up a little bit.  Say again.
19          A    It gives you a .5, 50,000 divided by
20    the hundred thousand.  Is that what you're saying?
21          Q    Uh-huh.
22          A    Yeah.
23          Q    Now, the idea is that this portion of
24    equation is supposed to calculate your loss of
25    earnings, right?
```

SUSAN THOMPSON  7/30/2020

```
 1          A    It's the residual, yeah.  So it's not,
 2    it's the residual.  You're taking your prior, your
 3    current, dividing it by your current to come up
 4    with a fraction for what fraction of your prior
 5    earnings you're currently earning.  That's what
 6    that portion of that equation does.  You take that
 7    times the monthly benefit that's due under
 8    whatever, whatever the particular form says in
 9    this case.
10          So in that hypothetical, we calculated
11    that actually it's a negative .5 times the
12    maximum monthly benefit.  So he basically is
13    hitting the maximum because, well, he's hitting
14    the .5 according to this calculation.
15          Q    So, and the purpose of disability
16    insurance generally speaking is that it serves as
17    income replacement, right?  You'd agree with that?
18          A    Yes.
19          Q    Okay.  And the idea is that with a
20    residual disability benefit rider, you're
21    calculating your loss of income and multiplying
22    that by the maximum monthly benefit to give you
23    sort of a proportional income replacement, because
24    you're still working and you're still making some
25    money, and so the idea is that the residual
```

SUSAN THOMPSON  7/30/2020

```
 1    disability benefit supplements the loss of income
 2    that you've experienced as a result of a
 3    disability.
 4         Would you agree with that?
 5              MS. KERSTING:  Objection, form,
 6    lack of qualification.
 7         A    Yes, I would.
 8         Q    (By Mr. Bourhis) Okay.  And so as
 9    we've done with our hypothetical, if you've got
10    prior earnings of negative $100,000 due to a loss
11    and current earnings of positive $50,000, what
12    that suggests is that you've experienced a
13    50 percent loss of earnings, but that's obviously
14    not true if you went from losing a hundred
15    thousand dollars one year to earning $50,000 the
16    next year.
17         You haven't experienced a loss of earnings
18    at all, have you?
19              MR. OSETE:  Object to form.
20              MS. KERSTING:  Objection, form.
21              MR. OSETE:  Oh my.
22              MS. KERSTING:  I know.  This is
23    ridiculous.
24         A    You go from the loss --
25              MR. BOURHIS:  I don't appreciate
```

SUSAN THOMPSON  7/30/2020

```
 1    you saying my question is ridiculous.  But this
 2    serves as a warning.
 3                  MS. KERSTING:  Your question is
 4    ridiculous.  I'm sorry.
 5                  MR. BOURHIS:  Okay, well, that's
 6    on the record.  I don't appreciate that.  I would
 7    ask for a little more respect, please.
 8                  MS. KERSTING:  Are we going to do
 9    any more math or are we moving on?
10                  MR. BOURHIS:  Well, someone has to
11    do some math.
12          Would you please repeat the question?
13                  (The reporter read back the
14          question:  And so as we've done with our
15          hypothetical, if you've got prior
16          earnings of negative $100,000 due to a
17          loss and current earnings of positive
18          $50,000, what that suggests is that
19          you've experienced a 50 percent loss of
20          earnings, but that's obviously not true
21          if you went from losing a hundred
22          thousand dollars one year to earning
23          $50,000 the next year.
24                  You haven't experienced a loss
25          of earnings at all, have you?)
```

SUSAN THOMPSON  7/30/2020

```
 1          A    So my answer is if you had, prior year
 2     had a loss of a hundred thousand and the current
 3     year you have income of 50,000, just looking at
 4     that alone does not appear that you have a loss of
 5     income in the current year.
 6          Q    (By Mr. Bourhis) So in other words,
 7     when you actually apply numbers to this equation,
 8     if you're factoring in losses, sometimes it
 9     elicits an incorrect assessment of someone's loss
10     of earnings.  You would agree, right?
11               MS. KERSTING:  Objection, form.
12          A    It could.
13          Q    (By Mr. Bourhis) And so the equation
14     as written in the policy, if applied to a loss of
15     earnings, simply doesn't make sense?  You would
16     agree, right?
17               MS. KERSTING:  Objection, form.
18          A    I don't understand your question.  I'm
19     sorry.
20          Q    (By Mr. Bourhis) In other words, if
21     you're using a loss of earnings with this
22     equation, you're going to get skewed results?
23     You're going to get results that don't make
24     sense, right?
25               MS. KERSTING:  Objection, form.
```

SUSAN THOMPSON  7/30/2020

```
 1          A    You're saying if I'm using their
 2    positive income stream and throwing in losses as
 3    well, that it skews the calculation?
 4          Q    (By Mr. Bourhis) Right.
 5          A    If that's your question, that's
 6    correct.
 7          Q    Okay.  And so we reviewed this when it
 8    came to 191st Street because obviously Garver took
 9    substantial losses, right?
10          A    Yes.
11               MS. KERSTING:  Objection, form.
12          Q    (By Mr. Bourhis) And we agreed that
13    it wouldn't make sense to apply substantial
14    business losses in a situation where the equation
15    is going to elicit erroneous results when it
16    comes to income replacement, right?
17               MS. KERSTING:  Objection, form.
18          A    That's what we discussed, that with
19    regard to the fact that 191 was a, an entity that
20    only threw off losses for tax purposes, and
21    therefore it would likely skew this calculation
22    inappropriately.
23          Q    (By Mr. Bourhis) Okay, good.  And you
24    would agree, of course, that when you look at the
25    whole picture when it comes to calculating
```

SUSAN THOMPSON  7/30/2020

```
 1    residual disability benefits, taking into account
 2    this equation and the relevant definitions of
 3    earnings, that it's of course vague and
 4    ambiguous, right?
 5                   MS. KERSTING:  Objection, form.
 6          A    Yes.
 7          Q    (By Mr. Bourhis) Okay.  Let's look,
 8    let's go down to page, let's go to page 34,
 9    please.
10                   THE VIDEOGRAPHER:  Plaintiff's
11    Exhibit 3 or Plaintiff's Exhibit 4?
12                   MR. BOURHIS:  This is the same
13    document we're looking at, the addendum.
14                   THE VIDEOGRAPHER:  Thirty-four of
15    three?
16          Q    (By Mr. Bourhis) That is pdf page 34.
17    Okay, so we're looking at the definition of total
18    disability.  I'm going to ask you about what
19    effect it would have if Mr. Garver exited the
20    workforce.
21          Definition of total disability says,
22    Solely due to injury or sickness during the your
23    occupation period you are unable to perform the
24    substantial and material duties of your
25    occupation and, B, you are not working.
```

SUSAN THOMPSON  7/30/2020

1           Is that an accurate reading?

2      A    Yes.

3      Q    Okay.  And so if by these terms, if

4   Bob Garver were not working, he would not satisfy

5   this definition of total disability, right?

6                MS. KERSTING:  Objection, form,

7   lack of qualification.

8      A    That's correct.  I would agree.

9      Q    (By Mr. Bourhis) Okay.  And so we

10  looked at residual disability because Bob Garver

11  is working, right?

12                MS. KERSTING:  Objection, form.

13     A    That's correct.

14     Q    (By Mr. Bourhis) Okay.  Let's go to

15  the definition of residual disability.

16                THE VIDEOGRAPHER:  Do you know

17  where that's at?

18                MR. BOURHIS:  Yeah.  I'm just

19  scrolling for it.  Okay, 57.

20     Q    (By Mr. Bourhis) We've already

21  reviewed this.  If someone is residually

22  disabled, you compared their loss of earnings and

23  multiplied that by the basic monthly benefit?

24                MS. KERSTING:  Objection, form.

25     Q    (By Mr. Bourhis) My question is, if

SUSAN THOMPSON  7/30/2020

1    **Bob Garver exited the workforce, his earnings**

2    **would be zero, right?  How would that affect his**

3    **residual disability benefits?**

4              MS. KERSTING:  Objection, form,

5    lack of qualification.

6         A    It would not affect my damage

7    calculation because we've already hit maximum

8    disability, so the fact that he has no income, it

9    just makes the delta higher, but it doesn't change

10   the damage calculation.

11        Q    (By Mr. Bourhis) Okay.  And let's go

12   **back to the Smith report.  We'll wrap this up by**

13   **having you go through the last couple of pages**

14   **and then we'll done here.**

15              MR. BOURHIS:  This is Exhibit 4,

16   Keith, and we were on page eight.

17              (Counsel presented to the

18              witness premarked Exhibit No. 4.)

19        Q    (By Mr. Bourhis) Susan, if you would

20   **please go through the remainder of this report**

21   **and identify where you disagree with the findings**

22   **and opinions.**

23              MS. KERSTING:  Objection, form.

24        Q    (By Mr. Bourhis) Strike that.  Susan,

25   **would you please read this report and identify**

SUSAN THOMPSON  7/30/2020

1     **where you disagree with it.**

2                    MS. KERSTING:  Objection, form.

3          A    So we stopped on page eight.  And

4     again, he's just reiterating information he's

5     gleaned from various texts and documents.

6     Basically he does the same thing on nine.

7          And then on page ten is where his opinion

8     number two is.  And he states that I failed to

9     obtain sufficient relevant data in arriving at my

10    conclusions that the Plaintiff experienced a loss

11    of net benefits of $1,293,377 as calculated in my

12    report dated April 15, 2020.  Obviously I

13    disagree that I failed to obtain sufficient

14    relevant data.

15         He says that my calculation estimating

16    future earnings is inappropriate, but he doesn't

17    say anything else based on that, so I don't know

18    what he's basing that on, and I disagree with

19    that.

20         The basis for his opinion, I don't

21    understand why he says it's unclear as to what,

22    if any, opinions Ms. Thompson has regarding this

23    matter, as his opinion number two above states,

24    that exactly what my conclusion was of the net

25    loss of benefits of the roughly 1.29 million.

SUSAN THOMPSON  7/30/2020

```
1              He said that my opinions and schedules do
2      not comply with basically Rule 26, which I
3      disagree.  And so he says he can't opine an
4      unstated opinions.  I don't know what he's
5      talking about.  I think I -- believe that I met
6      the requirements of Rule 26.  I think he's clear
7      that he understands what my conclusion is.
8              He makes the comment that I ignored the
9      calculations performed by Principal Life
10     Insurance.  That was not part of my assignment.
11         Q    Let me ask you about that.  Your
12     assignment was to review this from a neutral
13     perspective and assess Bob Garver's prior earnings
14     based off of his tax forms and how the policy
15     defines prior earnings, correct?
16                  MS. KERSTING:  Objection, form.
17         A    Correct.
18         Q    (By Mr. Bourhis) You simply weren't
19     going to accept Principal's calculation as true
20     on their face, right?
21                  MS. KERSTING:  Objection, form.
22         A    I don't think I even had them to begin
23     with.  No, I was just asked to use the, the
24     information of the insured and use the policy and
25     to calculate it based on that, and that's what I
```

SUSAN THOMPSON  7/30/2020

1   did.

2        **Q      (By Mr. Bourhis) You believe that you**

3   **exercised independent judgment in calculating**

4   **these prior earnings?**

5                    MS. KERSTING:  Objection, form.

6        A    Yes, I believe I did.

7        **Q      (By Mr. Bourhis) Thank you.  Please**

8   **continue.**

9        A    So I believe one of his comments as

10  far as overstating monthly earnings, he said it

11  excluded a 179 deduction, which is true, we did.

12  However, I recalculated it, and it makes no

13  difference on the loss that I calculated.

14        He believes that the losses from 191st

15  Street Investors should be included, and clearly

16  we have left that out.

17        He makes a comment his last bullet point

18  from the bottom of 10 of 12, he notes that we

19  used the income on the K-1 as opposed to what's

20  reported on the individual tax return.  I believe

21  we used the correct number there.

22        Then going on to page 11 of 12, he

23  indicates that we failed to consider the

24  probability of death, unemployment, leaving the

25  workforce, business uncertain at this.  That is

SUSAN THOMPSON  7/30/2020

1    true.  We calculated this as a contract.  The

2    contract is payable through age 65, and it is

3    presented as such.

4         The discount rate that we used, he says,

5    is too low, and he proposes using a 20-year

6    treasury yield, which I believe is incorrect.

7         **Q    Please explain why you believe that's**

8    **incorrect.**

9         A    Yes.  Typically what you're supposed

10   to do is when you calculate these, we have let's

11   just say we have a roughly 20-year period here we

12   want to clean up.  You're supposed doing in and

13   literally calculate the present value factor for

14   every one of those 20 years, and then you add them

15   up, and you get your answer.

16        Well, if you use what you would have to

17   present value of payment in year 20, you are

18   going to be penalizing every year prior to that

19   because it's too heavy of a discount.  If you use

20   the discount rate in year one, then you're using

21   the wrong discount for everything going forward.

22        So what you do is you need a half period

23   convention, which even that, so that you're not,

24   you're not unfairly discounting too heavily on

25   the front end or the back end.  In fact, if you

SUSAN THOMPSON  7/30/2020

1    look at my, where we have the T-Bill, I think I

2    included that sheet in my report.

3          And if you look at what the rates are in

4    year one and year 20, look at year ten.  It's

5    exactly the average of the two, which provides a

6    mathematically more sound, it's an estimate,

7    right, because neither of us was doing the 20

8    years all the way.

9          But it provides the most sound estimate of

10   what the present value is, and that using that

11   midyear convention is widely used by many experts

12   and widely accepted in these types of

13   calculations.

14         So his, his indication of trying to use

15   the 20 year is, it's not widely used, quite

16   frankly, and I think it's erroneous and flawed.

17   I think throwing in, trying to throw in the

18   credit rating of the insurance company is

19   inappropriate in this particular instance because

20   we are, we are discounting that cash flow, and we

21   are relying on the interest rate from that

22   T-Bill, which is what it would be reasonable for

23   the individual to be able to invest in and be

24   able to get the benefits from.  We're not looking

25   at the insurance company.

SUSAN THOMPSON  7/30/2020

1         And the premise is also that the insurance

2   company is, it's healthy and able to make these

3   payments through his age 65.

4         So that's my thoughts on his, how he

5   calculates his present value rate.  I think he's

6   inappropriate and mathematically flawed.

7         **Q    Is it also your opinion that the use**

8   **of the present value factor that Smith propounds**

9   **here is unfair?**

10               MS. KERSTING:  Objection, form.

11         A    When I say it's flawed, it's going to

12   give an inappropriate number.  It's just wrong.

13   That's not how you do it.

14         And I don't, I mean, he calculates a

15   discount rate, but he doesn't apply it to

16   anything.  Even though he made a comment that

17   there's no loss, I still haven't seen a

18   calculation or anything that he's done that has

19   shown that there is no loss.

20         And then he goes on to say that it's

21   flawed because I have overstated it because I

22   based it on annual measurements.  I think that

23   we've discussed that quite a bit.  And we've done

24   the calculation on a monthly basis.  It could be

25   cut off at any given month in any given year if

SUSAN THOMPSON  7/30/2020

1    that was appropriate.

2          And again, we talked about he's saying

3    that I didn't prepare an analysis of monthly

4    earnings.  We've talked about that I think

5    appropriately, that you can't -- and the policy

6    actually calls for what you would report in your

7    income tax returns.  Well, those monthlies are

8    likely not to be that.

9          If you consider that, first of all they

10   don't often prepare them, and they don't create

11   the appropriate adjustments except at yearend.

12   So if we're talking tax base and they're doing

13   their books on a basis other than tax, then you

14   would have a problem there.

15         So the most reliable and I think

16   reasonable source would be to use those actual

17   tax returns.  And that gave us a full 12 months

18   of operations.  And that is also in accordance

19   with the policy that it says to use the highest

20   12 months from the past I think two years.

21         So I think that what we have done is very

22   reasonable.  It's widely accepted in the

23   industry, methodology of doing that, and is

24   appropriate as well in this matter.

25         **Q    (By Mr. Bourhis) Let me ask you one**

SUSAN THOMPSON  7/30/2020

1    more question.

2         As the policy is written, if the insured

3    does not have the profit and loss statements, as

4    you've already testified that many small

5    businesses do not generate profit and loss

6    statements, would it be possible for Principal to

7    calculate the monthly benefits owed under

8    residual disability without that information?

9                   MS. KERSTING:  Objection, form.

10        A    You're saying would it be possible to

11   calculate the residual without monthly P&Ls?

12        Q    (By Mr. Bourhis) Uh-huh, on a monthly

13   basis.

14        A    Well --

15        Q    Or would you need to wait until you

16   have the yearend tax returns in order to calculate

17   the monthly benefits that were owed?

18                   MS. KERSTING:  Objection, form.

19        A    Again, I would use the yearend tax

20   information, because you've already had, that CPA

21   has already gone through, looked at all of the

22   transactions of his work, determined what types of

23   entries needed to be made, what kind of

24   adjustments needed to be made for any given

25   transaction, for any given time period, and then

SUSAN THOMPSON  7/30/2020

```
1    posted yearend catch-up.
2          Without looking at the documents, I can't
3    tell you if you went back -- I don't even know if
4    they have, what they have, whether or not you
5    could recreate it on a monthly basis.  I don't
6    know.  I haven't looked.
7          Q    (By Mr. Bourhis) Well, let me ask you
8    this.
9          The way the policy is written, it's
10   impossible to calculate the benefits owed to
11   someone on a month-to-month basis -- strike that.
12         The way the policy is written, it's
13   impossible to calculate the residual disability
14   benefits owed to an insured business owner who
15   does not generate monthly profit and loss
16   statements.  You would agree, right?
17                   MS. KERSTING:  Objection, form.
18                   MR. OSETE:  Objection, form.
19         A    I think that's true.
20         Q    (By Mr. Bourhis) So in other words,
21   you would need to wait until you have that
22   insured's yearend tax returns in order to
23   calculate the benefits that were owed for that
24   tax year, right?
25                   MS. KERSTING:  Objection, form.
```

SUSAN THOMPSON  7/30/2020

```
 1          A     In this instance that's true.
 2          Q     (By Mr. Bourhis) Okay.  Does that
 3    seem fair to you, that an insured who owns his
 4    own business would not be able to receive monthly
 5    benefits until his insurance company has the tax
 6    returns for that year?
 7                 MS. KERSTING:  Objection, form.
 8          A     I don't think I have an opinion on, on
 9    that, on how the insurance company deals with it.
10                 MR. BOURHIS:  Okay.  Those are all
11    the questions that I have.
12                 MR. OSETE:  I just have one more.
13                 MS. KERSTING:  I have questions,
14    too.
15                         EXAMINATION
16    QUESTIONS BY MR. OSETE:
17          Q     Just one more.  Ms. Thompson, you
18    testified just now to Mr. Bourhis that you
19    exercised independent judgment in reaching your
20    calculations.  Is that correct?
21          A     Yes.  I mean, where I can, yes.
22          Q     So you did or you didn't?
23          A     I exercised independent judgment in
24    preparing my calculations.
25          Q     Okay.  And your, and your signatures
```

SUSAN THOMPSON  7/30/2020

1    appear on all these documents you prepared,

2    correct?  Your signature appears on these

3    documents that you have prepared, correct?

4         A    Yes.

5         Q    Okay.  Now, how do you reconcile

6    exercising independent judgment in reaching your

7    calculations while also being simply told to just

8    exclude certain items from your calculations?  How

9    do you reconcile that?

10              MR. BOURHIS:  Objection, misstates

11   the witness' testimony.  Objection to form.

12        A    So you kind of stepped on my answer

13   when you first started here.  You asked me if I

14   used independent judgment in coming across, in

15   preparing these calculations in that, I used

16   independent judgment on where to get what

17   information.

18        So the income information that I pulled

19   off the tax returns, that was my judgment that I

20   used in pulling that.  How we prepared the

21   present value calculations, where we pulled all

22   of our data for discount rates and present value

23   and all that, that is mine.

24        I also state in my report that I consulted

25   with counsel to make sure that my understanding

SUSAN THOMPSON  7/30/2020

```
 1    in reading the policy and my understanding of the
 2    facts in the case, so yes, I absolutely did
 3    consult for understanding of the case matter.
 4          But as far as the calculations, I made the
 5    calculations.  There are assumptions inherent in
 6    my calculation.  I'm assuming that what counsel
 7    told me is correct, that he's disabled, and so
 8    the calculation assumes disability.
 9          The other assumption I was told to make
10    was -- slow down -- was to leave out the 191st
11    because all it did was generate losses and that
12    it was incorrect.  That I left out.
13          So yes, I did have input.  I do have
14    assumptions in there.  But I exercised my own
15    judgment from an accounting and financial
16    standpoint in how and what the inputs were
17    largely to this calculation.
18          Q    And had Mr. Bourhis not told you to
19    exclude those losses, would you have excluded
20    those losses?
21          A    Well, that was, that was a discussion
22    that we had early on as I was trying to understand
23    what that entity was and what it did, because I
24    didn't know, I honestly didn't know enough about
25    it to know how to handle it.
```

```
 1            And he said that, my understanding is he
 2       had some research, and he said that based on his
 3       understanding of how it works, it should not be
 4       included and that I needed to leave that out, so
 5       I did.
 6            Q    Okay, thanks.
 7                 MR. OSETE:  Edna?
 8                 MS. KERSTING:  I have further
 9       questions, too.  Thanks.
10                    EXAMINATION
11       QUESTIONS BY MS. KERSTING:
12            Q    Let's talk about the policy a little
13       bit first.  Let's go back to Exhibit 2 and PLIC
14       34.  That's my Exhibit 2., and then PLIC 34.  This
15       is part of the residual disability rider.
16            I represent that to you.  And up there,
17       you see where it says, Residual disability means?
18       Do you see that?
19            A    Yes.
20            Q    Did you look at this definition before
21       you prepared or before you instructed Brian to
22       prepare those schedules?
23            A    Yes.
24                 MR. BOURHIS:  Objection, form.
25            Q    (By Ms. Kersting) You are not -- and
```

SUSAN THOMPSON  7/30/2020

1    it says, Residual disability means you are not

2    totally disabled and solely due to injury or

3    sickness you have a loss of earnings equal to or

4    greater than 20 percent of your prior earnings.

5         Do you see that?

6         A    Yes.

7         Q    Did I read that correctly?

8         A    Yes.

9         Q    And did you apply this definition when

10   you decided what amounts to include with regard to

11   prior earnings and with regard to current

12   earnings, or did you simply follow the tax

13   returns?

14                MR. BOURHIS:  Objection, form,

15   qualifications.

16        A    Did I follow this or follow the tax

17   returns?  I don't understand the connection there.

18        Q    (By Ms. Kersting) You're a

19   accountant, correct, and you are guided by the

20   information that was provided on the tax returns;

21   isn't that correct?

22                MR. BOURHIS:  Objection, form.

23        A    So yes, I used the information in the

24   tax returns.

25        Q    (By Ms. Kersting) Because you're not

SUSAN THOMPSON  7/30/2020

```
 1     an insurance expert, are you?

 2          A     That's correct.  I am not.

 3          Q     You're not an expert on insurance

 4     policy language, are you?

 5          A     No.

 6          Q     And you usually do not render opinions

 7     as to what an insurance policy provision means;

 8     isn't that correct?

 9          A     Correct.

10          Q     So when you look at this disability

11     definition here, that means, one, you're not

12     totally disabled; and two, solely due to injury or

13     sickness you have a loss of earnings, that doesn't

14     really mean anything to you, do you?

15                MR. BOURHIS:  Objection, misstates

16     the witness' testimony.  Objection to form.

17          A     Well, it does mean something to me

18     because that is an indication of whether or not

19     the policy provisions are valid and that if they

20     are, then you do the calculation.

21          Q     (By Ms. Kersting) And in your

22     calculations of your determination of loss of

23     earnings, did you look at what loss of earnings

24     were solely due to injury or sickness?

25          A     I believe I did.
```

SUSAN THOMPSON  7/30/2020

1      Q     And you believe that the tax returns

2   accurately represent whatever loss of earnings are

3   solely due to injury or sickness?

4      A     That's my understanding.

5      Q     And if Mr. Garver had made himself a

6   10 percent owner of Welborn Sales and his wife an

7   90 percent owner of Welborn Sales, then those

8   10 percent of business income that was attributed

9   to him would be what is accurately indicated as

10   the earnings that he had, and the last that would

11   be reflected would be the loss due to injury or

12   sickness in your opinion?

13                    MR. BOURHIS:  Form.

14      A     I'm sorry.  You have to repeat that.

15      Q     (By Ms. Kersting) If Mr. Garver when

16   he purchased Welborn Sales had decided to be a

17   10 percent shareholder of the company and

18   Mrs. Garver had become a 90 percent shareholder

19   of the company, then the amounts on the K-1s that

20   were issued by Welborn Sales to Mr. Garver and

21   Mrs. Garver would reflect such 10 percent and

22   such 90 percent ownership split, correct?

23                    MR. BOURHIS:  Objection to form,

24   calls for speculation.

25      A     Yes.

SUSAN THOMPSON  7/30/2020

1          Q      (By Ms. Kersting) And for your loss

2    of earnings calculation, you would look at

3    Mr. Garver's K-1; isn't that correct?

4          A      As I did in this matter.  That would

5    be one of the things I'd look at, of course.

6          Q      And if he is only a 10 percent owner,

7    the amount that you would have attributed to his

8    current earnings would be significantly less than

9    if he were a 50 percent owner; isn't that correct?

10                MR. BOURHIS:  Objection, form.

11         A      All things being equal yes.

12         Q      (By Ms. Kersting) And you would posit

13   in your calculation, which then you would be

14   preparing based on that 10 percent revenue

15   reflected on the K-1 or income reflected on the

16   K-1, as being a loss of earnings solely due to

17   injury or sickness, wouldn't you?

18         A      If nothing else changed but the

19   10 percent, from 50/50 to 10 percent 90, it would

20   change the calculation.  You're right.

21         Q      It would change the calculation.  And

22   you would only look at the 10 percent that he

23   received, correct?

24         A      Yes.

25                MR. BOURHIS:  Objection, form.

SUSAN THOMPSON  7/30/2020

```
 1            A     Sorry.

 2            Q     (By Ms. Kersting) And you would not

 3   do a separate assessment as to whether the loss

 4   of earnings that resulted was solely due to

 5   injury or sickness, would you?

 6                  MR. BOURHIS:  Objection, form.

 7            A     I did not personally do an assessment

 8   either way.  I was told that that's what it was by

 9   counsel, so ...

10            Q     (By Ms. Kersting) You were told to

11   just look at the tax returns, correct?

12            A     Yes.

13            Q     You also told us that with regard to

14   the earnings definition, that you received or

15   rather it was in the questions from counsel that

16   counsel and you discussed the earnings provision,

17   and he provided you clarifications that explained

18   the ambiguities to you.

19            I wanted to know what clarifications

20   counsel provided to explain ambiguities in the

21   earnings definition to you.

22                  MR. BOURHIS:  Objection,

23   completely misstates the expert's testimony.

24   Objection to form.

25            A     I don't know that we cleared up the
```

SUSAN THOMPSON  7/30/2020

```
 1    ambiguities, but with regard to specific
 2    terminology in the policy, he helped me work
 3    through that in relationship to other areas in the
 4    policy that maybe discussed that issue or that
 5    term and basically helped me triangulate from all
 6    the information and the various pieces of the
 7    policy and the riders to come up to what, what was
 8    likely the best definition of that, that the
 9    policy was referring to.
10         So it was a discussion and him helping me
11    to find, you know, other places in the policy
12    maybe where that was also discussed to help me
13    get a better understanding.
14         Q    (By Ms. Kersting) Let's take a look
15    at the earnings definition that's in Exhibit 2
16    again.  And I believe it's at the beginning page.
17    I'm not sure, maybe four, a little further.
18    Yeah, right there, earnings at the bottom.  And
19    there are two parts to it, as counsel explained.
20         Please let me know which part you consider
21    ambiguous.
22         A    Well, I considered it all, but he is
23    not an employee -- this is not appropriate for the
24    calculation because he does have an ownership
25    interest in the entities, so ...
```

SUSAN THOMPSON  7/30/2020

1      **Q     And the definition continues on the**
2   **next page, doesn't it?**
3      A     So I considered it, but I didn't use
4   it.  And yes, it does continue on the next page.
5   And that is primarily what I relied upon, because
6   it talks about as a business owner.
7      **Q     And can you tell me where you feel**
8   **there are ambiguities here?**
9            MR. BOURHIS:  Objection to form.
10      A     So here it talks about your share of
11   the gross revenue or income earned by all such
12   business entities, including income you and others
13   under your supervision.  So that's where we
14   discussed, well, if you've got an entity that has
15   no gross revenues because there's no, there's no
16   share in gross revenues because it's all losses,
17   so that's where we talked about 191st Street and
18   how, how would that play into this particular
19   section.
20      I just think unreimbursed business
21   expenses is kind of a very, very, very broad
22   under the tax laws as to the entities are
23   incurred on a regular basis and essential to
24   established business operations of the entities
25   and to not exceed expenses before disability

SUSAN THOMPSON  7/30/2020

```
1    begins.  It gives examples.
2            It's just not, the whole, the gross, the
3    your share of gross revenues earned is just kind
4    of a nebulous phrase.  It really is.
5            Q     (By Ms. Kersting) You've never
6    applied a provision like that to a calculation
7    before, have you?
8                    MR. BOURHIS:  Objection to form.
9            A    I don't know that that's true, but ...
10           Q     (By Ms. Kersting) So do you have
11   experience in applying policy language like that
12   to calculations?
13                   MR. BOURHIS:  Objection to form.
14           A    I don't know if I did at the time I
15   did this.  I have done some since.  This is
16   complicated because there is not a single, a
17   single entity that's, that he's an owner in, so it
18   gets a little more complicated.
19           And that's why we were, we had discussions
20   on that 191st.  That's all I have to say.
21           Q     (By Ms. Kersting) What clarifications
22   did counsel provide to you so you felt like you
23   could provide this provision to your calculation?
24           A    I think we've gone over that, that we
25   were using the income based on the tax returns,
```

SUSAN THOMPSON  7/30/2020

1    and that that was the reason --

2         Q    And I --

3         A    I'm sorry, I'm still speaking.  And

4    that that was a reasonable basis for determining

5    the revenues earned.

6         **Q    That is the only clarification that**

7    **counsel provided to you, to enlighten you as to**

8    **the, and that's your word, ambiguities in this**

9    **provision?**

10             MR. BOURHIS:  Objection, asked and

11   answered.  Objection to form.

12        A    I think I've answered this multiple

13   times, that there were multiple different ways

14   that this came up as I went through and how we

15   dealt with it, so I don't have anything to add.

16        **Q    (By Ms. Kersting) We also looked at**

17   **Mr. Smith's report.  And am I correct in**

18   **summarizing your testimony that Mr. Smith had**

19   **significantly more information than you did when**

20   **he prepared his report?**

21        A    No.  He has --

22             MR. BOURHIS:  Objection, misstates

23   the expert's testimony.  Objection to form.

24        **Q    (By Ms. Kersting) What is your**

25   **answer, Ms. Thompson?**

SUSAN THOMPSON  7/30/2020

```
 1          A    I said I didn't say that.  I just
 2    noted that he had some documents that I did not.
 3          Q    Should we go through the documents?  I
 4    believe there was Mr. Bourhis' Exhibit No. 3
 5    maybe?
 6               THE VIDEOGRAPHER:  I'm sorry,
 7    which one?
 8               MS. KERSTING:  I believe it was
 9    number three, the expert report, Mr. Smith's
10    report.  No, that's not it.  Maybe it was number
11    2.
12               MR. OSETE:  I think it was
13    Exhibit 4, Edna.
14               MS. KERSTING:  Exhibit 4.  I
15    appreciate it.  That's it.
16          Q    (By Ms. Kersting) Let's go to
17    documents analyzed, page three.
18               MR. BOURHIS:  I'm going to object
19    on the basis that you're using an exhibit that you
20    didn't disclose to be used in the deposition
21    yourself.
22               MS. KERSTING:  I don't have to
23    disclose my exhibits.  And if you use an exhibit,
24    obviously it's something I can use as well.
25          Q    (By Ms. Kersting) See the section
```

SUSAN THOMPSON  7/30/2020

1    down at the bottom where it says documents

2    analyzed?

3              A    Hold on.  Let me view this.  Yes.

4              Q    And the first item it says here is,

5    The complaint in the matter of Robert P. Garver

6    versus Principal Life Insurance Company, The Roth

7    Companies, Inc. and Duane Roth filed October 31,

8    2019.

9              You did have the complaint, didn't you?

10             A    Hang on.  I'm looking in my documents.

11   I don't see on my -- I don't see it on my

12   Exhibit B, but I'm looking to see if I actually

13   had it and I just didn't put it in there because

14   I'm not relying on it.  Yes, I have the complaint.

15             Q    And then it says, Amended answer in

16   the matter of Robert P. Garver filed November 14,

17   2019.

18             Did you have any answers?

19             A    I don't think I have that document.

20             Q    And the list continues I believe on

21   the next page.  It says, Plaintiff's Responses and

22   Objections to Defendants The Roth Companies, Inc.

23   and Duane Roth's First Request for Production of

24   Documents dated February 7, 2020.

25             Did you have that?

SUSAN THOMPSON  7/30/2020

```
 1          A    I don't believe so.
 2          Q    Did you have Plaintiff's Answers and
 3    Objections to Defendants The Roth Companies, Inc.
 4    and Duane Roth's First Interrogatories to
 5    Plaintiff Robert Garver filed February 10, 2020?
 6          A    I don't think so.
 7          Q    You told us that you had the policy?
 8          A    I didn't hear you.  I'm sorry.
 9          Q    I said you told us you had the policy;
10    is that correct?
11          A    I can't understand you.  Say it again.
12          Q    You told us that you had the policy;
13    is that correct?
14          A    Yes.  I'm sorry.  You were just
15    garbled.
16               MR. BOURHIS:  Objection to form.
17          Q    (By Ms. Kersting) 1040 U.S.
18    individual income tax return for Robert Garver
19    for calendars years 2015 through 2018, did you
20    have those?
21               MR. BOURHIS:  Objection, asked and
22    answered.
23          A    Yeah, I think we had those.
24          Q    (By Ms. Kersting) And the form 1120S,
25    U.S. income tax return for an S corporation for
```

SUSAN THOMPSON  7/30/2020

1      **Robert Garver Builders, Inc. for the calendar**
2      **year 2018, did you have that one?**
3             A    Could we make this easier so I don't
4      have to talk so much?
5             I don't have the Principal Life Insurance
6      underwriting claim file.  I don't have the expert
7      report of Charles Finch.  And I'm not sure what
8      the March 30 correspondence is.
9             **Q    Okay.  So would it be fair to say that**
10     **there are several items on this list that you did**
11     **not have?**
12            A    There are a few items in this list
13     which I do not have.
14            **Q    Including the entire underwriting file**
15     **and the entire claim file of my client; is that**
16     **correct?**
17                   MR. BOURHIS:  Objection, asked and
18     answered.
19            A    Yes.
20            **Q    (By Ms. Kersting) Thank you.  You**
21     **also testified that Mr. Smith wouldn't have the**
22     **qualifications to see whether someone is working**
23     **or not or has the ability to work.**
24            **What qualifications do you believe someone**
25     **needs to see if somebody is earning an income and**

SUSAN THOMPSON  7/30/2020

1      is working if they look at a tax return?

2                      MR. BOURHIS:  Objection, form,

3      misstates the expert's testimony, qualifications.

4          A    I didn't say that.  What I said was

5      he's saying that, he's saying that the claim

6      disability did not prevent him from generating

7      earnings for his occupation.  And I'm saying I

8      don't know that he has an expertise to say that

9      that disability did not prevent him from earning

10     or generating earnings from his occupation.

11         I think that's something that comes more

12     from a physician or a voc rehab person who can

13     tell you what you can perform based upon your

14     limitations and your disabilities, and that was

15     my point in that.

16         Q    (By Ms. Kersting) You've seen

17     Mr. Garver's tax returns, haven't you, including

18     the ones from Welborn Sales?

19                     MR. BOURHIS:  Objection, asked and

20     answered.  At this point it's becoming harassing.

21     My witness is sick, as you obviously know.  You've

22     asked the same question probably five times on

23     multiple fronts.

24         I'm going to object on the basis that

25     you're harassing the witness at this point.

SUSAN THOMPSON  7/30/2020

```
 1                   MS. KERSTING:  Matt, you can make
 2    the record.  I have a right to ask my questions.
 3    It is actually a simple question that can be
 4    answered with a single word, yes.
 5                   MR. BOURHIS:  And it's a simple
 6    question that she's answered five or six times.
 7    And you know that.  And she's sick, obviously not
 8    feeling well, and you're harassing her at this
 9    point.
10                   MS. KERSTING:  I'm not harassing
11    her.  I have a right to my examination.
12                   MR. BOURHIS:  You don't have a
13    right to ask the same question that's been
14    answered five times before when you've got a sick
15    witness.  That's harassing.
16         Q    (By Ms. Kersting) Based on the tax
17    return that you do have, the 2018 Welborn Sales
18    tax return, you saw that Mr. Garver was
19    generating an income; isn't that correct?
20         A    Yes.
21         Q    So he was working in an occupation,
22    his occupation, at that point in time; isn't that
23    correct?
24         A    Yes, but --
25                   MR. BOURHIS:  Objection to form.
```

SUSAN THOMPSON  7/30/2020

```
 1          A    He's working in an occupation.
 2          Q    (By Ms. Kersting) Which at this point
 3    in his occupation, isn't it?
 4               MR. BOURHIS:  Objection, form.
 5          A    I don't know exactly what he does at
 6    Welborn.
 7          Q    (By Ms. Kersting) But that is his
 8    occupation, isn't it?
 9               MR. BOURHIS:  Objection, calls for
10    a legal conclusion.  Objection to form.
11          A    I don't know.
12          Q    (By Ms. Kersting) We saw Mr. Bourhis
13    guide you through the calculation of prior
14    earnings and current earnings and providing you
15    with the formula during your deposition
16    testimony.
17          Is that the way, how he clarified and
18    guided you when you prepared your expert report?
19               MR. BOURHIS:  Objection, form.
20          A    No.  I mean, I don't understand your
21    question.  He asked me questions in the
22    deposition.  He didn't ask me those questions or
23    do that when we were going through the policy
24    language.
25          Q    (By Ms. Kersting) But you were going
```

SUSAN THOMPSON  7/30/2020

 1    **through the policy language together?**

 2        A    Yes.

 3              MR. BOURHIS:  Objection, asked and

 4    answered.  Objection to form.

 5        **Q    (By Ms. Kersting) And he provided**

 6    **clarifications and guidance?**

 7              MR. BOURHIS:  Objection, asked and

 8    answered.

 9        **Q    (By Ms. Kersting) Did you answer?**

10              MR. BOURHIS:  Yeah, five times

11    already.

12        A    I'm sorry, I didn't realize you were

13    waiting.  Yes, I think -- I don't even know what

14    your question was anymore.  I'm sorry.  Could you

15    restate it?

16        **Q    (By Ms. Kersting) That while you went**

17    **through the policy language together with**

18    **Mr. Bourhis, he provided you with clarifications**

19    **and guidance?**

20              MR. BOURHIS:  Objection, asked and

21    answered.

22        A    Yeah, with some things.

23              MS. KERSTING:  I have nothing

24    further.

25              MR. BOURHIS:  You can go ahead and

SUSAN THOMPSON  7/30/2020

1    answer the question again.

2                    MS. KERSTING:  She already did.  I

3    have no further questions.

4                    MR. BOURHIS:  Okay, good, okay.

5    Are you all set?  I'm done.

6                    MR. OSETE:  I'm done, thank you,

7    Matthew.

8                    THE VIDEOGRAPHER:  Close the video

9    recorded deposition of Susan Thompson at 1:01 p.m.

10   We're off the record.

11                    (The witness was excused, and

12        the deposition ended at 1:01 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF REPORTER

 2         I, Saundra Tippins, Certified Court Reporter

 3    (Missouri) and Certified Shorthand Reporter

 4    (Kansas), do hereby certify that the witness whose

 5    testimony appears in the foregoing deposition was

 6    duly sworn by me pursuant to Section 492.010 RSMo;

 7    that the testimony of said witness was taken by me

 8    to the best of my ability and thereafter reduced to

 9    typewriting under my direction; that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to the action in which this deposition was

12    taken, and further that I am not a relative or

13    employee of any attorney or counsel employed by the

14    parties thereto, nor financially or otherwise

15    interested in the outcome of the action.

16

17

18

19

20    _____

21         Certified Court Reporter

22    Within and for the State of Missouri

23

24

25
```

SUSAN THOMPSON  7/30/2020

```
 1                    ALARIS LITIGATION SERVICES

 2

 3   August 11, 2020

 4
     MR. MATTHEW BOURHIS
 5   BOURHIS LAW FIRM
     1808 Wedmeyer Street, Suite 214
 6   San Francisco, California  94129

 7   IN RE: ROBERT P. GARVER v. PRINCIPAL LIFE
             INSURANCE CO., THE ROTH COMPANIES, INC.,
 8           and DUANE ROTH

 9   Dear Mr. Bourhis:

10   Please find enclosed your copies of the deposition of
     SUSAN THOMPSON taken on July 30, 2020 in the
11   above-referenced case. Also enclosed is the original
     signature page and errata sheets.
12
     Please have the witness read your copy of the
13   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the signature
14   page before a notary public.

15

16   Please return the errata sheets and notarized

17   signature page within 30 days to our office at 711 N

18   11th Street, St. Louis, MO 63101 for filing.

19

20   Sincerely,

21

22

23   Saundra Tippins

24

25   Enclosures
```

```
 1                    ERRATA SHEET
      Witness Name: SUSAN THOMPSON
 2    Case Name: ROBERT P. GARVER v. PRINCIPAL LIFE
                 INSURANCE CO., THE ROTH COMPANIES, INC.,
 3               and DUANE ROTH
      Date Taken: JULY 30, 2020
 4
 5    Page #_____   Line #_____
 6    Should read:  _____
 7    Reason for change:  _____
 8
 9    Page #_____   Line #_____
10    Should read:  _____
11    Reason for change:  _____
12
13    Page #_____   Line #_____
14    Should read:  _____
15    Reason for change:  _____
16
17    Page #_____   Line #_____
18    Should read:  _____
19    Reason for change:  _____
20
21    Page #_____   Line #_____
22    Should read:  _____
23    Reason for change:  _____
24
25    Witness Signature:  _____
```

SUSAN THOMPSON  7/30/2020

```
 1   STATE OF _____)

 2

 3   COUNTY OF _____)

 4

 5   I, SUSAN THOMPSON, do hereby certify:

 6        That I have read the foregoing deposition;

 7        That I have made such changes in form

 8   and/or substance to the within deposition as might

 9   be necessary to render the same true and correct;

10        That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12        I declare under penalty of perjury that the

13   foregoing is true and correct.

14        Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                         _____

20                         SUSAN THOMPSON

21

22                         _____

23                         NOTARY PUBLIC

24   My Commission Expires:

25
```

**A**

a.m 1:13 5:11
    43:3,6 80:10
    80:13 109:9,12
    130:21
ability 24:19
    127:19,21
    168:23 174:8
able 24:25 72:4
    127:7,11,15
    128:7 130:10
    147:23,24
    148:2 152:4
above-refere...
    110:6 175:11
absolute 128:8
    128:19
absolutely
    42:25 65:8
    154:2
accept 144:19
acceptable
    67:4
accepted 147:12
    149:22
accident 107:4
account 140:1
accountant
    15:20,22
    59:25 156:19
accounting 8:12
    10:24 11:3,7
    51:17 127:2
    154:15
accrue 45:7,12
accurate 56:10
    62:7 141:1
accurately
    123:21,23
    158:2,9
acknowledges
    6:16,19
acquired 71:22
    72:19
acted 70:4
acting 65:23

action 15:17
    18:22 174:11,15
active 11:10
activity 98:15,16
actual 149:16
actuarial 80:24
actuary 15:6,9
add 146:14
    164:15
added 54:18
addendum 2:14
    2:21 40:16,23
    54:13,15 94:18
    97:12 102:17
    125:20 131:1
    140:13
addition 82:21
    133:1
additional 33:19
address 7:24
    7:25 125:20
adjust 12:5
adjustment
    90:21
adjustments
    149:11 150:24
adjustors 13:1
administering
    6:20
advance 9:23
    10:7
affect 75:5 91:9
    91:24 92:10
    104:16 133:11
    142:2,6
afraid 109:2
afternoon 3:12
age 7:12 71:9
    90:20 91:8
    97:2 105:2,4
    146:2 148:3
ago 81:10 113:19
agree 48:1 51:16
    72:25 117:3
    119:1,12 121:9
    122:16 131:22
    135:17 136:4

138:10,16
    139:24 141:8
    151:16
agreed 5:1 61:12
    139:12
agreed-upon
    16:2,9,25 17:2
    17:8
agreement
    6:24 97:8
agricultural
    18:21
ahead 14:7,10
    14:25 68:17
    112:14 172:25
AICPA 11:22
al 5:14
Alaris 4:17,21
    5:19 175:1
alert 108:3
algorithm 131:8
    131:14
allegations
    27:17 28:8,11
    28:13,21,22
    28:24 29:19
allegedly 102:21
allowed 10:1
    14:23 23:4,18
    43:19,25
    124:15
alongside 12:25
ambiguities
    160:18,20
    161:1 162:8
    164:8
ambiguity 23:13
ambiguous
    12:12,19 13:10
    13:10,11 14:21
    22:20 119:13
    120:10,24
    121:8 140:4
    161:21
amended 27:16
    27:22 31:13,14
    40:14 166:15

amendments
    115:18
amount 86:3,23
    89:18 90:11
    92:8 117:6
    131:9 132:2,3
    132:5,17 159:7
amounts 46:25
    98:7,21 100:21
    117:24 156:10
    158:19
analysis 98:22
    149:3
analyzed
    126:25 165:17
    166:2
and/or 175:13
    177:8
annual 105:24
    106:15 107:6
    108:13 148:22
answer 14:3,10
    14:18 15:4
    46:4 74:2
    75:18 79:1,1
    138:1 146:15
    153:12 164:25
    166:15 172:9
    173:1
answered 13:14
    15:1 21:15
    22:10 36:20
    52:23 69:13
    70:22 71:15,19
    73:5 79:7
    95:11,22 100:4
    103:2 108:1
    112:13 113:15
    164:11,12
    167:22 168:18
    169:20 170:4
    170:6,14 172:4
    172:8,21
answers 117:12
    166:18 167:2
anybody 95:18
anybody's

28:24
anymore 172:14
apologize
    28:23
apparently
    104:15
appear 138:4
    153:1
appearing 3:13
    6:14
appears 97:11
    153:2 174:5
applied 110:22
    111:5 138:14
    163:6
applies 89:1
apply 50:5
    111:18 138:7
    139:13 148:15
    156:9
applying 163:11
appreciate
    42:21 136:25
    137:6 165:15
appropriate
    13:4 44:13
    124:22 131:21
    149:1,11,24
    161:23
appropriately
    149:5
April 25:17 95:2
    110:7 125:9
    143:12
arbitrarily 52:10
arbitrary 122:3
    124:4
area 28:19 115:6
    126:17
areas 161:3
argue 58:9
argument
    44:24
argumentative
    44:20 70:6
    76:6
arrangement

SUSAN THOMPSON  7/30/2020

6:22 64:20
**arriving** 143:9
**aside** 9:10 18:1
    36:5 92:22
**asked** 16:24
    21:14 22:9
    24:19,22 26:3
    26:5 36:19
    40:8 50:21
    51:4 52:22,24
    62:20,22
    69:13,15 70:21
    71:14,18 73:5,9
    74:18,24 79:4
    79:7 82:20
    83:21 87:5
    88:24 95:10
    95:21 100:3
    101:12 103:1
    107:25 110:9
    110:21 112:1,12
    113:4,14,19
    144:23 153:13
    164:10 167:21
    168:17 169:19
    169:22 171:21
    172:3,7,20
**asking** 12:7,8
    14:15 17:7
    37:17 55:3,17
    75:7 76:9,10
    76:16 77:25
    81:12 87:3,24
    105:16
**asks** 79:7
**aspect** 11:23
**aspects** 40:17
**assertion** 38:1
**assess** 144:13
**assessment**
    138:9 160:3,7
**assigned** 132:2
**assignment**
    82:21 102:2
    144:10,12
**assist** 27:8
    113:24

**assistance** 95:8
    95:17 96:7
**assisted** 113:21
    114:10
**associated**
    127:11,16
**assume** 71:6
    98:20,20
**assumed** 56:13
    69:8 111:4
**assumes** 72:1
    154:8
**assuming** 36:9
    60:19 154:6
**assumption**
    50:24 51:5
    55:22 56:18
    56:19 60:17
    60:23 61:1,6,8
    63:11 154:9
**assumptions**
    26:10,14 47:21
    154:5,14
**assurance** 16:1
    16:23
**attached** 2:23
    16:7 30:7
    110:12
**attachments**
    115:18
**attending** 6:14
**attestation** 16:6
**attorney** 9:13,17
    93:24 174:13
**attorneys** 5:21
**attributable**
    38:23
**attribute** 123:19
    124:5,22
**attributed** 38:21
    158:8 159:7
**attributes**
    129:20
**attributing**
    53:16
**August** 110:14
    175:3

**Automatically**
    45:21,23
**available** 30:20
    32:14
**Avenue** 8:1
**average** 147:5
**awarded** 76:13

---

**B**

**B** 30:6,12 33:19
    36:6 99:17
    140:25 166:12
**B.S** 10:23 11:3,7
**back** 17:12 18:13
    26:1 30:3
    36:22 43:5
    55:14 58:17
    65:16 74:16
    79:20 80:12
    99:12 100:13
    100:13 109:11
    114:16 128:7
    130:23,25
    137:13 142:12
    146:25 151:3
    155:13
**background**
    14:14
**balance** 61:22
    61:24 63:5
**ball** 65:13
**base** 103:15
    149:12
**based** 23:13
    24:23 32:5
    39:10 45:15
    46:8,9 50:24
    51:5,12,23
    52:20 53:5
    61:18 63:16
    69:10 80:19,21
    84:4,10 86:3
    96:16 98:6
    100:19 101:4
    111:8 122:14
    132:15 143:17
    144:14,25

148:22 155:2
    159:14 163:25
    169:13 170:16
**basic** 141:23
**basically** 41:7
    47:7 89:12
    90:2 135:12
    143:6 144:2
    161:5
**basing** 143:18
**basis** 8:18 23:10
    29:13 59:4
    69:6 105:24
    105:25 106:1,9
    127:13 128:16
    143:20 148:24
    149:13 150:13
    151:5,11
    162:23 164:4
    165:19 169:24
**Bates** 2:10 95:5
    109:3 116:11
**bathroom** 79:19
**becoming** 15:19
    128:15 169:20
**began** 1:13
**beginning** 2:10
    84:8 126:1
    161:16
**begins** 87:16
    88:8 90:19
    163:1
**behalf** 1:9 5:25
    6:2,5 7:13 9:15
**believe** 23:23
    31:3 35:12
    37:25 39:21
    40:1,18 41:16
    41:21 48:22
    50:11 57:5,15
    58:24 67:13
    69:6 81:10
    82:7 85:20
    86:12,20,25
    96:24 99:13
    100:24 106:21
    107:19 108:14

113:7 123:1
    144:5 145:2,6
    145:9,20
    146:6,7
    157:25 158:1
    161:16 165:4,8
    166:20 167:1
    168:24
**believes** 145:14
**benefit** 56:9
    69:9 70:18
    76:24 77:8,9
    78:12 85:14
    86:3 90:3,8,11
    90:20 91:10
    91:19,20 92:7
    92:10,24 93:1
    97:1,7 108:7
    131:7 135:7,12
    135:20,22
    136:1 141:23
**benefits** 13:17
    14:17 24:23
    41:8,18,24
    42:2 43:10,12
    45:7,12,18
    46:3,5,15
    54:20 56:6
    67:5 68:10,24
    77:13 78:13,17
    78:22 79:5
    85:19,22 86:2
    86:5,11,16
    87:6,15 88:1
    89:10 90:1
    91:4 93:13
    101:21 102:12
    102:21 103:23
    104:2 110:10
    115:3,3,4
    116:23 117:6
    131:9 132:5
    133:9 140:1
    142:3 143:11
    143:25 147:24
    150:7,17 151:10
    151:14,23

152:5
**best** 60:21
 63:16 106:23
 107:7,8 161:8
 174:8
**better** 12:23
 106:12,12
 120:22 161:13
**beyond** 16:5
 28:18 36:4
 69:20 127:22
**bill** 78:2 85:3
**birth** 90:18 91:2
 91:13 92:23
**bit** 109:23
 114:24 117:11
 133:23 134:18
 148:23 155:13
**blanket** 73:1
**blow** 97:23
 99:23 101:18
 102:9 103:20
 110:2 112:6
**blown** 112:8
**Board** 16:17
**Bob** 118:3,15
 129:22 130:4
 130:9 141:4,10
 142:1 144:13
**body** 87:18
**books** 149:13
**bottom** 49:22
 95:5 114:8
 116:15 123:8
 128:22 129:17
 130:3 145:18
 161:18 166:1
**Bourhis** 2:4 4:3
 4:3 5:24,24
 7:3,3 9:3,16
 9:22 10:2 12:3
 12:11,18 13:9,18
 14:1,19 20:24
 21:14 22:9,19
 23:3,9,19 24:6
 25:2,21,22,24
 26:13,16 27:5

27:21 28:4,12
29:6,12,21
30:24 31:8,15
32:9,22 33:9
33:11,20 34:17
36:19 37:2
38:11 39:15,18
39:22 40:9
42:17 43:7
44:14,19,23
45:9,14 46:16
47:25 48:17
49:8 51:7,8
52:1,7,22 53:9
53:13,23
54:25 55:5
59:7,21 60:1,7
63:18 64:25
65:10,15 66:12
66:24 67:18
68:11 69:12,15
69:23 70:5,21
71:2,14,18,24
72:22 73:4,13
73:16,24 74:3
74:22 75:15
76:5,15 77:10
77:21 78:8,15
78:23 79:6,9
79:13,18,23
83:1,3,15,19
83:20 84:17
85:25 87:2,9
87:19 88:13,19
89:6,19 90:13
91:5,12,16,21
93:3,17 95:10
95:18,21 96:7
97:15 100:3
101:12 103:1,11
104:17,25
105:22 107:25
108:3 109:4
110:24 111:16
111:24 112:12
112:18,19
113:14 114:19

114:21 115:11,16
115:22 116:1,3
116:7,10 117:2
117:14,17,19
118:19 119:5,11
119:16,22
120:4,14,19
121:6,12,16
122:1,7 123:6
124:12,19
125:3,7,15,19
130:25 131:13
131:22 132:9
133:25 136:8
136:25 137:5
137:10 138:6
138:13,20
139:4,12,23
140:7,12,16
141:9,14,18,20
141:25 142:11
142:15,19,24
144:18 145:2,7
149:25 150:12
151:7,20 152:2
152:10,18
153:10 154:18
155:24 156:14
156:22 157:15
158:13,23
159:10,25
160:6,22
162:9 163:8,13
164:10,22
165:18 167:16
167:21 168:17
169:2,19 170:5
170:12,25
171:4,9,12,19
172:3,7,10,18
172:20,25
173:4 175:4,5
175:9
**Bourhis'** 165:4
**Bourhis/Princi…**
 2:20
**box** 81:21

**breach** 18:20
**break** 42:18,20
 54:7,9 55:6
 79:10,12,14,14
 79:15,17,19,25
 80:7 81:12,25
 109:5 130:19
**breathe** 130:16
**Brian** 84:23,24
 95:16 114:1
 155:21
**brief** 52:16
**bring** 128:13
**broad** 126:17
 162:21
**broke** 19:3
 134:18
**Bryan** 4:13 6:4
 93:25
**Builder** 37:15
 38:22 39:11
 50:13,16,19
 51:1,14 52:5,9
 52:21 53:12
 118:16
**Builders** 122:11
 122:19 123:11
 127:9 128:24
 168:1
**building** 128:12
**bullet** 112:23
 145:17
**bunch** 129:9
**business** 8:10
 59:1 71:23
 72:20,21
 105:8 106:2,13
 117:23 118:9
 119:18,24
 122:13 123:19
 124:6,23
 127:8,12,16
 128:4,10,13,18
 128:23 132:20
 139:14 145:25
 151:14 152:4
 158:8 162:6,12

162:20,24
**businesses** 9:11
 74:24 118:5
 150:5
**buy** 75:21
**buying** 72:10

**C**
**C** 4:1
**calculate** 13:21
 24:20 46:3
 50:21 51:4
 56:11,16 61:13
 70:1,10 84:11
 86:4 88:10,16
 89:22 101:21
 105:1,12,16
 111:18 112:17,18
 115:2 117:5
 118:9 130:10
 131:9 132:4
 134:24 144:25
 146:10,13
 150:7,11,16
 151:10,13,23
**calculated** 39:4
 39:9 43:12
 61:16 69:22
 77:13 81:6
 84:4,8 85:13
 85:22 86:2,8
 90:8 104:3
 111:20 133:9
 135:10 143:11
 145:13 146:1
**calculates** 46:7
 148:5,14
**calculating**
 41:18 46:8,24
 52:19 102:21
 106:18 116:23
 118:15 119:25
 130:9 135:21
 139:25 145:3
**calculation** 29:1
 37:19 41:23
 42:7,9,11 44:8

46:22 48:11,16
48:25 49:15
50:6 51:25
53:19 54:11,23
55:1 56:23
68:20 70:14
70:25 71:4,8
72:18 73:2,11
74:20 75:6,13
76:10,18 80:17
83:17,22
85:21 87:15,16
88:8 89:12,25
90:2,3,19
91:10,25 92:2
92:11,15 93:1
93:10 98:8
100:22 101:4,8
101:9,13
102:24 105:3
105:14,20
110:10 111:2
112:2 113:7
128:1 131:8,15
131:19 132:12
132:22 133:11
135:14 139:3
139:21 142:7
142:10 143:15
144:19 148:18
148:24 154:6
154:8,17
157:20 159:2
159:13,20,21
161:24 163:6
163:23 171:13
**calculations**
13:5 25:19
46:2 53:6 71:6
80:23,25
85:5,8 86:13
86:14 98:22
111:3,9 115:10
128:18 144:9
147:13 152:20
152:24 153:7
153:8,15,21

154:4,5
157:22 163:12
**calculator** 70:4
70:11,17
**calendar** 168:1
**calendars**
167:19
**California** 4:4
8:2 11:13,14
18:1,6,8 23:17
175:6
**call** 55:7,8
131:14
**called** 17:8 24:11
46:2
**calling** 54:13
**calls** 20:24
25:2 28:4
29:7,7,23,24
44:14,15 46:16
66:12,24
67:18 68:11
72:23 73:18
74:6,7 77:22
78:16 91:6
149:6 158:24
171:9
**camera** 38:7
**capacity** 72:5
**care** 127:11,15
**case** 1:4 3:4
5:14 19:2,5,23
22:22 24:14
26:12,15 48:5
53:8 77:3
85:6,9 110:22
112:24 115:12
118:3 135:9
154:2,3 175:11
176:2
**cases** 17:15,23
18:10 19:7,8,15
19:18 20:15,16
20:19 21:8,10
22:12 111:22
**cash** 147:20
**catastrophic**

83:22 85:13
89:25 110:11
110:20 111:5,14
111:20 112:3
**catch** 27:12
**catch-up** 151:1
**cause** 3:16
**Cave** 4:13 6:5
93:25
**CCR** 1:11
**certain** 3:16
16:21 40:17
47:21,23,24
113:6 131:24
132:17 153:8
**Certainly** 117:13
**CERTIFICATE**
174:1
**certifications**
11:18
**certified** 3:14
6:11 11:21 174:2
174:3,21
**certify** 15:5
174:4 177:5
**cetera** 104:21
**chance** 34:1,14
**change** 51:21
76:18 86:4
92:4,8 101:9
123:15 142:9
159:20,21
176:7,11,15,19
176:23
**changed** 59:11
59:13,24
98:22 159:18
**changes** 37:9
37:23 54:12
54:16 60:4,10
60:14 175:13
177:7,10
**charge** 39:22
**charged** 39:14
**Charles** 168:7
**check** 16:24
**Chicago** 4:9

**cite** 27:16
**cited** 42:2
**City** 4:14,18,22
**civil** 15:12
**claim** 13:7,16
14:16 65:19
67:9,16 69:1
126:15 168:6
168:15 169:5
**claimed** 126:22
126:23 129:4
**claiming** 38:12
66:5,22
**claims** 12:2,6,10
12:10,19,21
13:12 18:14,15
18:21 68:3
**clarification**
43:10 54:6,6
55:17,25 56:4
164:6
**clarifications**
160:17,19
163:21 172:6
172:18
**clarified** 171:17
**clarify** 61:5
94:18 95:7
98:4 100:17
104:19 107:18
**class** 18:22
**clean** 146:12
**clear** 76:8
90:24 100:1
101:16 102:19
105:6 107:13
112:7 113:20
119:7 144:6
**cleared** 160:25
**clearly** 12:21
37:14,15 53:15
87:16 145:15
**client** 16:12 17:7
128:12 168:15
**clients** 17:14
**close** 10:19
173:8

**coaching** 23:5
73:22,24
**COLA** 86:5
90:4,11,21
92:3,6,25
**collar** 18:17
**combined** 81:23
**come** 9:21 16:17
135:3 161:7
**comes** 48:13
104:9 116:23
118:14 119:23
119:25 132:11
139:16,25
169:11
**coming** 62:5
153:14
**comment**
127:23 128:16
144:8 145:17
148:16
**comments**
145:9
**Commission**
177:24
**commuting**
59:4,4
**companies** 1:6
3:6,19 6:6
17:15 73:15
94:1 106:6
166:7,22
167:3 175:7
176:2
**company** 5:14
16:21 34:5
37:10 38:1
51:13 52:10
69:18 72:10
76:1,13 78:6
107:20 121:18
147:18,25
148:2 152:5,9
158:17,19
166:6
**compared**
141:22

Case 2:19-cv-02354-TC   Document 138-1   Filed 05/07/21   Page 182 of 203

comparing 117:4
compensate
    40:9
competent 67:9
complaint 27:17
    27:22,24 28:2
    28:6 29:4,19
    166:5,9,14
complete 24:25
    25:7 58:19
    107:9
completely
    132:23 160:23
complicated
    118:25 163:16
    163:18
comply 144:2
component
    86:6
components
    131:21
compound
    14:20
computer 79:24
concern 69:14
concerning
    68:2
conclusion
    28:5 44:15
    46:17 66:13
    66:25 67:19
    68:12 74:6
    78:16 79:7
    91:6 102:18
    143:24 144:7
    171:10
conclusions
    143:10
concurrence
    110:8
condition 93:6
    93:13
confine 23:4
    73:21
confirm 19:16
    94:25 95:25
confirmed 97:4

confirming
    55:10
confused 78:18
confusing
    87:25
connection 14:5
    48:25 156:17
consensus
    79:16
consent 6:22
consider 36:24
    68:16,19,22
    71:11,17,22
    72:13,15
    80:24 92:25
    93:6 104:15
    104:23 105:6
    119:3 145:23
    149:9 161:20
consideration
    53:1 88:11
    90:25
considered
    30:4,5 31:1
    90:10,15
    102:20 161:22
    162:3
considering
    88:17
consistent
    112:23
consists 15:25
consult 154:3
consulted 100:2
    153:24
consulting 8:19
    9:1 15:25 16:6
    17:13
Consumer
    32:15 33:1
contacted 24:3
    82:14,19 83:16
    114:25
contacting
    20:13
contained
    82:22 115:19

contains 28:7
contemplate
    72:6,10,14
continuation
    126:21
continue 56:22
    74:3 130:1
    145:8 162:4
continues 50:2
    67:3,21 68:1
    162:1 166:20
continuing 11:8
    79:22
contract 71:10
    77:9 78:12
    105:2,4 146:1
    146:2
contracts 18:20
    76:24
contrary 118:10
convention
    146:23 147:11
convoluted
    46:4
cooperate 68:2
copied 86:19
copies 2:24
    175:10
copy 10:6 27:12
    96:14 121:21
    175:12
corporation
    167:25
correct 9:18
    17:24,25 18:9
    19:9 20:2 25:1
    25:4,12,20
    26:10 28:3
    29:20 31:21
    32:10 33:10
    35:9 39:13
    40:7,15 41:9
    42:12 44:11
    46:23,24 47:1
    47:21,24
    48:10 49:2,10
    49:12,15,16

50:19 53:22
    54:17 55:15,18
    55:19,19,21
    56:1 57:11
    58:4,11,18,24
    60:6,11,15,18
    60:21 61:20
    63:7 65:11,12
    66:11 67:17
    68:13,18 69:11
    69:24 70:2,23
    71:8,20 72:21
    75:14 76:14,19
    77:20 78:4,11
    78:14,21,24
    79:8 80:17
    81:3 82:11,12
    82:19 83:2,13
    83:14 86:21,21
    86:25 88:3,4
    88:8,12,18
    89:2,5,7,11,13
    89:15 90:6,12
    91:13 92:5,8
    92:12,16 93:11
    93:16 96:19
    98:12 101:5,11
    102:3,4,14
    105:9 107:16
    111:7 112:23
    113:10 114:8,12
    115:4,21 118:5
    119:4 120:1,3
    121:5 122:19
    122:24 123:5
    125:9,22
    139:6 141:8,13
    144:15,17
    145:21 152:20
    153:2,3 154:7
    156:19,21
    157:2,8,9
    158:22 159:3
    159:9,23
    160:11 164:17
    167:10,13
    168:16 170:19

170:23 177:9
    177:13
corrected 40:14
correction 43:8
    55:14,16 81:11
corrections
    175:13
correctly 30:8
    54:14 66:1
    67:12 98:10
    101:24 104:5
    110:15 156:7
corresponde...
    168:8
costs 127:11,15
counsel 5:2,2
    6:16,19,21,24
    10:8 12:23,24
    27:2 29:8
    32:3 40:20
    43:21,22 44:5
    47:20 49:18
    54:8 60:24
    61:7,9 82:1,3
    86:9 89:13
    94:23 96:17
    96:22 98:7,14
    100:21 101:5
    109:20 110:9
    112:9,21 113:1,2
    113:5,13,16,19
    114:23 116:8
    121:14 125:5
    142:17 153:25
    154:6 160:9,15
    160:16,20
    161:19 163:22
    164:7 174:10
    174:13
counsel's 80:21
count 22:4
COUNTY 177:3
couple 21:25
    142:13
course 130:18
    139:24 140:3
    159:5

SUSAN THOMPSON  7/30/2020

court 1:1 3:1,15
3:17 4:16 5:15
6:8,11 18:8
19:12 174:2,21
CPA 11:10 85:1
127:1 150:20
CPIU 56:25
57:1 72:17
108:18
create 133:3
149:10
created 116:19
creates 133:2
credit 133:24
147:18
crimes 18:17
criminal 15:12
crystal 65:13
current 15:24
72:4 115:3
117:5 132:14,19
133:4,11,18
134:9 135:3,3
136:11 137:17
138:2,5 156:11
159:8 171:14
currently 8:6,8
64:14 93:14,19
135:5
curve 33:5 80:3
80:15 103:25
104:10
cut 148:25
CV 2:12 8:23
10:10,17 17:21
18:13,25 19:7
19:11 20:15
21:8,11 22:7,12
36:1 126:16

D

daily 33:4 80:2
80:15 103:25
104:10
damage 13:4
142:6,10
damages 13:21

18:19 111:18
data 32:13
143:9,14
153:22
date 5:10 23:7
23:25 54:25
67:5 84:9,11
84:13 85:14,16
86:4,23 87:7
87:11,15,22,25
88:2,8 89:17
89:17 90:10,10
90:17,17 91:2
91:3,7,13,15,19
91:19,19 92:4
92:8,14,23,23
92:24 96:24
107:4 176:3
dated 24:1 25:8
82:23 83:5
95:2 110:13
125:8 143:12
166:24
dates 42:9 55:3
55:4,18,18,19
56:1 86:22
day 3:10,13 24:4
177:14
day-to-day 8:18
days 59:5 66:4
66:20 81:10
175:17
dealings 24:15
deals 152:9
dealt 164:15
Dear 175:9
death 18:19
102:22 105:7
145:24
December
41:24 85:24
123:22
decided 13:16
61:15 132:10
156:10 158:16
decision 33:15
122:3 124:4

declare 177:12
declared
129:23
decrease 53:7
decreased
123:10
deduction
145:11
deep 98:23
defective 18:22
Defendant 4:6
6:2 7:13 20:7
94:1
Defendants 1:7
1:9 3:7,20 4:11
5:3 6:5 93:25
166:22 167:3
defense 20:22
21:4,12
defined 90:16
97:7 132:1
defines 144:15
definitely 76:21
definition 47:15
47:17 48:10,15
48:18,22
49:25 50:5
116:22 117:15
140:17,21 141:5
141:15 155:20
156:9 157:11
160:14,21
161:8,15 162:1
definitions
89:21 140:2
degrees 10:25
delay 43:13
delineated
18:24
delta 133:3
142:9
denied 67:5,16
69:3 73:9
74:18
Department
80:2,15
103:24 104:10

departures
18:18
depends 17:7
20:9 21:1,5
deposed 21:21
21:23
deposes 7:13
deposition 1:8
1:13 3:9 5:3,12
5:17 6:12 9:14
9:24 19:13
34:19 37:2
40:6 45:3
77:3 93:8
165:20 171:15
171:22 173:9
173:12 174:5,11
175:10 177:6,8
177:11
depositions
22:6 23:10
deposits 62:5
depreciation
123:20 124:6
124:24
derived 128:23
128:25
described 112:11
112:15
description 2:9
62:7
desired 175:13
determination
13:7,16 14:16
157:22
determine
13:20 24:22
determined
150:22
determines 91:3
91:15,18 92:3
92:7
determining
164:4
devoting 9:1
dice 107:8
DICKER 4:8

difference 56:1
129:6 145:13
different 17:12
59:19 75:4
76:2 97:5,6
113:18 119:1
129:5,10
164:13
directed 17:4
direction 43:21
49:14 85:11
86:9 89:13
92:9 98:7,14
100:21 101:4
113:2,5,12,16
174:9
directly 24:7
38:23
Directors 16:17
directs 16:12
disabilities
169:14
disability 12:16
19:2,5,8,15,23
24:24 31:5
34:6 45:8
55:23 56:2
66:5,22
68:24 77:7,8
81:4 83:22
85:14 89:25
90:17 92:14
92:23 96:15
96:25 97:6
101:22 106:23
107:2 108:7
110:11,13,20
111:5,14,21
112:3 115:17
116:16,24 117:7
123:14,17
126:22,23
128:5 131:7,10
132:5 135:15
135:20 136:1,3
140:1,18,21
141:5,10,15

142:3,8 150:8
151:13 154:8
155:15,17 156:1
157:10 162:25
169:6,9
disabled 103:16
106:25 127:6
128:15 141:22
154:7 156:2
157:12
disagree 70:8
125:25 126:9
142:21 143:1,13
143:18 144:3
disagreement
126:2
disciplinary
15:16
disclose 165:20
165:23
disclosed
82:25
discount 80:4
146:4,19,20,21
148:15 153:22
discounted
103:23
discounting
146:24 147:20
discourteously
70:7
discussed
52:19 65:4
115:1,8 119:6
124:13 139:18
148:23 160:16
161:4,12 162:14
discussion 32:5
37:22 39:23
51:19 52:16,18
121:7 128:1
154:21 161:10
discussions
163:19
disrespectful
70:6
distribution

64:24
distributions
64:17,22
District 1:1,1 3:1,1
3:17,17 5:15,15
divided 51:20
106:16 133:19
134:14,19
dividing 135:3
divorce 75:11,16
75:22 76:12
76:12
dizzy 130:13
document
30:16 31:4
66:9 82:5
125:24 140:13
166:19
documents
26:17,20 30:4
30:5,18,20
31:1 32:2
33:18,20,25
34:10,12,16
36:5,7,18,22
36:25 56:15
70:1 100:1
129:10,12
143:5 151:2
153:1,3 165:2
165:3,17 166:1
166:10,24
doing 6:21 16:9
16:23 17:2
60:10 64:14
72:8 80:22
128:17 146:12
147:7 149:12
149:23
dollars 136:15
137:22
double-check
97:19
double-check...
20:20
dozen 21:25
Dr 36:6

draft 31:22
driver's 11:19
Duane 1:6 3:6
3:20 6:6 94:1
166:7,23 167:4
175:8 176:3
due 24:23 41:18
44:3 45:13,18
45:19 46:15
61:19 77:14,16
78:14,22 79:5
85:19 86:2,3
86:11,16 87:6
88:1 101:22
102:12,21
103:23 105:2
123:14,17
135:7 136:10
137:16 140:22
156:2 157:12
157:24 158:3
158:11 159:16
160:4
duly 174:6
duties 140:24

──────── E ────────
E 4:1,1 54:4
57:14 81:17
earlier 54:5
76:25 93:24
95:14 100:10
101:3 107:20
112:15
early 57:25
58:5,6 154:22
earned 162:11
163:3 164:5
earning 132:17
135:5 136:15
137:22 168:25
169:9
earnings 46:25
47:14,17 48:10
49:1,6,23
50:6,22 51:3
51:5 52:20

53:7,19,20
56:12,17 57:21
58:17 61:14
65:6 98:9
100:22 105:13
105:13,17,20
105:21,21
106:19 107:4
116:15 117:4,5
117:15,21,23
118:9,15
119:25 123:14
123:16,21
126:21,24
127:4 128:14
128:22,25
130:9,10 132:1
132:12,14,19
133:1,4,4,13,17
133:18,20
134:4,10,14,25
135:5 136:10,11
136:13,17
137:16,17,20
137:25 138:10
138:15,21
140:3 141:22
142:1 143:16
144:13,15
145:4,10 149:4
156:3,4,11,12
157:13,23,23
158:2,10 159:2
159:8,16 160:4
160:14,16,21
161:15,18 169:7
169:10 171:14
171:14
easier 168:3
economic 32:13
EDELMAN 4:8
Edna 4:7 6:1 7:5
9:22 14:1 23:9
42:18 76:5
79:9 93:20
155:7 165:13
edna.kersting...

4:10
education
10:20 11:6,9
133:8 140:19
effect 107:1
133:8 140:19
eight 27:18 41:3
42:2 129:10
131:2,4 142:16
143:3
EISLER 4:8
either 16:25
19:12 20:12
105:21 106:4
116:12 160:8
electrical 77:24
electricity 77:18
77:19 78:2,3,7
electronically
2:24
elicit 139:15
elicits 138:9
elimination
90:18 91:14,17
92:24
Elser 6:2
email 34:3
employed 8:6,8
174:10,13
employee
59:24 117:22
161:23 174:13
employees
59:20
enclosed 175:10
175:11
Enclosures
175:25
encompassing
126:18
ended 173:12
engaged 101:20
engagement
24:1
engagements
8:20
enlighten 164:7
entail 16:8

entire 115:23
168:14,15
entirety 47:13
49:3
entities 38:9
161:25 162:12
162:22,24
entitled 13:17
13:20 14:17
89:10
entitlement
66:9 69:10
entity 37:12
117:23 139:19
154:23 162:14
163:17
entries 106:8
150:23
equal 156:3
159:11
equation 131:15
131:23 132:4
132:16 134:24
135:6 138:7,13
138:22 139:14
140:2
era 106:14
Ernest 125:8
errata 175:11,13
175:16 176:1
erroneous
139:15 147:16
escalation
56:24,25
essence 68:7
117:3
essential
162:23
essentially
125:12 131:23
established
96:17 162:24
estate 18:20
estates 18:23
estimate 63:14
147:6,9
estimating

143:15
estimation
106:16
et 5:14 104:21
evaluating 81:5
evasive 15:5
evidence 63:25
exact 57:1
exactly 16:8
63:12 64:1
112:11,15
143:24 147:5
171:5
examination
6:13 7:15
93:21 114:20
152:15 155:10
170:11
examined 3:10
7:12
example
102:22
126:20 131:25
examples 163:1
exceed 162:25
exception 67:8
exclude 47:24
98:15,21 113:8
153:8 154:19
excluded 49:14
98:8 100:21
145:11 154:19
excluding 113:6
excuse 26:23
45:22 108:25
excused 173:11
Executed 177:14
exercised 145:3
152:19,23
154:14
exercising
153:6
exhibit 2:9,11,12
2:13,14,15,16
2:17 9:19 10:9
19:17 27:3
30:3,6,12,14

33:19 36:6
40:18,21 48:6
49:17,19 65:17
82:4,6 86:1
94:21,24
97:21 99:14,17
108:25 109:19
109:21 116:2,9
118:22 121:13
121:15 125:4,6
126:4 131:2
140:11,11
142:15,18
155:13,14
161:15 165:4,13
165:14,19,23
166:12
exhibits 2:8,23
9:23 10:5,7
34:11,13 97:18
115:19 116:4
165:23
exited 140:19
142:1
expect 40:11
53:6
expected 13:3
expenses 60:9
60:13 64:8
123:20 124:6
124:23 129:21
162:21,25
experience
70:12 80:19
127:19,24
134:7 163:11
experienced
136:2,12,17
137:19,24
143:10
experiences
130:11 134:6
expert 2:13
15:20 17:18
34:22,25 35:3
40:17 81:9
82:7,23,24

84:16 85:12
113:24 118:25
120:8 125:7,13
157:1,3 165:9
168:6 171:18
expert's 129:20
160:23 164:23
169:3
expertise 28:19
70:12 115:6
126:17 127:3
127:21,22
169:8
experts 147:11
Expires 177:24
explain 52:1
146:7 160:20
explained 52:13
97:13 160:17
161:19
explore 14:13
51:12 52:19
expressed 101:7
expressly 5:7
extent 10:14
103:16

——————
F
face 144:20
fact 12:24 95:1
96:2 124:1,7
139:19 142:8
146:25
factor 71:12,17
146:13 148:8
factoring 138:8
factors 102:23
119:1
facts 26:10,11
92:22 112:24
154:2
failed 143:8,13
145:23
fair 9:7 15:24
18:4 103:10
152:3 168:9
fairly 20:21 21:11

false 128:8
familiarity 111:13
far 30:9 39:1,15
43:14 46:14
49:5 53:5
68:25 69:2
77:2 145:10
154:4
February 23:22
25:1,5 102:13
103:24 104:1,3
166:24 167:5
federal 18:8
31:14 117:24
122:10
feel 106:5 162:7
feeling 94:8
170:8
felt 163:22
figure 132:3,15
132:18 133:14
133:17,19,20
134:10
file 9:23 22:24
22:25 32:1,3
122:11 168:6,14
168:15
filed 15:17
38:20 57:25
58:1,4,5,6,8
58:10,17 68:4
166:7,16 167:5
filing 175:18
financial 11:21
16:19 98:16
106:4,11 124:21
154:15
financially
174:14
Finch 34:23
35:22 168:7
Finch's 35:20
find 75:2 106:2
126:2 161:11
175:10
findings 142:21
fine 99:8 109:6

SUSAN THOMPSON  7/30/2020

finger 94:7
finish 109:15
firm 4:3 8:12
    24:16 39:15,18
    40:9 84:25
    95:18 96:7
    103:12 175:5
first 27:16,22
    30:17 58:22
    106:25 110:2
    111:25 112:1
    117:21 122:2
    126:5,10,20
    149:9 153:13
    155:13 166:4
    166:23 167:4
fit 74:4
five 3:12 16:18
    21:4 48:8,8
    50:2 79:20
    112:7 126:13
    130:18 169:22
    170:6,14
    172:10
five-minute
    42:18 79:10
    79:25 109:5
fix 23:15
flat 72:16 90:3
flawed 147:16
    148:6,11,21
flip 41:2
flow 147:20
focused 128:11
follow 47:17
    133:24 156:12
    156:16,16
followed 38:18
    38:25
following 16:21
    65:24 96:18
follows 84:13
footnote 81:14
foregoing 174:5
    177:6,13
forenoon 3:12
forensic 8:13 9:1

15:19 39:25
forensics 11:21
forgetting 38:8
form 9:3 12:3
    13:18 14:19,20
    14:24 23:5,11
    23:12,18 25:21
    28:12 29:6,10
    29:23 30:24
    31:20 45:2,9
    46:17 47:25
    48:17 51:7
    52:7 53:9,23
    59:7,21 60:1,7
    64:25 65:10
    65:15 69:12
    69:23 70:7
    72:22 73:13,18
    73:20,21 74:5
    74:8 75:15
    76:15 77:10,21
    78:8,15,23
    79:6 83:1,3,15
    84:17 85:25
    87:2,9,19
    88:13 89:6,19
    90:13 91:5,12
    91:16 93:3,17
    97:15 104:17
    104:25 105:22
    110:24 111:16
    111:24 112:20
    113:15 115:9,15
    115:20,24
    116:25 117:9
    118:18 119:2,10
    119:14,20
    120:2,12 121:4
    121:10,24
    122:5 123:3
    124:9,16,25
    125:14,17 131:11
    131:17 132:7
    132:24 133:22
    135:8 136:5,19
    136:20 138:11
    138:17,25

139:11,17 140:5
    141:6,12,24
    142:4,23
    143:2 144:16
    144:21 145:5
    148:10 150:9
    150:18 151:17
    151:18,25
    152:7 153:11
    155:24 156:14
    156:22 157:16
    158:13,23
    159:10,25
    160:6,24
    162:9 163:8,13
    164:11,23
    167:16,24
    169:2 170:25
    171:4,10,19
    172:4 177:7
formal 10:20
    11:2,6
formed 30:21
forms 26:21
    100:11 122:14
    122:17,22
    144:14
formula 171:15
forth 101:22
forward 48:7
    51:9 69:10,14
    72:16 77:13
    146:21
found 17:2 23:6
    54:20
four 27:13,13
    41:1,2 48:7
    49:21 68:2
    85:18 86:15
    87:20 112:6
    117:25 126:12
    129:8 161:17
fraction 135:4,4
Francisco 4:4
    175:6
frankly 147:16
fraud 16:14 18:16

fraudulent 18:15
frequency
    67:23
Fresno 8:1
front 27:6 83:7
    111:4 146:25
fronts 169:23
fulfill 65:24
full 26:3 149:17
Fully 68:2
further 6:19
    27:10 46:12
    68:9 127:17
    155:8 161:17
    172:24 173:3
    174:12
future 78:22
    79:4 101:21
    102:12,20,21
    103:13,23
    104:2,14,20
    104:22 105:17
    105:21 115:3
    143:16

─────────

## G

GAAP/GAAS
    18:17
gain 133:10
gained 32:4
garbled 167:15
Garver 1:2 3:2
    3:18 5:13
    24:23 31:5
    37:15 38:13
    38:22 39:11
    41:8 50:12,16
    50:18,19,23
    51:1,6,14 52:5
    52:6,8,21
    53:12,22
    58:22 60:5
    64:17,23,24
    68:22 71:6,22
    72:19 73:11,14
    74:21 75:10,11
    75:11 76:11,11

89:9 91:3
    101:22 102:12
    102:22 110:11
    118:4,15 122:11
    122:12,18,23
    123:8,11,20
    124:7,24 127:8
    128:23 129:22
    130:4 139:8
    140:19 141:4,10
    142:1 158:5,15
    158:18,20,21
    166:5,16 167:5
    167:18 168:1
    170:18 175:7
    176:2
Garver's 46:24
    49:1 50:8
    56:11 65:6
    73:3 75:12
    92:23 93:6
    96:14 105:13
    117:4 118:15
    123:13,16
    130:9 144:13
    159:3 169:17
general 14:14
    18:19 61:21
    63:8
generally 17:16
    20:3 26:8,21
    37:21 46:9
    47:3 78:5 84:1
    111:15 117:8,13
    135:16
generate 128:13
    150:5 151:15
    154:11
generating
    126:24 127:3
    128:6 169:6,10
    170:19
getting 96:23
    130:13
give 17:1 23:8
    83:25 105:11
    120:17 127:2

SUSAN THOMPSON  7/30/2020

134:15 135:22
148:12
given 130:11
148:25,25
150:24,25
gives 16:23
92:9 134:16,19
163:1
giving 94:3
133:21,23
gleaned 143:5
go 14:7,10,25
19:17 20:19
27:10,13 30:2
30:18 36:22
41:1 48:7
53:16 65:16
68:16 76:21
79:17 95:5
96:10,10
97:23 99:12
99:16,16,18
100:13,13
101:17 102:6,6
102:7,7,9
103:17,18,18,18
109:1,1 110:1
112:5,14 116:1
116:10,14
117:18 118:7
121:12,13 123:6
125:3,24
128:7 129:3
130:25 131:5
132:23 136:24
140:8,8 141:14
142:11,13,20
155:13 165:3
165:16 172:25
goal 64:21,22
goes 16:5 43:14
52:25 56:23
66:10 71:8
97:2 127:17
128:24 148:20
going 10:3 26:8
29:10 43:2

51:9 61:13,16
62:6 66:14
69:2,10,14
72:16,25
75:18 77:13
79:13,14,18,19
79:22,23
80:9 88:20
99:17 101:19
103:21 109:8
110:5 117:20
125:24 127:5
128:3,21
130:20 132:22
133:5 137:8
138:22,23
139:15 140:18
144:19 145:22
146:18,21
148:11 165:18
169:24 171:23
171:25
good 7:17,18
11:16 55:12
139:23 173:4
governing
118:13
graduated
10:23
great 23:21
117:12
greater 156:4
gross 162:11,15
162:16 163:2,3
guess 28:22
63:13
guidance 96:17
96:21 112:9,21
113:1,19 114:23
119:6 120:8
121:1 172:6,19
guide 171:13
guided 156:19
171:18
guilty 120:22
guys' 24:20

## H

half 53:16
146:22
handle 154:25
handling 12:1,9
12:21
Hang 126:4
130:13 166:10
happen 71:22
132:16 133:15
133:16
happened 65:9
107:7
happy 19:16
23:11
harassing
169:20,25
170:8,10,15
hard 27:12
haywire 132:23
head 133:24
health 12:17
103:13,14
healthy 148:2
hear 7:20 120:5
167:8
heard 22:16
52:8 74:23
heavily 21:5
146:24
heavy 146:19
held 5:17
help 27:14
161:12
helped 97:4
161:2,5
helpful 120:20
helping 161:10
Hemming 8:9
8:10,14,17,22
9:5,10
Hi 93:23
higher 133:7
142:9
highest 106:22
149:19

hired 59:19
hit 142:7
hitting 135:13,13
hold 11:18 29:21
166:3
home 66:3,20
honestly 154:24
hot 42:22
hour 40:2
hours 3:11
human 70:4,11
70:16
hundred 15:25
37:16 38:2,21
39:10 50:18
51:15,20,21
52:2,6,9,11
53:12 76:17
122:18 134:20
136:14 137:21
138:2
husband 37:12
64:18
hypothetical
75:19,21 77:23
134:3 135:10
136:9 137:15
Hypothetically
132:13

## I

idea 93:12
134:23 135:19
135:25
identified
124:20
identifies 129:17
130:4
identify 126:3
131:6 142:21
142:25
ignored 144:8
III 30:4
Illinois 4:9
impact 123:15
impossible
151:10,13

improper 23:17
inadvertently
86:19
inappropriate
143:16 147:19
148:6,12
inappropriately
139:22
include 32:4
41:23 43:22
44:6 47:23
49:9 54:19
83:11 86:6
89:22 101:3
102:23 107:1
117:23 119:24
130:7 132:11
156:10
included 43:15
55:23 62:12
82:24 83:9,18
90:6 101:9
108:13 119:18
133:14 145:15
147:2 155:4
includes 41:25
85:24
including 56:8
133:1 162:12
168:14 169:17
inclusion 104:13
income 28:18
28:21 38:14
38:24 39:9
52:3 53:16
57:1 72:7 73:3
73:12 74:21
75:24 76:4,20
96:15 98:25
108:7 110:13
117:24 123:20
124:6,23
127:20,24
128:6 129:18
129:21 130:7
135:17,21,23
136:1 138:3,5

SUSAN THOMPSON  7/30/2020

139:2,16 142:8
145:19 149:7
153:18 158:8
159:15 162:11
162:12 163:25
167:18,25
168:25 170:19
**incomplete**
77:22
**inconsistent**
129:2
**incorrect** 55:24
62:18 70:17
86:17 138:9
146:6,8 154:12
**increase** 73:12
74:21 86:5
92:4,7,25
108:13,15
**increased** 75:8
**increases** 73:3
**incurred** 60:10
162:23
**independent**
145:3 152:19
152:23 153:6
153:14,16
**independently**
28:10,20
29:18
**index** 2:8 32:16
33:1 108:14
**indicate** 6:24
122:22 175:13
**indicated** 37:9
51:9 158:9
**indicates** 41:7
124:21 126:23
145:23
**indication** 37:10
147:14 157:18
**individual**
145:20 147:23
167:18
**industry** 111:14
149:23
**informally** 13:2

**information**
13:22 31:18
32:5,8,18,21
33:2,6,12 39:6
44:17 45:7,12
47:3,6,23,24
51:23 52:15
53:21 55:20
56:15 57:6,23
58:20 59:9
60:19,22
63:17 64:10
65:8 68:9
70:14 81:23
83:9 103:7,11
103:14,15
105:23 106:10
106:11,13,23
107:6 126:8,11
129:9,11 143:4
144:24 150:8
150:20 153:17
153:18 156:20
156:23 161:6
164:19
**inhaler** 94:4
**inherent** 154:5
**initial** 2:13 25:8
25:10,16 27:5
30:22 31:2
33:17 35:8,10
40:13 94:17
100:6,8 125:16
**initially** 24:22
26:5,7
**injury** 140:22
156:2 157:12
157:24 158:3
158:11 159:17
160:5
**input** 154:13
**inputs** 154:16
**installment**
22:13,15,20
76:24,24 77:9
78:12
**instance** 126:19

147:19 152:1
**instructed** 46:19
49:8 60:24
155:21
**instruction** 90:4
**instructions**
12:21,23
83:24 89:21
**insurance** 1:5
3:5,19 5:13
11:24 12:5,17
18:14,15 19:2,5
19:8,15,23
22:13,15,20
34:5 37:10
38:1 43:18,25
45:8 51:13
52:9 69:18
76:25 77:8
107:20 110:12
115:17 116:16
121:17 135:16
144:10 147:18
147:25 148:1
152:5,9 157:1
157:3,7 166:6
168:5 175:7
176:2
**insured** 69:18
134:5 144:24
150:2 151:14
152:3
**insured's** 151:22
**insurer** 68:8
**intended** 42:14
**intentionally**
21:19
**intents** 70:3
**interest** 43:13
43:15,20,22
43:25 44:3,6
44:10,13 55:1
56:3,9 85:21
85:24 86:7,8
117:23 147:21
161:25
**interested**

174:15
**interesting** 52:3
**interests** 118:4
**interpret** 70:13
97:2 120:11,24
121:7
**interpreted**
129:24
**Interrogatories**
167:4
**interrupting**
14:2
**interruption**
128:18
**introduce** 5:22
**introduction**
110:3
**invest** 147:23
**investigate**
28:10,24
29:18
**investigated**
28:20
**investigation**
16:13,15
**investigations**
18:16
**Investors** 31:20
49:10,11 98:11
98:17,24 99:5
101:1 119:23
130:6,8,12
145:15
**invoices** 39:17
39:20
**involve** 22:12
**involved** 9:11
15:21 68:14,17
84:15,18,21
89:1,4
**issue** 55:9 161:4
**issued** 50:9,23
53:22 158:20
**It'll** 9:21
**item** 166:4
**items** 153:8
168:10,12

**J**

**January** 24:2
59:1,4 85:23
**Jesus** 4:12 6:4
7:7 93:23
**jesus.osete@...**
4:14
**Join** 123:4
**joined** 9:4
**journal** 106:8
**judgment** 145:3
152:19,23
153:6,14,16,19
154:15
**July** 1:10 3:11
5:10 25:8
35:17 56:7
77:14 78:13,17
78:19 80:3,16
82:23 83:5
86:7 107:4
110:8 175:10
176:3
**June** 41:4 42:1
54:21 107:21
121:17

**K**

**K-1** 47:1,8,10
50:16 53:21
57:4,12 72:20
122:14 145:19
159:3,15,16
**K-1s** 47:13 50:9
50:23 158:19
**Kansas** 1:1 3:1,16
3:17 4:14,18,22
5:16 31:14
40:9 59:5
174:4
**keep** 11:9 38:8
120:17
**Keith** 4:21 5:19
94:20 95:4
96:5,10 97:22
99:12,16,23
100:15 101:17

SUSAN THOMPSON  7/30/2020

102:6 103:18
108:17,24
109:1,13,18
110:1 112:5
114:5 116:3
117:17 142:16
Kersting 2:2,6
4:7 6:1,1 7:5,5
7:16 9:6,25
10:4,10 12:8,14
12:16 13:6,13
13:15,23 14:4,7
14:22,25 21:7
21:20 22:11,21
23:2,6,16,21
23:24 25:6
25:23 27:4
28:7,15 29:9
29:14,17 30:1
30:2,15,19,25
37:1 40:22
42:19,24 43:17
44:18,21,25
45:6,11,17
46:20 48:3
48:20 49:20
52:12 53:2,11
53:14 54:1
59:10,23 60:3
60:8 63:20
63:22 65:2,11
65:16 66:15
67:2,21 68:13
69:21,24 70:9
70:24 71:5,16
71:21 72:9
73:2,8,19 74:1
74:8,10,14
75:10,20 76:7
76:23 77:12
78:1,11,19,24
79:11,15,21
80:1,5,14 82:5
83:6,16 84:20
86:10 87:5,11
87:22 88:15
88:23 89:8,23

91:2,9,14,18
91:23 93:5,18
94:16 109:24
114:15,17 115:9
115:15,20,24
116:25 117:9
118:18 119:2,10
119:14,20
120:2,12,16
121:4,10,24
122:5 123:4
124:9,16,25
125:14,17 131:11
131:17 132:7
132:24 133:22
136:5,20,22
137:3,8 138:11
138:17,25
139:11,17 140:5
141:6,12,24
142:4,23
143:2 144:16
144:21 145:5
148:10 150:9
150:18 151:17
151:25 152:7
152:13 155:8,11
155:25 156:18
156:25 157:21
158:15 159:1
159:12 160:2
160:10 161:14
163:5,10,21
164:16,24
165:8,14,16,22
165:25 167:17
167:24 168:20
169:16 170:1
170:10,16 171:2
171:7,12,25
172:5,9,16,23
173:2
kicks 90:4
kind 8:10 10:14
10:19 11:19
12:13 16:11
18:10,12 36:23

42:20 74:15
75:19 99:10
102:23 112:2
150:23 153:12
162:21 163:3
kinds 17:14
know 9:20 12:4
14:9 15:15,23
17:19 18:3 19:6
19:10 20:1
21:10,25 22:4
22:14,23 23:9
34:3 35:22,24
35:25 38:20
39:16 43:18
44:23 46:13
46:14,18 48:1
50:15 54:17
55:16 58:1,7
59:8,15,22
62:1,8 64:4,7
64:13,16,20
66:14,18 68:14
70:12 72:12
72:24 73:23
75:17 77:1,16
77:17 78:9
82:17 90:18,21
92:12 94:2,5
94:5,12,16
97:5 98:3
99:4,5,15
100:11 105:19
107:7 108:16
109:23,23
118:21 127:1
136:22 141:16
143:17 144:4
151:3,6 154:24
154:24,25
160:19,25
161:11,20
163:9,14 169:8
169:21 170:7
171:5,11 172:13
knowledge
36:2 60:2,4,9

60:12
known 107:9

————— L —————

labeled 34:10
lack 124:10,17
125:1 136:6
141:7 142:5
language 48:24
85:15,16 157:4
163:11 171:24
172:1,17
large 18:12
133:2
largely 154:17
larger 133:3
late 56:4 58:8
law 4:3 24:16
39:15,18 40:9
77:17 103:12
175:5
lawful 7:12
laws 162:22
lawsuits 18:22
learn 59:5
leave 154:10
155:4
leaving 105:7
113:17 145:24
ledger 63:8
left 80:6 145:16
154:12
legal 28:5 29:7
29:24 44:15
46:17 65:23
66:13,25
67:19 68:12
74:6 78:16
79:7 91:6
171:10
Leighton 4:13
6:5
let's 9:19 27:1
40:25,25 41:1
48:7 49:17
58:8 65:16
81:8 96:11

97:23 99:16
99:16 100:13
100:13,16
102:5 103:17
105:10 108:23
109:3 116:1
121:12,13 125:3
130:25 132:18
132:21 134:3,4
134:9,10 140:7
140:8,8 141:14
142:11 146:10
155:12,13
161:14 165:16
letter 2:19 24:1
34:4 41:4,11,14
42:1,5,6,8
54:21 55:20
107:20,24
121:17,18,22
122:2,10
124:20
level 56:14
126:21 128:14
liabilities 129:21
license 11:9,10
11:16,20
licensed 11:23
15:6 85:1
licenses 11:19
life 1:5 3:5,19
4:6 5:13 6:3
7:13 12:13,16
38:12 52:4
67:15 110:12
144:9 166:6
168:5 175:7
176:2
limit 14:22 45:2
47:8
limitations
169:14
limited 16:13
18:6
limiting 29:10
Linda 10:23 11:3
11:7

SUSAN THOMPSON  7/30/2020

line 127:18 176:5
176:9,13,17,21
link 5:18 32:25
33:1 116:4
list 19:18 30:18
100:11 166:20
168:10,12
listed 19:7,11
20:15,19 22:12
26:22,24
30:6 36:6
43:19
lists 117:25
literally 104:9
146:13
litigation 4:17,21
5:20 8:13,20
9:2 15:21 175:1
little 17:12 27:10
41:1 81:14
90:14,22
109:23 114:24
117:11 133:21
133:23 134:18
137:7 155:12
161:17 163:18
Livingston 32:11
LLC 8:9
LLP 4:8,13 8:9
Locust 4:18,22
Loma 10:23 11:3
11:7
long 45:24
longer 56:2
72:4
look 8:23 9:19
10:19 17:10
19:17 22:23
27:1 28:16
30:11 31:4
32:13 34:1,8
34:14 36:25
41:17 42:5,8
47:14 48:3,4
49:17 51:10
58:2 61:22
62:10,20

63:12 65:7,17
81:8 139:24
140:7 147:1,3,4
155:20 157:10
157:23 159:2
159:5,22
160:11 161:14
169:1
looked 32:18
33:6,18 40:12
54:10 55:11
58:17,19
62:24 97:5
108:22 118:11
141:10 150:21
151:6 164:16
looking 17:5,6
17:10 23:8
27:6 33:12
38:6 81:12
83:5 86:1
90:17 92:13,19
107:5 117:3
118:22 126:4
126:12 133:5
138:3 140:13
140:17 147:24
151:2 166:10
166:12
looks 10:12,19
27:15 64:1
86:18
lose 127:19,21
losing 136:14
137:21
loss 28:17,21
61:23 62:1,8,9
62:10,20,25
63:6 65:20
66:3,10,19
67:4,15,22
68:7,23 69:9
88:11,17,24
89:4 107:11
123:13,21
127:20,24
130:11 133:2,10

134:7,24
135:21 136:1,10
136:13,17,24
137:17,19,24
138:2,4,9,14
138:21 141:22
143:10,25
145:13 148:17
148:19 150:3,5
151:15 156:3
157:13,22,23
158:2,11 159:1
159:16 160:3
losses 18:22
49:9 98:6
100:15,20,23
100:24 101:2
101:10 113:6
119:18,24
130:5,8 132:11
132:13,15,20
133:14 134:5
138:8 139:2,9
139:14,20
145:14 154:11
154:19,20
162:16
lost 57:9
lot 13:2 28:18
57:18 114:22
119:1,3,7 126:8
lots 18:21
Louis 175:18
low 146:5

___

## M

Main 4:13
maintain 123:18
majority 18:5,5
53:25
making 38:1
55:24 128:9
135:24
manner 6:23
manufacturing
18:23
March 168:8

marked 37:15
material 129:7
140:24
math 137:9,11
mathematically
133:15 147:6
148:6
mathematician
133:16
Matt 114:17 170:1
matter 5:12
15:21 30:6
77:17 110:6
143:23 149:24
154:3 159:4
166:5,16
matters 68:3
Matthew 4:3
5:24 7:3 9:16
12:14 13:14
14:6,23 24:6
29:9,15 44:22
73:21 74:9
173:7 175:4
matthew.bour...
4:5
maximum 90:19
135:12,13,22
142:7
mean 12:4,20
16:4 37:24
72:18 89:17
90:16 96:21
98:14 112:10
115:17 120:7
120:25 127:13
129:8 148:14
152:21 157:14
157:17 171:20
meaning 12:10
40:6 53:21
69:21 92:22
112:21 113:11
120:9
means 13:8
22:15 53:20
66:8 67:14

90:9 128:6
155:17 156:1
157:7,11
measurements
148:22
medical 93:6,9
93:13
meeting 45:24
mention 120:8
mentioned
37:25 90:23
91:1 93:24
94:3 95:14
mess 92:20
met 64:22
144:5
method 46:7
89:24
methodology
46:7,8 131:19
149:23
methods 89:21
middle 14:2
midyear 147:11
million 143:25
mind 103:19
mine 58:5
153:23
minus 134:14
minute 63:18
105:11 113:19
minutes 79:20
miscalculation
41:20
misplaced
126:5
misquoting
48:5
Missouri 3:16
4:14,18,22
174:3,22
misspoke 81:18
87:14
misstated 42:4
42:6,7
misstatement
87:18,21

SUSAN THOMPSON  7/30/2020

misstates 71:2
   73:4,17 112:19
   153:10 157:15
   160:23 164:22
   169:3
misunderstood
   29:2
MO 175:18
Molly 122:22
moment 131:1
money 39:14
   62:5,6 135:25
Monroe 4:9
Montgomery
   4:21 5:19 10:13
month 46:10
   66:10 78:2
   82:11,16
   148:25
month-to-mo...
   151:11
monthlies 149:7
monthly 66:4,21
   69:6 97:1
   105:12,13,16
   105:20,24
   106:4,8,17
   135:7,12,22
   141:23 145:10
   148:24 149:3
   150:7,11,12,17
   151:5,15 152:4
months 68:23
   106:22 149:17
   149:20
morbidity 71:17
morning 7:17,18
Morse 8:9,11,15
   8:17,22 9:5,10
mortality 71:11
MOSKOWITZ
   4:8
moving 27:11,11
   137:9
multiple 164:12
   164:13 169:23
multiplied

141:23
multiplying
   135:21

N

N 4:1 175:17
name 5:18,19
   6:25 7:19,21
   18:23 95:14
   176:1,2 177:11
nebulous 163:4
necessarily
   74:25 126:18
   128:9,19
necessary 69:9
   177:9
need 10:15 13:11
   29:22 42:20
   42:22 74:12
   75:9 92:16
   94:6,18 115:1
   126:5 146:22
   150:15 151:21
needed 26:2
   150:23,24
   155:4
needs 168:25
negative 132:14
   132:19,21
   133:14,17,20
   134:4,13,14
   135:11 136:10
   137:16
neither 147:7
   174:9
net 130:11 134:7
   143:11,24
neutral 144:12
Nevada 18:1
never 9:22
   22:16 35:19
   103:19 163:5
Nevertheless
   60:16
new 59:25
nine 3:11 102:7
   143:6

nonresponsive
   15:5
Nope 15:7,18
   35:23
normal 121:7
North 7:25
notarized
   175:16
notary 3:14 5:5
   175:14 177:23
note 23:3 81:20
   126:10
noted 165:2
notes 31:25
   32:1,3,6,7
   38:4 145:18
notice 65:19
   69:1
noticed 81:13
November
   166:16
number 2:10
   8:4 31:5 68:1
   95:5 96:11,16
   101:18 110:13
   126:14 129:5
   143:8,23
   145:21 148:12
   165:9,10
numbers 131:24
   138:7
numerical 132:2
numerous 115:7
   118:4

O

o'clock 3:11,12
   37:8,8
oath 6:20
object 23:10
   29:6,12 74:5
   83:1 117:10
   120:17 136:19
   165:18 169:24
objection 9:3
   10:3 12:3,11,18
   13:9,11,18 14:19

14:20,23 21:14
   22:9,19 23:12
   23:18 25:2,21
   28:4,12 29:23
   29:23,24
   30:24 36:19
   44:14,19 45:1
   45:9,14 46:16
   47:25 48:17
   51:7 52:7,22
   53:9,13,23
   59:7,21 60:1,7
   64:25 65:10
   65:15 66:12
   66:24 67:18
   68:11 69:12,23
   70:5,7,21 71:2
   71:14,18,24
   72:22 73:4,13
   73:16,17,18,20
   74:7 75:15
   76:15 77:10,21
   78:8,15,23
   79:6 83:3,15
   84:17 85:25
   87:2,9,19
   88:13,19 89:6
   89:19 90:13
   91:5,12,16,21
   93:3,17 95:10
   95:21 97:15
   100:3 103:1
   104:17,25
   105:22 107:25
   110:24 111:16
   111:24 112:12
   112:19,20
   113:14,15 115:9
   115:15,20,24
   116:25 117:9
   118:18 119:2,10
   119:14,20
   120:2,12 121:4
   121:10,24
   122:5 123:3
   124:9,16,25
   125:14,17 131:11

131:17 132:7
   132:24 133:22
   136:5,20
   138:11,17,25
   139:11,17 140:5
   141:6,12,24
   142:4,23
   143:2 144:16
   144:21 145:5
   148:10 150:9
   150:18 151:17
   151:18,25
   152:7 153:10,11
   155:24 156:14
   156:22 157:15
   157:16 158:23
   159:10,25
   160:6,22,24
   162:9 163:8,13
   164:10,11,22
   164:23 167:16
   167:21 168:17
   169:2,19
   170:25 171:4,9
   171:10,19 172:3
   172:4,7,20
objections 6:23
   23:5 29:10,22
   45:2 73:22
   74:4,9,22
   166:22 167:3
observations
   129:9
obtain 31:7
   143:9,13
obtained 31:14
obviously 21:21
   115:1 118:3
   136:13 137:20
   139:8 143:12
   165:24 169:21
   170:7
occasion 16:2
occasions 115:7
occupation
   75:3 126:25
   127:4 140:23

140:25 169:7
169:10 170:21
170:22 171:1,3
171:8
**October** 34:6
41:24,25
55:24 166:7
**offensive** 70:17
**office** 66:3,20
175:17
**oftentimes**
106:6
**oh** 16:14 25:13
34:24 40:19
79:2,11 87:14
89:3 96:23
100:16 103:19
108:18 136:21
**okay** 10:2,20
17:17 19:22
23:19,22
25:15 27:13
27:20 28:6
30:1 38:6
40:18,25,25
42:16,24 56:5
62:23 68:16
76:2 79:10,21
92:19 95:4,6
95:13,17,25
96:4,5,11,21
96:24 97:10
97:16 98:3,13
98:18,20 99:4
99:8,11 100:7
101:2,12,15
102:1,5,9,10,16
103:21 104:7
104:12,12
105:5,10
106:18 107:11
107:18,23
108:9,9,17,23
109:1 110:4,17
110:19 111:2,11
111:19 112:5,16
112:25 113:11

113:20 114:3,13
114:22 115:11
115:16,22 116:1
116:10 117:2,14
118:3,7,13,19
118:22,23
119:5,16,22
120:7,23
121:12,13,16
123:6 124:12
124:19 125:3
125:19,23
126:8 130:1
131:4,13 132:9
133:13 134:2,9
134:12 135:19
136:8 137:5
139:7,23 140:7
140:17 141:3,9
141:14,19
142:11 152:2
152:10,25
153:5 155:6
168:9 173:4,4
**once** 55:14
60:14 132:3
**ones** 169:18
**onset** 89:17
91:15,19,19
92:24
**open** 20:12
**operate** 56:13
**operations**
149:18 162:24
**opine** 144:3
**opinion** 17:1
29:7,24 30:6
33:17 35:8,9,11
44:12 46:11,21
89:9 101:7
110:21 118:14
122:8 123:25
126:14 129:19
143:7,20,23
148:7 152:8
158:12
**opinions** 30:21

31:2 44:2
82:22 83:11
142:22 143:22
144:1,4 157:6
**opportunity**
23:14
**opposed** 145:19
**opposing** 12:24
**options** 10:5
**order** 121:1
150:16 151:22
**ordinary** 129:18
130:5
**original** 2:23
27:15 82:21
94:21 95:1
110:5 113:21
175:11
**originally** 76:3
**Osete** 2:3,5
4:12 6:4,4 7:7
7:7 93:20,22
93:24 94:20
94:25 95:4,6
95:13,23
96:10,12 97:16
97:22,25
99:15,20,23
99:25 100:7
101:17,19
102:5,10 103:3
103:17,21
104:18 105:5
108:5,24
109:6,13,18,22
110:1,4,25
111:19,25
112:14,25 114:4
114:7,15 123:3
136:19,21
151:18 152:12
152:16 155:7
165:12 173:6
**outcome** 174:15
**outset** 94:2
**outside** 75:5
126:16

**overstated**
148:21
**overstating**
145:10
**owed** 117:6
131:9 132:6
150:7,17 151:10
151:14,23
**owned** 37:12
38:13 51:15
52:6,9,11
76:20 122:18
**owner** 39:1
50:18 51:6
53:12 64:16,21
64:23 67:9
118:9 127:8
128:4,10 151:14
158:6,7 159:6
159:9 162:6
163:17
**ownership**
37:16 38:3
39:10,11 50:25
52:21 76:1
117:22 118:4
122:13,23
123:9,10,11,12
123:15 158:22
161:24
**owning** 127:12
127:16
**owns** 76:17
124:7 130:4
152:3

──── P ────

**P** 1:2 3:2,18 4:1,1
31:5 110:10
166:5,16 175:7
176:2
**P&Ls** 150:11
**p.m** 130:24
173:9,12
**page** 2:1,9 27:7
27:13,13 41:1,2
48:8,8 49:20

50:2 59:11,14
65:17 96:1,11
97:23 99:18
100:15,16
101:17 102:6,7
102:7,8 103:19
109:2 110:2,2
112:5,6 114:5
116:11,13,14
117:18 118:8
122:10 123:7
126:6,10,12,13
129:3,8,14
130:3 131:2,4
140:8,8,16
142:16 143:3,7
145:22 161:16
162:2,4 165:17
166:21 175:11
175:14,17
176:5,9,13,17
176:21
**pages** 48:7
142:13
**paid** 34:6 39:20
41:8,22 42:3
43:12 46:5
64:17 68:10
92:8
**Paisner** 4:13 6:5
**paper** 134:1
**paragraph**
27:18 30:4
41:3,17 42:2
48:9 85:18
86:15 87:20
97:23 100:14
101:18 102:9
103:20 104:8
110:3 112:6
123:7,23
126:20 127:5
127:18 128:3
128:21 129:16
130:2,3 131:7
**Pardon** 48:20
**part** 36:24 57:9

SUSAN THOMPSON  7/30/2020

69:3 72:2
75:21 76:12
97:20 144:10
155:15 161:20
participating
6:13
particular 115:12
135:8 147:19
162:18
parties 3:13
5:22 6:21
174:11,14
partner 8:16,17
parts 161:19
party 15:11
passage 46:10
46:15
passes 45:20
61:19 71:6
Patrick 125:8
pause 120:21
pay 77:19 78:2
payable 81:15
81:21 146:2
payment 43:13
54:24 56:2,3
78:7 88:10,16
89:2 146:17
payments 39:5
54:20 55:23
57:2 62:5
69:22 70:2,10
81:5 84:3
91:20 105:2
108:4,5 148:3
payroll 17:5
paystubs 47:5
pdf 116:11 140:16
penalizing
146:18
penalty 38:20
177:12
pending 3:16
79:3
people 59:19
114:11
percent 15:25

37:16 38:2,13
38:21,22
39:10,11 43:16
50:18,25 51:6
51:15 52:2,6,9
52:11,20 53:12
75:8,25 76:13
76:17,20 86:7
104:1,8,13,24
108:18 122:13
122:18 123:10
123:12,19 124:1
124:5,7,22
129:17,20,22
130:5 133:5,6
133:6 136:13
137:19 156:4
158:6,7,8,17,18
158:21,22
159:6,9,14,19
159:19,22
percentage
20:6 81:14,21
86:5 123:15
perform 16:18
101:13 140:23
169:13
performed 17:1
25:18 29:1
44:8 53:6 71:1
89:12 144:9
performing
93:9
period 59:12,16
66:4,21 70:18
90:19,20,20
91:15,17 92:24
106:24 107:10
126:22,25
140:23 146:11
146:22 150:25
periods 96:25
perjury 38:20
177:12
person 6:20
84:21 169:12
personal 18:18

personally
160:7
perspective
144:13
phone 24:11
phrase 97:11,13
110:20 113:1,2
113:5,12 163:4
phrased 59:6
physically 6:17
physician
169:12
picture 139:25
piece 105:8
134:1
pieces 161:6
place 60:14
places 97:6
161:11
Plaintiff 1:3 3:3
3:18 4:2 5:2
5:25 127:6
143:10 167:5
Plaintiff's 2:19
2:21,22 126:21
128:22 129:17
140:10,11
166:21 167:2
Plaintiffs 20:4,8
21:3
Plaintiffs' 20:22
21:12
play 134:3
162:18
pleading 27:25
28:3,6
please 5:21 6:8
6:24 7:21 14:3
14:22 15:4
22:25 45:2
54:1 73:6 80:5
94:4,12,22
95:15 97:23
97:24 98:13
99:24 101:18
102:6,9 103:18
103:20 105:11

106:19 108:24
109:2,19 112:6
114:6 117:19
118:20 120:17
125:23 126:3
130:1,17 131:4
137:7,12 140:9
142:20,25
145:7 146:7
161:20 175:10
175:12,16
PLIC 2:11 65:18
155:13,14
plug 131:20,24
132:4
point 28:25
44:18 45:4
56:9 58:10
71:7 76:16
82:16 94:7
99:2 103:8,8
125:25 145:17
169:15,20,25
170:9,22 171:2
points 112:23
126:2
policies 16:22
policy 13:22
24:24,24
26:21 31:5,7
43:18,25 45:8
45:16,18,25
46:6,6,19
47:15,18 48:14
48:24 49:21
56:24 57:2
61:19 65:17
68:3,4 69:25
72:3 75:1 77:8
77:8 78:13
84:5,10,14
85:15,17 88:18
89:14,17,20
90:9 92:4
93:1 96:15,16
96:16 101:22
106:21 108:21

110:13 111:21
115:2,3,4,12,17
115:18,23
116:13,16 117:7
120:10 121:2
123:13 124:13
124:14 131:24
132:2 138:14
144:14,24
149:5,19 150:2
151:9,12 154:1
155:12 157:4,7
157:19 161:2,4
161:7,9,11
163:11 167:7,9
167:12 171:23
172:1,17
portion 75:12
91:10,24
134:23 135:6
posit 159:12
position 8:14
123:18
positive 132:17
133:19 134:10
136:11 137:17
139:2
possible 19:25
134:6,7 150:6
150:10
post 133:11
post-disability
53:19 56:12,16
57:21 58:16
61:14 65:6
129:4
post-graduate
10:25
posted 151:1
potentially
133:3
practice 15:25
pre 133:10
pre-disability
46:25 49:1
50:22 51:3,5
52:20 53:7

SUSAN THOMPSON  7/30/2020

129:1
pre-injury 72:8
precisely 82:17
predominantly
  20:10 21:18
prefer 23:11
premarked 10:9
  27:3 40:21
  49:19 82:4
  94:24 109:21
  116:9 121:15
  125:6 142:18
premise 148:1
preparation
  36:7,10 37:2
  40:2 84:16,19
  84:21
prepare 69:5
  70:14 83:21
  85:5,8 106:3
  106:6,7 110:9
  149:3,10
  155:22
prepared 27:5
  31:23 34:23
  35:8,11 71:4
  81:9 82:10
  95:12 153:1,3
  153:20 155:21
  164:20 171:18
preparing 31:1
  82:14 83:17
  95:9,18 96:8
  100:2 102:2
  113:24 114:11
  152:24 153:15
  159:14
prepay 77:24
present 5:21
  6:17 80:4,16
  80:23,25
  102:11 103:22
  104:2 115:2
  116:19 146:13
  146:17 147:10
  148:5,8 153:21
  153:22

presented 10:8
  27:2 37:20
  38:25 40:20
  49:18 82:3
  94:23 109:20
  116:8 121:14
  125:5 142:17
  146:3
president 123:9
pretty 18:24
  94:10 99:7,8
prevent 126:24
  169:6,9
previous 74:23
  83:9,13
  106:22 111:21
  118:10
previously
  82:19,24
  83:12
Price 32:15 33:1
primarily 162:5
principal 1:5 3:5
  3:19 4:6 5:13
  6:2 7:13 38:12
  52:4 54:22
  67:15 84:25
  102:2 110:12
  121:17 122:4
  124:5,15
  129:23 144:9
  150:6 166:6
  168:5 175:7
  176:2
Principal's
  144:19
prior 15:19
  25:18 48:9
  49:6 54:7
  86:19 93:9
  98:8 100:22
  105:21 106:18
  119:25 128:15
  131:25 132:16
  133:3,13,17,20
  134:4,13 135:2
  135:4 136:10

137:15 138:1
  144:13,15
  145:4 146:18
  156:4,11 171:13
probability
  105:6 145:24
probably 9:4,8
  12:22 21:16
  22:2 25:25
  28:16 32:4
  56:10 169:22
problem 29:3
  35:2 149:14
procedure 15:12
procedures
  16:2,10,11,22
  16:25 17:3,8
proceed 7:10
proceeding
  6:18,23
produced 3:10
  7:12
product 22:13
  22:15 108:14
Production
  166:23
products 76:25
profession 9:12
  72:2
profit 62:1,8,9
  62:10,20,24
  63:6 150:3,5
  151:15
projection 65:5
  65:12
prompted 55:13
proof 61:23
  65:20 66:2,9
  66:19 67:3,14
  67:22 68:7,23
  69:9 88:11,17
  88:24 89:4
proper 73:19
  106:7
properly 97:3
proportional
  135:23

proposed 34:13
proposes 146:5
propounds
  148:8
prorate 107:3
provide 10:6
  27:21 67:22
  68:23 69:8
  110:21 131:19
  163:22,23
provided 9:23
  25:19 32:8,21
  33:8 39:17
  40:13,16 44:17
  68:9 81:10
  96:14 103:11
  121:21 122:14
  131:23 156:20
  160:17,20
  164:7 172:5,18
provides 46:7
  123:13 127:13
  127:24 147:5,9
providing 171:14
provision 43:18
  43:24 116:15
  116:24 117:7,21
  118:8,10,14,20
  118:25 119:12
  119:17 120:24
  121:3 157:7
  160:16 163:6
  163:23 164:9
provisions
  45:25 46:1
  93:1 157:19
public 3:14 5:5
  175:14 177:23
publicly 32:14
published 80:3
  80:16 104:1,11
pull 34:2 94:20
  100:16 108:17
  108:25 109:18
  114:5 131:3
pulled 48:6
  82:6 129:10

153:18,21
pulling 153:20
purchased
  58:25 158:16
purpose 135:15
purposes 70:3
  102:18 117:25
  139:20
pursuant 111:3
  111:21 174:6
put 10:3 23:3
  26:2 131:14
  166:13
PV 31:22

**Q**

qualification
  124:10,17 125:1
  136:6 141:7
  142:5
qualifications
  127:2 156:15
  168:22,24
  169:3
question 13:24
  14:11,12,13 15:2
  18:12 23:15
  28:23 29:15
  29:16 44:22
  45:10 63:19,21
  74:2,12,17,23
  76:7 79:3
  83:8,10 87:4
  88:21 90:7,7
  105:15,18 137:1
  137:3,12,14
  138:18 139:5
  141:25 150:1
  169:22 170:3
  170:6,13 171:21
  172:14 173:1
questioning
  94:10 109:16
questions 2:1
  7:16 93:19,22
  94:9 109:15
  114:18,21

152:11,13,16
155:9,11
160:15 170:2
171:21,22
173:3
quickly 94:11
quite 147:15
148:23
quote 96:14
98:6 101:23
101:24 102:11
103:22 104:5
110:5
quote/unquote
88:25

**R**

R 4:1
R-e-p-u-c-c-i
84:23
ran 61:6
rate 33:5 39:25
44:10,13 72:16
80:3,15 81:2
103:25 104:11
104:16,24
105:1,4 146:4
146:20 147:21
148:5,15
rates 147:3
153:22
rating 147:18
rationale 52:4
re-summarizing
129:11
reach 24:7
104:7 108:15
108:20
reaching 30:5
104:12 105:14
105:20 152:19
153:6
read 6:8 30:7,9
30:9 36:1,14
45:17 46:19
49:3,5 59:2
66:1 67:12

70:13,19 74:16
93:8 96:15
97:4 98:10
101:19 110:5,15
111:17 115:22
117:20 118:20
121:22 123:23
124:12 137:13
142:25 156:7
175:12 176:6
176:10,14,18
176:22 177:6
reading 38:4
45:16 119:17
126:16 129:19
141:1 154:1
reads 72:3
real 18:20 75:18
realize 79:2
92:13 172:12
really 10:18
20:9 46:21
63:13 65:7
79:11 93:12
126:9 157:14
163:4
reason 52:2
76:18 123:1
164:1 176:7,11
176:15,19,23
reasonable
61:10 67:23
77:11 106:1
147:22 149:16
149:22 164:4
reasonablene...
61:7
reasons 123:16
rebuttal 2:22
35:10 125:12
125:16
recalculated
75:9 145:12
recall 15:23
26:7 44:1 59:9
112:4 115:1
117:15 118:23

receipt 33:18
receive 10:21
15:8 33:24
34:12,16,19
35:1 75:12
77:18 78:1
95:8,17 96:6
152:4
received 12:9
33:19,25 34:11
35:3,19 67:16
72:20 75:17
75:25 77:20
107:14 159:23
160:14
receiving 68:24
Recess 43:4
80:11 109:10
130:22
recognition 17:6
recollection
19:19 77:4
reconcile 153:5
153:9
record 5:10
6:25 7:19,22
10:3 23:3 43:3
43:5 55:14
79:22 80:6,8
80:10,12 98:13
109:9,11 114:5
130:21,23
137:6 170:2
173:10
recorded 5:11
173:9
records 62:4
93:9
recreate 151:5
redo 52:25
reduce 133:9
reduced 54:18
174:8
reduction
80:25
refer 18:13
reference 104:8

113:6
referenced
107:19
referencing
41:4
referred 41:12
54:14
referring 34:10
36:23 48:2
85:20 89:20
100:23 108:19
120:25 122:8
161:9
refers 49:4
reflect 20:16
21:11 80:6,7
123:21 158:21
reflected 17:20
22:6 30:21
39:6 50:17
52:5 158:11
159:15,15
reflects 58:3
refresh 19:19
refreshed 77:3
regard 15:21
16:18 27:17,17
31:13 32:7
50:12,13 53:18
54:7 57:20
58:18 64:21
65:5 82:14
83:17 89:24
98:11 103:13
110:19 139:19
156:10,11
160:13 161:1
regarding 18:22
28:17 113:17
143:22
regular 162:23
rehab 169:12
reiterating
143:4
related 11:23
49:9 75:2
110:11 174:10

relating 68:3
relationship
161:3
relationships
128:12
relative 174:12
relevant 116:22
140:2 143:9,14
reliable 149:15
relied 49:5 61:8
162:5
relying 44:16
147:21 166:14
remainder
142:20
remaining 41:8
remember
23:24 34:7
35:2 82:13,13
119:7 120:21
reminded
34:24
Remington 8:1
remotely 3:13
6:12,19,21
removed 54:23
render 157:6
177:9
rendering 33:17
repeat 11:5 73:6
137:12 158:14
rephrase 76:8
113:3
replaced 54:24
54:25
replacement
135:17,23
139:16
replicate 60:20
replicated
60:13 70:25
report 2:13,14,15
2:17,21,22
17:11 25:8,10,11
25:16 26:4,8
26:22,24
27:5 30:7,22

31:2 34:22,25
35:3,20,25
36:4,6,13,15
36:21 40:3,13
40:14,17 41:2
48:5 54:11
56:5,6 75:9
81:9 82:7,10
82:15,23,24
83:4,10,12,13
83:18 84:16,19
84:22 85:13
86:19,21 87:17
92:13 94:17,17
94:21 95:2,9
95:12,19 96:8
97:11 100:2,6
100:8 102:3,4
102:11,14,19
103:22 104:15
104:23 108:11
108:12 109:2
109:24 110:6
111:3,9 113:3,4
113:12,21,22
113:23,24,25
114:6,11 115:19
116:20 120:9
125:8,12,13,13
125:16,16,19
129:20 142:12
142:20,25
143:12 147:2
149:6 153:24
164:17,20
165:9,10 168:7
171:18
**reported** 117:24
145:20
**reporter** 3:15
4:16 5:5 6:8
6:10,11 74:16
137:13 174:1,2
174:3,21
**reporter's** 5:18
**reporting** 6:18
106:14,15

**reports** 36:12,14
113:18 125:21
**represent** 5:23
93:25 155:16
158:2
**representation**
44:16
**representative**
65:23
**represented**
9:13 99:1
**Repucci** 84:23
84:24 95:16
**request** 74:5
166:23
**requested** 66:3
66:20 67:15
68:8
**required** 11:9
67:5,23 68:8
106:8 108:21
**requirement**
66:9,18
**requirements**
46:12 65:24
67:22 88:12
88:17,25 89:5
144:6
**requires** 119:6
**reread** 74:12
81:16
**research** 155:2
**reserved** 5:7
**residual** 97:6
116:24 117:7
131:6,10 132:5
135:1,2,20,25
140:1 141:10,15
142:3 150:8,11
151:13 155:15
155:17 156:1
**residually** 141:21
**respect** 112:2
113:23 137:7
**respond** 11:4
**response** 45:1
74:25 120:5

**Responses**
166:21
**responsibility**
69:19
**rest** 69:17
**restate** 95:15
172:15
**result** 123:18
128:5 136:2
**resulted** 160:4
**results** 138:22
138:23 139:15
**resume** 20:20
30:17 99:17
**retained** 17:18
17:24 18:2,11
19:1,4,22 20:3
20:17,21
22:22 24:5
118:24 122:13
**retentions**
17:20 18:5
20:7,8,22,23
21:12,13
**retirement**
104:21
**return** 31:14
38:25 50:9
57:15,16,24
58:4,15 60:17
62:13,14,17
69:11 70:13,19
99:6 100:25
105:25 106:12
106:20 122:11
145:20 167:18
167:25 169:1
170:17,18
175:16
**returning** 128:10
**returns** 31:17,19
37:13,14,21
38:19,19 39:5
39:7 47:4,7,13
50:13,14,17
51:24 57:18
57:23 98:25

100:10 107:14
149:7,17
150:16 151:22
152:6 153:19
156:13,17,20
156:24 158:1
160:11 163:25
169:17
**revenue** 17:6
52:3 98:19
128:13 159:14
162:11
**revenues** 75:7
162:15,16
163:3 164:5
**review** 26:17,19
36:7,17,21,24
96:16 125:23
126:1 144:12
**reviewed** 26:20
36:9,12 47:12
50:8 107:19
115:12 116:19
117:15 118:24
121:18 125:11
139:7 141:21
**rid** 59:19
**rider** 83:23
86:3 92:3,6
110:12,20,22
111:5,14,21
112:3,17
135:20 155:15
**riders** 115:18
161:7
**ridiculous**
136:23 137:1,4
**right** 9:25 10:22
25:14 27:25
48:11,13 50:4
51:23 55:4
57:17,25
58:19 67:10
72:2 73:3,11
74:20 76:19
78:25 79:12
79:25 83:7

85:18 86:23
87:22,23
90:11 94:5
96:1 100:16
106:24 107:15
107:21 109:5
111:6 113:9
115:8,13,19,23
116:4,7,16,20
116:24 118:1,11
118:16 119:8,13
120:11,14 121:1
121:3,19,23
122:1,4,8,17
123:2 124:2,8
124:15,24
125:11,13,21
126:7 130:14
131:5,10,15,16
132:6 133:4
134:6,11,16,25
135:17 138:10
138:16,24
139:4,9,16
140:4 141:5,11
142:2 144:20
147:7 151:16
151:24 159:20
161:18 170:2,11
170:13
**risks** 102:20
104:14,20,22
**Robert** 1:2 3:2
3:18 5:13 31:5
37:15 38:3,21
39:10 50:12,16
50:19 51:1,14
52:5,8,11,21
53:12 110:10
117:4 118:15
122:11,18
123:11 127:8
128:23 166:5
166:16 167:5
167:18 168:1
175:7 176:2
**role** 12:6 13:19

SUSAN THOMPSON  7/30/2020

13:21 14:13
123:9
ropes 59:6
roster 59:24
Roth 1:6,6 3:6,6
3:19,20 4:11
6:6,6 93:25
94:1 166:6,7
166:22 167:3
175:7,8 176:2
176:3
Roth's 166:23
167:4
roughly 9:5
23:22 143:25
146:11
RPG78EXPERT
2:16
RSMo 174:6
Rule 144:2,6
run 46:22
running 87:13

————————
S
————————
S 4:1 167:25
sales 39:12
52:3 58:23
59:11,18 60:5
62:6,11,21
63:2,12 64:1,4
64:5,13 72:11
72:12,16 75:13
76:17,21 81:17
81:18 122:23
123:10,12,19
124:1 127:9
128:25 129:4
129:18 158:6,7
158:16,20
169:18 170:17
Sales' 53:21
62:17 64:7
75:7 124:6,23
129:21
Salina 59:5
San 4:4 175:6
satisfy 141:4

Saundra 1:11
3:14 4:17 5:4
5:18 6:10
74:14 174:2
175:23
saw 20:17 38:6
170:18 171:12
saying 34:5
36:15 38:11
52:10 73:10
74:19 134:20
137:1 139:1
149:2 150:10
169:5,5,7
says 7:14 18:14
42:2 49:23
65:19,22 66:2
81:14,21 86:16
86:20 88:1,7
96:13 101:20
102:11 106:21
126:20 127:6
127:18 128:3
135:8 140:21
143:15,21
144:3 146:4
149:19 155:17
156:1 166:1,4
166:15,21
Schedule 54:4
57:14 81:13,17
81:20 86:20
86:20 87:12
87:17 88:7
90:16 104:3
106:19
schedules
25:19 26:6,9
31:22,23
85:10 144:1
155:22
school 11:2
science 15:9
scope 16:13
screen 9:25
98:1
scroll 10:14 27:8

30:16
scrolling 141:19
sec 29:21
second 23:8
57:6 71:23
72:10,19,20
84:20 103:18
123:7 126:5
127:17 130:2,3
130:13,17
section 48:4,4
116:12 117:21
162:19 165:25
174:6
see 20:21 27:19
27:20 30:4
36:22 41:4
43:17,24
49:22 50:9
65:19,22 66:6
67:6,10,24
68:5 74:4
81:16 96:11,12
96:12 97:25
99:20 102:5
105:10 107:5
108:23 109:3
116:12 119:18
124:13 155:17
155:18 156:5
165:25 166:11
166:11,12
168:22,25
seeing 44:1
126:10
seen 34:22
41:14 49:25
53:5 77:2
148:17 169:16
send 66:2,19
114:16
sense 129:2
138:15,24
139:13
sent 108:3
sentence 66:16
66:23

separate 83:21
160:3
September
41:22
serves 135:16
137:2
services 4:17,21
5:20 39:15
175:1
set 85:10 101:22
173:5
seven 27:18
114:5 129:8,8
129:14 130:3
share 76:13
129:17 162:10
162:16 163:3
shared 10:5
83:12
shareholder
50:19 158:17
158:18
sharing 10:1
sheet 147:2
176:1
sheets 63:5
175:11,13,16
shorthand 5:4,5
174:3
shortly 24:2
show 21:16
showing 86:12
96:1
shown 99:13
100:25 148:19
shows 63:25
sick 169:21
170:7,14
sickness 140:22
156:3 157:13
157:24 158:3
158:12 159:17
160:5
side 20:12,17
20:20 21:18
38:7
sign 175:13

signal 94:3
signature 5:7
96:1,2 114:8
153:2 175:11,13
175:17 176:25
signatures
152:25
significantly
159:8 164:19
similar 16:14
72:11
simple 170:3,5
simplistic 90:15
simply 19:23
60:20 106:16
111:4 121:6
131:8 138:15
144:18 153:7
156:12
Sincerely
175:20
single 66:10
68:23 163:16
163:17 170:4
sit 59:9 119:17
situation 94:13
97:3 99:10
139:14
six 27:18 48:8
81:10 170:6
skew 139:21
skewed 21:5
138:22
skews 139:3
slice 107:8
slightly 129:5
slow 154:10
small 106:2
150:4
smaller 106:13
Smith 2:22
34:25 35:24
36:3,12,14
125:8 142:12
148:8 164:18
168:21
Smith's 35:3

SUSAN THOMPSON  7/30/2020

36:6,21 164:17
165:9
solely 8:25 9:4
123:14 140:22
156:2 157:12
157:24 158:3
159:16 160:4
somebody 13:17
168:25
someone's
138:9
somewhat
70:17
sorry 7:20 8:3
11:5 13:10
14:20 19:3
24:20 25:14
25:16 28:1
29:2 30:3,13
35:1 39:2 41:2
62:19 68:16
73:6 74:15
79:2 87:10,25
88:14,22 89:3
93:4 94:8
103:3 108:8
108:25 110:18
116:5,11 120:4
120:6,19 137:4
138:19 158:14
160:1 164:3
165:6 167:8,14
172:12,14
sort 135:23
sorts 131:15
sound 147:6,9
sounded 14:4
sounds 67:20
77:11
source 106:12
149:16
speak 37:1,4,6
speaking 111:15
133:15 135:16
164:3
specific 16:18,19
16:19,24 33:2

48:2 56:25
75:2 89:23,24
161:1
specifically
17:10 28:14
49:6 77:6
101:20
specifies 118:8
specify 23:12
speculation
20:25 25:3
29:7,25 44:15
63:15,22
72:23 73:18
74:7 77:22
158:24
speculative
68:12 71:25
spends 128:11
split 20:7,22
21:11 158:22
spoke 130:15
SSS 2:6
St 175:18
staff 84:7,8,15
95:12 96:23
114:1,11
stamped 109:3
116:12
stance 51:12
stand 116:6
standard 45:5
standing 11:16
standpoint 51:17
51:18 124:21
154:16
start 26:9 45:4
46:4 84:3
85:14,23 86:11
86:13,13,14
87:15 88:2
90:10 92:1,16
94:16 116:13,14
126:13
started 59:3
85:19 87:12,14
92:15 106:20

153:13
starting 53:20
65:7 78:13,17
97:9 128:12
state 7:19,21
11:12 18:2,8
153:24 174:22
177:1
stated 87:16
102:14
statement
61:24 62:2,4
62:8,9,18 73:1
102:18 127:14
128:2
statements
61:22,23 62:11
62:21,25 63:2
63:6 106:4
150:3,6 151:16
states 1:1 3:1,15
5:15 56:6
117:22 122:10
123:8 143:8
143:23
stating 6:25
statutory 86:6
step 79:24
stepped 153:12
steps 16:18
stipulate 7:1
stipulated 5:1
7:4,6,8
stipulation 6:8
10:1
stop 27:11 45:3
129:13
stopped 143:3
straight 81:2
stream 39:4,9
69:22 70:2,10
75:24 76:4,20
81:5 84:2
88:10,16 89:1
98:19 139:2
Street 4:4,9,13
4:18,22 31:20

49:10,11,11
98:11,16,24
99:5 100:25
113:17 119:23
130:5,8,12
132:10,21
139:8 145:15
162:17 175:5
175:18
strike 15:4 96:9
100:12 111:12
122:9 125:13
142:24 151:11
struck 19:15
stuff 120:20
stupid 88:20
submission
110:9
submit 66:9
submitted 67:3
110:7
subscribe 177:11
substance
37:22 177:8
substantial
132:20 139:9
139:13 140:24
substantially
84:15
substantiate
127:25
subtracted
133:17
suddenly 72:20
sued 15:14
sufficient 143:9
143:13
suggest 73:10
74:19 124:14
suggested 33:11
suggests 136:12
137:18
Suite 4:4,9,13
175:5
sum 37:21
summarizing
164:18

supervision
162:13
supplement
102:17
supplemental
2:15,17 35:8
40:14 81:8
82:7,23 85:12
86:21 87:17
92:13 94:17
97:11 108:12
109:24 110:10
113:23,25
125:20
supplements
136:1
support 8:13
9:2
supposed 84:3
131:20 134:24
146:9,12
sure 10:15 12:20
16:20 20:1,18
22:14 26:9
28:9 37:17
42:24 54:14
54:17 55:2,25
70:1 92:19,20
97:5,7 112:22
129:15 134:8
153:25 161:17
168:7
survey 32:11
Susan 1:8 3:9
5:3,12 7:11,23
14:20 43:7
79:14,20,23
114:22 120:20
142:19,24
173:9 175:10
176:1 177:5,20
suspected 18:15
sustainable
127:10,15
swear 6:9 7:2
sworn 3:10 7:12
174:6

SUSAN THOMPSON  7/30/2020

synonymous
113:1

**T**
T-Bill 147:1,22
tables 81:4
take 9:19 19:17
 27:1 30:11 31:4
 42:17 49:17
 64:23 79:10
 79:12,14,14,16
 79:19,25 80:6
 81:8 109:4
 120:21 126:7
 127:11,15
 130:15,17,18
 131:3 135:6
 161:14
taken 1:9 5:4
 6:12 79:16
 132:20 174:7
 174:12 175:10
 176:3
takes 70:12
talk 40:25 48:9
 55:5,8 62:19
 76:4 82:1
 155:12 168:4
talked 24:13
 37:13,23 54:5
 54:8 76:23
 94:16 98:3
 100:9 104:14
 107:11 109:23
 113:20 114:22
 119:23 120:9
 120:23 121:23
 122:2 132:10
 149:2,4 162:17
talking 21:7,9
 35:16 38:9
 40:23 51:8
 57:21 78:18
 83:4,6 100:14
 108:16 120:18
 129:1 144:5
 149:12

talks 162:6,10
task 25:1 69:15
 69:16,19
tasked 69:3
tax 26:20,20
 31:18,19 37:13
 37:14,20
 38:19,19,25
 39:5,6 47:3,7
 47:12 50:8,13
 50:14,17 51:17
 51:24 57:15,16
 57:18,23,23
 57:24 58:4,15
 60:17 62:12,14
 62:17 69:10
 70:13,19
 98:25 99:6,10
 100:10,11,25
 105:25 106:11
 107:14 117:24
 122:11,21
 139:20 144:14
 145:20 149:7
 149:12,13,17
 150:16,19
 151:22,24
 152:5 153:19
 156:12,16,20
 156:24 158:1
 160:11 162:22
 163:25 167:18
 167:25 169:1
 169:17 170:16
 170:18
taxes 58:10,13
telephone 8:4
tell 10:18 17:9
 18:13 24:18
 27:6 34:2 54:1
 83:20 84:2
 94:8 98:13
 99:2 106:19
 121:1 122:2
 128:17 151:3
 162:7 169:13
Telling 41:14

ten 41:17 143:7
 147:4
ten-minute 80:7
 130:19
ten-year 33:4
 80:2 103:25
 104:10
tend 23:10
term 12:19 13:12
 22:17,20 77:5
 119:18 120:10
 132:1 161:5
terminations
 18:19
terminology
 24:21 161:2
terms 7:1 71:9
 77:6 131:25
 141:3
testified 19:12
 101:3 111:12
 113:7 122:16,21
 150:4 152:18
 168:21
testify 19:24
 40:8
testifying 17:24
testimony 18:6
 40:6 54:7 71:3
 73:5,17 112:20
 153:11 157:16
 160:23 164:18
 164:23 169:3
 171:16 174:5,7
texts 143:5
thank 43:1 93:18
 93:20 94:14
 96:5 98:20
 99:24 101:18
 105:10 109:1,7
 109:13,14
 114:16 145:7
 168:20 173:6
thanks 155:6,9
thereon 177:10
thereto 174:14
thing 61:3 75:18

101:16 108:9
 143:6
things 12:22
 16:23,24 19:11
 19:11 34:3 51:11
 53:1 73:15
 90:23 91:1
 94:19 119:3
 159:5,11
 172:22
think 8:24 9:5
 13:19 16:3,5
 16:20 18:3,24
 19:10,20
 20:10 21:5
 22:18 25:13
 33:23 34:6,13
 34:18 35:4
 47:2,4,4 48:7
 48:18 51:22
 53:24 55:22
 59:2 75:5
 77:5 84:13
 90:14,16 93:2
 93:4 94:15
 95:13 97:1
 99:18 100:15
 102:8 105:25
 107:16 108:2,3
 109:1 111:23
 121:2 126:12
 126:15 127:20
 127:22 128:7
 128:8 129:3
 130:15 133:23
 144:5,6,22
 147:1,16,17
 148:5,22
 149:4,15,20,21
 151:19 152:8
 162:20 163:24
 164:12 165:12
 166:19 167:6
 167:23 169:11
 172:13
thinking 79:1
third 128:21

129:16
Thirty-four
 140:14
Thompson 1:8
 2:12,13,14,15
 2:17,21 3:9 5:4
 5:12 7:11,23
 10:11 14:8 15:1
 42:19 74:1,10
 93:23 95:1
 96:13 99:21
 109:14,22
 110:4 114:14
 117:10 143:22
 152:17 164:25
 173:9 175:10
 176:1 177:5,20
thought 37:7,11
 39:2 61:9
 62:19 107:8
thoughts 38:16
 148:4
thousand
 134:20 136:15
 137:22 138:2
three 21:3
 67:22 110:2
 123:7 126:12
 140:15 165:9
 165:17
three-second
 120:21
threw 139:20
throat 42:22
throw 147:17
throwing 139:2
 147:17
ticked 36:23
tied 36:23
time 5:11 9:1
 37:8 45:20
 46:9,15 52:25
 57:6 58:9,20
 59:12 60:22
 61:19 66:10
 72:17 85:3
 88:14,21 106:5

SUSAN THOMPSON  7/30/2020

112:1 118:24
120:17 126:7
128:11 131:3
150:25 163:14
170:22
timeframe 63:3
times 17:17
21:23 56:25
111:20 135:7,11
164:13 169:22
170:6,14
172:10
timing 37:7 69:1
Tippins 1:11 3:14
4:17 5:5,18
6:11 174:2
175:23
today 6:13 9:14
14:13 36:8,10
78:20 114:23
119:17 122:16
122:21
Today's 5:10
told 38:11 41:21
43:22 44:5,10
46:21 47:20
55:11 62:16
81:19 88:23
97:10 98:15,21
112:17,18 113:8
153:7 154:7,9
154:18 160:8
160:10,13
167:7,9,12
top 96:13
total 104:2
126:22 140:17
140:21 141:5
totally 70:5
75:4 109:6
156:2 157:12
training 12:1,5,9
13:2 15:8
transaction
150:25
transactions
16:20 150:22

transcribed 5:6
transcript 175:13
transcripts
34:20 93:9
transition 127:7
travel 40:10
treasure 33:4
treasury 80:2
80:15 103:25
104:10 146:6
treated 37:18,19
38:2,24 51:16
treating 38:14
triangulate
161:5
trick 14:11
triers 12:24
true 25:25 29:11
72:24 74:25
91:8 123:2
126:18 128:9
128:19 136:14
137:20 144:19
145:11 146:1
151:19 152:1
163:9 177:9,13
trust 18:23
truth 29:4,18
try 74:4 94:10
trying 16:19
24:20 27:12
73:8 74:17
147:14,17
154:22
Tuesday 35:4
35:13,14,18
turn 32:1,2
two 21:2 50:23
66:2 93:14
122:10 143:8
143:23 147:5
149:20 157:12
161:19
type 16:13 72:7
72:7
types 8:19,20
12:17 13:4

16:20 18:16,21
18:21 73:15
115:10 147:12
150:22
typewriting 5:6
174:9
Typically 146:9
typo 41:20
42:13 86:24

_____

**U**

U.S 3:17 32:15
32:25 80:1,14
103:24 104:9
167:17,25
uh-huh 41:13
49:13 65:25
98:2 134:21
150:12
unable 23:4
127:6 128:4
140:23
unaware 65:1,2
uncertain 105:8
145:25
unclear 143:21
underlying
36:18,22,25
understand
27:24 28:1,2
43:11 45:10
48:21 58:21
58:25 59:10
59:18,23
61:25 63:3
66:16,17,23
67:1 69:5 73:9
74:17 77:7,15
83:8 88:21
105:15,17
125:15 129:6
138:18 143:21
154:22 156:17
167:11 171:20
understanding
6:16 28:23
45:19 51:14

61:18,21 75:1
97:12,18 98:6
98:23 99:9
100:20 107:23
112:22 153:25
154:1,3 155:1,3
158:4 161:13
understands
144:7
understood
19:14,14 37:17
55:25
underwriting
168:6,14
unemployment
102:22 104:21
105:7 145:24
unfair 148:9
unfairly 146:24
unilaterally
79:16
unintelligible
23:14
United 1:1 3:1
5:15
University 10:23
unprofessional
70:6
unreimbursed
162:20
unstated 144:4
unsure 13:8
update 40:17
updated 10:15
110:7
uphold 74:5
usage 32:23
use 24:20 47:6
47:10,11 56:16
57:3,7,8,10
61:16 78:3
79:18 80:22
81:4,19 89:24
90:5 94:4
104:16 105:1
106:22 107:9
113:2 131:9

144:23,24
146:16,19
147:14 148:7
149:16,19
150:19 162:3
165:23,24
useful 106:5
uses 113:4,12
usually 23:12
32:1 58:3
106:12 157:6

_____

**V**

v 175:7 176:2
vague 12:11,18
13:9,10,11 14:21
22:19 119:12
120:10,24
121:8 140:3
vagueness
23:13
valid 157:19
value 80:4,17
80:23,25
101:21 102:11
103:22 104:2
115:2 116:19
146:13,17
147:10 148:5,8
153:21,22
varies 21:17
various 8:19
13:4 18:16
26:20 143:5
161:6
vast 18:5
verbally 6:25
verify 122:12
version 10:16
25:11
versus 5:13
20:11 24:23
166:6
video 5:11 173:8
Videographer
4:20 5:9 6:7
7:9 30:13 43:2

SUSAN THOMPSON  7/30/2020

43:5 80:9,12
109:8,11 116:5
130:20,23
140:10,14
141:16 165:6
173:8
**VIDEOTAPED**
1:8 3:9
**view** 166:3
**voc** 169:12
**volume** 64:4
**vs** 1:4 3:4

**W**

**W-2** 47:10,11
53:22 57:3,8
57:10,12 81:18
81:19 107:17
**W-2s** 31:10 47:1
**wage-an-hour**
18:20
**wages** 54:4
57:14
**wait** 57:6 63:18
117:11 131:3
150:15 151:21
**waiting** 172:13
**waive** 6:22
**walk** 97:17 134:1
**want** 17:10,11
22:5 47:8
51:10 52:19
58:2 79:12
80:7 90:24
90:24 92:20
94:2,5,15
95:6,7,25
97:17,17 98:4
99:25 100:17
101:15,16
102:19 109:16
109:16 112:7
114:23 146:12
**wanted** 43:8
54:13,16 55:2
97:19,20
108:9 109:25

160:19
**warning** 73:20
137:2
**wasn't** 13:25
29:14,15 33:8
44:21 53:11
92:19
**wave** 94:6
**way** 10:5 16:22
21:6 38:15
51:16 72:3
92:11 99:2
107:7 117:20
122:8 129:24
147:8 151:9,12
160:8 171:17
**ways** 164:13
**we'll** 45:3
52:25 102:16
102:16 108:12
109:15 116:12
116:14 120:22
142:12,14
**we're** 35:16
57:20 76:8
79:21,22
86:12 90:17
107:5 117:20
125:24 133:5
140:13,17
147:24 149:12
173:10
**we've** 40:12
114:22 115:7
118:10 136:9
137:14 141:20
142:7 148:23
148:23 149:4
163:24
**web** 32:25 33:1
59:11,14
**Wedmeyer** 4:4
175:5
**week** 35:14
59:5
**Welborn** 37:11
38:2,13,23

39:11 50:14,15
51:15 52:2,10
53:20 58:22
59:11,18 60:5
62:6,11,15,15
62:17,21 63:2
63:12 64:1,5,7
64:13 72:11,12
72:16 75:7,12
76:17 81:17,18
122:23 123:9
123:12,19 124:1
124:5,23
127:9 128:25
129:4,18,21
158:6,7,16,20
169:18 170:17
171:6
**welcome** 94:15
**went** 10:22
20:16 37:8
54:18 76:22
136:14 137:21
151:3 164:14
172:16
**weren't** 37:14
144:18
**West** 4:9
**whatsoever**
127:13
**white** 18:16
**widely** 147:11,12
147:15 149:22
**wife** 37:12 50:10
50:24 59:6
122:22 158:6
**wild** 75:19,20
**wildly** 75:7
**Wilson** 4:8 6:2
**witness** 5:7 6:9
6:14,17 7:2
10:9 14:2
15:20 17:18
23:5 27:3
40:21 42:21
43:1,9 49:19
73:22,25

80:6 82:4
86:1 94:24
109:21 116:9
118:22,25
121:15 125:6,8
126:4 142:18
169:21,25
170:15 173:11
174:4,7 175:12
176:1,25
**witness'** 71:3
73:5,17 112:20
153:11 157:16
**word** 120:8
164:8 170:4
**wording** 75:2
**words** 104:18
104:20 112:16
138:6,20
151:20
**work** 7:25 8:19
16:1,8 20:10
21:17 40:4,5
72:3,4,8 127:7
127:19,22
128:4,5,7,10
150:22 161:2
168:23
**worked** 12:22
12:25,25 18:17
18:18 58:22
114:1
**workforce**
105:7 140:20
142:1 145:25
**working** 9:16
59:3 72:1
135:24 140:25
141:4,11 168:22
169:1 170:21
171:1
**works** 69:17
77:17 155:3
**wouldn't** 50:15
96:15 132:23
139:13 159:17
168:21

**wrap** 94:10
142:12
**writing** 26:2
**written** 138:14
150:2 151:9,12
**wrong** 72:19
75:6,13 76:11
87:23 88:2
129:7 146:21
148:12
**wrongful** 18:18
18:19

**X**

**Y**

**yeah** 12:20 21:9
27:15 28:16
30:9,10 55:18
65:18 69:25
75:8 79:4
86:18 91:7
98:2 102:8
105:19 116:14
120:19 133:25
134:22 135:1
141:18 161:18
167:23 172:10
172:22
**year** 20:9 21:2
21:2,3 57:20
58:18,22 67:4
75:8 78:18,20
106:25 122:15
130:11 136:15
136:16 137:22
137:23 138:1,3
138:5 146:17
146:18,20
147:4,4,4,15
148:25 151:24
152:6 168:2
**yearend** 106:10
149:11 150:16
150:19 151:1
151:22
**years** 8:21,25

SUSAN THOMPSON  7/30/2020

9:6 12:22
93:14 128:17
146:14 147:8
149:20 167:19
**yesterday**
33:25 34:11
37:5 39:23
51:8 52:17
**yield** 33:4 80:2
80:15 103:25
104:10 146:6

---

**Z**
**zero** 142:2
**Zoom** 4:3,7,12
4:17,21 5:17
6:14,15 120:20

---

**0**

---

**1**
**1** 2:11 41:25
86:20,20
87:12,17 88:7
90:16 104:3
**1,205,453** 104:4
**1,293,377**
102:13 143:11
**1.29** 143:25
**1.33** 104:1,8,13
104:24
**1:01** 173:9,12
**10** 2:12 145:18
158:6,8,17,21
159:6,14,19,19
159:22 167:5
**10/1** 42:10,11
**10/1/2018** 41:19
56:6 85:19,23
86:16 88:2
**10/12** 87:16
92:20
**10/12/17** 88:8
92:16,18
**10/12/2017** 88:6
**10/21/2017**
86:15 87:1

**10/27** 87:10
**10/27/2017** 87:7
**10/31/2017**
86:13
**10:39** 80:10
**10:43** 80:13
**100** 38:13
122:13 123:10
123:19 124:5
124:22 129:22
**100,000** 132:18
134:5,13,15
136:10 137:16
**1040** 167:17
**109** 2:17
**11** 145:22 175:3
**11:24** 109:9
**11:30** 109:12
**11:58** 130:21
**1120S** 167:24
**1125-E** 122:14
**114** 2:4
**116** 2:21
**11th** 175:18
**12** 65:17 106:16
106:22 126:13
129:8,9,10,14
130:4 145:18
145:22 149:17
149:20
**12-month**
106:24 107:10
**12/13/19** 32:11
**12:03** 130:24
**1200** 4:13
**121** 2:20
**125** 2:22
**126** 2:12 9:19
10:9 19:17
30:3
**127** 2:13 27:1,3
30:3 40:12,18
**128** 2:14 40:19
40:21 48:7
**129** 2:15 82:4,6
**13** 100:14
**14** 131:7 166:16

**15** 25:17 57:18
65:18 95:2
110:7 143:12
**155** 2:5
**16** 48:9 57:18
97:23 100:16
**1608** 4:18,22
**17** 57:19 87:3
**179** 145:11
**18** 43:16 57:19
86:7 87:4
**1808** 4:4 175:5
**19** 9:6 41:4 42:1
54:21
**191** 139:19
**191st** 31:20,25
32:5 49:9,11,11
98:11,16,24
99:5 100:25
113:17 119:23
130:5,8,12
132:10,20
139:8 145:14
154:10 162:17
163:20
**19th** 121:17
**1st** 85:23

---

**2**
**2** 2:11,19 49:17
49:19 65:17
121:13,15
155:13,14
161:15 165:11
**2.2** 108:13,15
**2.22** 108:18
**2/26/2020**
33:5
**2:19-CV-0235...**
1:4 3:4 5:14
**20** 9:9 83:5
146:14,17
147:4,7,15
156:4 177:15
**20-year** 146:5,11
**2001** 9:5
**2015** 31:13

110:14 122:12
167:19
**2016** 31:17 49:9
106:20,25
**2017** 106:25
107:4
**2018** 31:10,19
41:8,24 42:3
43:14 53:20
56:14,21 57:4
57:7,12,12,17
57:22,24 58:4
58:10,18,21
59:1,4 60:5,17
63:12 64:2
69:10 81:17,24
85:24 108:6
122:12 123:22
167:19 168:2
170:17
**2019** 31:11 56:12
56:17 57:3,3,5
57:8,10,13,21
57:25 58:4,5
58:6,8,11,13,16
60:14,16 61:23
62:11,17,22,24
63:4,9,11 64:1
64:5,8,18
81:15,18,21,22
85:23 107:14
166:8,17
**2020** 1:10 3:11
5:10 23:23
24:2 25:9,17
41:4 56:7
64:17 77:14
80:3,16 83:2
86:7 95:2
102:13 103:24
104:1,3 107:21
110:7,8 121:17
125:9 143:12
166:24 167:5
175:3,10 176:3
**2021** 65:7,8
70:18

**2039** 61:4,14
70:19 71:7
81:15,22
**214** 4:4 175:5
**22nd** 80:3,16
**24** 82:23 110:8
**24th** 25:8
**25** 8:23
**26** 104:1 144:2,6
**27** 2:13
**28th** 35:16,17
**29** 102:13
103:24 104:3

---

**3**
**3** 2:21 25:1,5
81:13,20
106:19 116:2,9
131:2 140:11
165:4
**30** 1:10 12:22
22:3 24:2
77:14 78:13,17
125:9 168:8
175:10,17
176:3
**30th** 3:10 5:10
78:19
**31** 86:7 103:20
116:13,14 166:7
**31st** 123:22
**32** 102:9 116:11
**34** 140:8,16
155:14,14
**3800** 4:9,13

---

**4**
**4** 2:22 125:4,6
140:11 142:15
142:18 165:13
165:14
**40** 2:14 130:5
**400** 40:1,2
**49** 2:11
**492.010** 174:6

---

**5**

SUSAN THOMPSON  7/30/2020

**5** 134:16,19
 135:11,14
**50** 22:1 38:22
 39:11 50:25
 51:6 52:20
 75:8,25 76:13
 76:20 123:12
 124:1,7 129:17
 129:20 136:13
 137:19 159:9
**50,000** 132:21
 134:11,14,17,19
 136:11,15
 137:18,23
 138:3
**50/50** 21:11,16
 37:12,14 51:20
 122:23 159:19
**500** 134:16
**548** 2:16 94:21
 94:24
**549** 108:25
**55** 4:9
**550** 2:17 108:25
 109:19,21
**559)440-0575**
 8:5
**57** 141:19

**6**
**6** 110:14
**6/19/20** 2:19
**60603** 4:9
**63101** 175:18
**64105** 4:14
**64108** 4:18,22
**65** 71:9 91:8
 97:2 105:3,4
 146:2 148:3

**7**
**7** 2:2 37:8
 166:24
**7/12** 92:20
**7/12/17** 92:14
**7/31/2020** 41:19
 86:17 87:8

 88:2
**711** 175:17
**75** 133:5,6
**7541** 7:25
**7881467** 31:6
 110:13

**8**
**8,000** 86:4
 90:3
**8:57** 1:13 5:11
**80** 101:17
**82** 2:15 96:11
**83** 97:23 100:16
**85** 133:6
**86** 95:5 102:8
**89** 102:8

**9**
**9** 37:8
**9:46** 43:3
**9:54** 43:6
**90** 66:4,20
 96:25 158:7
 158:18,22
 159:19
**93** 2:3
**94** 2:16
**94129** 4:4 175:6
**97** 99:18