In the United States District Court
for the District of Kansas

———————

Case No. 19-cv-02354-TC-KGG

———————

ROBERT P. GARVER,

*Plaintiff*

v.

THE ROTH COMPANIES, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Plaintiff Robert Garver filed suit against The Roth Companies, an insurance brokerage firm through which he purchased a disability policy, and against his individual broker, Duane Roth. The Roth Defendants have filed a motion for summary judgment on all of Garver's claims. Doc. 120. For the following reasons, that motion is granted in part and denied in part.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

## B

Plaintiff Garver was a builder/contractor who purchased disability insurance from Principal Life Insurance Company,[1] via the Roth Defendants. Doc. 121 at ¶¶ 1, 3–4; Doc. 127 at 2, ¶¶ 1, 3–4. This dispute arises from the apparent mismatch between the type and amount of coverage that Garver believed he purchased and what he actually obtained. *See* Doc. 109 at ¶ 3.

**1.** During the insurance-buying process, Duane Roth told Garver that he would qualify for insurance that, in the event of disability, would provide $7,000 per month in benefits. Doc. 121 at ¶ 4; Doc. 127 at 2, ¶ 4; *see* Doc. 127 at 7, ¶ 8; Doc. 141 at ¶ 8 (controverting in irrelevant part).[2] Roth and Garver discussed a policy that would continue

---

[1] Principal Life has been dismissed from this case. Doc. 155.

[2] Although the basic fact—that Roth and Garver discussed a $7,000 benefit amount—is not in dispute, the parties present different views about the certitude of those statements. That dispute is not ultimately relevant but, even if it were, it would be viewed in the light most favorable to nonmovant Garver. *Allen*, 119 F.3d at 839–40.

coverage in the event that Garver could not resume his predisability occupation but did begin some other type of work. Doc. 121 at ¶¶ 7–9; Doc. 127 at 2, ¶¶ 7–9.

The parties dispute what Roth intended to convey, and what Garver understood, about the nature of this coverage. Garver claims that he was trying to purchase coverage known in the industry as "own occupation" coverage, or coverage that would continue to pay Garver's entire disability benefit unless and until he was able to return to work in his own occupation—regardless of whether he began working in another field and regardless of what his new wages were. *See* Doc. 127 at 2, ¶¶ 6–9. What Garver actually purchased was "residual disability" coverage, or coverage that would continue to pay disability benefits unless and until Garver returned to work in his own field—*but* would decrease those benefits by a certain percentage based on any new wages that Garver began to earn in another occupation. Doc. 121 at ¶¶ 18–19; Doc. 127 at 3, ¶¶ 18–19. The Roth Defendants claim that they adequately explained the nature of this coverage to Garver at the time. *See* Doc. 121 at ¶¶ 4–9, 15–19.

Garver has identified only one statement, which he attributes to Roth, that could constitute an affirmative representation about coverage type. Doc. 127 at 7, ¶ 9. Specifically, Garver has testified that Roth—at some unknown time(s)—represented that "you're buying this own occupation policy, and this will allow you if you're disabled to collect a paycheck in another occupation without penalty, and you won't have to go flip burgers. Those were the words that they were using a lot, and that was our understanding." Doc. 121-3 at 97:2–9.

Following initial discussions about coverage type and amounts, Roth prepared an insurance application for a policy providing $7,000 per month in coverage, with a residual disability—not an own occupation—rider. Doc. 121 at ¶ 9; Doc. 121-5. Garver personally signed that application, which Roth submitted to Principal Life. Doc. 121 at ¶ 9; Doc. 121-5 at 10–11.

Principal Life determined in its underwriting process that Garver did not qualify for $7,000 per month in coverage. Doc. 121 at ¶ 11; *see*

Doc. 127 at 2–3, ¶ 11.[3] Instead, Principal Life was willing to write a policy for a maximum monthly benefit of $4,500. Doc. 121 at ¶ 11; *see* Doc. 127 at 2–3, ¶ 11. Nothing in the record suggests that the Roth Defendants participated in Principal Life's underwriting decision. *See* Doc. 121 at ¶ 11; *see* Doc. 127 at 2–3, ¶ 11. Garver does not allege any specific conversations with, or other statements from, the Roth Defendants wherein they continued to represent a $7,000-per-month coverage amount *after* Principal Life refused to underwrite. *See* Doc. 127 at 2–8.

After Principal Life refused to cover Garver for $7,000 per month, Roth presented to Garver an amended application in the amount that Principal Life would underwrite ($4,500), along with a document that summarized the coverage for which Garver was applying (including the definition of the residual disability rider).[4] Doc. 121 at ¶¶ 11–13, 15–17; Doc. 127 at 2–3, ¶¶ 11–13, 15–17. These documents clearly stated the amount of monthly coverage offered and that Garver would

---

[3] Garver attempts to controvert the fact that Principal Life refused to insure him for $7,000 per month by pointing to his expert witness's opinion that he was "qualified for $7,000 per month in benefits." Doc. 127 at p. 2, ¶ 11. But the fact that one insurance expert would have reached a different underwriting conclusion than the one that Principal Life actually reached does not create a genuine dispute of this fact. Principal Life, in a process independent from Roth, refused to cover Garver in that amount. Garver has identified no facts suggesting otherwise.

[4] Garver attempts to controvert this fact by claiming that he "was told to sign the application without reading it." Doc. 127 at 2–3, ¶¶ 11 & 15. In support of that assertion, Garver cites his deposition, wherein his testimony was *not* that Roth instructed him to sign without reading but rather that he chose not to read the documents before signing because he does not "read the fine print on every contract," he trusted Roth, and Roth did not affirmatively "ask [him] to read all that" but only expressly "asked [him] to sign it." Doc. 121-3 at 140:13–142:24; *see also* Doc. 121-3 at 144:3–13 ("Q: [I]t's your testimony that the advice that was provided to you was to not read the form that you're signing? [Objection omitted] A: The advice, there was no advice. It was just a request to sign the form."). Thus, there is no *genuine* dispute that Garver received written copies of his amended application and a "Premium Summary" that Roth prepared and that accurately reflected a $4,500 benefit amount. *See also* Doc. 121 at ¶¶ 12; Doc. 127 at 3, ¶¶ 12 (showing Garver does not controvert the fact that, separate from his amended application, he executed an "Amendment and Acceptance Form"). Nor is there any evidence suggesting that Roth prevented or actively discouraged Garver from reading these documents. *See* Doc. 127 at 2–8.

be entitled to total disability benefits only if he was not working. Doc. 121 at ¶¶ 11, 16–17; Doc. 127 at 2–3, ¶¶ 11, 16–17. Even though Principal Life required only an agent's signature, *see* Doc. 121-7 at 8, Garver personally signed his amended application. Doc. 121 at ¶¶ 12–13; Doc. 127 at 3, ¶¶ 12–13. He also signed the coverage summary, which expressly stated that the residual disability rider for which he was applying would "provide[] a portion of the Maximum Monthly Benefit" in the event that Garver returned to work "in another occupation." Doc. 121 at ¶¶ 16–17; Doc. 127 at 3, ¶¶ 16–17. Finally, Garver signed an acknowledgment stating that he received a copy of the policy.[5] Doc. 121 at ¶ 14; Doc. 127 at 3, ¶ 14. Garver proceeded to purchase insurance from Principal Life as described in the amended application and Roth's summary document. *See* Doc. 121 at ¶ 18; Doc. 127 at 3, ¶ 18.

**2.** Garver became seriously injured in 2017, when he fell from a roof while working. Doc. 121 at ¶ 22; Doc. 127 at 4, ¶ 22 (controverted in irrelevant part). He applied for his disability benefits, which Principal Life began paying in fall 2017. Doc. 121 at ¶¶ 22–23; Doc. 127 at 4, ¶¶ 22–23. At that time, Principal Life sent Garver a letter stating, "If you are able to return to work with restrictions from your doctor, we'll calculate your monthly earnings and pay your benefits based upon your Loss of Earnings. Please notify me as soon as possible if you return to work." Doc. 121-11; Doc. 121 at ¶ 25. As Garver points out, it is not entirely clear whether this letter addresses his residual disability benefits or only a potential return to work in his own field. Doc. 127 at 4, ¶ 25.

In January 2018, Garver purchased his father-in-law's company, Wellborn Sales, and began working as Wellborn's president. Doc. 121 at ¶ 26; Doc. 127 at 4, ¶ 26. From January onward, he worked for Wellborn—commuting several days a week to perform work in person. But he declined to draw a paycheck and began asking Roth if doing so would adversely affect his disability benefits. Doc. 121 at ¶ 27; Doc. 127 at 4, ¶ 27.

In March 2018, after several unenlightening back-and-forths, Roth emailed Garver. He stated: "Bob, We are going to want you to begin compensation fr[o]m your new company. Under the definition[]of your Principal Financial contract the Own Occupation provision will

---

[5] The undisputed facts establish that Garver signed this acknowledgment form, but there is a genuine—yet immaterial—dispute of fact as to whether Garver actually received a copy of the policy.

help support your income from your role in the new Business. The contract will pay your income under conditions you have experienced. We will coordinate a call as follow up." Doc. 127 at 8–9, ¶¶ 20, 22–23; Doc. 141 at ¶¶ 20, 22–23. Garver alleges that he interpreted this message as confirmation that he could draw a paycheck and still continue receiving 100 percent of his monthly disability benefit.[6] Doc. 127 at 9–10, ¶ 24; *see also* Doc. 141 at ¶ 24.

At some point in the following months, Garver disclosed to Principal Life that he had returned to work. Doc. 121 at ¶ 29; Doc. 127 at 5, ¶ 29. Principal Life informed Garver that his residual disability rider would now apply, instead of his total disability benefit, and asked for paystubs from Wellborn so that Principal Life could calculate the new benefit amount. Doc. 121 at ¶ 29; Doc. 127 at 5, ¶ 29. Garver declined to respond, and Principal Life again requested this information. Doc. 121 at ¶ 30; Doc. 127 at 5, ¶ 30. In response, Garver told Principal Life that he was "not agreeable to providing pay stubs or any other financial information at this time." Doc. 121 at ¶ 31; Doc. 127 at 5, ¶ 31.

Principal Life then wrote to Garver, advising that it was terminating his benefits as a consequence of his failure to provide "the Proof of Loss that is needed for us to evaluate your claim to determine your eligibility to benefits per the terms of your policy." Doc. 121 at ¶ 32; Doc. 127 at 5, ¶ 32. The letter explained that "[s]ince you refuse to provide your Earning documentation we are unable to determine if you have had a Loss of Earnings to qualify for Residual Disability benefits." Doc. 121 at ¶ 32; Doc. 127 at 5, ¶ 32

**3.** Garver's complaints against the Roth Defendants involve the procurement of his insurance policy and the advice he later sought as an insured. On the procurement side, he contends that "Roth delivered a policy with smaller benefits and narrower coverage" than Garver requested. Doc. 109 at 15. Specifically, Garver contends that the Roth Defendants led him to believe that his monthly coverage amount would be $7,000 and that he would have "own occupation" coverage (*i.e.*, coverage that would continue to pay 100 percent of its benefit amount if Garver returned to work in a different field following any

---

[6] The parties assume that Garver's return to work at Wellborn, without pay, was insufficient to trigger his residual disability rider. *See also* Doc. 121-8 at 11 (showing that the policy defined "working" as labor or services for which an insured draws "earnings"). Instead, they treat Garver's decision to draw a paycheck as the triggering event for the rider.

disability). *See* Doc. 109 at ¶ 3(a); Doc. 127 at 1, 14–17. On the advice side, Garver alleges that after his physical injury Roth misrepresented the conditions for coverage, such that Garver unwittingly disqualified himself from full benefits. Doc. 109 at 16. All of this conduct, Garver alleges, constitutes the common law torts of intentional misrepresentation and negligence. Doc. 109 at ¶ 4.a.

The Roth Defendants have moved for summary judgment on both categories of claim. *See* Docs. 120–21. While their motion was pending, counsel for the Roth Defendants filed a motion to withdraw. Doc. 157.

## II

The Roth Defendants' motion for summary judgment is granted in part and denied in part. Garver claims that three alleged bad acts each give rise to both misrepresentation and negligence claims: the Roth Defendants' failure to procure Garver an insurance policy with a higher coverage amount, their failure to procure a policy with a more comprehensive coverage type, and their failure to properly advise Garver that returning to work would shift his eligibility from total disability to residual disability benefits. The Roth Defendants are granted judgment on Garver's negligence and misrepresentation claims arising from the alleged failure to procure a higher coverage amount. They are also granted judgment on Garver's misrepresentation claim arising from the alleged failure to procure a different coverage type. But their motion for summary judgment is denied as to Garver's negligence claim for the alleged failure to procure a more comprehensive coverage type and as to Garver's negligence and misrepresentation claims arising from their post-disability advice.

## A

The Roth Defendants argue that they "are entitled to summary judgment on Mr. Garver's misrepresentation claim because he cannot

establish the elements of that claim." Doc. 121 at 13.[7] Under Kansas law,[8] a plaintiff asserting fraudulent misrepresentation must establish that the defendant made an untrue statement of fact while knowing it to be untrue and with intent to deceive or with reckless disregard as to the truth, the plaintiff justifiably relied on the statement, and as a result of this justifiable reliance, the plaintiff suffered damage. *Gerhardt v. Harris*, 934 P.2d 976, 981 (Kan. 1997); *see also Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 787 (Kan. 2010).[9]

    **1.** Garver contends that the Roth Defendants misrepresented the amount and the type of coverage they procured for him. Because Garver cannot show justifiable reliance on any of the allegedly misleading statements about coverage type or amount, the Roth Defendants are entitled to summary judgment on these claims.

    **a.** Garver's claim that Roth misrepresented the amount of his monthly benefit fails for at least two reasons. First, when Roth made his representations about a $7,000 benefit, those statements were not untrue. Roth did, in fact, assist Garver with completing and submitting to Principal Life an application for $7,000 per month in coverage. After review, Principal Life declined to underwrite coverage for Garver in that amount. Garver has identified no facts to suggest that Roth made

---

[7] While the Roth Defendants complain that Garver's claims are "sparse and vague," Doc. 121 at 13, the same can be said of their summary judgment submissions. The argument and authorities section of their opening brief is fewer than three pages long and cites little legal authority in support of its position. The Tenth Circuit observed that district courts should not be "forced to prod" parties to present cogent arguments. *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("To do so would not only consume an inordinate amount of time, but would result in courts abandoning their neutrality and becoming advocates in the adversarial process."). Nonetheless, a significant effort has been made to fairly interpret the arguments and evaluate which claims should be tried. The following analysis, therefore, represents these best efforts.

[8] The parties agree that Kansas law gives rise to Garver's claims. Doc. 109 at ¶ 1(d).

[9] Although not entirely clear from the parties' pretrial contentions, *see* Doc. 109, the summary judgment papers confirm that the parties understand Garver's "misrepresentation" claims to allege intentional (and not negligent) misrepresentation. Doc. 121 at 13; Doc. 127 at 13–14; *see Wilkinson v. Shoney's Inc.*, 4 P.3d 1149, 1165 (Kan. 2000) (explaining difference between intentional and negligent misrepresentation under Kansas law).

the same representation—of $7,000 in monthly coverage—after Principal Life refused to issue coverage in that amount. In fact, the undisputed facts show that after this refusal, Roth gave Garver several documents explaining the lesser coverage amount that Principal Life *was* willing to extend. While neither party provides clear facts about their verbal communications after Principal Life refused to insure, Garver signed at least three documents reflecting the new benefit amount, and there is nothing to suggest that these documents contained any inaccuracies compared with the coverage ultimately purchased.

Second, even if Roth had implied that $7,000 in coverage was possible, or otherwise made inconsistent representations, after Principal Life denied Garver's first application, any reliance on those statements was not justifiable. Roth provided Garver with multiple written statements clearly showing that his monthly benefit amount would be $4,500. When a plaintiff "knows or has reason to know of facts which make his reliance unreasonable," he cannot be "justified in relying upon [a misrepresentation's] truth without investigation." *Sippy v. Cristich*, 609 P.2d 204, 208 (Kan. Ct. App. 1980) (quoting *Goff v. Am. Sav. Ass'n of Kan.*, 561 P.2d 897, 903 (Kan. Ct. App. 1977)).

Garver argues against that conclusion, reasoning that Roth was an "expert" in insurance while Garver had "limited knowledge of insurance." Doc. 127 at 18–19. But in asking whether a plaintiff has "reason to know of facts" that make reliance unjustifiable, Kansas law asks only whether there is enough information to "serve as a danger signal . . . to any normal person of [plaintiff's] intelligence and experience." *Sippy*, 609 P.2d at 208 (quoting *Goff*, 561 P.2d at 903); *cf. Alires v. McGehee*, 85 P.3d 1191, 1200 (Kan. 2004) (holding purchaser's reliance on false statements in seller disclosure form was unjustified where purchaser declined to have property inspected, per her contract rights). The multitude of documents in Garver's possession indicating the amount was $4,500—not $7,000—was more than a sufficient danger signal that his belief was unjustifiable.

Further, while case law on contract rescission is not directly on point, it demonstrates that a party in possession of a written contract can rarely be justified in relying on prior verbal representations. *See, e.g.*, *Albers v. Nelson*, 809 P.2d 1194, 1197–99 (Kan. 1991). As a general matter, "[a] party to a contract has a duty to learn the contents of a written contract before signing it." *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 129 (Kan. 2003); *see Miner v. Farm Bureau Mut. Ins. Co.*, 841 P.2d 1093, 1102–03 (Kan. Ct. App. 1992) (recognizing this duty even where

a party cannot himself read); *see also Jones v. Reliable Sec. Inc.*, 28 P.3d 1051, 1062 (Kan. Ct. App. 2001) (observing, in contract-reformation context, that a "vigilant insured paying significant premiums should be expected to obtain and read a copy of the policy"). This is true even where "contracting parties have carried out negotiations" with which their later written agreement sits at odds. *Cf. Albers*, 809 P.2d at 1197.

Kansas law offers a limited exception to this rule for parties who were induced to enter a contract through fraud, undue influence, or mutual mistake. *See Albers*, 809 P.2d at 1197. But as to fraud, Kansas courts have applied this exception only in circumstances where the contract's *execution* was procured by the fraud, such as where one party affirmatively misrepresents the nature of the document or actively conceals its terms. *See id.*; *see also Myers v. Fleetwood Farms*, 271 P.2d 257, 262–63 (Kan. 1954); *J.B. Colt Co. v. Kocher*, 255 P. 48, 49–50 (Kan. 1927); *W. Tractor Equip. Co. v. Ayers*, 225 P. 115, 116 (Kan. 1924). While Garver is, of course, pursuing a fraudulent misrepresentation claim, he has not actually produced any facts showing that the Roth Defendants affirmatively misrepresented or concealed the $4,500 monthly benefit reflected in the documents that Garver received and signed. The Roth Defendants are granted judgment on Garver's claim for misrepresentation of his monthly benefit amount.

**b.** So too with Garver's claim that Roth represented that his policy would provide a more comprehensive type of "own occupation" coverage than it actually did—any reliance was unjustifiable. Unlike with coverage amounts, there might be a viable fact question as to whether, in the course of Garver's insurance shopping, Roth made any inaccurate statements about the type of coverage he would pursue. But that dispute is immaterial where Garver received multiple written statements describing, in detail, the type of rider for which he was actually applying and where Garver has not alleged that Roth specifically misrepresented or concealed the contents of those writings.

At most, Garver alleges that these documents were inherently inconsistent with conversations wherein he and Roth generally discussed the type of coverage Garver wanted. *See supra* n.2; Doc. 121 at ¶ 4; Doc. 127 at 2, ¶ 4 & 7, ¶ 8. Under Kansas law, that allegation is insufficient.

In *Albers*, the parties entered a real-estate transaction via written contract, with defendants claiming the transaction was meant to be a loan and reverse mortgage, while plaintiffs—and the contract—asserted that the transaction was an absolute sale with a purchase option.

10

809 P.2d at 1195–96. The defendants argued that plaintiffs "fraudu-lently misrepresented facts and information which induced them to enter the contract ... [and] conveyed the impression they would assist in a loan" rather than a sale. *Id.* at 1197. The defendants further alleged that they failed to read the contract before signing because they be-lieved it reflected the parties' prior understanding and because, due to time constraints beyond any party's control, "they were required to sign the documents under strained circumstances and had no oppor-tunity to consult their own attorney." *Id.* After summarizing the law, the Kansas Supreme Court held that while "[f]raudulent misrepresen-tation as to the legal effect of an instrument will void a contract ... the fact that a party signs a contract and does not know its contents is not alone sufficient." *Id.* at 1198. Thus, despite the defendants' "mistaken belief" about the nature of the contract and their assertion that the parties had previously discussed a loan rather than a sale, there was no specific allegation of "an untrue statement" about the written con-tract's terms that would prevent summary judgment. *Id.*

The same reasoning warrants summary judgment on Garver's cov-erage-type misrepresentation claim. *Cf. Slaymaker v. Westgate State Bank*, 739 P.2d 444, 452–53 (Kan. 1987) (affirming summary judgment on misrepresentation claim where undisputed facts showed no justifiable reliance); *Northland Nat'l Bank v. USD No. 453, Leavenworth Cnty.*, Nos. 73,439 & 73,440, 1996 WL 35069605, at *2 (Kan. Ct. App. Feb. 2, 1996) (distinguishing between actual reliance, which may be a fact question for the jury, and whether "reliance was *justifiable*, which is a question of law" (emphasis added)). Even if Roth and Garver's prior discussions were inconsistent with the written documents Roth pro-vided, Garver's reliance on those conversations was not, as a matter of law, justifiable where they conflicted with the documents and where Roth did not actively conceal or misrepresent the terms of those doc-uments. *See Albers*, 809 P.2d at 1197–99; *see also Young v. Hecht*, 597 P.2d 682, 688 (Kan. Ct. App. 1979) ("[I]f the recipient of a fraudulent rep-resentation has information which would serve as a danger signal to a person of ordinary intelligence and experience, he is not justified in relying upon that representation."). Consequently, the Roth Defend-ants are granted judgment on both of Garver's insurance-procurement misrepresentation claims.

**2.** Garver's evidence does create a question of fact as to one mis-representation claim. He contends that, in March 2018, an email from Roth misrepresented the effects of Garver choosing to draw a

paycheck from his new job. The language in this email can be easily read (as the Roth Defendants argue) to correctly state that Garver would continue receiving benefits—albeit reduced—after returning to work. But that is not the only way that the email can be read. It is possible for a reasonable jury to agree with Garver that the email contained a representation that his benefits would continue—in full—after he resumed work. Thus, whether the email contained any untrue statement is a fact question for the jury.

Moreover, Garver has identified sufficient evidence to permit a reasonable jury to find that he relied on this email. Roth was a broker for Principal Life, and he represented that he had been in contact with Principal Life on Garver's question. While Garver had within his possession a letter from Principal Life that arguably contradicted Roth's email, it too is subject to more than one reasonable interpretation. Thus, as to this claim, there is a question of fact about Garver's justifiable reliance.

Even so, the Roth Defendants argue that the claim fails for lack of causation. Doc. 121 at 14. They are correct that uncontroverted evidence shows that Garver refused to provide information that his policy required (*i.e.*, his new salary, which Principal Life needed to calculate his residual disability benefit). Doc. 121 at 15; Doc. 141 at 21; Doc. 109 at ¶ 2.a.8–11. This evidence also establishes that it was Garver's refusal to cooperate, and not the Roth Defendants' conduct, that caused the loss of Garver's residual disability payments. *See Tetuan v. A.H. Robins Co.*, 738 P.2d 1210, 1230 (Kan. 1987) ("To satisfy the requirements of misrepresentation, it must appear that the defendant's tortious conduct has in fact caused the plaintiff damage.") (internal quotation marks and citations omitted); Doc. 121 at 15; Doc. 141 at 21; Doc. 109 at ¶ 2.a.8–11; *see also* Doc. 109 at ¶ 5.

But Garver's refusal to cooperate only caused the loss of his *residual* disability benefit—that reduced amount that Principal Life was obligated to pay even after Garver returned to work. *See supra* Part I.B.1. (defining residual benefits under Garver's policy). His refusal to cooperate did not cause the change in his eligibility, from pre-employment total disability benefits ($4,500) to his residual disability benefit, once he began working again. That change, Garver argues, was the result of the Roth Defendants advising him to return to work. Thus, Garver's misrepresentation claim arising from Roth's March 2018 email may proceed to trial, but his damages must be limited to the delta—if

any[10]—between (i) what Principal Life would have been obligated to pay in residual disability benefits had Garver cooperated and (ii) Garver's pre-employment, $4,500-per-month total disability benefit.

## B

The Roth Defendants also seek summary judgment on Garver's "negligence claim because he cannot establish the elements of negligence against them." Doc. 121 at 14. To succeed in a negligence claim, Kansas law requires a plaintiff to establish that the defendant owed a duty to the plaintiff, the defendant breached that duty, the plaintiff suffered damages, and the breach proximately caused those damages. *Patterson v. Cowley Cnty.*, 413 P.3d 432, 437 (Kan. 2018).

The Roth Defendants assume that a duty exists and do not challenge its scope at the summary judgment stage. Instead, they argue that Garver cannot satisfy the other elements of negligence for his procurement or post-injury claims. Doc. 121 at 14–15. Ordinarily, issues of breach, causation, and damage are all questions of fact, rarely amenable to summary judgment. *See Thomas v. Cnty. Comm'rs*, 262 P.3d 336, 346 (Kan. 2011). But when the undisputed facts show that a reasonable jury could come to only one conclusion, summary judgment is appropriate even on these issues. *See Jarboe v. Bd. of Cnty. Comm'rs*, 938 P.2d 1293, 1299 (Kan. 1997); *Long v. Turk*, 962 P.2d 1093, Syl. ¶ 4 (Kan. 1998).

**1.** Garver's negligent procurement claims focus on two different aspects of his insurance purchase: the coverage amount and the coverage type. Because a reasonable jury could not find causation as to the former, summary judgment is proper. But, as to the latter—the type of coverage actually procured—there appears to be genuine disputes of material fact for a jury to resolve.

---

[10] It is not clear that Garver can prove *any* damages on his post-disability advice claims. The record suggests that Garver's residual disability benefit plus any amount of income from Wellborn—where he had already been working without compensation—might exceed the $4,500 per month that he would have continued receiving from total disability benefits alone. *See, e.g.*, *Hutchinson Travel Agency, Inc. v. McGregor*, 701 P.2d 977, 980 (Kan. Ct. App. 1985) ("Reliance in a fraudulent misrepresentation case must be reasonable, justifiable and *detrimental*.") (emphasis added). But because the parties have not briefed this issue, it is not taken up at this juncture.

The Roth Defendants are entitled to summary judgment insofar as Garver is claiming that they negligently failed to procure insurance with $7,000 per month in coverage. Roth assisted Garver with completing an application seeking $7,000 in monthly benefits. The undisputed facts show that Roth in fact submitted the application for that amount, as instructed. Principal Life refused to issue a policy in the amount requested. Moreover, following Principal Life's refusal, Roth presented Garver with an amended application and accurate written disclosures of the $4,500 in monthly coverage that Principal Life *would* extend. Garver elected to proceed. Thus, Roth's conduct was not the cause of Garver purchasing a policy that provided less than $7,000 per month in coverage. *See Wilcheck v. Doonan Truck & Equip.*, 552 P.2d 938, 942–43 (Kan. 1976) (defining proximate cause as "that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act"); *cf. Schneider v. Liberty Asset Mgmt.*, 251 P.3d 666, 671 (Kan. Ct. App. 2011) (holding, in KCPA context, that any misrepresentations were "not the cause of harm" to plaintiff, in light of "her failure to read her inspector's report [and] her decision to proceed with the purchase even though she had information that the roof was not new"). No reasonable jury could reach the opposite conclusion, and the Roth Defendants are entitled to judgment, as a matter of law, on Garver's negligent procurement claim for the failure to obtain $7,000 in coverage.

But as to Garver's claim that the Roth Defendants negligently failed to procure the appropriate type of coverage, fact questions remain for the jury. The Roth Defendants assert that they supplied Garver with accurate information about how his policy would function in the event of injury, arguing that these details were "not hidden from Mr. Garver." Doc. 141 at 20. Fair enough. But unlike with Garver's misrepresentation claims—which require that his reliance be justifiable, *see supra* Part II.A.—Garver's negligent procurement claims may proceed even where "the insured neither read the policies nor complained to the agent about insufficient coverage." *Weinlood v. Fisher & Assocs.*, 975 P.2d 1226, 1227 (Kan. Ct. App. 1999). Thus, despite the general rule that parties are charged with knowledge of the contents of their contracts, in this context "[a]n applicant for insurance through an independent agent may assume that the agent prepared the application and obtained the coverage ordered by the applicant." *Id.* at 1226, Syl. ¶ 3.

That said, this right to assume only exists so long as the insured is
"without knowledge to the contrary." *Weinlood*, 975 P.2d at 1226, Syl.
¶ 3. Thus, where an insured actually "discover[s] the omission from
the application and the error in the policy, it [is] his duty to call them
to the attention of the company and have the necessary corrections
made. Delay would . . . indicate[] acquiescence." *Id.* at 1228 (quoting
*Pfiester v. Mo. State Life. Ins.*, 116 P. 245, 248–49 (Kan. 1911)). In other
words, an insured has no obligation to "examine the application or the
policy" for errors, but will be charged with any knowledge that he or
she actually obtains. *See id.*

There is a genuine dispute as to whether Garver knew or should
have known that his policy provided "residual disability" rather than
"own occupation" coverage. Roth proactively supplied Garver with
not only the amended application but also a summary sheet more fully
explaining the type of coverages requested. And Garver signed each of
these documents. But the terms are complicated, with Garver's expert
opining that the labeling of "own occupation" riders often causes con-
fusion even within the insurance industry. Doc. 127-24 at 9–10. And a
large part of Roth's function in this transaction was to translate
Garver's stated desires into the correct categories of coverage. Thus, a
reasonable jury may find that Roth breached his duty of care to Garver
and caused Garver to purchase "residual disability" coverage that
would decrease upon new employment rather than full "own occupa-
tion" coverage that would continue unchanged even when Garver re-
turned to work. This theory of negligence must be resolved at trial.[11]

**2.** Garver's post-disability negligent advice claim may also proceed
to trial, in part. The Roth Defendants assume that Kansas law would
recognize a continuing duty to advise an insured under these circum-
stances. Accepting that such a duty exists, the evidence submitted by
the parties is sufficient to create a viable fact question as to whether it

---

[11] Because the Roth Defendants are granted judgment on all of Garver's cov-
erage-amount claims, *see supra* Parts II.A.1.a. & II.B.1.a., there is no legal or
factual basis for Garver to use a $7,000 monthly benefit amount to calculate
his other damages. Thus, as with Garver's remaining misrepresentation claim,
any damages for the alleged failure to procure an appropriate coverage type
must be limited to the difference between the residual disability benefit to
which Garver remained entitled after beginning work at Wellborn and the
full $4,500 that, had he held "own occupation" coverage, he could have con-
tinued receiving each month even after resuming work.

was breached. As discussed above, *supra* Part II.A.2., Roth's March 2018 email was at least arguably ambiguous, and there is sufficient evidence that Garver acted because of that email to put the question to a jury.

The Roth Defendants argue that Garver cannot prove causation because Principal Life stopped paying due to Garver's refusal to cooperate under his policy. *See supra* Part II.A.2 (discussing same argument in misrepresentation context); Doc. 121 at 15; Doc. 141 at 21. Both the undisputed facts in the summary judgment briefing and the parties' stipulations in the pretrial conference support this argument. *See, e.g.*, Doc. 109 at ¶ 2.a.8–11. But, as explained above, Garver's failure to cooperate only caused the loss of his *residual* disability benefit—it did not cause the loss of his total disability status. *See supra* Part II.A.2. Thus, Garver may proceed to trial on his post-procurement negligent advice claim, but the damages that he may recover are limited to the difference between Garver's full $4,500-per-month benefit and the reduced benefits for which he would, with cooperation, have remained eligible after resuming work.

### III

In addition to moving for summary judgment, defense counsel has, once again, filed a motion to withdraw. Doc. 157; *see also* Doc. 112. That motion complies with the requirements of D. Kan. Rule 83.5.5(a). Although counsel has filed a certified mail return receipt showing service only on Defendant The Roth Companies, Inc., counsel has also filed an affidavit stating (i) that no receipt—showing either acceptance or failure to deliver—has been returned for Duane Roth individually and (ii) that a copy of the motion to withdraw was sent to Roth via email at an address known to be correct and by which Roth has communicated with counsel throughout the course of this litigation. Doc. 159-1. This is sufficient under D. Kan. Rule 83.5.5(a)(4)(B).

Thus, the motion to withdraw is granted. Defendants have 30 days to obtain new counsel. They are reminded that the corporate defendant, The Roth Companies, Inc., may not appear in court on its own behalf but must retain counsel. **In the event that new counsel does not file an entry of appearance on behalf of The Roth Companies, Inc., within 30 days, the Court may find The Roth Companies, Inc., to be in default and may grant judgment against it without further proceedings.**

**IV**

For these reasons, the Roth Defendants' motion for summary judgment, Doc. 120, is granted in part and denied in part, and defense counsel's motion to withdraw, Doc. 157, is granted.

It is so ordered.


Date:  January 26, 2022                   s/Toby Crouse
                                         Toby Crouse
                                         United States District Judge